**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CYXTERA TECHNOLOGIES, INC., *et al.*, | Case No. 23-14853 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING DISCLOSURE STATEMENT RELATING TO THE AMENDED
JOINT PLAN OF REORGANIZATION OF CYXTERA TECHNOLOGIES, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE THAT** on August 15, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed (i) the *Disclosure Statement Relating to*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera.  The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

*the Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 407] (the "Disclosure Statement") and (ii) the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation Procedure, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 408].

**PLEASE TAKE FURTHER NOTICE** the Debtors hereby file the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (the "Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that a comparison between the Revised Disclosure Statement and the Disclosure Statement is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Revised Disclosure Statement, and all other documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Kurtzman Carson Consultants LLC at https://www.kccllc.net/cyxtera.  You may also obtain copies of any pleadings filed in these chapter 11 cases by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

Dated: September 13, 2023

/s/  Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      edward.sassower@kirkland.com
            christopher.marcus@kirkland.com
            derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

## **Exhibit A**

**Revised Disclosure Statement**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CYXTERA TECHNOLOGIES, INC., *et al.*, | Case No. 23-14853 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DISCLOSURE STATEMENT RELATING TO THE AMENDED JOINT**
**PLAN OF REORGANIZATION OF CYXTERA TECHNOLOGIES, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera. The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is: 2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN
APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY
THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT
TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND
IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE
STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING
VOTES TO ACCEPT OR REJECT THE AMENDED JOINT PLAN OF REORGANIZATION OF
CYXTERA TECHNOLOGIES, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE
STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER
PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH
HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE
INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS
DESCRIBED IN ARTICLE IX HEREIN.[2]

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS
OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL,
OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO
CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL,
SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE
STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED
THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE
ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT
DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS,
SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS
AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS
BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES
ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH
THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY
DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY
BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND
PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY
REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL
PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT
HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE
SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE
INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY
MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON
FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, attached hereto as
**Exhibit A**.

VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND
FORWARD-LOOKING STATEMENTS**

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the SEC or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws").  Any representation to the contrary is a criminal offense.  The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock under the Plan (other than any New Common Stock underlying the Management Incentive Plan), and to the extent such exemption is not available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws.  Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements."  However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms.  Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates.  These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- Business strategy;

- Technology;

- Financial condition, revenues, cash flows, and expenses;

- The adequacy of the Debtors' capital resources and liquidity;

- Levels of indebtedness, liquidity, and compliance with debt covenants;

- Financial strategy, budget, projections, and operating results;

- The amount, nature, and timing of capital expenditures;

- Availability and terms of capital;

- Successful results from the Debtors' operations;

- The integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- Costs of conducting the Debtors' other operations;

- General economic and business conditions;

- Effectiveness of the Debtors' risk management activities;

- Counterparty credit risk;

- The outcome of pending and future litigation;

- Uncertainty regarding the Debtors' future operating results;

- Plans, objectives, and expectations;

- Risks in connection with acquisitions;

- The potential adoption of new governmental regulations; and

- The Debtors' ability to satisfy future cash obligations.

**Statements concerning these and other matters are not guarantees of the Company's future performance. There are risks, uncertainties, and other important factors that could cause the Post-Effective Date Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors'; (l) the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed**

restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the New Takeback Facility and the New Common Stock, to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with landlords, suppliers, partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement.  Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct.  The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION.................................................................................................... 1

II.     PRELIMINARY STATEMENT .............................................................................. 1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
        AND THE PLAN .................................................................................................... 3

        A.      What is chapter 11?..................................................................................... 3
        B.      Why are the Debtors sending me this Disclosure Statement?........................... 4
        C.      Am I entitled to vote on the Plan?.................................................................. 4
        D.      What is the "toggle" feature of the Plan?....................................................... 4
        E.      What is the Recapitalization Transaction under the Plan?................................ 5
        F.      What is a Sale Transaction under the Plan?.................................................... 5
        G.      When will I be informed if the Debtors "toggle" to a Sale Transaction? ........... 5
        H.      What will I receive from the Debtors if the Plan is consummated?................... 5
        I.      What will I receive from the Debtors if I hold an Allowed Administrative Claim,
                DIP Claim, or a Priority Tax Claim? ............................................................. 8
        J.      Are any regulatory approvals required to consummate the Plan?.................... 10
        K.      What happens to my recovery if the Plan is not confirmed or does not go
                effective?................................................................................................. 10
        L.      If the Plan provides that I get a distribution, do I get it upon Confirmation or
                when the Plan goes effective, and what is meant by "Confirmation," "Effective
                Date," and "Consummation?"..................................................................... 11
        M.      What are the sources of Cash and other consideration required to fund the Plan?........... 11
        N.      Are there risks to owning the New Common Stock upon the Debtors' emergence
                from chapter 11? ..................................................................................... 11
        O.      Is there potential litigation related to the Plan?............................................ 11
        P.      What is the Management Incentive Plan and how will it affect the distribution
                I receive under the Plan?........................................................................... 11
        Q.      Does the Plan preserve Causes of Action?................................................... 12
        R.      Will there be releases, exculpation, and injunction granted to parties in interest as
                part of the Plan?...................................................................................... 12
        S.      When is the deadline to vote on the Plan? .................................................. 17
        T.      How do I vote on the Plan?........................................................................ 17
        U.      Why is the Bankruptcy Court holding a Confirmation Hearing? .................... 17
        V.      What is the purpose of the Confirmation Hearing? ...................................... 17
        W.      What is the effect of the Plan on the Debtors' ongoing businesses? .............. 17
        X.      Will any party have significant influence over the corporate governance and
                operations of the Post-Effective Date Debtors?............................................ 18
        Y.      Who do I contact if I have additional questions with respect to this Disclosure
                Statement or the Plan? ............................................................................. 18
        Z.      Do the Debtors recommend voting in favor of the Plan? .............................. 19
        AA.     Who Supports the Plan?............................................................................ 19

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
        OVERVIEW.......................................................................................................... 19

        A.      Cyxtera's Business Operations and Services ............................................... 19
        B.      Corporate History ................................................................................... 21

    C.      The Debtors' Prepetition Corporate and Capital Structure ................................................ 22

**V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................................ 25**

    A.      The Precipitous Rise in Interest Expense Undermines Liquidity ..................... 25
    B.      Pursuit of All Reasonable Alternatives .................................................................. 26

**VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE
        CHAPTER 11 CASES ................................................................................................ 28**

    A.      First Day Relief and Other Case Matters ............................................................. 28
    B.      Appointment of Unsecured Creditors' Committee ............................................ 29
    C.      Lease Rejections and Optimization ...................................................................... 30
    D.      Sale Process and Bidding Procedures ................................................................... 31
    E.      Approval of the DIP Facility................................................................................. 31
    F.      Bar Date Motion .................................................................................................... 32
    G.      The Special Committee's Independent Investigation ........................................ 32
    H.      The Canadian CCAA Recognition Proceedings ................................................ 33
    I.      Proposed Confirmation Schedule ........................................................................ 34

**VII.   SUMMARY OF THE PLAN ................................................................................... 34**

    A.      General Settlement of Claims and Interests........................................................ 34
    B.      Restructuring Transactions .................................................................................... 35
    C.      The Equity Investment Transaction or Recapitalization Transaction .............. 36
    D.      The Asset Sale ....................................................................................................... 39
    E.      Preservation of Causes of Action ........................................................................ 42
    F.      Vesting of Assets in the Post-Effective Date Debtors ...................................... 43
    G.      Cancellation of Existing Agreements and Interests ........................................... 44
    H.      Corporate Action................................................................................................... 44
    I.      Directors and Officers of the Post-Effective Date Debtors............................... 44
    J.      Effectuating Documents; Further Transactions ................................................. 45
    K.      Section 1146 Exemption ....................................................................................... 45
    L.      Private Company .................................................................................................... 45
    M.    Closing the Chapter 11 Cases .............................................................................. 46
    N.      Director and Officer Liability Insurance............................................................. 46

**VIII.  OTHER KEY ASPECTS OF THE PLAN .......................................................... 46**

    A.      Treatment of Executory Contracts and Unexpired Leases................................ 46
    B.      Conditions Precedent to Confirmation and Consummation of the Plan .......... 49

**IX.    RISK FACTORS......................................................................................................... 51**

    A.      Bankruptcy Law Considerations.......................................................................... 51
    B.      Risks Related to Recoveries Under the Plan....................................................... 55
    C.      Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses ............. 57
    D.      Risks Related to the Offer and Issuance of Securities Under the Plan ............................ 66

**X.      SOLICITATION AND VOTING PROCEDURES .................................................... 68**

    A.      Holders of Claims Entitled to Vote on the Plan................................................. 68
    B.      Voting on the Plan ................................................................................................. 68
    C.      Ballots Not Counted.............................................................................................. 68

D.      Votes Required for Acceptance by a Class ........................................................ 68
E.      Certain Factors to Be Considered Prior to Voting ......................................... 69
F.      Solicitation Procedures .................................................................................. 69

**XI.      CONFIRMATION OF THE PLAN** ...................................................................... **70**

A.      The Confirmation Hearing ............................................................................. 70
B.      Requirements for Confirmation of the Plan .................................................. 70
C.      Feasibility ...................................................................................................... 71
D.      Acceptance by Impaired Classes ................................................................... 71
E.      Confirmation Without Acceptance by All Impaired Classes .......................... 72
F.      Valuation ........................................................................................................ 72
G.      Liquidation Analysis ..................................................................................... 73

**XII.      CERTAIN SECURITIES LAW MATTERS** ...................................................... **73**

A.      New Common Stock ....................................................................................... 73
B.      Exemption from Registration Requirements; Issuance of New Common Stock
       under the Plan ................................................................................................ 74
C.      Resales of New Common Stock; Definition of "Underwriter" Under Section
       1145(b) of the Bankruptcy Code ................................................................... 74

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
       THE PLAN** ........................................................................................................ **77**

A.      Introduction ................................................................................................... 77
B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and
       the Post-Effective Date Debtors .................................................................... 79
C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders ... 82
D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders ......... 86
E.      Information Reporting and Back-Up Withholding ......................................... 90

**XIV.    CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE
       PLAN** ................................................................................................................. **90**

A.      Introduction ................................................................................................... 90
B.      Residents of Canada ...................................................................................... 91
C.      Non-Residents of Canada .............................................................................. 92
D.      Consequences to the Canadian Debtors ........................................................ 93

**XV.      RECOMMENDATION OF THE DEBTORS** ...................................................... **93**

# EXHIBITS[1]

| | |
|---|---|
| EXHIBIT A | Plan of Reorganization |
| EXHIBIT B | RSA |
| EXHIBIT C | Organizational Structure Chart |
| EXHIBIT D | Liquidation Analysis |
| EXHIBIT E | Financial Projections |

---

[1] Each Exhibit is incorporated herein by reference.

I.    **INTRODUCTION**

Cyxtera Technologies, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Cyxtera" or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTORS AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RSA BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

II.    **PRELIMINARY STATEMENT**

Cyxtera filed these Chapter 11 Cases to implement a comprehensive financial and operational restructuring.  Founded in 2017 through a carve-out acquisition from Lumen Technologies, Inc. (f/k/a CenturyLink, Inc.), Cyxtera is a global leader in data center colocation and interconnection services. Cyxtera provides an innovative suite of connected and intelligently-automated infrastructure and interconnection solutions to more than 2,300 leading enterprises, service providers, and government agencies around the world.  From its founding in 2017, Cyxtera's core business performance has remained strong, generating revenue growth from $695 million in 2017 to $746 million in 2022.

Despite its strong core business performance, the Company has recently faced significant headwinds owing primarily to inflation and macroeconomic volatility, which have driven up interest rates and energy prices.  As inflation swelled in 2021 and 2022, the Federal Reserve reacted by raising interest rates at the fastest pace in decades.  This contributed to the ballooning of Cyxtera's annualized interest expense on funded debt from $35.9 million in Q1 2022 to $75.7 million in Q1 2023.

These challenges, along with the impending maturity of the Company's revolving and term loans, placed increasing pressure on Cyxtera's capital-intensive business, straining the Company's liquidity profile and its ability to invest in the business.  Accordingly, starting in late 2021, the Company began to explore all strategic alternatives, including an investment in or sale of some or all of its business, and, thereafter, a further equity investment from its existing sponsor.

As part of these efforts, the Company—with the assistance of Kirkland & Ellis, LLP ("Kirkland") as legal counsel, Guggenheim Securities, LLC ("Guggenheim Securities") as investment banker, and, later, AlixPartners, LLP ("AlixPartners," and together with Kirkland and Guggenheim Securities, the "Advisors") as financial advisor—engaged with an ad hoc group of First Lien Lenders (the "Ad Hoc Group"), represented by Gibson, Dunn & Crutcher LLP as legal counsel and Houlihan Lokey, Inc. as financial advisor, to chart a value-maximizing path forward.  In parallel, on March 27, 2023, the Company, with the assistance of Guggenheim Securities, launched a marketing process (the "Marketing Process") to engage potential interested parties concerning a significant investment in or purchase of some or all of the Company's assets and/or equity (the "Sale Transaction").

These discussions with the Ad Hoc Group proved successful, culminating in the entry into a restructuring support agreement (the "RSA") on May 4, 2023, which enjoys the broad support of Holders

whose claims represent approximately 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement, as well as the Consenting Sponsors.  Concurrently with the entry into the RSA, members of the Ad Hoc Group provided Cyxtera with a new money, $50 million term loan Bridge Facility, of which $36 million was drawn prior to the Petition Date, to bridge the Company's financing needs, continue the prepetition Marketing Process, provide time to prepare for a potential chapter 11 filing, and otherwise avoid a value destructive, free fall bankruptcy filing.

One month after the RSA became effective, on June 4, 2023, Cyxtera initiated a prearranged court-supervised process under chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the District of New Jersey ("the Bankruptcy Court").  The bankruptcy filing represented a continuation of the agreement embodied in the RSA, and the Debtors entered these Chapter 11 Cases on sound footing with a commitment of approximately $200.5 million in debtor-in-possession financing from certain members of the Ad Hoc Group.  At the "First Day" Hearing on June 6, 2023, the Bankruptcy Court granted interim approval to access approximately $90.5 million of the $200.5 million, $40 million of which constituted new money, approximately $36.5 million of which consisted of a "roll up" of prepetition obligations on account of the Bridge Facility (as defined herein), and $14 million of which consisted of escrowed proceeds funded pursuant to the Bridge Facility (as defined herein).  On July 19, 2023, the Bankruptcy Court granted final approval of the DIP Facility.  The details of the DIP Facility are discussed in greater detail herein.

To facilitate the Marketing Process postpetition, the Debtors filed a motion to establish procedures to govern an efficient, public, and flexible auction process to realize the full value of existing assets and/or equity, which the Bankruptcy Court approved on June 29, 2023 [Docket No. 180] (the "Bidding Procedures Order" and the bidding procedures approved thereby, the "Bidding Procedures").  In accordance with the process outlined in the Bidding Procedures, the Debtors received at least one acceptable non-binding written proposal prior to the July 10, 2023, Acceptable Bidder (as defined in the Bidding Procedures) deadline.  Accordingly, the Debtors extended the sale timeline whereby all binding bids must be actually received by no later than July 31, 2023, at 5:00 p.m. (prevailing Eastern Time).  As the Marketing Process progressed, the Debtors, in consultation with the Ad Hoc Group and the official committee of unsecured creditors (the "Committee"), determined the significant and increasing interest in the Sale Package (as defined below) warranted an extension of the sale schedule.  To that end, the Debtors filed the *Notices of Amended Sale Schedule* [Docket Nos. 353 and 450] extending certain deadlines and providing the Debtors with additional time to complete their comprehensive Marketing Process, to receive and evaluate bids, and, if necessary, to hold an Auction to determine the highest and best bid for some or substantially all of the New Common Stock of Reorganized Cyxtera and/or some or substantially all of the Debtors' assets (the "Sale Package").

The Debtors have received multiple bids for the Sale Package, but none of these bids were Qualified Bids (as defined in the Bidding Procedures).  The Debtors do not believe at this time that any of the bids received to date are more value-maximizing than the Recapitalization Transaction proposed under the Plan. Accordingly, on August 29, 2023, the Debtors filed a *Notice of Cancellation of Auction* [Docket No. 472] notifying parties-in-interest that the Debtors, in accordance with the Bidding Procedures Order and in consultation with the Ad Hoc Group and the Committee, had cancelled the Auction scheduled to occur on August 30, 2023.  However, negotiations with certain bidders remain ongoing as of the filing of this Disclosure Statement, and, as discussed further below, the Plan provides flexibility for the Debtors to "toggle" to a Sale Transaction should one develop that is more value-maximizing than the Recapitalization Transaction.

The Plan provides that the Debtors will pursue the Recapitalization Transaction unless a more value-maximizing Sale Transaction materializes with a third party prior to the Confirmation Hearing.  The Debtors' goal from the outset of these Chapter 11 Cases has been to maximize value for all stakeholders on

the most expeditious timeline possible.  Accordingly, while the Plan contemplates the Recapitalization Transaction as the baseline transaction by which holders of claims should evaluate the Plan, the Debtors continue to engage with multiple bidders, and therefore, the Debtors may "toggle" to a Sale Transaction if a higher or otherwise better Sale Transaction materializes prior to the Confirmation Hearing.  If the Debtors "toggle" to a Sale Transaction pursuant to the Plan, the Debtors will file and serve a notice of such Sale Transaction in advance of the Confirmation Hearing.

Under the Recapitalization Transaction:  (i) Holders of First Lien Claims shall receive their *pro rata* share of 100 percent of the New Common Stock, subject to dilution by the Management Incentive Plan, (ii) Holders of General Unsecured Claims shall receive their *pro rata* share of the GUC Recovery Pool, and (iii) all DIP Claims shall be converted on the Effective Date on a dollar-for-dollar basis into New Takeback Facility Loans (unless such DIP Claims are paid in full in cash).  The Recapitalization Transaction would deleverage Cyxtera's prepetition indebtedness by more than $950 million and provide Cyxtera with enhanced flexibility to invest in its business.

If the Plan "toggles" to a Sale Transaction, then under a Sale Transaction:  (i) Holders of First Lien Claims shall receive their *pro rata* share of the Distributable Consideration, (ii) Holders of General Unsecured Claims shall receive their *pro rata* share of the GUC Recovery Pool, and (iii) Holders of DIP Claims shall receive payment in full in Cash or, with the consent of the Required Consenting Term Lenders, such other treatment rending such Allowed DIP Claims Unimpaired.

As of the filing of this Disclosure Statement, the scope of the GUC Recovery Pool remains undetermined and subject to continued negotiation with the Committee.  Since the appointment of the Committee on June 21, 2023 [Docket No. 133], the Debtors have devoted significant time and resources to providing diligence and engaging with the Committee and its advisors to bring them up to speed on the developments in the Debtors' Chapter 11 Cases.  The Debtors have been particularly diligent regarding certain key issues regarding the DIP Facility and the Plan—in the days and weeks immediately following the Committee's appointment, the Debtors and the Committee engaged in constant dialogue regarding certain key issues including the establishment of an escrow account for certain "stub" rent amounts, the scope of DIP liens, implications, and potential impact of a Sale Transaction.

Discussions with the Committee have been, and continue to be, constructive and remain ongoing, and therefore, the Plan does not currently contemplate a definite recovery for Holders of General Unsecured Claims.  While the Committee is not yet supportive of the Plan, the Debtors continue to actively engage with the Committee and hope to come to an agreement with the Committee and the Consenting Stakeholders regarding the Plan in advance of the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.**    **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.**    **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [September 14], 2023). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.**    **What is the "toggle" feature of the Plan?**

The Plan will implement the Recapitalization Transaction unless the Debtors, with the consent of the Required Consenting Term Lenders, pivot or "toggle" to a Sale Transaction that results from the Marketing Process and the Debtors' ongoing negotiations with certain bidders. If the Debtors "toggle" to a Sale Transaction, Claims and Interests will receive the proposed treatment under the Plan for a Sale Transaction. As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Plan did not include a "toggle" feature, which reduces expenses and permits the Debtors to emerge in either scenario on the expedited timeline currently contemplated.

A vote to accept the Plan is a vote to approve both the Recapitalization Transaction and a Sale Transaction. If the Debtors "toggle" to a Sale Transaction pursuant to the Plan, the Debtors will file and serve a notice of such Sale Transaction in advance of the Confirmation Hearing.

**E.      What is the Recapitalization Transaction under the Plan?**

The proposed Plan contemplates that the Debtors will pursue a balance sheet recapitalization unless the Debtors, with the consent of the Required Consenting Term Lenders, determine that a Sale Transaction presents a higher and/or more value-maximizing opportunity. If the Recapitalization Transaction is consummated, more than $950 million of the Debtors' prepetition funded debt obligations would be eliminated—Holders of First Lien Claims would receive, in full and final satisfaction of their First Lien Claims, their *pro rata* share of 100 percent of the Reorganized Cyxtera's New Common Stock, subject to dilution by a Management Incentive Plan, and Holders of General Unsecured Claims would receive their *pro rata* share of the GUC Recovery Pool.

**F.      What is a Sale Transaction under the Plan?**

As the Debtors pursue the Recapitalization Transaction, they will continue to engage with all parties regarding a sale of the Sale Package. Should a Sale Transaction materialize that proves more value maximizing, the Debtors will "toggle" and pursue such a sale.

In the event of a Sale Transaction, a Purchaser would purchase all or substantially all of the New Common Stock in exchange for the Purchase Price (such transaction, an "Equity Investment Transaction") or all or substantially all of the Debtors' assets (such transaction, an "Asset Sale"). If a Sale Transaction is consummated, Holders of First Lien Claims would receive, in full and final satisfaction of their First Lien Claims, their *pro rata* share of the Distributable Consideration, Holders of General Unsecured Claims would receive their *pro rata* share of the GUC Recovery Pool, and Holders of the DIP Claims would receive payment in full in Cash or, with the consent of Required Consenting Term Lenders, such other treatment rendering Allowed DIP Clams Unimpaired in accordance with section 1124 of the Bankruptcy Code. Further, depending on the type of transaction, whether an Asset Sale or Equity Investment Transaction, either the Post-Effective Date Debtors or the Purchaser, as applicable, would operate the Debtors' businesses after the Effective Date.

**G.      When will I be informed if the Debtors "toggle" to a Sale Transaction?**

While the Debtors are pursuing the Recapitalization Transaction, the Debtors continue to engage with multiple bidders regarding a potential Sale Transaction. If the Debtors "toggle" to a Sale Transaction in accordance with the Plan and with the consent of the Required Consenting Term Lenders, then the Debtors will file and serve a notice of such Sale Transaction in advance of the Confirmation Hearing.

**H.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Allowed Amount of Claims | Estimated % Recovery |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim and at the option of the Debtors and the Required Consenting Term Lenders, either: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) Reinstatement of its Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or (iii) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $40,000,000 | 100% |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $0 | 100% |
| Class 3 | First Lien Claims | On the Effective Date, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive, in full and final satisfaction of such Claim: (i) in the event of a Recapitalization Transaction, its *pro rata* share of 100 percent of the New Common Stock, subject to dilution by the Management Incentive Plan; or (ii) in the event of a Sale Transaction, its *pro rata* share of the Distributable Consideration (including, for the avoidance of doubt, the Residual Cash). | $969,387,346.74 *plus* $4,943,699.00 of letter of credit obligations | Unspecified[5] |

---

[4] The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

[5] As described herein, the Debtors continue to engage with multiple bidders with respect to a potential Sale Transaction. Because the Debtors do not want to prejudice the sale process by disclosing the estimated recoveries for First Lien Claims or General Unsecured Claims, such recoveries are not estimated herein. The Plan is broadly supported by Holders whose claims represent approximately 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement, as well as the Consenting Sponsors. For more detail about the projected recovery on account of the First Lien Claims, please see Art. III.B.3 of the Plan and Article XI.F of this Disclosure Statement entitled, "Valuation."

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim/ Interest** | **Projected Allowed Amount of Claims** | **Estimated % Recovery** |
| Class 4 | General Unsecured Claims | [Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each Holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Recovery Pool.][6] | $80,000,000 - $90,000,000 | To Be Determined[7] |
| Class 5 | Section 510 Claims | On the Effective Date, all Section 510 Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510 Claims will not receive any distribution on account of such Section 510 Claims. | $0 | N/A |
| Class 6 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, with the consent of the Required Consenting Term Lenders (not to be unreasonably withheld), and, in the event of a Sale Transaction, in consultation with the Purchaser, either: (i) Reinstated; or (ii) canceled or released without any distribution on account of such Claim. | N/A | 0% or 100% |
| Class 7 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be, at the election of the applicable Debtor or Post-Effective Date Debtor, with the consent of the Required Consenting Term Lenders (not to be unreasonably withheld), and, in the event of a Sale Transaction, in consultation with the Purchaser, either: (i) Reinstated; or (ii) canceled or released without any distribution on account of such Interests. | N/A | 0% or 100% |
| Class 8 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Interests shall receive no recovery or distribution on account of their Existing Equity Interests. | N/A | 0% |

---

[6]    Treatment of General Unsecured Claims subject to continued negotiation with the Committee.

[7]    The Plan does not currently contemplate a definite recovery for Holders of General Unsecured Claims.  The GUC Recovery Pool remains subject to continued negotiation with the Committee, and the recoveries for Holders of General Unsecured Claims are dependent on the resolution of these negotiations.  For more detail about the projected recovery on account of the General Unsecured Claims, please see Art. III.B.4 of the Plan and Article IX.B.9 of this Disclosure Statement, entitled "The Debtors' General Unsecured Creditors May Not Receive Any Recovery."

I.    **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Receivables Program Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Professional Fee Claims, Receivables Program Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Post-Effective Date Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party by the Claims Objection Deadline. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

2.    **DIP Claims**

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim: (i) in the event of a Recapitalization Transaction, either (a) the DIP Loan giving rise to such Allowed DIP Claim shall be refinanced by means of a cashless settlement whereby such DIP Loan shall be converted on a dollar-for-dollar basis into New Takeback Facility Loans in accordance with the DIP Documents and the New Takeback Facility Documents, and all collateral that secures the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall be reaffirmed, ratified, and shall automatically secure all [Obligations] (as defined in the New Takeback Facility Documents) under the New Takeback Facility Documents, subject to the priorities of liens and payment set forth in the New Takeback Facility Documents, or (b) such DIP Claim shall be paid in full in Cash; or (ii) in

8

the event of a Sale Transaction, Holders of the DIP Claims shall receive payment in full in Cash or, with the consent of Required Consenting Term Lenders, such other treatment rendering Allowed DIP Clams Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**3.     Professional Fee Claims**

**a.   Final Fee Applications and Payment of Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Post-Effective Date Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account. The Post-Effective Date Debtors shall establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

**b.   Professional Fee Escrow Account**

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Post-Effective Date Debtors, without any further action or order of the Bankruptcy Court; *provided*, *however*, in the event of a Sale Transaction, any remaining amount in the professional Fee Escrow Account shall constitute Residual Cash and be distributable to Holders of Allowed First Lien Claims.

**c.   Professional Fee Amount**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Post-Effective Date Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

**d.   Post-Confirmation Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Post-Effective Date Debtors, and/or the Plan Administrator, as applicable,

may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**4.        Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**5.        Payment of Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the RSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.

**6.        Receivables Program Claims**

All Receivables Program Claims shall be Allowed Claims.  On the Effective Date, unless otherwise agreed by the Holder of a Receivables Program Claim and the applicable Debtor or Post-Effective Date Debtor, Allowed Receivables Program Claims will be satisfied in full in accordance with the terms of the Receivables Program Documents.  On the Effective Date, or as soon as reasonably practicable thereafter, all fees and expenses incurred by the advisors to the parties to the Receivables Program shall be paid in full in Cash to the extent required under the Final Receivables Program Order.

**J.        Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.  In the case of a Sale Transaction, a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (and expiration or early termination of the waiting period thereunder) may be required as a condition precedent to any asset sale that exceeds the applicable size of the transaction threshold.

**K.        What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.

**L.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article VIII.B of this Disclosure Statement, entitled "Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**M.      What are the sources of Cash and other consideration required to fund the Plan?**

If the Recapitalization Transaction or the Equity Investment Transaction is consummated, the Debtors shall fund distributions under the Plan, as applicable, with:  (i) the issuance of New Takeback Facility Loans under the New Takeback Facility, (ii) the proceeds from the Equity Investment Transaction, (iii) the New Common Stock, and (iv) the Debtors' Cash on hand.

If the Asset Sale is consummated, the Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Asset Sale, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors.

**N.      Are there risks to owning the New Common Stock upon the Debtors' emergence from chapter 11?**

Yes.  *See* Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**O.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article XI.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**P.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On or as soon as reasonably practicable following the Effective Date, the Post-Effective Date Debtors shall adopt and implement the Management Incentive Plan, which will provide that up to ten percent of the value of the New Common Stock as of the Effective Date, on a fully diluted basis, shall be issued in connection with the Management Incentive Plan on terms acceptable to the Required Consenting Term Lenders and the Debtors, and, in the event of an Equity Investment Transaction, the Purchaser.  The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

**Q.      Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Post-Effective Date Debtors, shall retain and may enforce (or the Plan Administrator may enforce, if applicable) all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Post-Effective Date Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Post-Effective Date Debtors, as applicable, as of the Effective Date.

The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Post-Effective Date Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Post-Effective Date Debtor, as applicable, except as otherwise expressly provided in the Plan, including Article VII of the Plan.  The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.E of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

**R.      Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an

integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (I) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND (II) ALL OTHER HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT (1) VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN OR (2) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION DEADLINE. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

1.    **Release of Liens**

**Except as otherwise provided in the New Takeback Facility Documents, the Plan, the Confirmation Order, the Purchase Agreement (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Post-Effective Date Debtors or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

2.    **Releases by the Debtors**[8]

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Post-Effective Date Debtors and the Plan Administrator, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, the Post-Effective Date Debtors, or the Plan Administrator), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Post-Effective Date Debtors, if applicable, the Plan Administrator, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the New Organizational Documents, the Receivables Program Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Post-Effective Date Debtors or the Plan Administrator, asserting any Claim or Cause of Action released pursuant to the Debtor Release.

---

[8]    Release provisions subject to ongoing review, including as part of the Special Committee's Independent Investigation.

3.       **Releases by Holders of Claims and Interests**

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the New Organizational Documents, the Receivables Program Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

4.       **Exculpation**

**To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if**

15

applicable), the Plan and related agreements, instruments, and other documents, the New Takeback Facility Documents, the Receivables Program Documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

5.    **Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and

16

**(ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**S.      When is the deadline to vote on the Plan?**

The Voting Deadline is [October 26], 2023, at 4:00 p.m. (prevailing Eastern Time).

**T.      How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent, Kurtzman Carson Consultants LLC (the "Claims and Noticing Agent") **on or before the Voting Deadline, *i.e.*, [October 26], 2023, at 4:00 p.m., prevailing Eastern Time**. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**U.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**V.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**W.      What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code or pursuing a going-concern sale. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the

Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**X.    Will any party have significant influence over the corporate governance and operations of the Post-Effective Date Debtors?**

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of Cyxtera shall expire, and, if applicable, the members for the initial term of the New Board shall be appointed; *provided*, that the disinterested directors of Cyxtera, comprising the special committee of Cyxtera's Board, shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan. The disinterested directors of Cyxtera shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Post-Effective Date Debtors, the Purchaser, or any other Entity without their prior written consent.

The Initial members of the New Board, if applicable, will be identified in the Plan Supplement to the extent known at the time of filing. In the event of a Recapitalization Transaction or an Equity Investment Transaction, each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors. The members of the New Board shall be chosen by the Debtors or the Post-Effective Date Debtors, subject to the applicable terms of the RSA, and, if applicable, the Purchase Agreement.

**Y.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kurtzman Carson Consultants LLC, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Cyxtera Ballot Processing Center
> c/o KCC
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, CA 90245

> *By electronic mail at:*
> https://www.kccllc.net/cyxtera/inquiry

> *By telephone (toll free) at:*
> 877-726-6510 (domestic) or 424-236-7250 (international) and request to speak with a member of the Solicitation Team.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the documents from the Debtors' restructuring website at

https://www.kccllc.net/cyxtera (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**Z.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  A Recapitalization Transaction will significantly delever the Debtors' balance sheet, and a Sale Transaction, if any, will only allow for a higher or otherwise better recovery.  Either a Recapitalization Transaction or a Sale Transaction will allow for a quick confirmation by no later than November 6, 2023.

**AA.    Who Supports the Plan?**

The Plan is supported by the Debtors and the Holders of 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement (the "Consenting Lenders"), and the Holders of Existing Equity Interests that are signatories to the RSA or any subsequent Holder of Existing Equity Interests that becomes party thereto in accordance with the terms of the RSA, each solely in their capacity as    such    (the    "Consenting    Sponsors",    and    together    with    the    Consenting    Lenders, the "Consenting Stakeholders").

**IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

**A.     Cyxtera's Business Operations and Services**

**1.      The Company's Products and Services**

Cyxtera's global data center platform provides speed, scale, and agility for its customers' business demands by offering a complete suite of space, power, interconnection, bare metal, and remote management solutions.  Cyxtera's software-defined platform and highly interconnected ecosystem provides enterprises with the foundation they need to compete in today's digital world.  Over 90 percent of Cyxtera's revenue is derived from recurring, fixed term customer contracts.  Cyxtera's primary service and product offerings are described below.

*Colocation*.  (83 percent of revenue in 2022).  Cyxtera offers retail colocation services in approximately sixty high-quality, highly-connected data centers on three continents.  The Company's colocation services provide customers space and power in reliable, redundant, and secure data centers to host their critical applications and workloads in an integrated ecosystem.  Colocation space and power services are offered under fixed-duration contracts (typically three years) and generate monthly recurring revenue.  Colocation services are highly customizable and can range from a standard colocation rack or cabinet to a custom-designed cage, rack layout, and rack elevation, in addition to structured cabling solutions.

In certain of its locations, Cyxtera also offers smart cabinets ("SmartCabs"), which are on-demand, dedicated colocation cabinets, complete with built-in power and integrated, configurable, core network fabric.  SmartCabs allow customers to instantly deploy and dynamically configure their end-to-end colocation infrastructure in a cloud-like model with direct access to a robust ecosystem of technology and service providers, enabling customers to achieve rapid connectivity without requiring them to bring in additional network hardware.

*Interconnection.* (11 percent of revenue in 2022). Cyxtera enables enterprises to reap the benefits of fast networks, high-performance connections, and efficient, multi-network cloud-connect solutions by offering direct interconnection capabilities to global-reaching networks and major cloud providers. By providing direct connectivity to every major cloud provider through virtual and physical connections, Cyxtera eliminates the volatility of the public internet, enabling enterprises to reduce network costs, increase bandwidth, and improve network performance and reliability.

Cyxtera's densely connected global data center footprint can be provisioned through Cyxtera's "Digital Exchange," which is Cyxtera's connected data center fabric that allows enterprises to deploy their information technology infrastructure on-demand. These offerings provide customers (i) the ability to establish fast, convenient, affordable, and highly reliable connections to their preferred network of service providers, (ii) low latency public cloud entry points that connect customers to other carriers, content providers, cloud providers, financial exchanges, and other enterprise customers, and (iii) a wide range of technology and network service providers and business partners. Interconnection services are offered on month-to-month contract terms and generate monthly recurring revenue.

*Enterprise Bare Metal.* (1 percent of revenue in 2022). For customers that do not own their own servers and other information technology equipment, Cyxtera Enterprise Bare Metal provides customers with on-demand access to Cyxtera-owned servers and information technology infrastructure that allows customers to consume Cyxtera's data center services in a cloud-like fashion. Cyxtera's fully automated platform also enables customers to seamlessly connect to partner services, including single-tenant, private bare metal servers from NVIDIA, Nutanix, Fujitsu, HPE and Dell. Enterprise Bare Metal services are offered under fixed duration contracts and generate monthly recurring revenue.

*Deployment and Other Support Services.* (5 percent of revenue in 2022). Cyxtera offers a variety of value-added services to help customers streamline data center deployment. These services include custom data center installation and set-up, access to secure cages and cabinets, integrated structured cabling solutions, and the ability to deliver a turnkey environment. Deployment services are one-time in nature and generally billed at the time of completion or delivery. Cyxtera provides these services through a team of industry-recognized professionals that are available 24-7 to assist customers with routine management of their environments, such as server reboots, telecommunications support, equipment racking and stacking, operating system loading, and backups of critical data. These support services can be consumed on an ad hoc basis or in pre-paid blocks, in each case generating non-recurring revenue. Customers can also elect to purchase recurring monthly blocks of support hours, which generate monthly recurring revenue.

## 2. The Company's Broad Global Presence

Cyxtera provides its colocation and related solutions to its customers through the operation of its approximately sixty data centers, the majority of which are leased. Cyxtera's data center platform has a global footprint with data centers located in twenty-three large metropolitan areas in North America, Europe, and Asia. These data centers are in proximity to major business and financial hubs, core clusters of connectivity, and a wide range of data center customers, including a diverse collection of global enterprises and leading hyperscale cloud providers, positioning Cyxtera for continued growth.

## 3. The Company's Customers

Cyxtera has more than 2,300 customers across all major industry verticals, including: (i) retail; (ii) transport and logistics; (iii) manufacturing and natural resources; (iv) healthcare; (v) business services; (vi) media and content; (vii) banking and securities, (viii) network service providers; and (ix) cloud and information technology services. Cyxtera's customer base comprises approximately 90 percent private and public industry leading enterprises that generate at least one billion dollars in revenue and/or have more than one thousand employees, and 10 percent small businesses. Cyxtera has a diverse customer mix with

10 percent of its revenue generated by its largest customer, Lumen, 32 percent of its revenue generated by its top twenty customers (excluding Lumen), and the remaining 58 percent of its revenue generated by all other customers.[9]  Cyxtera's customers are long-tenured with many of its top twenty customers having contracted with Cyxtera for at least sixteen years, dating back to Cyxtera's prior ownership.  Additionally, approximately 30 percent of Cyxtera's customers are deployed in more than one data center.

The Company generates its customer base through promotions and specials for existing and new customers, as well as through a channel-led sales model that leverages third-party partners located around the world to engage in referrals, resales, or strategic alliances with respect to the Cyxtera's products and services.  On average, direct sales to end-users make up approximately 75 percent of the Company's total bookings.  The Company generates these direct sales using Cyxtera-employed salespersons and sales agents who offer certain promotions and special incentives.  Indirect sales and promotions via channel partners make up approximately 25 percent of total bookings.

## B.    Corporate History

Cyxtera was founded in 2017 by affiliates of private equity firms BC Partners and Medina Capital for the purpose of acquiring Lumen's data center and colocation business.[10]  The Lumen data center portfolio consisted of high-quality, strategically located, and well-maintained data center assets that were under-optimized as a relatively small business unit within a large telecommunications carrier focused on its core networking business.  Cyxtera's founders therefore saw an opportunity to transform Lumen's assets into a next-generation carrier-neutral global data center platform under a proven data center management team.

On May 1, 2017, with the completion of the acquisition, and in combination with Medina Capital's security and data analytics colocation business, Cyxtera was born.  The Cyxtera management team took the underutilized assets and improved the business by developing Cyxtera's existing infrastructure through strategic investments in the platform, including by adding sellable capacity based on customer demand, broadening the scope of Cyxtera's interconnection offerings to further drive the carrier-neutral advantages of the platform, adding new service provider developments, and developing innovative bare-metal offerings.

On November 14, 2019, Starboard Value Acquisition Corp. ("SVAC") was incorporated in Delaware as a special purpose acquisition vehicle (or SPAC) for the purpose of effectuating a merger, capital stock exchange, asset acquisition, or other business combination with one or more businesses.  On September 14, 2020, SVAC completed its initial public offering ("IPO") on the Nasdaq stock exchange (NASDAQ: SVAC), issuing approximately thirty-six million units of class A common stock at $10.00 per unit.  Simultaneously with the closing of the IPO, SVAC completed a private placement of an aggregate of 6,133,333 warrants to SVAC Sponsor LLC, at a purchase price of $1.50 per warrant.

On February 21, 2021, SVAC entered into subscription agreements with Fidelity Management & Research Company LLC and clients of Starboard Value LP (collectively, the "PIPE Investors"), pursuant to which, among other things, SVAC agreed to issue and sell in a private placement, an aggregate of twenty-five million shares of Class A common stock to the PIPE Investors, for a purchase price of $10.00 per share (the "PIPE Investment").   On July 29, 2021, SVAC consummated its business combination (the "de-SPAC") with Cyxtera Technologies, Inc. (now known as Cyxtera Technologies, LLC)

---

[9]    Based on 2022 revenue.

[10]   Lumen retained an equity stake in the Company following the transaction and currently holds approximately 6.4 percent of Cyxtera Technologies' equity.

("Legacy Cyxtera").  As a result of the de-SPAC, Legacy Cyxtera became a wholly-owned subsidiary of SVAC and SVAC changed its name to Cyxtera Technologies, Inc (NASDAQ: CYXT).  Upon completion of the de-SPAC, the Company received proceeds of approximately $654 million, including $250 million on account of the PIPE Investment.  The proceeds of the de-SPAC, including the PIPE Investment, were used for general corporate purposes, retirement of certain outstanding funded indebtedness, and payment of expenses incurred in connection with the de-SPAC.

Since the de-SPAC, Cyxtera has continued to grow its business.  Throughout 2021 and 2022, Cyxtera announced various strategic industry partnerships to help expand its services.  Today, Cyxtera's platform consists of over 40,000 physical and virtual cross-connects, more than 300 network service providers, more than 1,400 networks, and offers low latency connectivity to major public cloud zones from virtually all of its data centers.

## C.    The Debtors' Prepetition Corporate and Capital Structure

### 1.    Corporate Structure

The below chart depicts a simplified version of the Debtors' current corporate structure.  Cyxtera has twenty-nine wholly-owned subsidiary entities, fifteen of which are Debtors in these Chapter 11 Cases. A more detailed corporate organizational structure chart, attached hereto as **Exhibit C**, depicts the Debtors' corporate structure, as well as the Debtors' various prepetition debt obligations.



### 2.    Cyxtera's Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $1.020 billion in aggregate outstanding principal and accrued interest for funded debt obligations, as reflected below:

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued Interest | Approximate Outstanding Amount |
|---|---|---|---|---|
| **Bridge Facility** | May 1, 2024 | $50.0 million | $0.5 million | $50.5 million |
| **Revolving Credit Facility** | April 2, 2024 | $97.1 million | $1.1 million | $98.3 million |
| **2019 First Lien Term Facility** | May 1, 2024 | $96.3 million | $0.8 million | $97.0 million |
| **2017 First Lien Term Facility** | May 1, 2024 | $768.1 million | $6.0 million | $774.1 million |
| *Total Funded Debt Obligations:* | | *$1,011.5 million* | *$8.3 million* | *$1,019.9 million* |

These obligations are discussed below:

### a. Term Loan Facilities

The Debtors are party to a first lien term loan credit facility under that certain first lien credit agreement dated as of May 1, 2017 (as amended by that first amendment dated as of April 30, 2018, as further amended by that certain second amendment, dated as of December 21, 2018, as further amended by that certain third amendment, dated as of May 13, 2019, as further amended by that certain fourth amendment, dated as of May 7, 2021, as further amended by that certain fifth amendment, dated as of July 6, 2021, as further amended by Amendment No. 6 (as defined herein), dated as of March 14, 2023, as further amended by Amendment No. 7 (as defined herein), dated as of May 2, 2023, as further amended by Amendment No. 8 (as defined herein), dated as of May 4, 2023, and as may be further amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time) (the "First Lien Credit Agreement"), by and between Cyxtera DC Holdings, Inc. (the "Borrower"), Cyxtera DC Parent Holdings, Inc. ("Holdings"), Cyxtera Communications, LLC ("Cyxtera Communications"), and Cyxtera Data Centers, Inc. (together with Cyxtera Communications and Holdings, the "Guarantors"), the first lien lenders from time to time party thereto (the "First Lien Lenders"), and Citibank, N.A., as administrative agent and collateral agent.  Pursuant to the First Lien Credit Agreement, the Debtors obtained credit facilities of up to $1.275 billion consisting of: (i) a $150 million first lien multi-currency revolving credit facility (the "Revolving Credit Facility"); and (ii) an $815 million first lien term loan facility (the "2017 First Lien Term Facility").  On May 13, 2019, the Debtors borrowed an additional $100 million in incremental first lien term loans under the First Lien Credit Agreement (the "2019 First Lien Term Facility" and together with the 2017 First Lien Term Facility, the "Term Loan Facilities").

The Term Loan Facilities mature on May 1, 2024, and are secured by liens on the collateral on a senior priority basis by substantially all of the Debtors' equity interests and material real property.  As of the Petition Date, an aggregate amount of approximately $871.1 million in unpaid principal and accrued but unpaid interest is outstanding under the Term Loan Facilities.

### b. Revolving Credit Facility

The First Lien Credit Agreement also provides the Debtors with a first lien, multi-currency Revolving Credit Facility.  As of the Petition Date, the Revolving Credit Facility borrowing base was $102.1 million with $4.9 million letters of credit outstanding.  Pursuant to Amendment No. 6, the Debtors requested, among other things, that the Revolving Credit Facility be extended and, in connection with such extension, the Debtors agreed to reduce the aggregate extended revolving commitments by 15 percent.  The Revolving Credit Facility matures on April 2, 2024, and is secured by liens on the collateral on a senior priority basis by substantially all of the Debtors' equity interests and material real property.  As of the

Petition Date, an aggregate of approximately $98.3 million in unpaid principal and accrued but unpaid interest is outstanding under the Revolving Credit Facility.

### c. Bridge Facility

On May 4, 2023, and in connection with entry into the Restructuring Support Agreement, the Borrower, Holdings, and the other loan parties and lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for such lenders entered into a first lien priority credit agreement that provided up to $50 million in new first lien term loans pursuant to the Bridge Facility. The guarantors under the Bridge Facility include the Guarantors under the First Lien Credit Agreement, in addition to Cyxtera Canada TRS, ULC, Cyxtera Canada, LLC, Cyxtera Communications Canada, ULC, Cyxtera Digital Services, LLC, Cyxtera Technology UK Limited, and Cyxtera UK TRS Limited.

The Bridge Facility is senior in right of payment to outstanding borrowings under the Term Loan Facilities and is secured on a *pari passu* basis with respect to all collateral securing the Term Loan Facilities. The Bridge Facility matures on the earliest of (i) May 1, 2024, (ii) the date on which the obligations under such facility become due and payable pursuant to the terms of the Bridge Facility, (iii) the effective date of the Debtors' chapter 11 plan, and (iv) the date of consummation of a sale of all or substantially all of any loan party's assets under Section 363 of the Bankruptcy Code. As of the Petition Date, an aggregate amount of approximately $50.5 million in obligations, including unpaid principal, accrued but unpaid interest, and escrowed but undrawn proceeds, was outstanding under the Bridge Facility, all of which was "rolled up" on a dollar-for-dollar basis into postpetition superpriority obligations under the DIP Facility pursuant to the Interim and Final DIP Orders.

### d. The Receivables Program

In 2020, the Company formed a wholly owned bankruptcy remote special purpose entity, Cyxtera Receivables Holdings, LLC ("Cyxtera Receivables Holdings"), to continuously receive, either through the purchase or the contribution of, trade receivables generated by Cyxtera Communications, LLC and Cyxtera Federal Group Inc. on account of their business operations (together, the "Originators," and the trade receivables the Originators generate, the "Receivables") pursuant to that certain purchase and sale agreement, dated as of August 31, 2022 (as the same may be amended, amended and restated, or otherwise modified from time to time) (the "Purchase and Sale Agreement"). Accordingly, pursuant to the Purchase and Sale Agreement, the Originators may either sell or contribute Receivables to Cyxtera Receivables Holdings on a daily basis at a fair market discount. Where a Receivable is sold to Cyxtera Receivables Holdings, Cyxtera Receivables Holdings makes certain payments to the Originators, payable at any time upon demand by the Originators, subject to the availability of funds by Cyxtera Receivables Holdings. Such transactions are either a true sale or an absolute contribution and conveyance of the Receivable by the Originators to Cyxtera Receivables Holdings, providing Cyxtera Receivables Holdings with the full benefits of ownership of the Receivables.

Further, Cyxtera Receivables Holdings, as seller, Cyxtera Communications, as Servicer, PNC Bank, National Association ("PNC Bank"), as Administrative Agent, and PNC Capital Markets LLC, as Structuring Agent, are each party to that certain receivables purchase agreement, dated as of August 31, 2022 (as the same may be amended, amended and restated, or otherwise modified from time to time) (the "Receivables Purchase Agreement," and, together with the Purchase and Sale Agreement, the "Receivables Program"). Pursuant to the Receivables Purchase Agreement, upon request by Cyxtera Receivables Holdings, PNC Bank makes capital investment payments to Cyxtera Receivables Holdings, subject to certain restrictions.

In consideration for PNC Bank's agreement to make such capital investment payments, Cyxtera Receivables Holdings, on the date of each investment payments, sells, assigns, or transfers to PNC Bank, all of Cyxtera Receivables Holdings' newly acquired rights, title, and interest in, to, and under the Receivables designated as sold, including all proceeds and collections with respect thereto. Cyxtera Receivables Holdings then designates certain of the Receivables to be sold by Cyxtera Receivables Holdings to PNC Bank and Cyxtera Receivables Holdings grants a security interest in any remaining, unsold Receivables to PNC Bank as collateral. Additionally, Cyxtera Receivables Holdings makes certain servicing fee payments to PNC Bank of 1.00 percent per annum based on the daily average aggregate outstanding principal balance of the then outstanding Receivables transferred to Cyxtera Receivables Holdings, as well as certain other yield and fee payments.

The Receivables Program is a critical component of the Debtors' liquidity position and serves as a material source of day-to-day operating liquidity for the Debtors. The Originators are responsible for generating approximately 95 percent of the Debtors' annual receivables. As such, if the Receivables Program were forced to cease, the Debtors would lose access to much of their revenue collections until PNC Bank's outstanding capital funded to Cyxtera Receivables Holdings were to be repaid (such "capital" is analogous to the outstanding principal of a loan made by PNC Bank to Cyxtera Receivables Holdings), a figure totaling $37.5 million dollars.

**e.  Equity**

Cyxtera Technologies' certificate of incorporation authorizes the board of directors to issue 500 million shares of Class A common stock ("Common Shares") and 10 million shares of preferred stock ("Preferred Shares"). Approximately 180 million Common Shares are outstanding as of the Petition Date. The Common Shares trade on the Nasdaq under the ticker symbol "CYXT." To date, Cyxtera has not issued any Preferred Shares.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    The Precipitous Rise in Interest Expense Undermines Liquidity

In recent years, Cyxtera has continued its strong operating performance, stable revenue growth, and low customer churn. In 2021 and 2022, Cyxtera met or exceeded its revenue guidance as of the de-SPAC transaction. Unfortunately, the de-SPAC transaction coincided with a rapid increase in inflation. In January 2021, the year-over-year change in the Consumer Price Index ("CPI") in the United States stood at approximately 1.4 percent.[11] By the time the de-SPAC closed, CPI in the United States had grown to approximately 5.4 percent, far ahead of the Federal Reserve's 2 percent inflation target.[12] This number ultimately peaked at over 9 percent in June 2022, and inflation remains elevated today.[13]

---

[11]  U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer Price Index - January 2021 (Feb. 10, 2021, 8:30 AM), https://www.bls.gov/news.release/archives/cpi_02102021.pdf.

[12]  U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer prices up 5.4 percent in 12 months ended July 2021 (Aug. 16, 2021), https://www.bls.gov/opub/ted/2021/consumer-prices-up-5-4-percent-in-12-months-ended-july-2021.htm#:~:text=Over%20the%2012%20months%20ended, over%20the%20last%2012%20months.

[13]  U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer prices up 9.1 percent over the year ended June 2022, largest increase in 40 years, (July 18, 2022), https://www.bls.gov/opub/ted/2022/consumer-prices-up-9-1-percent-over-the-year-ended-june-2022-largest-increase-in-40-years.htm#:~:text=SUBSCRIBE-Consumer %20 prices%20up%209.1%20percent%20over%20the%20year%20ended%20June,largest%20increase%20in%2040%20years&t ext=Over%20the%2012%20months%20endedUrban%20Consumers%20increased%209.1%20percent.

The Federal Reserve responded to this inflationary environment by aggressively raising interest rates.  As a result, beginning in mid-2022, the interest expense on Cyxtera's funded debt more than doubled and began to significantly undermine liquidity, despite core business performance remaining strong.  The annualized interest expense on the Debtors' funded debt facilities, all of which are variable interest rate facilities, rose from \$35.9 million as of March 31, 2022 to \$75.7 million as of March 31, 2023, calculated based on the balances and rates prevailing at the end of each quarter.  This rise in inflation and interest rates coincided with impending maturities under the Company's funded debt—the Revolving Credit Facility was scheduled to mature on November 1, 2023, and the Term Loan Facilities on May 1, 2024.  Therefore, a regular-way refinancing, something that likely would be justified by the core business performance, was not feasible.

During this period, the Company attempted to offset its escalating interest costs with operational improvements aimed at increasing occupancy at existing data centers, deploying capital efficient growth strategies, and optimizing its organizational structure.  Despite these measures, the continued strain on the balance sheet due to rising interest rates and Cyxtera's substantial debt service obligations continued to diminish Cyxtera's liquidity.

## B.    Pursuit of All Reasonable Alternatives

The Company was proactive in seeking to address its balance sheet issues.  Throughout 2022, the Company worked with advisors to explore interest in an acquisition of the Company or an investment in connection with a financing or refinancing transaction.  However, in large part due to the Company's mounting capital structure challenges and market volatility, the process did not result in any actionable proposals.

In November 2022, the Company retained Kirkland as counsel, and in December 2022, the Company retained Guggenheim Securities to assist in exploring various alternatives for its capital structure, including amending and/or refinancing its Term Loan Facilities and raising equity capital.  With respect to the capital raise, the Company, with the assistance of Guggenheim Securities, explored such transaction with, among others, the Company's three largest equity holders.  And, in connection with its refinancing efforts, the Company, with the assistance of Guggenheim Securities, also considered a comprehensive amend and extend transaction with respect to its Term Loan Facilities and commenced discussions with the Ad Hoc Group with respect to such transactions.

The Company also focused its efforts on extending the near-term Revolving Credit Facility maturity on November 1, 2023.  Failure to address this upcoming maturity could have given rise to a going concern qualification in the Company's audited financial statements due March 16, 2023.  Receiving a going concern qualification would have caused significant harm by disrupting the Company's day-to-day business operations and potentially resulting in an event of default under the Company's Term Loan Facilities.  On March 14, 2023, the Company successfully negotiated an extension of the maturity date under the Revolving Credit Facility to April 2, 2024, pursuant to that certain sixth amendment to the First Lien Credit Agreement ("Amendment No. 6").  Although the extension bought Cyxtera essential breathing room, more comprehensive restructuring measures needed to be taken in light of continued liquidity deterioration and a major looming maturity wall in spring 2024.

On March 25, 2023, the Company hired AlixPartners as restructuring advisor to assist with its restructuring efforts.  The Company, with the assistance of its advisors continued to engage with the Ad Hoc Group and certain other key prepetition stakeholders on the terms of a more comprehensive solution.  As part of these discussions, the Company explored the possibility of implementing a consensual restructuring or sale transaction on an out-of-court basis, pivoting to an in-court chapter 11 process, or pursuing both alternatives simultaneously.  With respect to the possibility of an in-court process, the

Company evaluated tools that could be utilized to enhance its operational performance, including the rejection of undesirable leases and contracts.

In parallel, on March 27, 2023, the Company, with the assistance of Guggenheim Securities, launched a marketing process to engage potential interested parties concerning a sale or investment transaction with the Company.  While the marketing process was underway, the Company and the Ad Hoc Group continued to negotiate a broader restructuring deal to be memorialized in a restructuring support agreement.

Prior to the Petition Date, the board of directors of Cyxtera Technologies, Inc. (the "Board") unanimously adopted resolutions (a) appointing Fred Arnold, Roger Meltzer, and Scott Vogel as disinterested directors of the Board, and (b) appointing Messrs.  Arnold, Meltzer, and Vogel as the sole members of a Special Committee of the Board (the "Special Committee").  The Special Committee was delegated sole authority on all matters related to consideration and negotiation of a restructuring, reorganization, or other transaction ("Transaction").  In addition, the Board delegated sole authority to the Special Committee to conduct an independent investigation with respect to:  (a) matters related to a Transaction in which a conflict of interest exists or is reasonably likely to exist between Cyxtera, on the one hand, and any Related Party,[14] on the other hand (the "Conflict Matters"); (b) whether any matter constitutes a Conflict Matter; and (c) potential claims or causes of action of the Debtors, if any, against the Related Parties (collectively, the "Independent Investigation").  In connection with this delegation, the Special Committee has been conducting an independent investigation with respect to the Independent Investigation, which remains ongoing as of the date hereof.

In late April 2023, the Company opted to utilize the five business-day grace period (the "Grace Period") permitted under the First Lien Credit Agreement with respect to the interest payment due on April 25, 2023.  The Company utilized the Grace Period to continue to engage in discussions with the Ad Hoc Group around the terms of a restructuring support agreement and bridge financing solution.  The Company ultimately negotiated and entered into a seventh amendment to the First Lien Credit Agreement ("Amendment No. 7"), under which the lenders refrained from exercising their rights and remedies under the First Lien Credit Agreement as a result of the missed interest payment until May 4, 2023, at 5:00 p.m. (prevailing Eastern time).

Following entry into Amendment No. 7, the Company, with the assistance of its Advisors worked around the clock with the Ad Hoc Group to finalize a restructuring support agreement and obtain financing necessary to fund operations prior to the filing of these chapter 11 cases.  On May 4, 2023, after extensive, arm's-length negotiations, the Debtors and the Ad Hoc Group entered into the RSA, attached hereto as **Exhibit B**, by and between the Debtors, the Consenting Lenders that, at the time, held approximately 64 percent of the First Lien Claims, and the Consenting Sponsors.[15]  The RSA contemplated a two-phase toggle approach whereby the Company would continue its out-of-court Marketing Process in pursuit of a Sale Transaction or toggle to an in-court restructuring, pursuant to which the Company would continue to pursue the Marketing Process or, if such process does not maximize value for stakeholders, pursue a standalone recapitalization of its balance sheet (the "Recapitalization Transaction," and together with the Sale Transaction, the "Restructuring Transactions").

---

[14]    As used herein, "Related Party" means the Company or any of its equityholders, affiliates, subsidiaries, directors, managers, officers, or other stakeholders.

[15]    Since the initial execution of the RSA on May 4, 2023, Holders of an additional 22 percent of First Lien Claims have signed the RSA, bringing the total support from Holders of First Lien Claims to 86 percent.

In connection with the Marketing Process, which remains ongoing, eighty-eight parties have been contacted.  As of the date of the filing of this Disclosure Statement, the Company has executed forty-five non-disclosure agreements with potential investors and has received letters of intent from seven potential investors.

Concurrently with entry into the RSA, the Company entered into the Bridge Facility, which provided an incremental $50 million in liquidity.[16]  The Bridge Facility offered the Company necessary breathing room for the parties to progress the Marketing Process while preparing for a possible in-court Recapitalization Transaction.  Without the critical funding provided by the Bridge Facility, the Company would have been unable to fulfill its interest payment obligations due on the 2017 First Lien Term Facility, while funding its operations.

On May 5, 2023, as contemplated by the RSA, Eric Koza of AlixPartners was engaged as Chief Restructuring Officer, and Raymond Li was engaged as Deputy Chief Restructuring Officer.  Details regarding Mr. Koza's and Mr. Li's retention are described in the *Debtors' Application for Entry of an Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 173], which was approved by the Court on July 19, 2023 [Docket No. 300].

# VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

## A.    First Day Relief and Other Case Matters

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  At a hearing on June 6, 2023, (the "First Day Hearing") the Bankruptcy Court granted all of the relief initially requested in the First Day Motions, and on June 29, 2023, and July 19, 2023, as applicable, the Bankruptcy Court granted certain of the First Day Motions on a final basis, including:[17]

- **Bar Date Motion**:  Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief [Docket No. 172].  On June 19, 2023, the Court entered an Order approving the Bar Date Motion [Docket No. 298].

- **Critical Vendors Motion**:  Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign

---

[16]    To facilitate the Company's entry into the Bridge Facility, the Company also entered into an eighth amendment to the First Lien Credit Agreement ("Amendment No. 8") with the First Lien Lenders wherein, among other changes, the First Lien Lenders agreed to amend the First Lien Credit Agreement to permit the Company to enter into the Bridge Facility.  Relatedly, each of Cyxtera Canada TRS, ULC, Cyxtera Canada, LLC, Cyxtera Communications Canada, ULC, Cyxtera Digital Services, LLC, Cyxtera Technology UK Limited, and Cyxtera UK TRS Limited were joined as guarantors under the First Lien Credit Agreement such that the guarantors thereunder aligned with the guarantors under the Bridge Facility.

[17]    The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/cyxtera.

Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief [Docket No. 16].  On June 6, 2023, the Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 65], and on June 29, 2023, the Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 182].

- **DIP Motion**:  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [Docket No. 23].  On June 6, 2023, the Court entered an Order approving the DIP Motion on an interim basis [Docket No. 70], and on July 19, 2023, the Court entered an Order approving the DIP Motion [Docket No. 297].

- **Foreign Representative Motion**:  Debtors' Motion for Entry of an Order (I) Authorizing Cyxtera Technologies, Inc. to Act as Foreign Representative, and (II) Granting Related Relief [Docket No. 14].  On June 6, 2023, the Court entered an Order approving the Foreign Representative Motion [Docket No. 66].

- **Receivables Facility Motion**:  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Rights Pursuant to the Receivables Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief [Docket No. 23].  On June 6, 2023, the Court entered an Order approving the Receivables Facility Motion on an interim basis [Docket No. 68], and on July 19, 2023, the Court entered an Order approving the Receivables Facility Motion [Docket No. 295].

## B.    Appointment of Unsecured Creditors' Committee

On June 21, 2023, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 133] appointing the Committee.  The five-member Committee has retained Pachulski Stang Ziehl & Jones LLP as its legal counsel and Alvarez and Marsal North America LLC as its financial advisor.  The Committee includes the following entities:

- CBRE Investment Management;

- Iron Mountain Data Centers, LLC;

- Pivot Technology Services Corp.;

- Securitas Security Services USA, Inc.; and

- Menlo Equities.

Immediately after the Committee's appointment, the Debtors began sharing diligence with the Committee, which has been substantial.  The Debtors have also proactively engaged the Committee regarding the key components of these Chapter 11 Cases, including the Sale Process, the Final DIP Order, and the substance of the Plan, which has been productive.  As a result of such discussions, information transfer and dialogue between the Debtors and the Committee remains robust and ongoing.

C.    **Lease Rejections and Optimization**

In preparation for the filing of these Chapter 11 Cases, and continuing on a postpetition basis, the Debtors, with the assistance of their advisors, undertook a comprehensive review of their lease portfolio, including an analysis of each of their data center locations and the associated revenues and expenses attendant thereto.  As a result of that analysis, the Debtors have determined in their business judgment that the costs incurred under certain leases constitute an unnecessary burden on the Debtors' Estates and that rejection of such leases would maximize the value of the Debtors' reorganized business.  As of the date hereof, the Debtors have taken the following steps with respect to their lease rejection and optimization strategy.

- On June 8, 2023, the Debtors filed (i) the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief [Docket No. 79] (the "Rejection Procedures Motion," and the procedures contemplated thereby, the "Rejection Procedures"), through which the Debtors sought approval of certain procedures for rejecting or assuming executory contracts and unexpired leases; and (ii) the Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) The Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date and (II) Granting Related Relief [Docket No. 78] (the "First Omnibus Rejection Motion"), whereby the Debtors sought to reject two data center leases in Moses Lake, Washington as of June 4, 2023, and one data center lease in Halfweg, Netherlands as of September 6, 2023.

- On June 29, 2023, the Court entered Orders approving the Rejection Procedures Motion [Docket No. 186] and the First Omnibus Rejection Motion [Docket No. 184].

- On June 30, 2023, the Debtors filed a *Notice of Rejection of an Unexpired Lease* [Docket No. 190], pursuant to which the Debtors provided notice in accordance with the Rejection Procedures that they will reject one data center lease in Elk Grove Village, IL as of September 4, 2023, and abandon certain property therein (the "Elk Grove Rejection"). The Elk Grove Rejection became effective as of September 5, 2023 [Docket No. 487].

- On July 20, 2023, the Court entered the *Supplemental Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases and (B) the Abandonment of Certain Personal Property, if any, Each Effective as of the Rejection Date and (II) Granting Related Relief* [Docket No. 302], which authorized the rejection of the Halfweg, Netherlands lease, as well as the abandonment of any property therein.

- On July 31, 2023, the Debtors filed a *Notice of Rejection of Certain Unexpired Lease*s [Docket No. 348], pursuant to which the Debtors provided notice in accordance with the Rejection Procedures that they will reject two data center leases in Santa Clara, CA as of July 31, 2023.  On August 11, 2023, the Court entered the *Second Order Approving the Rejection of Certain Unexpired Leases and the Abandonment of Certain Personal Property, if any* [Docket No. 415] rejecting the two Santa Clara, CA data center leases.

Further, on July 3, 2023, the Debtors filed an application [Docket No. 199] with the Bankruptcy Court requesting authorization to retain and employ Hilco Real Estate, LLC ("Hilco") to, among other things, represent the Debtors' interests in lease negotiations and strategic planning in connection with the lease optimization strategy, and on July 18, 2023, the Bankruptcy Court entered an order [Docket No. 291] approving the retention of Hilco as real estate consultant and advisor to the Debtors effective as of the

Petition Date.  As of the date hereof, Hilco continues to advise the Debtors on its lease optimization and rejection strategy.

**D.    Sale Process and Bidding Procedures**

As described above, in March 2023, the Debtors, with the assistance of Guggenheim Securities, launched a comprehensive Marketing Process to engage interested third parties in a potential Sale Transaction.  The Marketing Process ran in parallel with the Company's engagement with the Ad Hoc Group regarding the terms of a comprehensive restructuring transaction.

In connection with the Marketing Process, the Debtors, with the assistance of Guggenheim Securities, performed an initial outreach on a prepetition basis to approximately seventy-five financial and strategic parties to solicit interest in acquiring some or all of the assets and/or interests in the company.  In total, the Debtors, with the assistance of Guggenheim Securities, have engaged with approximately eighty-eight potential financial and strategic parties (the "Potential Purchasers").  The Debtors also executed forty-five non-disclosure agreements with these Potential Purchasers, and seven Potential Purchasers submitted non-binding letters of intent.

On June 29, 2023, the Court entered the Bidding Procedures Order, authorizing the Debtors to, among other things, continue the Marketing Process postpetition, and, if necessary, to conduct an auction (the "Auction").  The Bidding Procedures also allow the Debtors flexibility with respect to the structure of a potential Sale Transaction.  On July 10, 2023, pursuant to the Bidding Procedures Order, the Debtors received at least one non-binding written proposal (a "Proposal").  Upon review, and in consultation with the Committee and the Ad Hoc Group, the Debtors determined that they had received multiple acceptable Proposals from Acceptable Bidders.  Accordingly, the Debtors extended the Marketing Process timeline in accordance with the Bidding Procedures, such that binding bids were to be submitted by no later than July 31, 2023.  On July 31, 2023, and August 22, 2023, the Debtors filed the *Notices of Amended Sale Schedule* [Docket Nos. 353 and 450] modifying the sale schedule to provide the Debtors with additional time to complete their comprehensive sale process, to receive and evaluate bids, and, if necessary, to hold an Auction to determine the highest and otherwise best bid for the Sale Package and maximize value for the Debtors' stakeholders and their Estates.  Consequently, final bids were due on August 30, 2023.

As described above, the Debtors have received multiple bids for the Sale Package, but none of these bids were Qualified Bids (as defined in the Bidding Procedures).  The Debtors do not believe at this time that any of the bids received to date are more value-maximizing than the Recapitalization Transaction proposed under the Plan.  Accordingly, on August 29, 2023, the Debtors filed a *Notice of Cancellation of Auction* [Docket No. 472] notifying parties-in-interest that the Debtors, in accordance with the Bidding Procedures Order and in consultation with the Ad Hoc Group and the Committee, had cancelled the Auction scheduled to occur on August 30, 2023.  However, negotiations with certain bidders remain ongoing as of the filing of this Disclosure Statement, and the Plan provides flexibility for the Debtors to "toggle" to a Sale Transaction should one develop that is more value-maximizing than the Recapitalization Transaction.

**E.    Approval of the DIP Facility.**

On July 19, 2023, the Bankruptcy Court entered an order [Docket No. 297] approving, on a final basis, the relief requested in the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Final DIP Order").  The Final DIP Order approved, among other things, a superpriority senior secured term loan credit facility in the aggregate principal amount of $200,468,511.87, consisting of: (i) a new

money superpriority senior secured term loan credit facility in the principal amount of $150 million, (ii) a "roll-up" superpriority term loan facility in the principal amount of $36,468,511.87 (which includes accrued and unpaid interest as of the Petition Date on account of the Prepetition Priority Loans), and (iii) a superpriority term loan facility in the principal amount of $14 million that consisted of escrowed proceeds funded on account of the Bridge Facility.

The relief granted in the Final DIP Order incorporates the terms of a settlement with the Committee, which engaged in constructive dialogue with the Debtors with respect thereto. As a result of arm's-length, good faith negotiations in the days and weeks that immediately followed the Committee's appointment, the Debtors, the Ad Hoc Group, and the Committee reached a negotiated settlement on various issues relating to, among other things, an increase in the Committee's investigation budget, to $250,000, additional reporting obligations in favor of the Committee, the agreement to negotiate a wind-down budget in good-faith in the event of a Sale Transaction, and establishing the priority in which the Debtors, the DIP Lenders, and the Prepetition First Lien Secured Parties liquidate, or seek recovery from, as applicable, the DIP collateral.

**F.    Bar Date Motion**

On June 28, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 172] (the "Bar Date Motion"). On July 10, 2023, the Debtors filed their Schedules [Docket Nos. 213-243], and on July 19, 2023, the Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 298] (the "Bar Date Order"). Pursuant to the Bar Date Order, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was August 15, 2023, at 4:00 p.m. (prevailing Eastern Time) (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is December 1, 2023, at 4:00 p.m. (prevailing Eastern Time). On July 24, 2023, the Debtors published the *Notice of Bar Dates for Submitting Proofs of Claim and Claims Under Section 503(b)(9) of the Bankruptcy Code Against the Debtors* [Docket No. 333] in *The New York Times (National Edition)*. On July 24, 2023, the Debtors, through Kurtzman Carson Consultants LLC, caused the *Notice of Deadline Requiring Submission of Proofs of Claim on or Before August 15, 2023, and Related Procedures for Submitting Proofs of Claim in the Above-Captioned Chapter 11 Cases* [Docket No. 357] to be served on relevant parties in interest.

**G.    The Special Committee's Independent Investigation**

As described in Article V.B herein, the Board established the Special Committee and delegated sole authority to the Special Committee (i) on all matters related to a Transaction and Conflict Matters, and (ii) to conduct the Independent Investigation related thereto. Specifically, the Special Committee has the authority to, on behalf of the entire Board, take any action with respect to the Conflict Matters, including, but not limited to: (a) any release or settlement of potential claims or causes of action of the Company or its subsidiaries, if any, against the Related Parties; (b) any decision regarding all or part of a Transaction to the extent it constitutes a Conflict Matter; and (c) any other transaction implicating the Debtors involving Conflict Matters. The disinterested directors serving on the Special Committee retained Katten Muchin Rosenman LLP ("Katten") to provide independent legal counsel in connection with the Independent Investigation.

In furtherance of the Independent Investigation, the Special Committee has, to date, issued document and information requests to, among others, the Debtors and certain of the Debtors' significant equity holders. To date, Katten has received and reviewed approximately 4,300 documents, comprising approximately 49,000 pages, relevant to the Independent Investigation. Katten has also interviewed certain members of Company management and board of directors, as well as representatives of certain of the Debtors' significant equity holders. The Special Committee is continuing to investigate matters in accordance with the authority it has been given by the Board and in accordance with the disinterested directors' fiduciary obligations. Accordingly, the Independent Investigation remains ongoing as of the date hereof.

## H.     The Canadian CCAA Recognition Proceedings

Debtors Cyxtera Communications Canada, ULS and Cyxtera Canada TRS, ULC are Alberta unlimited liability corporations, and Cyxtera Canada LLC, which is the shareholder of Cyxtera Communications Canada, ULC is a Delaware limited liability corporation (collectively, the "Canadian Debtors"). On June 6, 2023, Cyxtera Technologies, Inc. and the Canadian Debtors commenced an ancillary recognition proceeding (the "Canadian Proceeding") in the Court of King's Bench of Alberta (the "Canadian Court") pursuant to the *Companies' Creditors Arrangement Act* (Canada) R.S.C. 1985, c. C-36 (as amended, the "CCAA"). The purpose of the initial recognition hearing for the Canadian Proceeding was to seek an initial recognition order and supplemental order.

- declaring Cyxtera Technologies, Inc. as the "foreign representative" of the Canadian Debtors in the Canadian Proceeding;

- declaring the Canadian Debtors' Chapter 11 Cases as "foreign main proceedings" under the applicable provisions of the CCAA to, among other things, protect the Debtors' assets and operations in Canada;

- staying all proceedings with respect to the Canadian Debtors' business and property;

- recognizing in Canada certain interim and final orders entered by the Bankruptcy Court in the Chapter 11 Cases which are applicable to the Canadian Debtors, including the *Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and* Ipso Facto *Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* [Docket No. 75];

- granting a superpriority interim financing charge over the property of the Canadian Debtors in favor of the DIP Lenders; and

- obtaining other orders necessary for the protection of the Canadian Debtors' property or the interests of the Canadian Debtors' creditors.

On June 7, 2023, the Canadian Court granted the order declaring Debtor Cyxtera Technologies, Inc. as the "foreign representative"[18] on behalf of the Canadian Debtors' estates (the "Foreign Representative") in the Canadian Proceeding and granted the other declarations and orders referenced above. Thereafter, on July 12 and July 31, 2023, the Canadian Court recognized certain other orders entered by the Bankruptcy

---

[18]    A "foreign representative" is defined in section 45(1) of the CCAA to mean "a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding respect of a debtor company, to (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or (b) act as a representative in respect of the foreign proceeding."

Court, including final Bankruptcy Court Orders, the Bidding Procedures Order, the Bar Date Order, and the Final DIP Order. The Canadian Debtors, through the Foreign Representative, will continue to seek formal recognition of relevant Bankruptcy Court orders for the remainder of these Chapter 11 Cases.

## I.    Proposed Confirmation Schedule

Under the RSA, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions. The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | [September 14], 2023 |
| Solicitation Mailing Deadline | Three (3) business days following entry of the Order (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Five (5) business days following entry of the Order (or as soon as reasonably practicable thereafter) |
| Plan Supplement Filing Deadline | The date that is no later than seven (7) days prior to the Confirmation Hearing |
| Voting Deadline | [October 26], 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Objection Deadline | [October 26], 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Voting Report | [November 2], 2023 |
| Confirmation Brief and Confirmation Reply Deadline | [November 2], 2023 |
| Confirmation Hearing Date | [November 6], 2023, or such other date as may be scheduled by the Court |

## VII.    SUMMARY OF THE PLAN

The Plan contemplates the following key terms described below. In addition, the Plan contains additional detail, including descriptions of the provisions governing distributions under the Plan, the procedures for resolving contingent, unliquidated, and disputed claims, and provisions related to modification, revocation, or withdrawal of the Plan, among others.

## A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule

9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

Before, on, and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions (which, for the avoidance of doubt, shall be in form, substance, and structure reasonably acceptable to the Required Consenting Term Lenders) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable: (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, the RSA, and the other Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, the RSA, and the other Definitive Documents; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the execution and delivery of the New Takeback Facility Documents and entry into the New Takeback Facility; (v) the issuance and distribution of the New Common Stock as set forth in the Plan; (vi) the implementation of the Management Incentive Plan; (vii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Post-Effective Date Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (viii) such other transactions that, in the reasonable business judgment of the Debtors or the Post-Effective Date Debtors, as applicable, the Required Consenting Term Lenders (in the event of a Recapitalization Transaction), and the Purchaser (in the event of a Sale Transaction), are required to effectuate the Restructuring Transactions; and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Debtors shall pursue the Recapitalization Transaction unless the Debtors determine, with the consent of the Required Consenting Term Lenders, to pursue an Equity Investment Transaction or an Asset Sale.

In the event of an Equity Investment Transaction, on the Effective Date, the Purchaser shall purchase substantially all of the New Common Stock free and clear of all Liens, Claims, Interests, charges, or other encumbrances in exchange for the Purchase Price set forth in the Purchase Agreement. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Post-Effective Date Debtors, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Equity Investment Transaction pursuant to the terms of the Purchase Agreement and the Plan. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

## C.    The Equity Investment Transaction or Recapitalization Transaction

If the Equity Investment Transaction or Recapitalization Transaction occurs, the following provisions shall govern.

### 1.    The Post-Effective Date Debtors

On the Effective Date, the New Board shall be established, and each Post-Effective Date Debtor shall adopt its New Organizational Documents. The Post-Effective Date Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

### 2.    Sources of Consideration for Plan Distributions

The Debtors shall fund or make distributions under the Plan, as applicable, with: (i) the issuance of New Takeback Facility Loans under the New Takeback Facility, (ii) the proceeds from the Equity Investment Transaction, (iii) the New Common Stock, and (iv) the Debtors' Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock, will be exempt from Securities Act registration, as described more fully in Article IV.C.5 of the Plan.

#### (a)    The New Takeback Facility

In the event of a Recapitalization Transaction, on the Effective Date, the Post-Effective Date Debtors shall enter into the New Takeback Facility Credit Agreement. Confirmation of the Plan shall be deemed approval of the New Takeback Facility and the New Takeback Facility Documents, as applicable, and all transactions contemplated thereby; all actions to be taken, undertakings to be made, and obligations to be incurred by the Post-Effective Date Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and authorization for the Post-Effective Date Debtors to enter into and execute the New Takeback Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Takeback Facility. Execution of the New Takeback Facility Credit Agreement by the New Takeback Facility Agent shall be deemed to bind all Holders of DIP Claims as if each such Holder had executed the New Takeback Facility Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Takeback Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Takeback Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New

Takeback Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Post-Effective Date Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(b)     **New Common Stock**

Reorganized Cyxtera shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents and any options or other equity awards, if any, reserved for the Management Incentive Plan. The issuance of the New Common Stock shall be authorized without the need for any further corporate action. On the Effective Date, the New Common Stock shall be issued and distributed pursuant to, and in accordance with, the Plan, and, in the event of an Equity Investment Transaction, the Purchase Agreement.

All of the shares of New Common Stock issued pursuant to the Plan and, if applicable, the Purchase Agreement shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Common Stock shall be deemed to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Post-Effective Date Debtor(s). The New Common Stock will not be registered under the Securities Act or on any national securities exchange as of the Effective Date.

3.     **Corporate Existence**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Post-Effective Date Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 4.      New Organizational Documents

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Effective Date Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Organizational Documents will prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Post-Effective Date Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Post-Effective Date Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents.  For the avoidance of doubt, any claimant's acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Post-Effective Date Debtors.

### 5.      Certain Securities Law Matters

Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Common Stock, as contemplated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities.

The shares of New Common Stock to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Stock in the New Organizational Documents.

The shares of New Common Stock that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

### 6.      Management Incentive Plan

On or as soon as reasonably practicable following the Effective Date, the Post-Effective Date Debtors shall adopt and implement the Management Incentive Plan, which will provide that up to ten percent of the value of the New Common Stock as of the Effective Date, on a fully diluted basis, shall be issued in connection with the Management Incentive Plan on terms acceptable to the Required

Consenting Term Lenders and the Debtors, and, in the event of an Equity Investment Transaction, the Purchaser.  The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

### 7.    Employment Obligations

Unless otherwise provided herein, and subject to Article V of the Plan, if applicable, all employee wages, compensation, retiree benefits (as defined in 11 U.S.C. § 1114(a) of the Bankruptcy Code), and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Post-Effective Date Debtors and shall remain in place as of the Effective Date, and the Post-Effective Date Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  On the Effective Date, the Post-Effective Date Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees; or (b) enter into new agreements with such employees on terms and conditions acceptable to the Post-Effective Date Debtors, such employee, and the Required Consenting Term Lenders, and, in the event of an Equity Investment Transaction, the Purchaser.

### D.    The Asset Sale

If the Asset Sale occurs, the following provisions shall govern.

### 1.    The Asset Sale

On the Effective Date, the Purchaser shall purchase substantially all of the Debtors' assets free and clear of all Liens, Claims, Interests, charges, or other encumbrances (except for those Liens, Claims, Interests, charges, or other encumbrances assumed by the Purchaser pursuant to the terms of the Purchase Agreement) in exchange for the Purchase Price as set forth in the Purchase Agreement.  The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, and the Purchaser, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

Subject to the consent rights set forth in the RSA, the Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Asset Sale pursuant to the terms of the Purchase Agreement and the Plan.  On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors or the Purchaser, as applicable, may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

### 2.    Sources of Consideration for Plan Distributions

The Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Asset Sale, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.      **Post-Effective Date Debtors**

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible as authorized by the Bankruptcy Court, (ii) resolving Disputed Claims, (iii) making distributions on account of Allowed Claims as provided hereunder, (iv) establishing and funding the Distribution Reserve Accounts, (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (vi) filing appropriate tax returns, (vii) complying with any continuing obligations under the Purchase Agreement, and (viii) administering the Plan in an efficacious manner.  The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Post-Effective Date Debtors and shall be subject to administration by the Plan Administrator, and the net proceeds thereof shall be Distributable Consideration.

4.      **Plan Administrator**

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Post-Effective Date Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers.  The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer.  The Debtors, after the Confirmation Date, and the Post-Effective Date Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator and upon three (3) Business Days' notice to counsel to the AHG, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind-Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including:  (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and

maintaining bank accounts in the name of the Post-Effective Date Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (viii) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.E of the Plan; (ix) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (x) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (xi) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

(a)    **Retention of Professionals**

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors. The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Post-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

(b)    **Compensation of the Plan Administrator**

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement, reasonably acceptable to the Required Consenting Term Lenders, and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

(c)    **Plan Administrator Expenses**

All costs, expenses, and obligations incurred by the Plan Administrator or the Post-Effective Date Debtors in administering the Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

(d)    **Exculpation, Indemnification, Insurance, and Liability Limitation**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors. The Plan Administrator may obtain,

at the expense of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

    **(e)**    **Tax Returns**

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

    **(f)**    **Dissolution of the Post-Effective Date Debtors**

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

To the extent the Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed, such Cash or other property shall constitute Residual Cash and shall be immediately allocated and distributable to the Holders of Allowed First Lien Claims.

**5.**    **Wind Down**

As soon as practicable after the Effective Date, the Plan Administrator shall: (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with and abide by the terms of the Purchase Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of one or more of the Debtors or the Post-Effective Date Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Existing Equity Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### E.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Post-Effective Date Debtors, shall retain and may enforce (or the Plan Administrator may enforce, if applicable) all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Post-Effective Date Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Post-Effective Date Debtors, as applicable, as of the Effective Date.

The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Post-Effective Date Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Post-Effective Date Debtor except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.E of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

### F.    Vesting of Assets in the Post-Effective Date Debtors

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan, the Plan Supplement, or the New Takeback Facility Documents, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Post-Effective Date Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Post-

Effective Date Debtor may operate its business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## G.    Cancellation of Existing Agreements and Interests

On the Effective Date, except with respect to the New Takeback Facility or to the extent otherwise provided in the Plan, including in Article V.A of the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding the foregoing or anything to the contrary herein, any rights of each Agent to indemnification under the DIP Documents, the Receivables Program Documents, the First Lien Credit Documents, and the Bridge Facility Documents shall remain binding and enforceable in accordance with the terms of such documents and shall not be subject to discharge, impairment, or release under the Plan or the Confirmation Order.

## H.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including, as and if applicable:  (i) selection of the directors, officers, or managers for the Post-Effective Date Debtors; (ii) the issuance and distribution of the New Common Stock; (iii) implementation of the Restructuring Transactions; (iv) entry into the New Takeback Facility Documents; (v) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) adoption by the New Board of the Management Incentive Plan; (ix) consummation of the Sale Transaction pursuant to the Purchase Agreement; (x) formation of the Post-Effective Date Debtors and selection of the Plan Administrator; and (xi) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Post-Effective Date Debtors.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including, in the event of a Recapitalization Transaction or an Equity Investment Transaction, the New Common Stock, the New Organizational Documents, the New Takeback Facility, the New Takeback Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### I.      Directors and Officers of the Post-Effective Date Debtors

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of Cyxtera shall expire, and, if applicable, the members for the initial term of the New Board shall be appointed; *provided*, that the disinterested directors of Cyxtera, comprising the Special Committee, shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan.  The disinterested directors of Cyxtera shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Post-Effective Date Debtors, the Purchaser, or any other Entity without their prior written consent.

The initial members of the New Board, if applicable, will be identified in the Plan Supplement to the extent known at the time of filing.  In the event of a Recapitalization Transaction or an Equity Investment Transaction, each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors.  The members of the New Board shall be chosen by the Debtors or the Post-Effective Date Debtors, subject to the applicable terms of the RSA, and, if applicable, the Purchase Agreement.

### J.      Effectuating Documents; Further Transactions

On and after the Effective Date, the Post-Effective Date Debtors and their respective officers and boards of directors and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

### K.      Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Post-Effective Date Debtor, as applicable, or to any other Person) of property under the Plan or pursuant to:  (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Post-Effective Date Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the grant of collateral as security for the New Takeback Facility; (vi) the Sale Transaction; or (vii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or

governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## L.  Private Company

The Post-Effective Date Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without Securities Act or Exchange Act reporting obligations upon emergence or as soon as practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

## M.  Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, the Post-Effective Date Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Post-Effective Date Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## N.  Director and Officer Liability Insurance

After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

## VIII.  OTHER KEY ASPECTS OF THE PLAN

## A.  Treatment of Executory Contracts and Unexpired Leases

### 1.  Assumption of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (i) was assumed or rejected previously by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the foregoing assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors, the Post-Effective Date Debtors, and/or the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including ninety (90) days after the Effective Date, *provided* that in the event of a Recapitalization Transaction, such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth in the RSA.

## 2.    Indemnification Obligations

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (ii) remain intact, in full force and effect, and irrevocable, (iii) not be limited, reduced, or terminated after the Effective Date, and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Post-Effective Date Debtors and/or the Plan Administrator, as applicable.

## 3.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Post-Effective Date Debtors no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claims is not Filed with the Claims and Noticing Agent within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Estates, or their property without the need for any objection by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

4.     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Post-Effective Date Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, including pursuant to the Plan, or related cure amount must be filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than thirty (30) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Post-Effective Date Debtor without the need for any objection by the Post-Effective Date Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Post-Effective Date Debtors, as applicable, of the Cure; *provided* that nothing herein shall prevent the Post-Effective Date Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Post-Effective Date Debtors may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or the Post-Effective Date Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or the Post-Effective Date Debtors, as applicable, with respect to which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Post-Effective Date Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.D of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

5.     **Insurance Policies**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability

48

Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the Post-Effective Date Debtors.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Post-Effective Date Debtors) or draw on any collateral or security therefor.

6.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors or the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

7.      **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Post-Effective Date Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

8.      **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

9.      **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtors or the Post-Effective Date Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

B.      **Conditions Precedent to Confirmation and Consummation of the Plan**

1.      **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

1.       the Restructuring Transactions shall have been implemented in accordance with the Restructuring Transactions Memorandum in all material respects;

2.       in the event of an Asset Sale, the Distribution Reserve Accounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind-Down Amount;

3.       the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall have become a Final Order;

4.       each document or agreement constituting the applicable Definitive Documents, the form and substance of which shall be subject to the consent rights set forth in the RSA (and, in the event of a Sale Transaction, the form and substance of which shall be reasonably acceptable to the Purchaser), shall have been executed and/or effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied or waived by the applicable party or parties prior to or contemporaneously with the occurrence of the Effective Date;

5.       he New Takeback Facility Documents, if applicable, the form and substance of which shall be subject to the consent rights set forth in the RSA, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the Required Consenting Term Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

6.       the DIP Claims shall have been indefeasibly paid in full in Cash or, solely to the extent set forth herein, satisfied by the New Takeback Facility;

7.       the New Common Stock shall have been issued;

8.       all Restructuring Expenses, to the extent invoiced, shall have been paid in full;

9.       the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Restructuring Transactions;

10.      if and as applicable, the Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of the Plan;

11.      if and as applicable, the Purchaser shall deliver the Purchase Price to the Debtors in exchange for the Post-Effective Date Debtors' distribution of the substantially all of the New Common Stock or transfer of substantially all of the Debtors' assets or as otherwise agreed to by the Debtors and the Purchaser;

12.      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed;

13.      the RSA shall remain in full force and effect;

14.      none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

15.     no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors; and

16.     all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court.

## 2.      Waiver of Conditions

The conditions to the Effective Date set forth in Article IX of the Plan, except for the condition set forth in Article IX.A.8 and 16 of the Plan (each of which may not be waived without the consent of the affected parties), may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Term Lenders and, in the event of a Sale Transaction, the Purchaser, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

## 3.      Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by the Debtors or other Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

## IX.     RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE POST-EFFECTIVE DATE DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

## A.     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1. **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

2. **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3. **The RSA May Be Terminated**

As more fully set forth in the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Required Consenting Stakeholders of their respective obligations under the documents. In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

4. **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date

does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

### 5.   The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 6.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 7.   The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the

Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 8. Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, and increasing expenses. See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 9. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 10. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA. The estimates set forth in this

Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 11.     Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 12.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 13.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Post-Effective Date Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to the Independent Investigation and objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

## B.     Risks Related to Recoveries Under the Plan

### 1.     Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Post-Effective Date Debtors Following the Effective Date

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Post-Effective Date Debtors. The holders may have interests that differ from those of the other holders of shares of New

Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Post-Effective Date Debtors and consequently impact the value of the shares of New Common Stock. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Post-Effective Date Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Post-Effective Date Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Post-Effective Date Debtors' businesses, financial condition, and operating results.

> **2.      Estimated Valuations of the Exit Facilities, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

> **3.      The Post-Effective Date Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful**

The Post-Effective Date Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Post-Effective Date Debtors' control. The Post-Effective Date Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facilities.

If cash flows and capital resources are insufficient to fund the Post-Effective Date Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Post-Effective Date Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

> **4.      The New Common Stock is Subject to Dilution**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

5. **The Terms of the Exit Facilities Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**

The terms of the Exit Facilities Documents have not been finalized and are subject to negotiations between the Debtors and the Consenting Stakeholders. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations, and the results of such negotiations may affect the rights of the holders of the New Common Stock following the Effective Date. As a result, the final terms of the Exit Facilities Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

6. **A Decline in the Post-Effective Date Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt**

The Debtors' or the Post-Effective Date Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Post-Effective Date Debtors, as applicable. Downgrades in the Post-Effective Date Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

7. **Certain Tax Implications of the Plan May Increase the Tax Liability of the Post-Effective Date Debtors**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Post-Effective Date Debtors and Holders of certain Claims.

8. **The Closing Conditions of a Sale Transaction May Not be Satisfied**

It is possible that the Debtors may not satisfy the closing conditions of a Sale Transaction if the Debtors determine to pursue a Sale Transaction. A failure to satisfy any of the closing conditions of the Sale Transaction related thereto could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

9. **The Debtors' General Unsecured Creditors May Not Receive Any Recovery**

The Debtors, the Committee and the Consenting Term Lenders continue to negotiate the terms of a GUC Recovery Pool. There is a possibility that these parties may not be able to reach an agreement on the contents of a GUC Recovery Pool, in which case Holders of General Unsecured Claims may not receive any recovery under the Plan.

C. **Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses**

1. **The Post-Effective Date Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Post-Effective Date Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Post-Effective Date Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Post-Effective Date Debtors' control. The Post-Effective Date Debtors may be unable to maintain a level of cash flow from operating activities

sufficient to permit the Post-Effective Date Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facilities and upon emergence.

**2.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**3.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Post-Effective Date Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4.      **Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections attached hereto as **<u>Exhibit E</u>** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

5.      **The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws and evolving environmental standards. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Post-Effective Date Debtors.

6.      **The Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Post-Effective Date Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Post-Effective Date Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Post-Effective Date Debtors may become

59

party to, nor the final resolution of such litigation. The impact of any such litigation on the Post-Effective Date Debtors' businesses and financial stability, however, could be material.

### 7. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 8. The Debtors' Business Depends on Their Ability to Keep Pace with Rapid Technological Changes That Impact Their Industry, and Ability to Grow and Retain the Debtors' Customer Base

The Debtors operate in a complex and rapidly shifting industry characterized by swift, and sometimes disruptive, technological developments, evolving industry standards, frequent new product introductions and enhancements, and changes in customer requirements. The Debtors' future success depends in part on their ability to continue to provide data center solutions that keep pace with evolving industry standards and changing customer demands. Although the positioning of their businesses is currently strong, changes in technology, standards, and in the Debtors' customers' businesses continue to occur rapidly and at unpredictable intervals, and the Debtors may not be able to respond adequately. The impact of these changes may be magnified by the intense competition in the Debtors' industry. If the Debtors are unable to successfully update and integrate their offerings to adapt to these changes, or if the Debtors do not successfully develop new capabilities needed by their customers to keep pace with these changes, the Debtors' business and financial results may suffer.

The Debtors' ability to keep up with technology and business changes is subject to a number of risks, and the Debtors may find it difficult or costly to, among other things: (i) update or expand their data centers fast enough to meet customers' needs; (ii) update the Debtors' products and services to keep pace with business, regulatory, and other developments in the industries where the Debtors' customers operate; and (iii) update the Debtors' offerings to keep pace with advancements in hardware, software, and data center technology.

The Debtors could also incur substantial costs if they need to modify their services or infrastructure in order to adapt to these changes. For example, the Debtors' data center infrastructure could require improvements due to (i) the development of new systems to deliver power to or eliminate heat from the servers they house, (ii) the development of new server technologies that require levels of critical load and heat removal that the Debtors' facilities are not designed to provide; or (iii) a fundamental change in the way in which the Debtors deliver services. The Debtors may not be able to timely adapt to changing technologies, if at all. The Debtors' ability to sustain and grow their business would suffer if they fail to respond to these changes in a timely and cost-effective manner.

60

9. **Acquisitions of Companies, Products, or Technologies, or Internal Restructuring and Cost Savings Initiatives May Disrupt the Debtors' Ongoing Business**

The Debtors have acquired and may continue to acquire companies, products, data center assets, and technologies that complement their strategic direction.  Acquisitions involve significant risks and uncertainties, including:

- inability to successfully integrate the acquired technology and operations into the Debtors' business and maintain uniform standards, controls, policies, and procedures;

- inability to realize synergies expected to result from an acquisition;

- challenges retaining the key employees, customers, resellers and other business partners of the acquired operation; and

- the internal control environment of an acquired entity may not be consistent with the Debtors' standards and may require significant time and resources to improve.

Acquisitions and divestitures are inherently risky.  The Debtors' transactions may not be successful and may, in some cases, harm operating results or their financial condition.  In addition, if the Debtors use debt to fund acquisitions or for other purposes, their interest expense and leverage may significantly increase.  If the Debtors issue equity securities as consideration in an acquisition, current shareholders' percentage ownership and earnings per share may be diluted.

In addition, from time to time, the Debtors may undertake internal restructurings and other initiatives intended to reduce expenses.  These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention.  Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs.  If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

10. **Cyberattacks or the Improper Disclosure or Control of Personal Information Could Result in Liability and Harm the Debtors' Reputation, Which Could Adversely Affect Its Business**

The Debtors are dependent on networks and systems to process, transmit and store electronic information and to communicate among the Debtors' locations around the world, and they may be required to store sensitive or confidential client data in connection with the services they provide.  As a result, the Debtors are subject to contractual terms and numerous U.S. and foreign laws and regulations designed to protect this information.  Furthermore, data privacy is subject to frequently changing rules and regulations, which sometimes conflict among the various jurisdictions and countries in which the Debtors provide services.  Although the Debtors have implemented appropriate policies and procedures to reduce the possibility of physical, logical and personnel security breaches, no such measures can completely eliminate the risk of cybersecurity attacks, especially in light of advances in criminal capabilities (including cyber-attacks or cyber intrusions over the internet, malware, computer viruses and the like), discovery of new vulnerabilities or attempts to exploit existing vulnerabilities in interconnected third party systems that are beyond the Debtors' control systems.

Unauthorized disclosure, either actual perceived, of sensitive or confidential client or customer data, whether through systems failure, system intrusion, employee negligence, fraud, or otherwise could

damage the Debtors' reputation and cause the Debtors to lose clients. Similarly, unauthorized access to or through the Debtors' information systems or those the Debtors develop for clients, whether by the Debtors' employees or third parties, could result in negative publicity, legal liability and damage to the Debtors' reputation, business, financial condition, results of operations and cash flows.

While the Debtors have not experienced a significant compromise to date, significant data loss or material financial losses related to cyber security attacks that has had an adverse effect on the Debtors' operations, there is no assurance that there may not be a material adverse effect in the future. Although the Debtors maintain cyber liability insurance, such insurance may not adequately or timely compensate the Debtors for all losses they may incur as any of the Debtors' client contracts do not contain limitations of liability for such losses.

### 11.    The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 12.    The Debtors May Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products and services, including renewals of current contracts. This is particularly important, given that over 90 percent of Cyxtera's revenue is derived from recurring, fixed term customer contracts. Existing customers may decide not to renew or to reduce their contracts with the Debtors or not to purchase additional products or services from the Debtors in the future, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products and services, the level of customer spending for data center and colocation technology, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products and services needed by customers, and the Debtors' ability to integrate and manage any acquired businesses. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively. The Debtors' revenue, which has been largely recurring in nature, comes from the sale of the Debtors' products and services under fixed-term contracts. The Debtors do not have a unilateral right to extend these contracts at the end of their term. If customers cancel or decide not to renew their contracts, the Debtors' business and financial results could be adversely and materially affected.

13. **The Debtors' Business is Highly Dependent on Third Parties and the Failure of their Physical or Customer Infrastructure Within their Data Centers Could Lead to Significant Cost and Disruption that Could Reduce their Revenue and Harm their Business Reputation and/or Financial Results**

The Debtors' business depends on providing customers with highly reliable data center solutions. The Debtors must safehouse their customers' infrastructure and equipment located in their data centers by ensuring that they remain operational at all times.  Problems at one or more data centers, whether or not they are within the Debtors' control, could result in service interruptions or significant infrastructure or equipment damage.  These could result from numerous externalities, including, but not limited to:

- human error;

- maintenance lapses and/or failures;

- equipment failure;

- availability of parts and materials necessary to appropriately maintain their infrastructure;

- cybersecurity incidents, including physical and electronic breaches;

- fires, earthquakes, hurricanes, floods, tornados or other nature disasters;

- extreme temperatures;

- water damage;

- fiber cuts;

- power loss, water loss and/or the loss of other local utilities;

- terrorist acts;

- sabotage and vandalism; and

- civil disorder.

The Debtors have service-level obligations to their customers.  As a result, service interruptions or significant equipment damage in their data centers could result in difficulty maintaining service-level commitments to these customers and may invite potential claims related to such failures.  Because the Debtors' data centers are critical to many of their customers' businesses, service interruptions or significant equipment damage in could also result in lost profits or other indirect or consequential damages to their customers. There can be no assurance that a court would enforce any contractual limitations on the Debtors' liability in the event that one of their customers brings a lawsuit as a result of a problem at one of their data centers.  Furthermore, the Debtors may decide to reach settlements with affected customers irrespective of any such contractual limitations.  Any such settlement may result in a reduction of revenue.  In addition, any loss of service, equipment damage or inability to meet their service-level commitment obligations could reduce the confidence of their customers and could consequently impair their ability to obtain and retain customers, which would adversely affect both their ability to generate revenues and their operating results.

Furthermore, the Debtors are dependent upon internet service providers, telecommunications carriers and other website operators in North America, Europe, and Asia, some of which have experienced

significant system failures and electrical outages in the past.  The Debtors' customers may in the future experience difficulties due to system failures unrelated to their systems and offerings.  If, for any reason, these providers fail to provide the required services, the Debtors' business, financial condition, and results of operations could be materially and adversely impacted.

14.    **The Debtors May Overestimate or Underestimate Their Data Center Capacity Requirements, and their Operating Margins and Profitability Could Be Adversely Affected**

The Debtors incur various costs of construction, leasing, and maintenance for their data centers, which constitute a significant portion of the Debtors' capital and operating expenses.  In order to manage growth and ensure adequate capacity for new and existing customers while minimizing unnecessary excess capacity costs, the Debtors continuously evaluate their short- and long-term data center capacity requirements.  If the Debtors overestimate the demand for their services and secure excess data center capacity, their operating margins could be materially reduced, which would materially impair the Debtors' profitability.  Conversely, if the Debtors underestimate their data center capacity requirements, the Debtors may not be able to service the expanding needs of their existing customers and may be required to limit new customer acquisition, which may materially impair the Debtors' revenue growth.  Substantial lead time is necessary to ensure that available space is adequate for the Debtors' needs and maximizes the Debtors' investment return.  If the Debtors inaccurately forecast their space needs, the Debtors may be forced to enter into a data center lease that may not properly fit their needs and may potentially be required to pay more to secure the space if the current customer demand were to require immediate space expansion.

15.    **The Debtors May Not Be Able to Renew the Leases on Their Existing Facilities on Beneficial Terms, if at all, Which Could Adversely Affect the Debtors' Operating Results**

The Debtors lease the space that houses their data centers in all but two of their locations.  Their data center leases are typically long-term, non-cancellable leases.  As of December 31, 2022, their data center leases have remaining lease terms of one year to thirty-two years.  As of December 31, 2022, five of the Debtors' leased facilities had a lease term expiring in fewer than five years, and an additional three leased facilities had lease terms expiring in fewer than ten years.

The Debtors' landlords could attempt to evict them for reasons beyond their control.  If the Debtors were forced to vacate any leased data center space, they would incur significant expense due to the high cost of relocating data center equipment and installing the necessary infrastructure elsewhere.  They may also lose customers that chose their services based on the location of the relevant data center.  In addition, the Debtors cannot provide any assurance that they will be able to renew their data center leases on or prior to their expiration dates on favorable terms, if at all.  Certain of the Debtors' landlords may view them as a competitor, which may impact their willingness to extend their leases beyond their contracted expiration dates.  If the Debtors are unable to renew their lease agreements, they could lose a significant number of customers who are unwilling to relocate their equipment to another one of their data center properties, which could have a material adverse effect on them.  Yet, even if they are able to renew their lease agreements, the terms and costs of renewal may be less favorable than the existing lease arrangements.  Failure to sufficiently increase revenue from customers at these facilities to offset these potentially higher costs could have a material adverse effect on the Debtors' financial performance.  Further, they may be unable to maintain good working relationships with their landlords, which could potentially result in the loss of current customers.  Such potentially strained relationships would have a significant impact on customer satisfaction, which would greatly reduce the Debtors' chances retaining their business.

16.     **Power Rate Increases, Power Outages, and Limited Availability of Electrical Resources May Adversely Affect the Debtors' Operating Results**

The Debtors' data centers are occasionally affected by disruptions related to their electricity sources, such as planned or unplanned power outages and limitations on transmission or distribution. Unplanned power outages, including, but not limited to, those as a result of large storms, earthquakes, fires, tsunamis, cyberattacks could harm their customers and business.  Some of the Debtors' data centers are located in leased buildings where, depending upon the lease requirements and number of tenants therein, they may not control some or all of the infrastructure, including generators and fuel tanks.  As a result, in the event of a power outage, the Debtors may be dependent upon the landlord, as well as the utility company, to restore the power.

In each of their markets, the Debtors rely on third parties to provide a sufficient amount of power to support the needs of their current and future customers.  At the same time, power and cooling requirements are increasing per unit of equipment.  As a result, some customers are consuming an increasing amount of power for the same amount of infrastructure.  The Debtors generally do not control the amount of power that their customers draw from their installed circuits, which can result in growth in the aggregate power consumption of their facilities beyond their original planning and expectations.  This means that limitations on the capacity of electrical delivery systems and equipment could limit customer utilization of the data centers.  These limitations could have a negative impact on the effective available capacity of a given data center and limit the Debtors' ability to grow their business, which could have a negative impact on their financial performance, operating results, and cash flows.

Recently, the cost of electricity has generally risen due to macroeconomic natural gas supply and demand constraints.  These constraints initially began as a result of inadequate natural gas reserves in Europe to meet European demand in light of sanctions on Russia as a result of the ongoing military conflict between Russia and Ukraine.  The Debtors' costs of electricity may also increase as a result of the physical effects of climate change, increased regulations driving alternative electricity generation, or as a result of their election to use renewable energy sources.  To the extent the Debtors incur increased utility costs, such increased costs could materially impact their overall financial performance.

As current and future customers increase their power footprint in the Debtors' data centers over time, the corresponding reduction in available power could limit the Debtors' ability to increase occupancy rates or network density within existing data centers.  Furthermore, at certain data centers, the aggregate maximum contractual obligation to provide power and cooling may exceed the physical capacity at such data centers if customers were to quickly increase their demand for power and cooling.  If the Debtors are unable to increase the available power and/or cooling or move the customer to another data center with sufficient power and cooling, they could lose the customer and invite liability under their agreement with such customer.  In addition, power and cooling systems are difficult and expensive to upgrade. Accordingly, the Debtors may not be able to efficiently upgrade or change these systems to meet new demands without incurring significant costs that they may not be able to pass on to their customers.  Any such material loss of customers, liability, or additional costs could adversely affect the Debtors' business and overall financial condition.

17.     **The Wind-Down Budget, If Any, May Change Materially**

In the event of an Asset Sale, the Debtors, the Committee, and the Required DIP Lenders will negotiate in good faith to establish a wind down budget to fund costs associated with pursuing confirmation of a chapter 11 plan, the wind down of any remaining assets of the Debtors' Estates, and otherwise administering the Debtors' Estates (the "Wind-Down Budget").  The Wind-Down Budget will be the Debtors' best estimates of actual expenses and revenues for the time period after the Debtors affirmatively elect to pursue an Asset Sale to the remainder of the Chapter 11 Cases.  Creditors should be aware that such

numbers may change, potentially materially, and any changes to the actual expenses and revenues will ultimately impact the amount of Asset Sale proceeds available to be paid to creditors under the Plan.

**D.    Risks Related to the Offer and Issuance of Securities Under the Plan**

**1.    The Debtors Do Not Intend to Register the Offer or Sale of New Common Stock and Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**

The New Common Stock will not be registered under the Securities Act or any Blue-Sky Laws. As summarized in Article XII of this Disclosure Statement, entitled "Certain Securities Laws Matters," certain of the New Common Stock may not be re-offered or resold except pursuant to an exemption from the registration requirements of the Securities Act and applicable Blue-Sky Laws. The Debtors do not intend currently to register the New Common Stock under the Securities Act. As a result, certain of the New Common Stock may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

The Debtors believe that all shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above will satisfy the requirements of section 1145(a) of the Bankruptcy Code. Accordingly, the Debtors believe that such New Common Stock (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws. Holders of such restricted securities may not be entitled to have their restricted securities registered and are not permitted to resell them except in accordance with an available exemption from registration under the Securities Act. Generally, Rule 144 of the Securities Act would permit the resale of securities received by a Person after a specified holding period if current information regarding the issuer is publicly available and, under certain circumstances, volume limitations, manner of sale requirements and certain other conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Equity Interests by affiliates of the issuer. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and

Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

The Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell such securities. *See* Article XII of this Disclosure Statement, entitled "Certain Securities Law Matters."

### 2.    A Liquid Trading Market for the Shares of New Common Stock May Not Develop

Although the Debtors may apply to relist the New Common Stock on a national securities exchange (subject to the terms of the Restructuring Support Agreement or other agreements that govern the Debtors after the Effective Date), the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Common Stock will develop. The liquidity of any market for New Common Stock will depend upon, among other things, the number of holders of shares of New Common Stock, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

In addition, the Post-Effective Date Debtors do not expect to be subject to the reporting requirements of the Securities Act, and Holders of the New Common Stock will not be entitled to any information except as expressly required by the Governance Documents. As a result, the information which the Debtors are required to provide in order to issue the New Common Stock may be less than the Debtors would be required to provide if the New Common Stock were registered. Among other things, the Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of Cyxtera; (c) selected quarterly financial data of Cyxtera; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and impair the marketability of the New Common Stock.

### 3.    Certain Securities will be Subject to Resale Restrictions

The New Common Stock underlying the Management Incentive Plan to be issued under the Plan has not been registered under the Securities Act, any state securities laws, or the laws of any other jurisdiction. Such securities will be issued and sold, if at all, pursuant to an exemption from registration under the applicable securities laws. Accordingly, such securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act, and other applicable law. In addition, holders of New Common Stock issued pursuant to Section 1145(a) of the Bankruptcy Code who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions. See Article XII of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the securities.

### 4.    The Trading Price for the New Common Stock May Be Depressed Following the Effective Date

Following the Effective Date of the Plan, certain shares of the New Common Stock may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements. In addition, Holders of Claims that receive the New Common Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Stock available for trading could cause the

trading price for the New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

## X.        SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.        Holders of Claims Entitled to Vote on the Plan

Holders of Claims in Classes 3 and 4 (the "Voting Classes") are entitled to vote to accept or reject the Plan.  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.  The Debtors are **not** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, or 8.

<div style="border: 1px solid black; padding: 10px;">

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

</div>

### B.        Voting on the Plan

The Voting Deadline is **[October 26], 2023, at 4:00 p.m. (prevailing Eastern Time**).  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is actually received by the Solicitation Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted.

### C.        Ballots Not Counted

No ballot will be counted toward Confirmation if, among other things:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims and Noticing Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described in the Disclosure Statement Order and the Solicitation Procedures attached thereto.

### D.        Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that

have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### E.      Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

### F.      Solicitation Procedures

#### 1.      Claims and Noticing Agent

The Debtors have retained Kurtzman Carson Consultants LLC to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.      Solicitation Package

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Class (collectively, the "Solicitation Package"):  (a) the Solicitation Procedures; (c) the applicable forms of Ballots, together with detailed voting instructions and instructions on how to submit the Ballots; (d) the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Classes to vote to accept the Plan; (e) the Confirmation Hearing Notice; (f) this Disclosure Statement (and the exhibits hereto, including the Plan); (g) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); (h) a pre-addressed, postage pre-paid reply envelope; and (i) any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Classes.

3.        **Distribution of the Solicitation Package and Plan Supplement**

The Debtors are causing the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Class on [September 26], 2023, which is [28] days before the Voting Deadline (*i.e.*, 4:00 p.m. (prevailing Eastern Time) on [October 26], 2023), and will complete the hard-copy mailing of all Solicitation Packages on or before [September 28], 2023.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by: (a) calling the Debtors' restructuring hotline at 877-726-6510 (domestic) or 424-236-7250 (international), (b) emailing https://www.kccllc.net/cyxtera/inquiry, and/or (c) writing to the Claims and Noticing Agent at Cyxtera Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245. You may also obtain copies of any pleadings Filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://www.kccllc.net/cyxtera (free of charge), or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

## XI.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## C. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Post-Effective Date Debtors.

On September 8, 2023, the Debtors filed the *Notice of Filing Liquidation Analysis and Financial Projections as Exhibits to the Disclosure Statement* [Docket No. 492]. The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[19]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

---

[19] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

**E.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

**1.      No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**2.      Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**F.      Valuation**

As described above, the Debtors continue to engage with multiple bidders with respect to a potential Sale Transaction.  Because the Debtors do not want to prejudice the competitive sale process by disclosing expected recoveries for First Lien Claims or General Unsecured Claims, this Disclosure Statement does not include a valuation analysis.  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. June 9, 2023) (ECF No. 378) (order approving disclosure

statement without a valuation analysis); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (same); *In re Z Gallerie, LLC.*, No. 19-10488 (LSS) (Bankr. D. Del. May 2, 2019) (ECF No. 259) (same); *In re PES Holdings, LLC.*, No. 19-11626 (KG) (Bankr. D. Del. Dec. 11, 2019) (ECF No. 259) (same).  If the Debtors determine not to pursue a Sale Transaction, then the Plan will implement the Recapitalization Transaction, and the Debtors intend to file a valuation analysis with respect to the Recapitalization Transaction in advance of the Confirmation Hearing, to the extent necessary to obtain confirmation of the Plan.

## G.    Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

On September 8, 2023, the Debtors filed the *Notice of Filing Liquidation Analysis and Financial Projections as Exhibits to the Disclosure Statement* [Docket No. 492].  Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors' financial and restructuring advisors, AlixPartners and Kirkland.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## XII.    CERTAIN SECURITIES LAW MATTERS

## A.    New Common Stock

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Stock to certain Holders of prepetition Claims against the Debtors.  The Debtors believe that the class of New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws.

The Debtors further believe that the issuance of the New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) after the Petition Date pursuant to the restructuring transactions under the Plan is, and subsequent transfers of such New Common Stock by the holders thereof that are not "underwriters" (which definition includes "Controlling Persons") will be, exempt from federal and state securities registration requirements under the Bankruptcy Code, Securities Act and any applicable state securities laws as described in more detail below, except in certain limited circumstances.

In addition, any New Common Stock underlying the Management Incentive Plan will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, and will also be considered "restricted securities." Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

The following discussion of the issuance and transferability of the New Common Stock relates solely to matters arising under federal securities laws and state securities laws. The rights of holders of New Common Stock, including the right to transfer such interests, will also be subject to any restrictions in the Governance Documents to the extent applicable. Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

**B.    Exemption from Registration Requirements; Issuance of New Common Stock under the Plan**

All shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) will be issued after the Petition Date without registration under the Securities Act, state securities laws or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property. The Debtors believe that all shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of New Common Stock. Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

**C.    Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code**

**1.    Resales of New Common Stock Issued Pursuant to Section 1145**

New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock issued in exchange for First Lien Claims pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely trade such New Common Stock.  However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 may not be available for resales of such New Common Stock by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE POST-EFFECTIVE DATE DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW COMMON STOCK**

**CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE
SUCH SECURITIES.**

> **2.**    **Resales of New Common Stock Issued Pursuant to Section 4(a)(2) of the Securities
> Act, Regulation D promulgated thereunder, Regulation S under the Securities Act,
> and/or Other Available Exemptions from Registration**

To the extent the exemption set forth Section 1145(a) of the Bankruptcy Code is unavailable, New
Common Stock will be offered, issued, and distributed in reliance of Section 4(a)(2) of the Securities Act,
Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available
exemptions from registration. Any New Common Stock underlying the Management Incentive Plan will
be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D
promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from
registration, will be considered "restricted securities," and may not be transferred except pursuant to an
effective registration statement under the Securities Act or an available exemption therefrom and pursuant
to applicable Blue-Sky Laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of
restricted securities if certain conditions are met. These conditions vary depending on whether the issuer
is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.
Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries,
controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not
been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer
that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate
may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such
holding period, as well as other securities without a holding period, but only if certain current public
information regarding the issuer is available at the time of the sale and only if the affiliate also complies
with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make
publicly available the requisite information regarding the Debtors, and, as a result, even after the holding
period, Rule 144 may not be available for resales of such New Common Stock by affiliates of the Debtors.
Restricted securities (as well as other securities held by affiliates) may be resold without holding periods
under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S
under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Stock offered, issued and distributed
pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the
one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S.
person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if
made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made
pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S.
person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person
who purchased securities in a transaction that did not require registration under the Securities Act; and
(b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S,
pursuant to registration under the Securities Act, or pursuant to an available exemption from registration;
and agrees not to engage in hedging transactions with regard to such securities unless in compliance with
the Securities Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled
to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this
Disclosure Statement, including, for the avoidance of doubt, whether the New Common Stock are exempt
from the registration requirements of Section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Stock will also be subject to any applicable transfer restrictions contained in the Governance Documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON STOCK MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Post-Effective Date Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Allowed First Lien and General Unsecured Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders of Allowed First Lien and General Unsecured Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive

foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Claims whose functional currency is not the U.S. dollar, Holders of Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). Moreover, this summary does not address any aspect of U.S. non-income (including state or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income). Furthermore, this summary assumes that a Holder of an Allowed Claim holds only Claims in a single class and holds such Claims and New Common Stock, as applicable, as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and the Post-Effective Date Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This discussion also assumes that none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes and that each of the Allowed Claims are denominated in U.S. dollars. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of an Allowed First Lien Claim and/or a General Unsecured Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of an Allowed First Lien Claim or a General Unsecured Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of an Allowed First Lien Claim or a General Unsecured Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Allowed First Lien Claim and/or a General Unsecured Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME**

**TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Post-Effective Date Debtors**

1.    **Characterization of the Restructuring Transactions**

The Debtors expect that the Restructuring Transactions will be structured in one of two ways: (a) a recapitalization of the existing Debtors (referred to as a Recapitalization Transaction), or (b) a sale transaction for some or substantially all of the New Common Stock of Reorganized Cyxtera (referred to as an Equity Investment Transaction) and/or substantially all of the Debtors' assets (referred to as an Asset Sale and together with an Equity Investment Transaction, a Sale Transaction). The Debtors have not yet determined whether the Restructuring Transactions will be consummated as a Recapitalization Transaction, an Equity Investment Transaction or an Asset Sale. Such decision will depend on, among other things, finalizing certain modeling and analytical determinations. This discussion assumes that the Restructuring Transactions will not be structured in a manner intended to constitute a tax-free reorganization pursuant to sections 368(a)(1)(G) and 354 of the IRC.

The Debtors generally do not expect to recognize any gain or loss as a result of consummating a Recapitalization Transaction or an Equity Investment Transaction. In an Asset Sale, the Debtors will generally realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets sold. Any such gain generally will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining gain will be recognized by the Debtors and result in a cash tax obligation. In either a Recapitalization Transaction or a Sale Transaction, the Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income") and, other than in an Asset Sale, the limitations on net operating losses ("NOLs"), deferred deductions under section 163(j) of the IRC ("163(j) Deductions") and other tax attributes.

If the Restructuring Transactions are structured as a Recapitalization Transaction, the Debtors expect to (i) structure the transaction such that any New Common Stock that is to be received by the Holders of Allowed First Lien Claims will first be issued and contributed by Reorganized Cyxtera to the Prepetition Borrower and, thereafter, such New Common Stock will be transferred by the Prepetition Borrower to such Holders in exchange for their Allowed First Lien Claims pursuant to the Plan, and (ii) treat such transactions as occurring in the same order described in the immediately preceding clause (i) (*i.e.*, issuance followed by contribution followed by exchange) for U.S. federal income tax purposes. The Debtors believe, and intend to take the position that, this treatment applies for U.S. federal income tax purposes, and the remainder of the discussion assumes such treatment. The tax consequences to the Debtors, the Post-Effective Date Debtors, and Holders of Allowed First Lien Claims described herein could be materially different in the event this characterization is not respected for U.S. federal income tax purposes.

2.    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the issue price of the New Takeback Facility Loans and (ii) the fair market value of the New Common Stock and/or Cash and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Post-Effective Date Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. 163(j) Deductions are not subject to reduction under these rules.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

As noted above, in connection with the Restructuring Transactions, the Debtors expect to realize COD Income.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the New Takeback Facility Loans and the fair market value of the New Common Stock and any other consideration, none of which can be determined until after the Plan is consummated.

### 3.        Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Post-Effective Date Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.[20]

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following

---

[20]   The IRS issued proposed regulations in September 2019 that would revoke IRS Notice 2003-65 and make substantial changes to the way limitations under section 382 of the IRC are calculated.  The changes would decrease the limitation set forth in section 382 of the IRC in most cases and potentially cause entities that would have had a net unrealized built-in gain under Notice 2003-65 to instead have a net unrealized built-in loss, which would result in additional limitations on the ability to deduct Pre-Change Losses (as defined below).  Additionally, the IRS issued further proposed regulations in January 2020 that would provide certain transition relief for the application of any finalized regulation.  Under such transition relief, any finalized regulations would apply only to ownership changes occurring 31 days after the regulations are finalized and certain specified and identifiable transactions would be subject to a "grandfathering" rule that allows for application of the prior IRS Notice 2003-65 rules.  Additionally, the "grandfathering" rule would also apply as long as a company files its chapter 11 case within 31 days of the issuance of final regulations, even where the applicable ownership change occurs more than 31 days after finalization of the regulations.  The Debtors anticipate that the Effective Date will occur before any such finalized regulations would be applicable (or that such a "grandfathering" rule would apply to the Restructuring Transactions) and, accordingly, the remainder of this discussion assumes that Notice 2003-65 will apply to the Post-Effective Date Debtors.  In the event the proposed regulations are finalized more than 31 days prior to the Effective Date, and the "grandfather" rule does not apply to prevent the finalized regulations from being applied to the Debtors and/or Post-Effective Date Debtors, the Debtors will make a supplemental filing to explain the potential effect of such finalized regulations.

five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Post-Effective Date Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### a. General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.01 percent for July 2023).  The annual limitation may be increased to the extent that the Post-Effective Date Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains).  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### b. Special Bankruptcy Exceptions

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization.  If the 382(l)(5) Exception applies and the Post-Effective Date Debtors undergo another "ownership change" within two years after the Effective Date, then the Post-Effective Date Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change

or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Post-Effective Date Debtors will elect out of its application.

## C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 1.    Consequences of the Restructuring Transactions to U.S. Holders of Allowed First Lien Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed First Lien Claim will receive its *pro rata* share of, (a) in the event of the Recapitalization Transaction, 100 percent of the New Common Stock issued pursuant to the Plan on the Effective Date, subject to dilution on account of the Management Incentive Plan, and (b) in the event of the Sale Transaction, the Distributable Consideration.

The U.S. federal income tax consequences to a U.S. Holder of Allowed First Lien Claims in a Recapitalization Transaction will depend, in part, on whether for U.S. federal income tax purposes the (a) Allowed First Lien Claim surrendered by such U.S. Holder constitutes a "security" of a Debtor, and (b) the New Common Stock received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity).  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

In general, as discussed in more detail below, for U.S. federal income tax purposes, a Recapitalization Transaction is expected to be at least partially taxable (and may be a fully taxable) to holders of Allowed First Lien Claims because the New Common Stock is expected to be issued by an entity other than the issuer of the Allowed First Lien Claims for U.S. federal income tax purposes and, therefore, the holders of such Claims are not exchanging a "security" for stock of the same issuer.

*Due to the inherently factual nature of the determination of whether a debt instrument constitutes a "security", U.S. Holders of Allowed First Lien Claims are urged to consult their tax advisors regarding the status of the Allowed First Lien Claims as "securities" for U.S. federal income tax purposes.*

### a. Treatment of U.S. Holders of Allowed First Lien Claims if the Restructuring Transactions are structured as a Recapitalization Transaction

In a Recapitalization Transaction, the entity issuing the New Common Stock under the Plan will not be the same entity as the Debtor against which the Allowed First Lien Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes). Accordingly, the exchange of such Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. A U.S. Holder of an Allowed First Lien Claim generally should recognize gain or loss equal to (a) the fair market value of the New Common Stock received less (b) the U.S. Holder's adjusted tax basis in its Allowed First Lien Claim. The adjusted tax basis of a U.S. Holder's Allowed First Lien Claims generally will equal a U.S. Holder's purchase price for such Allowed First Lien Claims, reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to such Allowed First Lien Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed First Lien Claim in such U.S. Holder's hands, whether such Claim constitutes a capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim. If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations. A U.S. Holder should obtain a tax basis in the New Common Stock equal to the fair market value of the New Common Stock as of the date such New Common Stock is distributed to such U.S. Holder. The holding period for any such New Common Stock should begin on the day following the receipt of such New Common Stock.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

### b. Treatment of U.S. Holders of Allowed First Lien Claims if the Restructuring Transactions are structured as a Sale Transaction

If the Restructuring Transactions are structured as a Sale Transaction, then the exchange of such Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. In such case, a U.S. Holder of an Allowed First Lien Claim generally should recognize gain or loss equal to (a) the amount of Cash received, if any, *less* (b) the U.S. Holder's adjusted tax basis in its Allowed First Lien Claim. The adjusted tax basis of a U.S. Holder's Allowed First Lien Claims generally will equal a U.S. Holder's purchase price for such Allowed First Lien Claims, reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to such Allowed First Lien Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed First Lien Claim in such U.S. Holder's hands, whether such Claim constitutes a

capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim. If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

2.      **Consequences of the Restructuring Transactions to U.S. Holders of Allowed General Unsecured Claims**

Except to the extent that a U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Recovery Pool in Cash. Accordingly, subject to the discussion of accrued interest and market discount below, each Holder of a General Unsecured Claim would generally recognize gain or loss in the exchange in an amount equal to the difference between (i) the sum of the amount of cash received from its share of the GUC Recovery Pool and (ii) such Holder's adjusted tax basis in its General Unsecured Claim. Generally, this gain or loss will be subject to the rules described above in "Consequences of the Restructuring Transactions to U.S. Holders of Allowed First Lien Claims."

3.      **Accrued Interest**

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan is attributable to accrued but unpaid interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest.  Certain Treasury Regulations, however, allocates payments first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.*

4.    **Market Discount**

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of an Allowed Claim (determined as described above) which was acquired with market discount should be treated as ordinary income to the extent of the amount of market discount that accrued thereon while such Allowed Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued).  To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim.*

5.    **Consequences to U.S. Holders of the Ownership and Disposition of New Common Stock**

a.    **Dividends on New Common Stock**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Cyxtera as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Cyxtera has sufficient earnings and profits and certain holding period requirements are satisfied.  The length of time that a U.S. Holder has held its stock is reduced for any period during which such U.S. Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### b.    Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock, as applicable as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed First Lien Claims or recognized an ordinary loss on the exchange of its Allowed First Lien Claims for New Common Stock.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed First Lien Claims and General Unsecured Claims. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

### 1.    Gain Recognition by Non-U.S. Holders of Allowed first Lien Claims

Any gain realized by a Non-U.S. Holder of an Allowed First Lien Claim on the exchange of its Allowed First Lien Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    Accrued Interest

Subject to the discussion of FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (or original issue discount, if any) with respect to Allowed First Lien Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)    the Non-U.S. Holder actually or constructively owns ten percent or more of the total combined voting power of all classes of Debtor's stock entitled to vote;

(b)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Debtor (each, within the meaning of the IRC);

(c)    the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d)    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of thirty percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest (or original issue discount, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a thirty percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest (or original issue discount, if any).  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

### 3.    Gain Recognition by Non-U.S. Holders of Allowed General Unsecured Claims

Except to the extent that a Non-U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Recovery Pool in Cash and will generally be subject to the rules described above in "Gain Recognition by Non-U.S. Holders of Allowed First Lien Claims."

3.      **Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Stock**

a.  **Dividends**

Any distributions made with respect to New Common Stock (other than certain distributions of stock of Reorganized Cyxtera) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Cyxtera, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain).  Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not ECI (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS may prescribe), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are ECI (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If Reorganized Debtor is considered a "U.S. real property holding corporation" (a "<u>USRPHC</u>"), distributions to a Non-U.S. Holder will generally be subject to withholding by Reorganized Debtor at a rate of 15 percent to the extent they are not treated as dividends.  In the event the New Common Stock are regularly traded on an established market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of equity interests that includes New Common Stock during a specified testing period.  Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. The Debtors believe they are, and will be, USRPHCs, in light of the nature of their assets and business operations, but no formal study has been or will be conducted in this regard.

b.  **Sale, Redemption, or Repurchase of New Common Stock**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of Reorganized Cyxtera unless:

(i)      such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)     such gain is ECI (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)     the issuer of such New Common Stock is or has been during a specified testing period a "USRPHC."

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a non-U.S. Holder of New Common Stock generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder ("FIRPTA").  Taxable gain from a non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the non-U.S. Holder's adjusted tax basis in such interest) would constitute ECI.  A non-U.S. Holder would also be subject to withholding tax equal to fifteen percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return.  The amount of any such withholding may be allowed as a credit against the non-U.S. Holder's U.S. federal income tax liability and may entitle the non-U.S. Holder to a refund if the non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds fifty percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) the non-U.S. Holder's holding period for its interests in the corporation.  As discussed above, the Debtors believe they are, and will be, USRPHCs, in light of the nature of their assets and business operations, but no formal study has been or will be conducted in this regard.

In general, FIRPTA will not apply upon a non-U.S. Holder's disposition of its New Common Stock if (x) the New Common Stock is treated as "regularly traded" on an established market and continue to be regularly traded on an established market and (y) the non-U.S. Holder did not directly or indirectly own more than five percent of the value of the New Common Stock during a specified testing period.

4.      FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder are urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

## E.    Information Reporting and Back-Up Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.   In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.   Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).   Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## XIV.    CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    Introduction

The following is a summary of the principal Canadian federal income tax consequences of the Plan to a Holder of General Unsecured Claims who, at all relevant times for purposes of the Income Tax Act (Canada) (the "Canadian Tax Act"), deals at arm's length with and is not affiliated with Cyxtera or any other entity related to Cyxtera, and holds its General Unsecured Claims as capital property.  The General Unsecured Claims will generally be considered to be capital property to a Holder thereof unless either the Holder of General Unsecured Claims holds (or will hold) such securities in the course of carrying on a business, or the Holder of General Unsecured Claims has acquired (or will acquire) such securities in a transaction or transactions considered to be an adventure in the nature of trade.

This summary does not apply to (a) a Holder of General Unsecured Claim an interest in which is a "tax shelter investment" as defined in the Canadian Tax Act, (b) a Holder of General Unsecured Claim that is a "financial institution" for purposes of the "mark-to-market" rules as defined in the Canadian Tax Act, (c) a Holder of General Unsecured Claim that is a "specified financial institution" as defined in the Canadian Tax Act, (d) a Holder of General Unsecured Claims that has made the "functional currency" reporting

election, or (e) a Canadian Holder (as defined below) in relation to which Cyxtera is a "foreign affiliate" as defined in the Canadian Tax Act.  Such Holders of General Unsecured Claims should consult with their own tax advisors.

This summary is based on the current provisions of the Canadian Tax Act, the regulations thereunder (the "Canadian Regulations") and the understanding of the current published administrative policies and assessing practices of the Canada Revenue Agency (the "CRA") publicly available prior to the date of the filing of this Disclosure Statement.  The summary also takes into account all specific proposals to amend the Canadian Tax Act and Canadian Regulations publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date of the filing of this Disclosure Statement (the "Canadian Tax Proposals") and assumes that all such Canadian Tax Proposals will be enacted in the form proposed.  No assurance can be given that the Canadian Tax Proposals will be enacted in the form proposed or at all.  This summary does not take into account or anticipate any changes in law or administrative policies or assess practices of the CRA, whether by way of judicial, governmental or legislative action or decisions, nor does it address any provincial, territorial or foreign tax legislation or considerations.

This summary is of a general nature only, is not exhaustive of all Canadian federal income tax consequences, and is not intended to be, nor should it be construed as, legal or tax advice to any particular Holder of General Unsecured Claims.  Holders of General Unsecured Claims are urged to consult their own tax advisors as to the tax consequences to them of the Plan in their particular circumstances.

For purpose of the Canadian Tax Act, all amounts, including cost, proceeds of disposition, interest or dividends received and accrued must be determined in Canadian currency at applicable exchange rates as determined in accordance with the Canadian Tax Act.  The amount of interest and any capital gain or capital loss of a Holder of General Unsecured Claims may be affected by fluctuations in Canadian dollar exchange rates.

**B.      Residents of Canada**

This portion of the summary applies to a Holder of General Unsecured Claim who, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention, and at all relevant times, is or is deemed to be resident of Canada (a "Canadian Holder").  Certain Canadian Holders whose General Unsecured Claims issued by Canadian Debtors that might not otherwise qualify as capital property may, in certain circumstances, treat the General Unsecured Claims issued by Canadian Debtors as capital property by making an irrevocable election pursuant to subsection 39(4) of the Canadian Tax Act, to the extent such General Unsecured Claims are "Canadian securities" as defined in the Canadian Tax Act.  Therefore, this election will not apply to the General Unsecured Claims that are not Canadian securities.  Canadian Holders are advised to consult their own tax advisors regarding such an election.

**1.      Exchange of the General Unsecured Claim**

A Canadian Holder will be considered to have disposed of its General Unsecured Claims upon the exchange of such General Unsecured Claims for cash.  Under the Plan, any cash received will be allocated first to the principal amount of the General Unsecured Claims, and the balance, if any, to the accrued interest with respect to the General Unsecured Claims.

A Canadian Holder that is a corporation, partnership, unit trust, or any trust of which a corporation or partnership is a beneficiary will generally be required to include in income the amount of interest accrued or deemed to accrue on the General Unsecured Claims up to the Effective Date or that became receivable or was received on or before the Effective Date, to the extent that such amounts have not otherwise been included in the Canadian Holder's income for the taxation year or a preceding taxation year.  Any other Canadian Holder, including an individual, will be required to include in income for a taxation year any

interest on the General Unsecured Claims received or receivable by such Canadian Holder in the taxation year (depending upon the method regularly followed by the Canadian Holder in computing income) except to the extent that such amount was otherwise included in its income for the taxation year or a preceding taxation year.  In addition, if such Canadian Holder has not otherwise included interest in the General Unsecured Claims in computing the Canadian Holder's income at periodic intervals of not more than one year, such Canadian Holder will be required to include in computing income for a taxation year any interest that accrues to the Canadian Holder on the General Unsecured Claims up to the end of any "anniversary day" (as defined in the Canadian Tax Act) in that taxation year to the extent such interest was not otherwise included in computing the Canadian Holder's income for that taxation year or a preceding taxation year. Generally, a Canadian Holder should be entitled to deduct in computing income for the year of disposition, amounts that were included in computing the Canadian Holder's income for the year of disposition or a preceding taxation year as interest in respect of the General Unsecured Claims, to the extent that such amounts were not received or receivable by the Canadian Holder and were not deducted by the Canadian Holder in computing income for the year of disposition or a preceding taxation year.

In general, a Canadian Holder will realize a capital gain (or capital loss) on the exchange of the General Unsecured Claims equal to the amount by which any cash received, net of any amount included in the Canadian Holder's income as interest, exceeds (or is exceeded by) the adjusted cost base to the Canadian Holder of such General Unsecured Claims, *plus* any reasonable costs of disposition.  The tax treatment of any capital gain (or capital loss) realized is described below under the heading "Taxation of Capital Gains and Capital Losses."

### 2.    Taxation of Capital Gains and Capital Losses

Generally, one-half of any capital gain (a "<u>Taxable Capital Gain</u>") realized by a Canadian Holder for a taxation year must be included in the Canadian Holder's income in the year.  A Canadian Holder is required to deduct one-half of any capital loss (an "allowable capital loss") realized in the taxation year from Taxable Capital Gains realized in that year, and allowable capital losses in excess of Taxable Capital Gains may be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent year, from net Taxable Capital Gains realized in such years to the extent and under the circumstances described in the Canadian Tax Act.

### 3.    Additional Refundable Tax

A Canadian Holder that is throughout the year a "Canadian-controlled private corporation" (as defined in the Canadian Tax Act) may be liable to pay an additional refundable tax of 6 and 2/3 percent on certain investment income, including amounts in respect of interest, certain dividends and Taxable Capital Gains.

### C.    Non-Residents of Canada

This portion of the summary applies to a Holder of General Unsecured Claims that, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention and at all relevant times, is not and will not be deemed to be resident of Canada and does not use or hold the General Unsecured Claims in carrying on a business in Canada (a "<u>Non-Canadian Holder</u>").  In addition, this summary does not apply to an insurer who carries on an insurance business in Canada and elsewhere or an authorized foreign bank that carries on a Canadian banking business.

### 1.    Exchange of the General Unsecured Claims

Upon the exchange by a Non-Canadian Holder of the General Unsecured Claims for cash, no taxes will be payable under the Canadian Tax Act by such a Non-Canadian Holder.

**D.       Consequences to the Canadian Debtors**

The exchange of General Unsecured Claims will result in the settlement or extinguishment of the General Unsecured Claims.  The "forgiven amount", as defined in the Canadian Tax Act, arising from the settlement or extinguishment will reduce, in prescribed order, certain tax attributes of the relevant Canadian Debtors, including non-capital losses, net capital losses, cumulative eligible capital, undepreciated capital cost of depreciable property and the adjusted cost base of certain capital property (the "Canadian Tax Shield").  Generally, one half of the amount by which the forgiven amount exceeds the Canadian Tax Shield (such amount, the "Excess") will be required to be included in the relevant Canadian Debtor's income for the taxation year in which the Effective Date takes place, unless the Excess was otherwise assigned by such relevant Canadian Debtor to other Canadian Debtors that are "eligible transferees" as defined in the Canadian Tax Act for reduction of such other Canadian Debtors' Canadian Tax Shield.

**XV.     RECOMMENDATION OF THE DEBTORS**

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  September 13, 2023

Cyxtera Technologies, Inc.
on behalf of itself and all other Debtors

By:  _/s/ Eric Koza_____

Eric Koza
Chief Restructuring Officer

<u>**Exhibit A**</u>

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CYXTERA TECHNOLOGIES, INC., *et al.*,[1] | ) Case No. 23-14853 (JKS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**AMENDED JOINT PLAN OF REORGANIZATION OF CYXTERA TECHNOLOGIES, INC.
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**COLE SCHOTZ P.C.**
Felice R. Yudkin, Esq. (NJ Bar No. 014962005)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:     (201) 489-3000
Email:          msirota@coleschotz.com
                wusatine@coleschotz.com
                fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          esassower@kirkland.com
                christopher.marcus@kirkland.com
                derek.hunter@kirkland.com

*Co-Counsel to
the Debtors and Debtors in Possession*

*Co-Counsel to
the Debtors and Debtors in Possession*

Dated:  September 13, 2023

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed Claims and Noticing Agent at https://www.kccllc.net/cyxtera.  The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is:  2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida, 33134.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ...................................................................................................................1
    A.    Defined Terms. .................................................................................................................1
    B.    Rules of Interpretation. ..................................................................................................13
    C.    Computation of Time. .....................................................................................................14
    D.    Governing Law. ..............................................................................................................14
    E.    Reference to Monetary Figures. .....................................................................................14
    F.    Reference to the Debtors and the Post-Effective Date Debtors.....................................14
    G.    Controlling Document. ...................................................................................................14
    H.    Consultation, Notice, Information, and Consent Rights.................................................15

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES .......15
    A.    Administrative Claims. ...................................................................................................15
    B.    DIP Claims. .....................................................................................................................15
    C.    Professional Fee Claims. ................................................................................................16
    D.    Priority Tax Claims. .......................................................................................................17
    E.    Payment of Restructuring Expenses. ..............................................................................17
    F.    Receivables Program Claims. .........................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS....................................17
    A.    Classification of Claims and Interests.............................................................................17
    B.    Treatment of Claims and Interests. .................................................................................18
    C.    Special Provision Governing Unimpaired Claims. ........................................................21
    D.    Elimination of Vacant Classes. ......................................................................................21
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ...................................21
    F.    Intercompany Interests. ..................................................................................................21
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................21
    H.    Controversy Concerning Impairment..............................................................................21
    I.    Subordinated Claims. .....................................................................................................22

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................................................22
    A.    General Settlement of Claims and Interests. ..................................................................22
    B.    Restructuring Transactions..............................................................................................22
    C.    The Equity Investment Transaction or Recapitalization Transaction. ...........................23
    D.    The Asset Sale. ...............................................................................................................26
    E.    Preservation of Causes of Action. ..................................................................................29
    F.    Cancellation of Existing Agreements and Interests. ......................................................30
    G.    Section 1146 Exemption. ...............................................................................................30
    H.    Corporate Action.............................................................................................................30
    I.    Directors and Officers of the Post-Effective Date Debtors. ..........................................31
    J.    Effectuating Documents; Further Transactions..............................................................31
    K.    Vesting of Assets in the Post-Effective Date Debtors....................................................31
    L.    Private Company..............................................................................................................31
    M.    Closing the Chapter 11 Cases. .......................................................................................32
    N.    Director and Officer Liability Insurance. .......................................................................32

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................32
    A.    Assumption of Executory Contracts and Unexpired Leases. .........................................32
    B.    Indemnification Obligations............................................................................................33
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................33
    D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..................33
    E.    Insurance Policies. ..........................................................................................................34

F.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases...........34
G.     Reservation of Rights...........34
H.     Nonoccurrence of Effective Date...........35
I.     Contracts and Leases Entered Into After the Petition Date...........35

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........35
A.     Timing and Calculation of Amounts to Be Distributed...........35
B.     Disbursing Agent...........35
C.     Rights and Powers of Disbursing Agent...........35
D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions...........36
E.     Manner of Payment...........37
F.     Compliance with Tax Requirements...........37
G.     Allocations...........37
H.     No Postpetition Interest on Claims...........37
I.     Foreign Currency Exchange Rate...........37
J.     Setoffs and Recoupment...........37
K.     Claims Paid or Payable by Third Parties...........38

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ...........38
A.     Disputed Claims Process...........38
B.     Allowance of Claims...........39
C.     Estimation of Claims...........39
D.     Claims Administration Responsibilities...........39
E.     Time to File Objections to Claims...........39
F.     Adjustment to Claims or Interests without Objection...........40
G.     Disputed and Contingent Claims Reserve...........40
H.     Disallowance of Claims or Interests...........40
I.     Amendments to Proofs of Claim or Interest...........40
J.     Distributions Pending Allowance...........40
K.     Distributions After Allowance...........41

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........41
A.     Discharge of Claims and Termination of Interests...........41
**B.**     **Release of Liens.** ...........41
**C.**     **Releases by the Debtors.** ...........42
**D.**     **Releases by Holders of Claims and Interests.** ...........42
**E.**     **Exculpation.** ...........43
**F.**     **Injunction.** ...........44
G.     Protections Against Discriminatory Treatment...........44
H.     Document Retention...........45
I.     Reimbursement or Contribution...........45

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN...........45
A.     Conditions Precedent to the Effective Date...........45
B.     Waiver of Conditions...........46
C.     Effect of Failure of Conditions...........46
D.     Substantial Consummation...........46

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...........46
A.     Modification and Amendments...........46
B.     Effect of Confirmation on Modifications...........47
C.     Revocation or Withdrawal of Plan...........47

ARTICLE XI. RETENTION OF JURISDICTION...........47

ARTICLE XII. MISCELLANEOUS PROVISIONS .................................................................................49
    A.    Immediate Binding Effect. ........................................................................................49
    B.    Additional Documents. .............................................................................................49
    C.    Payment of Statutory Fees. .......................................................................................49
    D.    Statutory Committee and Cessation of Fee and Expense Payment. ..........................49
    E.    Reservation of Rights. ..............................................................................................50
    F.    Successors and Assigns. ............................................................................................50
    G.    Notices. ....................................................................................................................50
    H.    Term of Injunctions or Stays. ...................................................................................51
    I.    Entire Agreement. ....................................................................................................51
    J.    Exhibits. ...................................................................................................................51
    K.    Nonseverability of Plan Provisions. .........................................................................51
    L.    Votes Solicited in Good Faith. ..................................................................................52
    M.    Closing of Chapter 11 Cases. ...................................................................................52
    N.    Waiver or Estoppel. ..................................................................................................52
    O.    Creditor Default. ......................................................................................................52
    P.    Removal or Abandonment of Third Parties' Property. ..............................................52

## INTRODUCTION

Cyxtera Technologies, Inc. and the above-captioned debtors and debtors in possession propose the Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of the Plan.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations as well as a summary and description of the Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; (d) Adequate Protection Claims (as defined in the DIP Orders); (e) Restructuring Expenses, and (f) the Disinterested Director Fee Claims.

2.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

3.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity were a debtor in a case under the Bankruptcy Code.

4.    "*Agents*" means, collectively, the DIP Agent, the Prepetition Agent, the Bridge Facility Agent, the New Takeback Facility Agent, and the Receivables Program Agent, including, in each case, any successors thereto.

5.    "*AHG*" means that certain ad hoc group of Holders of Term Loan Claims represented by the AHG Advisors.

6.    "*AHG Advisors*" means (i) Gibson, Dunn & Crutcher LLP, (ii) Houlihan Lokey Capital, Inc., and (iii) Gibbons P.C.

7.    "*Allowed*" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim timely Filed by the applicable bar date (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract,

instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection is so interposed, such Claim shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions under the Plan on account of such Claims or Interests. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, a Proof of Claim Filed after the applicable bar date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.   "Allow" and "Allowing" shall have correlative meanings.

8.    "*Asset Sale*" means a Sale Transaction in which the Debtors sell all or substantially all of their assets to the Purchaser pursuant to the Purchase Agreement.

9.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

10.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey.

11.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12.    "*Bidding Procedures*" means the bidding procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

13.    "*Bidding Procedures Documents*" means the Bidding Procedures, the Bidding Procedures Motion, and the Bidding Procedures Order.

14.    "*Bidding Procedures Motion*" means the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures and Auction, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 95].

15.    "*Bidding Procedures Order*" means the *Order (I) Approving the Bidding Procedures and Auction, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 180].

16.    "*Bridge Facility*" means that certain super senior financing facility issued pursuant to the Bridge Facility Credit Agreement.

17.    "*Bridge Facility Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative and collateral agent under the Bridge Facility Credit Agreement.

18.    "*Bridge Facility Credit Agreement*" means that certain Frist Lien Priority Credit Agreement dated as of May 4, 2023, by and among Initial Holdings, the Prepetition Borrower, the lenders party thereto, and the Bridge Facility Agent.

19.    "*Bridge Facility Documents*" means the Bridge Facility Credit Agreement and any other documentation necessary to effectuate the incurrence of the Bridge Facility.

20.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

22. "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

23. "*Cause of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including under any state or federal securities laws). Causes of Action include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

24. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

25. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

26. "*Claims and Noticing Agent*" means Kurtzman Carson Consultants LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

27. "*Claims Objection Deadline*" means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Post-Effective Date Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

28. "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

29. "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

30. "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

31. "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 133] and as may be reconstituted from time to time.

32. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

35.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, the form and substance of which shall be subject to the consent rights set forth in the RSA, and, in the event of a Sale Transaction, shall also be in form and substance reasonably acceptable to the Purchaser.

36.    "*Consenting Lenders*" means, collectively, the Holders of First Lien Claims that are signatories to the RSA or any subsequent Holder of First Lien Claims that becomes party thereto in accordance with the terms of the RSA, each solely in their capacity as such.

37.    "*Consenting Sponsors*" means, collectively, the Holders of Existing Equity Interests that are signatories to the RSA or any subsequent Holder of Existing Equity Interests that becomes party thereto in accordance with the terms of the RSA, each solely in their capacity as such.

38.    "*Consenting Stakeholders*" means, collectively, the Consenting Lenders and the Consenting Sponsors.

39.    "*Consummation*" means the occurrence of the Effective Date.

40.    "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

41.    "*Cyxtera*" means Cyxtera Technologies, Inc.

42.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

43.    "*Debtor Release*" means the release set forth in Article VIII.C hereof.

44.    "*Debtors*" means, collectively, each of the following:  Cyxtera Technologies, Inc., Cyxtera Canada TRS, ULC, Cyxtera Canada, LLC, Cyxtera Communications Canada, ULC, Cyxtera Communications, LLC, Cyxtera Data Centers, Inc., Cyxtera DC Holdings, Inc., Cyxtera DC Parent Holdings, Inc., Cyxtera Digital Services, LLC, Cyxtera Employer Services, LLC, Cyxtera Federal Group, Inc., Cyxtera Holdings, LLC, Cyxtera Management, Inc., Cyxtera Netherlands B.V., Cyxtera Technologies Maryland, Inc., and Cyxtera Technologies, LLC.

45.    "*Definitive Documents*" means, collectively and as applicable, (a) the Disclosure Statement; (b) the Solicitation Materials; (c) the New Organizational Documents; (d) the DIP Orders (and motion(s) seeking approval thereof); (e) the DIP Documents; (f) the New Takeback Facility Documents, (g) the Plan (and all exhibits thereto); (h) the Confirmation Order; (i) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials (and motion(s) seeking approval thereof); (j) all material pleadings Filed by the Debtors in connection with the Chapter 11 Cases (and related orders), including the first day pleadings and all orders sought pursuant thereto; (k) the Plan Supplement; (l) the MIP Documents; (m) any and all filings with or requests for regulatory or other approvals from any governmental entity or unit, other than ordinary course filings and requests, necessary or desirable to implement the Restructuring Transactions; (n) the Bridge Facility Documents; (o) the Bidding Procedures Documents; (p) the Purchase Agreement; and (q) such other agreements, instruments, and documentation as may be necessary to consummate and document the transactions contemplated by the Plan.  For the avoidance of doubt, the form and substance of each Definitive Document shall be subject to the consent rights set forth in the RSA.

46.    "*DIP Agent*" means the administrative agent and collateral agent under the DIP Facility.

47.    "*DIP Agent Advisors*" means ArentFox Schiff LLP, in its capacity as counsel to the DIP Agent and the Prepetition Priority Administrative Agent (as defined in the DIP Orders).

48.      "*DIP Claims*" means any Claim against any Debtor derived from, based upon, or arising under the DIP Facility, the DIP Credit Agreement, or the other DIP Documents.

49.      "*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June 7, 2023, by and among Initial Holdings, Prepetition Borrower, the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent.

50.      "*DIP Documents*" means, collectively, the DIP Credit Agreement and any other documents governing the DIP Facility, including the DIP Orders, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

51.      "*DIP Facility*" means the superpriority senior secured debtor-in-possession credit facility provided for under the DIP Documents.

52.      "*DIP Lenders*" means, collectively, each lender under the DIP Facility.

53.      "*DIP Loans*" means the loans issued pursuant to the DIP Credit Agreement.

54.      "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

55.      "*Disbursing Agent*" means, as applicable, the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, or any Entity the Debtors, the Post-Effective Date Debtors, or the Plan Administrator selects to make or to facilitate distributions in accordance with the Plan, which Entity may include the Claims and Noticing Agent and the Agents, as applicable.

56.      "*Disclosure Statement*" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

57.      "*Disinterested Director Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the disinterested directors of Cyxtera pursuant to their respective director agreements with Cyxtera.    On the Effective Date, the Disinterested Director Fee Claims shall be deemed Allowed Administrative Claims against Cyxtera.

58.      "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or Proof of Interest or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

59.      "*Disputed Claims Reserve Amount*" means Cash in an amount to be determined by the Debtors in consultation with the Required Consenting Term Lenders, which amount shall be used to fund the Disputed Claims Reserve.

60.      "*Disputed Claims Reserve*" means the account to be established on the Effective Date and funded with the Disputed Claims Reserve Amount for distribution as set forth in Article VII.G, if any.

61.      "*Distributable Consideration*" means, in the event of a Sale Transaction, all Cash of the Debtors or the Post-Effective Date Debtors, as applicable, on or after the Effective Date, including any Cash comprising the Purchase Price and the Residual Cash, after payment of the Administrative Claims, DIP Claims, Professional Fee Claims, Disinterested Director Fee Claims, Priority Tax Claims, Receivables Program Claims, Other Secured Claims, and Other Priority Claims, each as set forth in the Plan, and funding the Professional Fee Escrow Account, the GUC Recovery Pool, the Disputed Claims Reserve, the Wind-Down Reserve, and the Priority Claims Reserve, as applicable, *plus* any non-Cash consideration comprising the Purchase Price *plus* any proceeds generated by any Cause of Action retained by the Post-Effective Date Debtors.

62.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors and the Required Consenting Term Lenders.

63.     "*Distribution Reserve Accounts*" means, in the event of an Asset Sale, the Priority Claims Reserve and the Wind-Down Reserve established pursuant to the Plan.

64.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

65.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

66.     "*Equity Investment Transaction*" means a restructuring under the Plan pursuant to which, among other things, the Purchaser purchases all or substantially all of the New Common Stock in exchange for the Purchase Price.

67.     "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

68.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

69.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a et seq, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

70.     "*Exculpated Partie*s" means, collectively:  (a) the Debtors; (b) the Post-Effective Date Debtors, (c) the Committee and the members of the Committee; (d) the Plan Administrator (as applicable); and (e) with respect to each of the foregoing Entities in clauses (a) through (d), each of the Related Parties of such Entity.

71.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

72.     "*Existing Equity Interests*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of Cyxtera (in each case whether or not arising under or in connection with any employment agreement) immediately prior to the consummation of the transactions contemplated in the Plan.

73.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

74.     "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

75.     "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 297].

76.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed,

modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

77.    "*Final Receivables Program Order*" means the *Final Order (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Rights Pursuant to the Receivables Program, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 295].

78.    "*First Lien Claims*" means, collectively, the RCF Claims and the Term Loan Claims.

79.    "*First Lien Credit Agreement*" means that certain First Lien Credit Agreement, dated as of May 17, 2017, by and among the Prepetition Borrower, Initial Holdings, the lenders from time to time party thereto, and the Prepetition Agent, as the same may be amended, supplemented, or otherwise modified from time to time.

80.    "*First Lien Credit Documents*" means the First Lien Credit Agreement and any other documentation necessary to effectuate the incurrence of the Revolving Credit Facility or the Term Loan Facilities.

81.    "*General Unsecured Claim*" means any Claim that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Priority Tax Claim, (d) a Secured Tax Claim, (e) a DIP Claim, (f) an Other Secured Claim, (g) an Other Priority Claim, (h) a First Lien Claim, (i) a Receivables Program Claim, (j) an Intercompany Claim, (k) a Section 510 Claim, (l) a Disinterested Director Fee Claim, or (m) a Restructuring Expense.

82.    "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Post-Effective Date Debtors, as applicable.

83.    "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

84.    ["*GUC Recovery Pool*" means a pool of value to be distributed in accordance with Article III hereof.][2]

85.    "*Holder*" means an Entity that is the record owner of a Claim or Interest. For the avoidance of doubt, affiliated record owners of Claims or Interests managed or advised by the same institution shall constitute separate Holders.

86.    "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

87.    "*Initial Holdings*" means Cyxtera DC Parent Holdings, Inc.

88.    "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

89.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

---

[2]    [**NTD:**  Treatment of General Unsecured Claims subject to continued negotiation with the Committee.]

90.    "*Interest*" means, collectively, (a) any Equity Security in any Debtor and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, or repurchase rights; convertible, exercisable, or exchangeable securities; or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

91.    "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 70].

92.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

93.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

94.    "*Management Incentive Plan*" means, in the event of a Recapitalization Transaction or an Equity Investment Transaction, the management incentive plan reserving up to 10 percent of the New Common Stock on a fully diluted basis, with structure, awards, and terms of the management incentive plan to be determined by the New Board, which management incentive plan shall be acceptable to the Required Consenting Term Lenders and the Debtors.

95.    "*MIP Documents*" means, collectively, the documents governing the Management Incentive Plan, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

96.    "*New Board*" means, in the event of a Recapitalization Transaction or an Equity Investment Transaction, the board of directors or similar Governing Body of Reorganized Cyxtera, which shall be acceptable to the Required Consenting Term Lenders, including, without limitation, with respect to the number and identity of the directors.

97.    "*New Common Stock*" means, in the event of a Recapitalization Transaction or an Equity Investment Transaction, a single class of common equity interests issued by Reorganized Cyxtera on the Effective Date.

98.    "*New Organizational Documents*" means, in the event of a Recapitalization Transaction or an Equity Investment Transaction, the documents providing for corporate governance of Reorganized Cyxtera and the other Post-Effective Date Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and in form and substance subject to the consent rights set forth in the RSA and, in the event of a Sale Transaction, in form and substance reasonably acceptable to the Purchaser.

99.    "*New Takeback Facility*" means, in the event of a Recapitalization Transaction, a new senior secured, first lien, "first out" term loan facility, in an initial aggregate principal amount of $200,468,511.87 *plus* any accrued and unpaid interest, fees, costs, charges, expenses, and any other accrued and unpaid amounts under the DIP Documents as of the Effective Date, to be incurred by the Debtors on the Effective Date in connection with effectuating the Recapitalization Transaction in accordance with the Plan and the Restructuring Transactions Memorandum, in each case as determined by the Debtors and in form and substance subject to the consent rights set forth in the RSA.

100.    "*New Takeback Facility Agent*" means the agent under the New Takeback Facility Credit Agreement.

101.    "*New Takeback Facility Credit Agreement*" means the credit agreement with respect to the New Takeback Facility, as may be amended, supplemented, or otherwise modified from to time and which shall be in form and substance subject to the consent rights set forth in the RSA.

102.    "*New Takeback Facility Documents*" means the New Takeback Facility Credit Agreement and any other documentation necessary or appropriate to effectuate the incurrence of the New Takeback Facility, each of which shall be in form and substance subject to the consent rights set forth in the RSA.

103.    "*New Takeback Facility Loans*" means loans issued under the New Takeback Facility.

104.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

105.    "*Other Secured Claim*" means any Secured Claim against the Debtors other than the DIP Claims, the Priority Tax Claims, the Receivables Program Claims, or the First Lien Claims.

106.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

107.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

108.    "*Plan*" means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the RSA, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

109.    "*Plan Administrator*" means, in the event of an Asset Sale, the Person selected by the Debtors and the Required Consenting Term Lenders to administer all assets of the Estates vested in the Post-Effective Date Debtors, and thereafter, all assets held from time to time by the Post-Effective Date Debtors.

110.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

111.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors, to the extent reasonably practicable, no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable:  (a) the New Organizational Documents; (b) the identity and members of the New Board; (c) the Schedule of Retained Causes of Action; (d) the New Takeback Facility Documents; (e) the Restructuring Transactions Memorandum; (f) the Rejected Executory Contract and Unexpired Lease List, if any; (g) in the event of an asset sale, the identity of the Plan Administrator and the terms of compensation of the Plan Administrator; (h) in the event of a Sale Transaction, the Purchase Agreement; and (i) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

112.    "*Post-Effective Date Debtors*" means the Debtors after the Effective Date or the Plan Administrator, as applicable.

113.    "*Purchaser*" means, in the event that the Debtors, with the consent of the Required Consenting Term Lenders, determine to pursue a Sale Transaction, the "[Purchaser]" under and as defined in the Purchase Agreement.

114.    "*Purchase Agreement*" means the purchase agreement to be entered into by the Debtors and the Purchaser in accordance with the Bidding Procedures, which shall be in form and substance subject to the consent rights set forth in the RSA.

115.    "*Prepetition Agent*" means Citibank, N.A., in its capacity as administrative and collateral agent under the First Lien Credit Agreement.

116.    "*Prepetition Borrower*" means Cyxtera DC Holdings, Inc. (f/k/a Colorado Buyer Inc.).

117.    "*Prepetition First Lien Administrative Agent Advisors*" means (i) Davis Polk & Wardell LLP, (ii) Greenberg Traurig, LLP, and (iii) FTI Consulting, Inc.

118.    "*Priority Claims*" means, collectively, Administrative Claims, Priority Tax Claims, and Other Priority Claims.

119.    "*Priority Claims Reserve*" means, in the event of an Asset Sale, the account to be established and maintained by the Plan Administrator on the Effective Date and funded with the Priority Claims Reserve Amount for distribution to Holders of Priority Claims (except for Professional Fee Claims) as set forth in Article II.

120.    "*Priority Claims Reserve Amount*" means, in the event of an Asset Sale, Cash in an amount to be determined in the Debtors' reasonable business judgment and in consultation with the Required Consenting Term Lenders, which amount shall be used by the Plan Administrator to fund the Priority Claims Reserve.

121.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

122.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals reasonably estimate in good faith that they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

124.    "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

125.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

126.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date.

127.    "*Proof of Interest*" means a proof of Interest filed in any of the Debtors in the Chapter 11 Cases.

128.    "*Purchase Price*" has the meaning set forth in the Bidding Procedures.

129.    "*RCF Claims*" means any Claim on account of the Revolving Credit Facility.

130.    "*Recapitalization Transaction*" means, in the event that the Debtors, with the consent of the Required Consenting Term Lenders, do not determine to pursue a Sale Transaction, the restructuring transaction pursuant to the Plan, pursuant to which, among other things, Holders of First Lien Claims receive 100 percent of the New Common Stock, subject to dilution by the Management Incentive Plan.

131.    "*Receivables Program*" means that certain trade receivables securitization facility pursuant to the Receivables Program Documents and approved by the Final Receivables Program Order.

132.    "*Receivables Program Agent*" means, collectively, PNC Bank, National Association, in its capacity as Administrative Agent under the Receivables Program Documents, and PNC Capital Markets LLC, in its capacity as Structuring Agent under the Receivables Program Documents, including, in each case, any successors thereto.

133.    "*Receivables Program Claims*" means any Claims constituting Receivables Program Obligations (as defined in the Final Receivables Program Order).

134.    "*Receivables Program Documents*" means, collectively, the "Transaction Documents" as defined in the Final Receivables Program Order, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

135.    "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

136.    "*Rejected Executory Contract and Unexpired Lease List*" means the list to be included in the Plan Supplement, as determined by the Debtors and subject to the consent rights set forth in the RSA and, in the event of a Sale Transaction, reasonably acceptable to the Purchaser, of Executory Contracts and Unexpired Leases that will be rejected by the Post-Effective Date Debtors, pursuant to the Plan, which list may be amended from time to time subject to the consent rights set forth in the RSA and, in the event of a Sale Transaction, with the reasonable consent of the Purchaser.

137.    "*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

138.    "*Released Party*" means, each of, and in each case in its capacity as such:  (a) each Debtor; (b) each Post-Effective Date Debtor; (c) each Consenting Stakeholder; (d) each Releasing Party; (e) each Agent; (f) each DIP Lender; (g) in the event of a Sale Transaction, the Purchaser; (h) the Committee and each member of the Committee; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); (j) each Related Party of each Entity in clause (a) through this clause (j); *provided* that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the releases described in Article VIII.D of the Plan; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation.[3]

139.    "*Releasing Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Post-Effective Date Debtors; (c) each DIP Lender; (d) each Agent; (e) each Consenting Stakeholder; (f) in the event of a Sale Transaction, the Purchaser; (g) the Committee and each member of the Committee; (h) all Holders of Claims that vote to accept the Plan; (i) all Holders of Claims who are deemed to accept the Plan but who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (j) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (k) all Holders of Claims or Interests who vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (l) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that, for the avoidance of doubt, an Entity in clause (i) through clause (k) shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in Article VIII.D of the Plan; or (y) timely

---

[3]    [**NTD:**    Release provisions subject to ongoing review, including as part of the Special Committee investigation.]

objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation.

140.    "*Reorganized Cyxtera*" means Cyxtera Technologies, Inc., or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

141.    "*Required Consenting Term Lenders*" means, as of the relevant date, Consenting Lenders holding at least 66.67% of the aggregate outstanding principal amount of the Term Loan Claims that are held by Consenting Lenders.

142.    "*Residual Cash*" means, in the event of a Sale Transaction, the sum of (a) any amounts remaining in the Professional Fee Escrow Account after payment in full of all Allowed Professional Fee Claims, (b) any amounts remaining in the Priority Claims Reserve after payment in full of all Allowed Priority Claims and Allowed Administrative Claims (other than Professional Fee Claims), (c) any amounts remaining in the Disputed Claim Reserve after the final resolution of Disputed Claims, and (d) any amounts remaining in the Wind-Down Reserve after entry of a final decree closing the last of the Chapter 11 Cases.

143.    "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued from the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of:  (i) the AHG Advisors; (ii) the DIP Agent Advisors; and (iii) the Prepetition First Lien Administrative Agent Advisors.

144.    "*Restructuring Term Sheet*" means the term sheet attached to the RSA as <u>Exhibit B</u>.

145.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

146.    "*Restructuring Transactions Memorandum*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement, which shall be in form and substance acceptable to the Required Consenting Term Lenders, and, in the event of a Sale Transaction, the Purchaser.

147.    "*Revolving Credit Facility*" means that certain first lien, multi-currency revolving credit facility issued pursuant to the First Lien Credit Agreement.

148.    "*RSA*" means that certain restructuring support agreement, dated as of May 4, 2023, by and among the Debtors and the Consenting Stakeholders, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms.

149.    "*Sale Transaction*" means, as applicable, either an Equity Investment Transaction or an Asset Sale.

150.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, which shall be subject to the consent rights set forth in the RSA and, in the event of a Sale Transaction, subject to the consent of the Purchaser.

151.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

152.    "*Section 510 Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

153.    "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

154.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

155.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

156.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

157.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

158.    "*Term Loan Claims*" means any Claim on account of the Term Loan Facilities.

159.    "*Term Loan Facilities*" means those certain first lien term loan facilities issued pursuant to the First Lien Credit Agreement.

160.    "*Third-Party Release*" means the release set forth in Article VIII.D of the Plan.

161.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of New Jersey.

162.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

163.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

164.    "*Wind Down*" means, in the event of an Asset Sale, the wind down and dissolution of the Debtors' Estates as set forth in Article IV.D.5.

165.    "*Wind-Down Amount*" means, in the event of an Asset Sale, Cash in an amount to be determined by the Debtors with the consent of the Required Consenting Term Lenders, not to be unreasonably withheld, to fund the Wind Down in accordance with Article IV.D.5 of the Plan.

166.    "*Wind-Down Reserve*" means, in the event of an Asset Sale, the account to be established and maintained by the Plan Administrator and funded with the Wind-Down Amount to fund the Wind Down in accordance with Article IV.D.5 of the Plan and for Plan Administrator purposes in accordance with Article IV.D.4.

B.    *Rules of Interpretation.*

For purposes of the Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (ii) shall affect any party's consent rights over any of the Definitive Documents or any amendments thereto (both as that term is defined herein and as it is defined in the RSA); (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (iv) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (vi) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (vii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (viii) subject to the provisions of any contract, certificate of incorporation, bylaw,

instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (ix) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation"; (x) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (xi) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xiii) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xiv) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xv) any immaterial effectuating provisions may be interpreted by the Post-Effective Date Debtors in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (xvi) unless otherwise specified and subject to the reasonable consent of the Required Consenting Term Lenders, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan; any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Post-Effective Date Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors and the Post-Effective Date Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors and the Post-Effective Date Debtors shall mean the Debtors and the Post-Effective Date Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.       *Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all consultation, information, notice, and consent rights of the parties to the RSA, as applicable, and as respectively set forth therein, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the RSA, as applicable, shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Receivables Program Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.       *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Professional Fee Claims, Receivables Program Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Post-Effective Date Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**  Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party by the Claims Objection Deadline. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

B.       *DIP Claims.*

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim:  (i) in the event of a Recapitalization Transaction, either (a) the DIP Loan giving rise to such Allowed DIP Claim shall be refinanced by means of a cashless settlement whereby such DIP Loan shall be converted on a

dollar-for-dollar basis into New Takeback Facility Loans in accordance with the DIP Documents and the New Takeback Facility Documents, and all collateral that secures the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall be reaffirmed, ratified, and shall automatically secure all [Obligations] (as defined in the New Takeback Facility Documents) under the New Takeback Facility Documents, subject to the priorities of liens and payment set forth in the New Takeback Facility Documents, or (b) such DIP Claim shall be paid in full in Cash; or (ii) in the event of a Sale Transaction, Holders of the DIP Claims shall receive payment in full in Cash or, with the consent of Required Consenting Term Lenders, such other treatment rendering Allowed DIP Clams Unimpaired in accordance with section 1124 of the Bankruptcy Code.

C.      *Professional Fee Claims.*

   1.   Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Post-Effective Date Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.  The Post-Effective Date Debtors shall establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

   2.   Professional Fee Escrow Account.

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Post-Effective Date Debtors, without any further action or order of the Bankruptcy Court; *provided*, *however*, in the event of a Sale Transaction, any remaining amount in the professional Fee Escrow Account shall constitute Residual Cash and be distributable to Holders of Allowed First Lien Claims.

   3.   Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Post-Effective Date Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

   4.   Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Post-Effective

Date Debtors, and/or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the RSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.

F.      *Receivables Program Claims.*

All Receivables Program Claims shall be Allowed Claims.  On the Effective Date, unless otherwise agreed by the Holder of a Receivables Program Claim and the applicable Debtor or Post-Effective Date Debtor, Allowed Receivables Program Claims will be satisfied in full in accordance with the terms of the Receivables Program Documents.  On the Effective Date, or as soon as reasonably practicable thereafter, all fees and expenses incurred by the advisors to the parties to the Receivables Program shall be paid in full in Cash to the extent required under the Final Receivables Program Order.

### ARTICLE III.
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Post-Effective Date Debtors, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    Class 1 - Other Secured Claims

(a)    *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim and at the option of the Debtors and the Required Consenting Term Lenders, either:

(i)    payment in full in Cash of its Allowed Other Secured Claim;

(ii)    Reinstatement of its Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or

(iii)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 - Other Priority Claims</u>

    (a)    *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – First Lien Claims</u>

    (a)    *Classification*:  Class 3 consists of any First Lien Claims against any Debtor.

    (b)    *Allowance*:  The First Lien Claims shall be Allowed in the aggregate principal amount of $[961,496,926], plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First Lien Credit Agreement or related documents (including post-petition interest at the default contract rate) as of the Effective Date.

    (c)    *Treatment*:  On the Effective Date, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive, in full and final satisfaction of such Claim:

        (i)    in the event of a Recapitalization Transaction, its *pro rata* share of 100 percent of the New Common Stock, subject to dilution by the Management Incentive Plan; or

        (ii)    in the event of a Sale Transaction, its *pro rata* share of the Distributable Consideration (including, for the avoidance of doubt, the Residual Cash).

    (d)    *Voting*:  Class 3 is Impaired under the Plan, and Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. <u>Class 4 - General Unsecured Claims</u>

    (a)    *Classification*:  Class 4 consists of General Unsecured Claims.

    (b)    [*Treatment*:  Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each Holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Recovery Pool.][4]

    (c)    *Voting*:  Class 4 is Impaired under the Plan, and Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

---

[4]    **[NTD**:  Treatment of General Unsecured Claims subject to continued negotiation with the Committee.**]**

5.  <u>Class 5 - Section 510(b) Claims</u>

    (a)    *Classification*:  Class 5 consists of all Section 510(b) Claims.

    (b)    *Treatment*:  On the Effective Date, all Section 510 Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510 Claims will not receive any distribution on account of such Section 510 Claims.

    (c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Claims in Class 5 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.  <u>Class 6 - Intercompany Claims</u>

    (a)    *Classification*:  Class 6 consists of all Intercompany Claims.

    (b)    *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, with the consent of the Required Consenting Term Lenders (not to be unreasonably withheld), and, in the event of a Sale Transaction, in consultation with the Purchaser, either:

        (i)    Reinstated; or

        (ii)    canceled or released without any distribution on account of such Claim.

    (c)    *Voting*:  Class 6 is Unimpaired if the Class 6 Claims are Reinstated or Impaired if the Class 6 Claims are cancelled.  Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

7.  <u>Class 7 - Intercompany Interests</u>

    (a)    *Classification*:  Class 7 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, Intercompany Interests shall be, at the election of the applicable Debtor or Post-Effective Date Debtor, with the consent of the Required Consenting Term Lenders (not to be unreasonably withheld), and, in the event of a Sale Transaction, in consultation with the Purchaser, either:

        (i)    Reinstated; or

        (ii)    canceled or released without any distribution on account of such Interests.

    (c)    *Voting*:  Class 7 is Unimpaired if the Class 7 Interests are Reinstated or Impaired if the Class 8 Interests are cancelled.  Holders of Class 7 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8.    <u>Class 8 - Existing Equity Interests</u>

    (a)    *Classification*:  Class 8 consists of all Existing Equity Interests.

    (b)    *Treatment*:  On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Interests shall receive no recovery or distribution on account of their Existing Equity Interests.

    (c)    *Voting*:  Class 8 is Impaired under the Plan.  Holders of Allowed Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock, and in exchange for the agreement of the Debtors and/or the Post-Effective Date Debtors, as applicable, under the Plan to make certain distributions to the Holders of Allowed Claims.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the RSA, the Post-Effective Date Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

Before, on, and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions (which, for the avoidance of doubt, shall be in form, substance, and structure reasonably acceptable to the Required Consenting Term Lenders) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable:   (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, the RSA, and the other Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, the RSA, and the other Definitive Documents; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the execution and delivery of the New Takeback Facility Documents and entry into the New Takeback Facility; (v) the issuance and distribution of the New Common Stock as set forth in the Plan; (vi) the implementation of the Management Incentive Plan; (vii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Post-Effective Date Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (viii) such other transactions that, in the reasonable business judgment of the Debtors or the Post-Effective Date Debtors, as applicable, the Required Consenting Term Lenders (in the event of a Recapitalization Transaction), and the Purchaser (in the event of a Sale Transaction), are required to effectuate the Restructuring Transactions; and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Debtors shall pursue the Recapitalization Transaction unless the Debtors determine, with the consent of the Required Consenting Term Lenders, to pursue an Equity Investment Transaction or an Asset Sale.

In the event of an Equity Investment Transaction, on the Effective Date, the Purchaser shall purchase substantially all of the New Common Stock free and clear of all Liens, Claims, Interests, charges, or other encumbrances in exchange for the Purchase Price set forth in the Purchase Agreement.  The Confirmation Order shall authorize the Debtors, the Purchaser, and the Post-Effective Date Debtors, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Equity Investment Transaction pursuant to the terms of the Purchase Agreement and the Plan.  On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

C.      *The Equity Investment Transaction or Recapitalization Transaction.*

If the Equity Investment Transaction or Recapitalization Transaction occurs, the following provisions shall govern.

1.      The Post-Effective Date Debtors.

On the Effective Date, the New Board shall be established, and each Post-Effective Date Debtor shall adopt its New Organizational Documents.  The Post-Effective Date Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

2.      Sources of Consideration for Plan Distributions.

The Debtors shall fund or make distributions under the Plan, as applicable, with:  (i) the issuance of New Takeback Facility Loans under the New Takeback Facility, (ii) the proceeds from the Equity Investment Transaction; (iii) the New Common Stock, and (iv) the Debtors' Cash on hand.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock, will be exempt from Securities Act registration, as described more fully in Article IV.C.5 below.

(a)      The New Takeback Facility.

In the event of a Recapitalization Transaction, on the Effective Date, the Post-Effective Date Debtors shall enter into the New Takeback Facility Credit Agreement.  Confirmation of the Plan shall be deemed approval of the New Takeback Facility and the New Takeback Facility Documents, as applicable, and all transactions contemplated thereby; all actions to be taken, undertakings to be made, and obligations to be incurred by the Post-Effective Date Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and authorization for the Post-Effective Date Debtors to enter into and execute the New Takeback Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Takeback Facility.  Execution of the New Takeback Facility Credit Agreement by the New Takeback Facility Agent shall be deemed to bind all Holders of DIP Claims as if each such Holder had executed the New Takeback Facility Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Takeback Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Takeback Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Takeback Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Post-Effective Date Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(b)    New Common Stock.

Reorganized Cyxtera shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents and any options or other equity awards, if any, reserved for the Management Incentive Plan. The issuance of the New Common Stock shall be authorized without the need for any further corporate action. On the Effective Date, the New Common Stock shall be issued and distributed pursuant to, and in accordance with, the Plan, and, in the event of an Equity Investment Transaction, the Purchase Agreement.

All of the shares of New Common Stock issued pursuant to the Plan and, if applicable, the Purchase Agreement shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Common Stock shall be deemed to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Post-Effective Date Debtor(s). The New Common Stock will not be registered under the Securities Act or on any national securities exchange as of the Effective Date.

3.    Corporate Existence.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Post-Effective Date Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.    New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan. To the extent required under

the Plan or applicable non-bankruptcy law, each of the Post-Effective Date Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The New Organizational Documents will prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement. After the Effective Date, each Post-Effective Date Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Post-Effective Date Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents. For the avoidance of doubt, any claimant's acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Post-Effective Date Debtors.

     5.   <u>Certain Securities Law Matters.</u>

Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Common Stock as contemplated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities.

The shares of New Common Stock to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Stock in the New Organizational Documents.

The shares of New Common Stock that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

     6.   <u>Management Incentive Plan.</u>

On or as soon as reasonably practicable following the Effective Date, the Post-Effective Date Debtors shall adopt and implement the Management Incentive Plan, which will provide that up to 10% of the value of the New Common Stock as of the Effective Date, on a fully diluted basis, shall be issued in connection with the Management Incentive Plan on terms acceptable to the Required Consenting Term Lenders and the Debtors and, in the event of an Equity Investment Transaction, the Purchaser. The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

     7.   <u>Employment Obligations.</u>

Unless otherwise provided herein, and subject to Article V of the Plan, if applicable, all employee wages, compensation, retiree benefits (as defined in 11 U.S.C. § 1114(a) of the Bankruptcy Code), and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Post-Effective Date Debtors and shall remain in place as of the Effective Date, and the Post-Effective Date Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. On the

Effective Date, the Post-Effective Date Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees; or (b) enter into new agreements with such employees on terms and conditions acceptable to the Post-Effective Date Debtors, such employee, and the Required Consenting Term Lenders and, in the event of an Equity Investment Transaction, the Purchaser.

D.      *The Asset Sale.*

If the Asset Sale occurs, the following provisions shall govern.

1.      <u>The Asset Sale.</u>

On the Effective Date, the Purchaser shall purchase substantially all of the Debtors' assets free and clear of all Liens, Claims, Interests, charges, or other encumbrances (except for those Liens, Claims, Interests, charges, or other encumbrances assumed by the Purchaser pursuant to the terms of the Purchase Agreement) in exchange for the Purchase Price as set forth in the Purchase Agreement.  The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, and the Purchaser, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

Subject to the consent rights set forth in the RSA, the Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Asset Sale pursuant to the terms of the Purchase Agreement and the Plan.  On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors or the Purchaser, as applicable, may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.      <u>Sources of Consideration for Plan Distributions.</u>

The Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Asset Sale, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.      <u>Post-Effective Date Debtors.</u>

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible as authorized by the Bankruptcy Court; (ii) resolving Disputed Claims; (iii) making distributions on account of Allowed Claims as provided hereunder; (iv) establishing and funding the Distribution Reserve Accounts; (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (vi) filing appropriate tax returns; (vii) complying with any continuing obligations under the Purchase Agreement; and (viii) administering the Plan in an efficacious manner.  The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the

Post-Effective Date Debtors and shall be subject to administration by the Plan Administrator, and the net proceeds thereof shall be Distributable Consideration.

4. <u>Plan Administrator.</u>

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Post-Effective Date Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors. The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer. The Debtors, after the Confirmation Date, and the Post-Effective Date Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator and upon three (3) Business Days' notice to counsel to the AHG, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind-Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including: (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (viii) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.E; (ix) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (x) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (xi) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

(a) Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors. The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Post-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

    (b)  Compensation of the Plan Administrator.

   The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement, reasonably acceptable to the Required Consenting Term Lenders, and paid out of the Wind-Down Reserve.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

    (c)  Plan Administrator Expenses.

   All costs, expenses, and obligations incurred by the Plan Administrator or the Post-Effective Date Debtors in administering the Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Reserve.

   The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

    (d)  Exculpation, Indemnification, Insurance, and Liability Limitation.

   The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors.  The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

    (e)  Tax Returns.

   After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

    (f)  Dissolution of the Post-Effective Date Debtors.

   Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

   To the extent the Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed, such Cash or other property shall constitute Residual Cash and shall be immediately allocated and distributable to the Holders of Allowed First Lien Claims.

   5.  <u>Wind Down.</u>

   As soon as practicable after the Effective Date, the Plan Administrator shall:  (i) cause the Debtors and the

Post-Effective Date Debtors, as applicable, to comply with and abide by the terms of the Purchase Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of one or more of the Debtors or the Post-Effective Date Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Existing Equity Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

E.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Post-Effective Date Debtors, shall retain and may enforce (or the Plan Administrator may enforce, if applicable) all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Post-Effective Date Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Post-Effective Date Debtors, as applicable, as of the Effective Date.

The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Post-Effective Date Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Post-Effective Date Debtor except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance

will any Cause of Action preserved pursuant to this Article IV.E include any Claim or Cause of Action against a Released Party or Exculpated Party.

F.    *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except with respect to the New Takeback Facility or to the extent otherwise provided in the Plan, including in Article V.A hereof, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding the foregoing or anything to the contrary herein, any rights of each Agent to indemnification under the DIP Documents, the Receivables Program Documents, the First Lien Credit Documents, and the Bridge Facility Documents shall remain binding and enforceable in accordance with the terms of such documents and shall not be subject to discharge, impairment, or release under the Plan or the Confirmation Order.

G.    *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Post-Effective Date Debtor, as applicable, or to any other Person) of property under the Plan or pursuant to:  (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Post-Effective Date Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the grant of collateral as security for the New Takeback Facility; (vi) the Sale Transaction; or (vii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

H.    *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including, as and if applicable:  (i) selection of the directors, officers, or managers for the Post-Effective Date Debtors; (ii) the issuance and distribution of the New Common Stock; (iii) implementation of the Restructuring Transactions; (iv) entry into the New Takeback Facility Documents; (v) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) adoption by the New Board of the Management Incentive Plan; (ix) consummation of the Sale Transaction pursuant to the Purchase Agreement; (x) formation of the Post-Effective Date Debtors and selection of the Plan Administrator; and (xi) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect

without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Post-Effective Date Debtors.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including, in the event of a Recapitalization Transaction or an Equity Investment Transaction, the New Common Stock, the New Organizational Documents, the New Takeback Facility, the New Takeback Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.      *Directors and Officers of the Post-Effective Date Debtors.*

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of Cyxtera shall expire, and, if applicable, the members for the initial term of the New Board shall be appointed; *provided*, that the disinterested directors of Cyxtera, comprising the special committee of Cyxtera's board of directors, shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan.  The disinterested directors of Cyxtera shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Post-Effective Date Debtors, the Purchaser, or any other Entity without their prior written consent.

The Initial members of the New Board, if applicable, will be identified in the Plan Supplement to the extent known at the time of filing.  In the event of a Recapitalization Transaction or an Equity Investment Transaction, each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors.  The members of the New Board shall be chosen by the Debtors or the Post-Effective Date Debtors, subject to the applicable terms of the RSA and, if applicable, the Purchase Agreement.

J.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Post-Effective Date Debtors and their respective officers and boards of directors and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

K.      *Vesting of Assets in the Post-Effective Date Debtors.*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan, the Plan Supplement, or the New Takeback Facility Documents, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Post-Effective Date Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Post-Effective Date Debtor may operate its business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

L.      *Private Company.*

The Post-Effective Date Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company

without Securities Act or Exchange Act reporting obligations upon emergence or as soon as practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

M.      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Post-Effective Date Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Post-Effective Date Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

N.      *Director and Officer Liability Insurance.*

After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases.*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the foregoing assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors, the Post-Effective Date Debtors, and/or the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including ninety (90) days after the Effective Date; *provided* that in the event of a Recapitalization Transaction, such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth in the RSA.

B.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Post-Effective Date Debtors and/or the Plan Administrator, as applicable.

C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Post-Effective Date Debtors no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claims is not Filed with the Claims and Noticing Agent within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Estates, or their property without the need for any objection by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

D.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Post-Effective Date Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, including pursuant to the Plan, or related cure amount must be filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than thirty (30) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Post-Effective Date Debtor without the need for any objection by the Post-Effective Date Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Post-Effective Date Debtors, as applicable, of the Cure; *provided* that nothing herein shall prevent the Post-Effective Date Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The

Post-Effective Date Debtors may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or the Post-Effective Date Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or the Post-Effective Date Debtors, as applicable, with respect to which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Post-Effective Date Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.D shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the Post-Effective Date Debtors.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Post-Effective Date Debtors) or draw on any collateral or security therefor.

F.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

G.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Post-Effective Date Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was

executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtors or the Post-Effective Date Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims of Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or at such other time as provided for in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Post-Effective Date Debtors.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Post-Effective Date Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1. Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2. Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent, as appropriate: (a) to the signatory set forth on any Proof of Claim or Proof of Interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Post-Effective Date Debtors, or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Post-Effective Date Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

3. Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.

4. Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Post-Effective Date Debtors or the Plan Administrator, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheatment, abandoned property, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder related to such property or interest in property shall be discharged and forever barred.

E.    *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Post-Effective Date Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances in a tax-efficient manner acceptable to the Required Consenting Term Lenders.

G.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the DIP Orders, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.    *Setoffs and Recoupment.*

Except as expressly provided in the Plan, each Post-Effective Date Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Post-Effective Date Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Post-Effective Date Debtor(s) and Holder of Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date Debtor or its successor of any and all claims, rights, and Causes of Action that such Post-Effective Date Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Post-Effective Date Debtors, as applicable, unless such Holder actually has performed such

recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Claims Paid or Payable by Third Parties.*

      1.      <u>Claims Paid by Third Parties</u>.

The Debtors or the Post-Effective Date Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Post-Effective Date Debtor, as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Post-Effective Date Debtor, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Post-Effective Date Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder timely to repay or return such distribution shall result in the Holder owing the applicable Post-Effective Date Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is fully repaid.

      2.      <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.      <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained herein (including Article III of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

</div>

A.      *Disputed Claims Process.*

The Debtors and the Post-Effective Date Debtors shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of:  (a) the Effective Date or (b) the applicable claims bar date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Post-Effective Date Debtor, as applicable, without the need for any objection by the Debtor or Post-Effective Date Debtor, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of the Plan, the Plan Administrator or each of the Post-Effective Date Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

C.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

D.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Post-Effective Date Debtors and/or the Plan Administrator, as applicable, (and, in the event of an Equity Investment Transaction, the Purchaser) shall have the sole authority:  (i) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Post-Effective Date Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed by the Post-Effective Date Debtors on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

F.    *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Post-Effective Date Debtors and/or the Plan Administrator, as applicable, without the Post-Effective Date Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

G.    *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, may establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.  Following the final resolution of all Disputed Claims, any residual amounts in the Disputed Claims Reserve shall constitute Residual Cash and be immediately distributable to Holders of Allowed First Lien Claims.

H.    *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Post-Effective Date Debtors, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Post-Effective Date Debtors.  All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan after notice to the Holder of such Claim, but without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Post-Effective Date Debtors, in their sole discretion, any and all Proofs of Claim Filed after the applicable bar date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

I.    *Amendments to Proofs of Claim or Interest.*

On or after the Effective Date, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, and any such new or amended Proof of Claim or Proof of Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court absent prior Bankruptcy Court approval or agreement by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable; *provided* that the foregoing shall not apply to Administrative Claims [or claims filed by Governmental Units].

J.    *Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS[5]

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Post-Effective Date Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

**B.      *Release of Liens.***

**Except as otherwise provided in the New Takeback Facility Documents, the Plan, the Confirmation Order, the Purchase Agreement (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Post-Effective Date Debtors or the Plan Administrator, as applicable, to evidence the release of such Lien, including the**

---

[5]   **[NTD:**   Release provisions subject to ongoing review, including as part of the Special Committee investigation.**]**

execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.      *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Post-Effective Date Debtors and the Plan Administrator, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, the Post-Effective Date Debtors, or the Plan Administrator), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Post-Effective Date Debtors, if applicable, the Plan Administrator, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the New Organizational Documents, the Receivables Program Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Post-Effective Date Debtors or the Plan Administrator, asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable

non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the New Organizational Documents, the Receivables Program Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

*E.*      *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the New Takeback Facility Documents, the Receivables Program Documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will

be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Effective Date Debtors, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against the Post-Effective Date Debtors, or another Entity with whom the Post-Effective Date Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Post-Effective Date Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Post-Effective Date Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Restructuring Transactions shall have been implemented in accordance with the Restructuring Transactions Memorandum in all material respects;

2.      in the event of an Asset Sale, the Distribution Reserve Accounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind-Down Amount;

3.      the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall have become a Final Order;

4.      each document or agreement constituting the applicable Definitive Documents, the form and substance of which shall be subject to the consent rights set forth in the RSA (and, in the event of a Sale Transaction, the form and substance of which shall be reasonably acceptable to the Purchaser), shall have been executed and/or effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied or waived by the applicable party or parties prior to or contemporaneously with the occurrence of the Effective Date;

5.      the New Takeback Facility Documents, if applicable, the form and substance of which shall be subject to the consent rights set forth in the RSA, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the Required Consenting Term Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

6.      the DIP Claims shall have been indefeasibly paid in full in Cash or, solely to the extent set forth herein, satisfied by the New Takeback Facility;

7.      the New Common Stock shall have been issued;

8.      all Restructuring Expenses, to the extent invoiced, shall have been paid in full;

9.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Restructuring Transactions;

10.          if and as applicable, the Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of the Plan;

11.          if and as applicable, the Purchaser shall deliver the Purchase Price to the Debtors in exchange for the Post-Effective Date Debtors' distribution of the substantially all of the New Common Stock or transfer of substantially all of the Debtors' assets or as otherwise agreed to by the Debtors and the Purchaser;

12.          the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed;

13.          the RSA shall remain in full force and effect;

14.          none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

15.          no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors; and

16.          all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court.

B.       *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX, except for the conditions set forth in Article IX.A.8 and 16 of the Plan (each of which may not be waived without the consent of the affected parties), may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Term Lenders and, in the event of a Sale Transaction, the Purchaser, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.       *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by the Debtors or other Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.       *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.       *Modification and Amendments.*

Except as otherwise specifically provided in the Plan and only to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, rule 3019 of the Bankruptcy Rules, and, to the extent applicable,

sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify, the Plan with respect to such Debtor, one or more times, after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Post-Effective Date Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.         ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

6.         adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.         adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.         enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

9.         enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, discharges, and exculpations contained in the Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

13.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

14.        enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.        determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, including the RSA and the Purchase Agreement (if applicable);

16.        enter an order concluding or closing the Chapter 11 Cases;

17.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.        consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.        determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements (including the Purchase Agreement, if applicable), documents, or instruments executed in connection with the Plan;

21.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.       hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

23.       enforce all orders previously entered by the Bankruptcy Court; and

24.       hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Takeback Facility Documents shall be governed by the jurisdictional provisions therein, and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Post-Effective Date Debtors, the Purchaser (if applicable), and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

B.     *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Post-Effective Date Debtors, (or the Disbursing Agent on behalf of each of the Post-Effective Date Debtors) for each quarter (including any fraction thereof) until such Post-Effective Date Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

D.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee and any other statutory committee appointed in these Chapter 11 Cases shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Post-Effective Date Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

All monthly reports shall be filed, and all fees due and payable pursuant to section 1930(a) of Title 28 of the United States Code shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, (or the Disbursing Agent on behalf of each of the Post-Effective Date Debtors) on the Effective Date, and following the Effective Date, the Post-Effective Date Debtors (or the Disbursing Agent on behalf of each of the Post-Effective Date Debtors) shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) and shall file quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to file quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

    1.      if to the Debtors, to:

        Cyxtera Technologies, Inc.
        Attention:  Victor Semah, Chief Legal Counsel
        E-mail address:  victor.semah@cyxtera.com
        with copies to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, NY 10022
        Attention:  Edward O. Sassower, Christopher Marcus, Derek I. Hunter
        E-mail addresses:     esassower@kirkland.com
                    christopher.marcus@kirkland.com
                    derek.hunter@kirkland.com

    2.      if to a member of the AHG, to:

        Gibson, Dunn & Crutcher LLP
        200 Park Ave
        New York, NY 10166
        Attention:  Scott J. Greenberg, Steven Domanowski, Stephen D. Silverman
        E-mail addresses:     sgreenberg@gibsondunn.com,
                    sdomanowski@gibsondunn.com
                    ssilverman@gibsondunn.com

3.    if to a Consenting Sponsor, to:

       Latham & Watkins LLP
       1271 6th Avenue
       New York, NY 10020
       Attention:  George A. Davis, Joseph C. Celentino
       E-mail addresses:       george.davis@lw.com,
                           joe.celentino@lw.com

4.    if to the Purchaser, to:

       [●]

After the Effective Date, the Debtors have authority to notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.kccllc.net/cyxtera or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan, and any deletion or

modification thereof shall be subject to the consent rights set forth in the RSA (and, in the event of a Sale Transaction, with the reasonable consent of the Purchaser); and (iii) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals nor the Post-Effective Date Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Post-Effective Date Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the RSA, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a Holder of a Claim or Interest or the Purchaser in contravention of the provisions of the Plan shall be deemed an event of default under the Plan. Upon an event of default, the Post-Effective Date Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Post-Effective Date Debtors in remedying such default. Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may: (a) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award a judgment against such defaulting Holder of a Claim or Interest in favor of the Post-Effective Date Debtors in an amount, including interest, if applicable, to compensate the Post-Effective Date Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

P.      *Removal or Abandonment of Third Parties' Property.*

Nothing in the Plan shall impose upon the Post-Effective Date Debtors any obligation to store or protect any third party's property, all of which property will be deemed abandoned and surrendered to the Post-Effective Date Debtors if such property has not been removed (by its owner in a commercially reasonable manner, and with insurance to cover any damage from such removal) from any real property owned or leased by the Post-Effective Date Debtors within forty-five (45) days after Confirmation of the Plan. Following the abandonment and surrender of any such property, the Post-Effective Date Debtors may sell, transfer, assign, scrap, abandon, or otherwise dispose of such property and retain any proceeds resulting therefrom.

*[Remainder of page intentionally left blank.]*

Dated:  September 13, 2023

Cyxtera Technologies, Inc.
on behalf of itself and all other Debtors


/s/ Eric Koza
     Name:  Eric Koza
     Title:  Chief Restructuring Officer

**Exhibit B**

**RSA**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY  SUCH  OFFER  OR  SOLICITATION  WILL  COMPLY  WITH  ALL APPLICABLE  SECURITIES  LAWS  AND/OR  PROVISIONS  OF  THE  BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF  THE  AGREEMENT  EFFECTIVE  DATE  ON  THE  TERMS  DESCRIBED  HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS  RESTRUCTURING  SUPPORT  AGREEMENT  DOES  NOT  PURPORT  TO SUMMARIZE  ALL  OF  THE  TERMS,  CONDITIONS,  REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED  HEREIN,  WHICH  TRANSACTIONS  WILL  BE  SUBJECT  TO  THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE  APPROVAL  RIGHTS  OF  THE  PARTIES  SET  FORTH  HEREIN  AND  IN  SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**Agreement**") is made and entered into as of May 4, 2023 (the "**Execution Date**"), by and among the following parties, each in the capacity set forth on its signature page to this Agreement (each of the following described in sub-clauses (i) through (iv) of this preamble, a "**Party**" and, collectively, the "**Parties**"):[1]

    i.    Cyxtera Technologies, Inc., a company incorporated under the Laws of Delaware ("**Cyxtera**"), and each of its Affiliates listed on **Exhibit A** to this Agreement that have executed and delivered, or, in the future, executes and delivers, counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    As applicable, the undersigned holders of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, RCF Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting RCF Lenders**");

    iii.    the undersigned holders of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder,

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Term Lenders**," and along with the Consenting RCF Lenders, the "**Consenting Lenders**"); and

iv.    certain undersigned holders of outstanding Equity Interests (the "**Consenting Sponsors**," and, together with the Consenting Lenders, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders, including those Consenting Term Lenders that are members of an ad hoc group represented by Gibson, Dunn & Crutcher LLP and Houlihan Lokey Capital, Inc. (the "**AHG**"), have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**," and such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Restructuring Transactions set forth in the Restructuring Term Sheet contemplate a restructuring through either the sale of some or all of the Company Parties' business enterprise (a "**Sale Transaction**") and/or a recapitalization of the Company Parties' balance sheet (a "**Recapitalization Transaction**");

**WHEREAS**, to the extent applicable, the Parties have agreed that to the extent a Sale Transaction is not consummated out of court prior to the Toggle Date, then the Company Parties shall commence voluntary, jointly administered cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**") and pursue either a Sale Transaction or Recapitalization Transaction in the Bankruptcy Court; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    Definitions.  The following terms shall have the following definitions:

"**Acceptable Transaction**" has the meaning set forth in the Restructuring Term Sheet.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**AHG**" has the meaning set forth in the recitals to this Agreement.

"**AHG Lease Restructuring Advisor**" means an advisor to the AHG with respect to the analysis, negotiation, modification, assumption, and/or rejection of the Company Parties' unexpired lease portfolio.

"**AHG Professionals**" means (i) Gibson, Dunn & Crutcher LLP, as legal counsel to the AHG; (ii) Houlihan Lokey Capital, Inc., as financial advisor to the AHG; (iii) the AHG Lease Restructuring Advisor; (iv) one local legal counsel retained by the AHG in connection with the Restructuring Transactions; and (v) any other advisors retained by the AHG with the consent of the Company Parties (not to be unreasonably withheld, conditioned, or delayed).

"**Alternative Restructuring Proposal**" means any written or oral plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, debt incurrence (including, without limitation, any debtor-in-possession financing or exit financing) or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bidding Procedures**" means procedures governing the submission and evaluation of bids to purchase some or all of the Company's assets or equity.

"**Bidding Procedures Motion**" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking entry of the Bidding Procedures Order.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures.

"**Bridge Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**Bridge Facility Documents**" means the credit agreement governing the Bridge Facility (as defined in the Restructuring Term Sheet) and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Company Claims/Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the RCF Claims and the Term Loan Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Company Professionals**" means (i) Kirkland & Ellis LLP; (ii) Guggenheim Securities, LLC; and (iii) Alix Partners, LLP, each in its capacity as advisor to the Company Parties.

"**Company Releasing Party**" means each of the Company Parties, and, to the maximum extent permitted by law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting RCF Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Sponsors**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Sponsors' Professionals**" means Latham & Watkins, LLP in its capacity as advisor to the undersigned Consenting Sponsors.

"**Consenting Stakeholder Releasing Party**" means, each of, and in each case in its capacity as such: (a) the Consenting Stakeholders; (b) the Prepetition Agent; (c) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (d).

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means all documents, instruments, deeds, notifications, agreements, and filings related to documentation, implementation, and consummation of the Restructuring Transactions, including, without limitation: (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the Disclosure Statement Order; (E) the First Day Pleadings and all orders sought pursuant thereto; and (F) the Plan Supplement; (G) the DIP Order; (H) the DIP Documents; (I) the Exit Facility Documents; (J) the Solicitation Materials; (K) the First Lien Credit Agreement Amendment; (L) the Sale Documents; (M) the Bridge Facility Documents; and (N) the Scheduling Order, including any amendments, modifications, or supplements thereto.

"**Diligence Materials**" means (i) a DIP Facility sizing analysis; (ii) an analysis of projected lease and executory contract rejections and renegotiations in the context of a Recapitalization Transaction, including damage calculations under section 502(b)(6) of the Bankruptcy Code; (iii) an analysis of potential cost savings associated with the renegotiation of existing leases and contracts in the context of a Sale Transaction; (iv) both (A) a preliminary 1Q2023 financial update, including reasonably detailed MD&A, key operational KPIs such as churn and occupancy, and an overview of 2QTD trends, and (B) a draft 10Q filing in respect of 1Q2023, (v) updated financial and operational guidance for FY2023; (vi) a reasonably detailed revenue build-up for FY2023; (vii) a reasonably detailed budget, including with respect to

projected capital expenditures for FY2023 and FY2024; (viii) an updated 13-week cash flow forecast; (ix) an updated business plan, which shall have a case accounting for a potential Recapitalization Transaction and a status quo case, (x) a detailed summary of all employee retention and incentive programs applicable to the Company Parties, including aggregate amounts implicated, duration, timing of payments, number of employees included, supporting detail prepared by the Company's compensation consultant and, solely with respect to any insiders and key management-level employees, an employee-by-employee breakdown of the timing and amount of contemplated payments; and (xi) an update on the Marketing Process, including the identity of each potential bidder that has been contacted and the identity of each potential bidder that has signed a confidentiality agreement with the Company Parties.

"**DIP Agent**" means the administrative agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement, each of which shall be acceptable to the Required Consenting Term Lenders and the Company Parties.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement by and among certain Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms and conditions of the DIP Facility.

"**DIP Documents**" means, collectively, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**DIP Facility**" means the new superpriority secured term loans to be made in accordance with the DIP Credit Agreement.

"**DIP Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing, which shall be consistent with the DIP Credit Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means an order entered by the Bankruptcy Court approving the adequacy of the Disclosure Statement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facilities**" means the First-Out Take-Back Debt Facility and the Second-Out Take-Back Debt Facility.

"**Exit Facility Documents**" means the credit agreements governing the Exit Facilities and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**Final Bids**" means final bids submitted by the Potential Purchasers in the Marketing Process.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties, in consultation with the Consenting Term Lenders, determine are necessary or desirable to file.

"**First Lien Claims**" means, collectively, the RCF Claims and the Term Loan Claims.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of May 17, 2017, among Cyxtera DC Holdings, as the borrower, the lenders from time to time party thereto, and Citibank, N.A., as administrative agent for such lenders (as amended, supplemented or otherwise modified from time to time).

"**First Lien Credit Agreement Amendment**" means that certain amendment to the First Lien Credit Agreement as described in the Restructuring Term Sheet.

 "**First Lien Credit Documents**" means the First Lien Credit Agreement, the First Lien Credit Agreement Amendment, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**First-Out Take-Back Debt Facility**" means a senior secured, first lien "first-out" term loan facility, in form and substance acceptable to the Required Consenting Term Lenders, to be issued on the Plan Effective Date in accordance with the Restructuring Term Sheet.

"**General Milestones**" means the milestones set forth in <u>Section 4.01(a)</u> of this Agreement.

"**In-Court Dual Track Milestones**" means the milestones set forth in <u>Section 4.01(c)</u> of this Agreement.

"**In-Court Recap Milestones**" means the milestones set forth in <u>Section 4.01(d)</u> of this Agreement.

"**Independent Directors**" means Roger Meltzer and Fred Arnold, in their capacity as independent directors of the board of Cyxtera, and one additional director of the board of Cyxtera reasonably acceptable to the Company Parties and the Required Consenting Term Lenders whom the Company Parties shall use commercially reasonable efforts to obtain the necessary consents for and appoint prior to May 12, 2023.

"**IOIs**" means indications of interest submitted by the Potential Purchasers in the Marketing Process.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit D**.

"**Launch Date**" means April 14, 2023.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Marketing Process**" has the meaning set forth in the Restructuring Term Sheet.

"**Milestones**" means the General Milestones, the In-Court Dual Track Milestones, the In-Court Recap Track Milestones, and the Out-of-Court Milestones set forth in Section 4 of this Agreement.

"**Out-of-Court Milestones**" means the milestones set forth in Section 4.01(b) of this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Potential Purchasers**" means a group of potential transaction counterparties participating in the Marketing Process to be determined by the Company Parties in consultation with the AHG Professionals.

"**Prepetition Agent**" means Citibank, N.A., in its capacity as administrative and collateral agent under the First Lien Credit Agreement.

"**Purchase Agreement**" means the asset or stock purchase agreement to be entered into as part of the Sale Transaction by and among the Company Parties, as sellers, and the Winning Bidder (if any).

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**RCF Claims**" means any Claim on account of the Revolving Credit Facility.

"**Recapitalization Transaction**" has the meaning set forth in the recitals to this Agreement.

"**Related Party**" means, with respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity and any such person's or Entity's respective heirs, executors, estates, and nominees.

"**Released Claim**" means, with respect to any Releasing Party, any Claim or Cause of Action that is released by such Releasing Party under <u>Section 15</u> of this Agreement.

"**Released Company Parties**" means each of, and in each case in its capacity as such: (a) Company Party; (b) current and former Affiliates of each Entity in clause (a) through the following clause (c); and (c) each Related Party of each Entity in clause (a) through this clause (c).

"**Released Parties**" means each Released Company Party and each Released Stakeholder Party.

"**Released Stakeholder Parties**" means each of, and in each case in its capacity as such: (a) Consenting Stakeholder; (b) the Prepetition Agent; (c) current and former Affiliates of each Entity in clause (a) through the following clause (d); and (d) each Related Party of each Entity in clause (a) through this clause (d).

"**Releases**" means the releases contained in <u>Section 15</u> of this Agreement.

"**Releasing Parties**" means, collectively, each Company Releasing Party and each Consenting Stakeholder Releasing Party.

"**Required Consenting Lenders**" means, as of the relevant date, Consenting Lenders holding at least 50.01% of the aggregate outstanding principal amount of the First Lien Claims that are held by Consenting Lenders.

"**Required Consenting RCF Lenders**" means, as of the relevant date, Consenting Lenders holding at least 66.67% of the aggregate outstanding principal amount of RCF Claims that are held by Consenting Lenders.

"**Required Consenting Term Lenders**" means, as of the relevant date, Consenting Lenders holding at least 66.67% of the aggregate outstanding principal amount of the Term Loan Claims that are held by Consenting Lenders.

"**Required Consenting Stakeholders**" means the Required Consenting Term Lenders and the Consenting Sponsors.

"**Restructuring Effective Date**" means, as applicable, the Plan Effective Date or the Sale Closing Date.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Documents**" means all agreements, instruments, pleadings, orders or other related documents utilized to implement the Marketing Process and consummate the Sale Transaction, including, but not limited to, the Bidding Procedures, Bidding Procedures Motion, Bidding Procedures Order, and Purchase Agreement, each of which shall contain terms and conditions that are materially consistent with this Agreement.

"**Sale Transaction**" has the meaning set forth in the recitals to this Agreement.

"**Scheduling Order**" means an order scheduling a combined hearing regarding confirmation of the Plan and approval of the Disclosure Statement;

"**Second-Out Take-Back Debt Facility**" means a senior secured, first lien "second-out" term loan facility, in form and substance acceptable to the Required Consenting Term Lenders, to be issued on the Plan Effective Date in accordance with the Restructuring Term Sheet.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all materials to be distributed in connection with solicitation of votes to approve the Plan.

"**Special Committee**" means a newly established committee of Cyxtera's board of directors comprised of the Independent Directors, which shall be delegated exclusive power and

10

authority to oversee the Restructuring Transactions and to approve any decisions with respect thereto.

"**Sponsor Consent Right**" means the right of the Consenting Sponsors to consent to or approve any of the Definitive Documents (or any amendment, modification, or supplement thereto) that (i) materially and adversely affects, directly or indirectly, the economic recovery, or otherwise modifies or affects the releases or exculpation proposed to be granted to, or received by, the Consenting Sponsors pursuant to this Agreement or (ii) materially and adversely affects, directly or indirectly, the obligations that the Consenting Sponsors may have pursuant to this Agreement, in each case, which consent shall not be unreasonably withheld, conditioned or delayed.

"**Term Loan Claims**" means any Claim on account of the Term Loan Facilities.

"**Term Loan Facilities**" means those certain first lien term loan facilities issued pursuant to the First Lien Credit Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05.

"**Toggle Date**" means, as applicable, (i) the day on which a Toggle Trigger Event occurs; or (ii) the day the Company Parties, in their reasonable business judgment, and the Required Consenting Term Lenders agree to toggle to a Recapitalization Transaction.

"**Toggle Trigger Event**" has the meaning set forth in the Restructuring Term Sheet.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Winning Bidder**" has the meaning set forth in the Restructuring Term Sheet.

1.02.  Interpretation.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular

terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified;

(f)     the words "herein," "hereof," "hereinafter," "hereunder," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement unless the context otherwise requires;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day;

(j)     all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; and

(k)     the use of "include" or "including" is without limitation, whether stated or not and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; and

(l)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 16.11 other than counsel to the Company Parties.

**Section 2.     *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date and time on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties and the Consenting Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     holders of at least fifty (50%) of the aggregate outstanding principal amount of First Lien Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(c)     The First Lien Credit Agreement Amendment shall have been executed and effective;

(d)     the Company Parties shall have paid all reasonable and documented fees and expenses (including any reasonable fee and expense estimate through and including the Agreement Effective Date) of the AHG Professionals for which an invoice has been received by the Company Parties on or before the date that is one (1) Business Day prior to the Agreement Effective Date; and

(e)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in <u>Section 16.11</u> hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this <u>Section 2</u> have occurred.

**Section 3.**     *Definitive Documents*.  The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with <u>Section 14</u>.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance, including with respect to any amendment, modification or supplement thereto, reasonably acceptable to (a) the Company Parties, (b) the Required Consenting Term Lenders, and (c) solely to the extent required under the Sponsor Consent Right, the Consenting Sponsors.

**Section 4.**     *Milestones.*

4.01.   The following Milestones shall apply to this Agreement unless extended or waived in writing by the Required Consenting Term Lenders:

(a)     <u>General Milestones</u>.  The following Milestones shall apply in any event:

(i)     No later than 3 days after the Agreement Effective Date, the Company Parties shall have provided the members of the AHG with the Diligence Materials, which shall be in form and substance satisfactory to the Required Consenting Term Lenders;

(ii)    No later than the Launch Date, the Company Parties shall have commenced reaching out to Potential Purchasers;

(iii)   No later than 5 Business Days after the Launch Date, the Company Parties shall have commenced a good faith analysis of its existing executory contracts and unexpired leases with the purpose of reducing go-forward costs and expenses;

(iv)    No later than May 12, 2023:

a.      the Company Parties shall have appointed (A) a Chief Restructuring Officer, who shall be acceptable to the Required Consenting Term Lenders and shall report to the Special Committee; provided that, for the avoidance of doubt, the Required Consenting Term Lenders hereby consent to the appointment of Eric Koza as the Chief Restructuring Officer and (B) the Independent Directors;

b.      the Company Parties shall establish the Special Committee; and

c.      the Company Parties and the Required Consenting Term Lenders shall decide, in their reasonable judgment, whether to (A) continue pursuing the out-of-court Marketing Process, or (B) pursue, after filing the Chapter 11 Cases, (1) a Recapitalization Transaction or (2) a dual track process that allows the Company Parties to "toggle" between a Recapitalization Transaction or a Sale Transaction;

(v)      No later than 2 weeks after the execution of this Agreement, the Company Parties shall provide the AHG and the Consenting Sponsors' Professionals with copies of all material first-day filings, pleadings, and other first-day documentation in connection with a potential chapter 11 filing;

(vi)      In the event a Toggle Date occurs, the Company Parties shall commence the Chapter 11 Cases no later than 5 Business Days after the Toggle Date; and

(vii)      No later than May 14, 2023, the Petition Date shall have occurred.

(b)      Out-of-Court Milestones.  Solely to the extent that the Toggle Date has not occurred, the following Milestones shall apply:

(i)      The Company Parties shall request that Potential Purchasers submit IOIs from Potential Purchasers no later than 4 weeks after the Launch Date (the "**IOI Deadline**");

(ii)      No later than 3 Business Days after the IOI Deadline, the Company Parties shall provide the AHG Professionals with a reasonably detailed summary of recent Potential Purchaser activity;

(iii)      The Company Parties shall request that Potential Purchasers submit Final Bids no later than 9 weeks after the Launch Date (the "**Final Bid Deadline**");

(iv)      No later than the Final Bid Deadline, the Company Parties shall provide the AHG Professionals with a copy of each Final Bid received;

(v)      No later than 3 Business Days after the Final Bid Deadline, the Company Parties shall provide the AHG Professionals with a reasonably detailed summary of Potential Purchaser activity;

(vi)     No later than 13 weeks after the Launch Date, the Company Parties shall have negotiated and signed the Purchase Agreement to effectuate an Acceptable Transaction;

(vii)     No later than 3 Business Days after execution of the Purchase Agreement, the Company Parties shall provide the AHG Professionals with a reasonably detailed summary of recent Potential Purchaser activity; and

(viii)     No later than August 15, 2023, the Sale Transaction shall have closed ("**Sale Closing Date**").

(c)     <u>In-Court Dual Track Milestones</u>.   To the extent the Company Parties and the Required Consenting Term Lenders have agreed to continue to pursue a Sale Transaction in parallel with the Recapitalization Transaction, the following Milestones shall apply:

(i)     No later than 5 days prior to the Petition Date, the Company Parties shall have delivered to the AHG and the Consenting Sponsors DIP Documents that are reasonably acceptable to the Required Consenting Term Lenders;

(ii)     On the Petition Date, the Company Parties shall file (A) the Plan (which shall afford the Company Parties flexibility to "toggle" between a Sale Transaction and a Recapitalization Transaction), (B) the Disclosure Statement, (C) a motion seeking entry of Scheduling Order (if applicable), and (D) the Bidding Procedures Motion;

(iii)     No later than 2 Business Days after the Petition Date, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered (A) the interim DIP Order and (B) the Scheduling Order (if applicable);

(iv)     No later than 10 Business Days after the Petition Date, the Company Parties shall provide the AHG Professionals with a detailed update as to the status of negotiations with counterparties to executory contracts and leases on a contract-by-contract basis;

(v)     Subject to the availability of the Bankruptcy Court, if applicable, the Bidding Procedures Order shall be entered no later than 30 days after the Petition Date;

(vi)     No later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the final DIP Order;

(vii)     If applicable, the deadline for submitting qualified bids pursuant to the Bidding Procedures shall be no later than 45 days after the Petition Date;

(viii)     If applicable, any auction to select a winning bid pursuant to the Bidding Procedures shall commence no later than 60 days after the Petition Date;

(ix)     If applicable, an order approving a Sale Transaction (on a conditional basis if such Sale Transaction is to be consummated pursuant to the Plan and on a final basis if such Sale Transaction is consummated pursuant to section 363 of the Bankruptcy Code) shall be entered by the Bankruptcy Court no later than 70 days after the Petition Date;

(x)    No later than 70 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

(xi)    No later than 110 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(xii)    No later than the 120 days after the Petition Date, the Plan Effective Date shall have occurred; provided that, if necessary regulatory approvals associated with a Restructuring Transaction remain pending as of such date, this date shall automatically be extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

(d)    In-Court Recap Milestones.    Unless the Company Parties and the Required Consenting Term Lenders have agreed to continue to pursue a Sale Transaction in parallel with the Recapitalization Transaction, the following Milestones shall apply:

(i)    No later than 5 days prior to the Petition Date, the Company Parties shall have delivered to the AHG and the Consenting Sponsors DIP Documents that are reasonably acceptable to the Required Consenting Term Lenders;

(ii)    No later than 1 Business Day prior to the Petition Date, the Company Parties shall have commenced solicitation of the Plan;

(iii)    On the Petition Date, the Company Parties shall file (A) the Plan (votes for which shall have already been solicited), (B) the Disclosure Statement, and (C) a motion seeking entry of Scheduling Order;

(iv)    No later than 2 Business Days after the Petition Date, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered (i) the interim DIP Order and (ii) the Scheduling Order (if applicable);

(v)    No later than 10 Business Days after the Petition Date, the Company Parties shall provide the AHG Professionals with a detailed update as to the status of negotiations with counterparties to executory contracts and leases on a contract-by-contract basis;

(vi)    No later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the final DIP Order;

(vii)    No later than 45 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and the Disclosure Statement Order; and

(viii)    No later than 60 days after the Petition Date, the Plan Effective Date shall have occurred; provided that, if necessary regulatory approvals associated with a Restructuring Transaction remain pending as of such date, this date shall automatically be extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

**Section 5.**        *Commitments of the Consenting Lenders.*

5.01.   <u>General Commitments</u>.

(a)     During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims/Interests, to:

(i)     use commercially reasonable efforts and take to all reasonable actions necessary to support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders, including to obtain support for the Restructuring Transactions from holders of at least two-thirds of the First Lien Claims;

(iii)   use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in <u>Section 5.03(b)</u>;

(iv)    give any notice, order, instruction, or direction to the Prepetition Agent necessary to give effect to the Restructuring Transactions;

(v)     take, and direct the Prepetition Agent to take, all actions reasonably necessary in furtherance of the Sale Transaction, if applicable; and

(vi)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)     During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)   file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to

enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    object to, delay, impede, or take any other action to interfere with entry of any Sale Document and/or consummation of any Sale Transaction;

(vi)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or interests in the Company Parties; or

(vii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; provided that nothing in this Agreement shall limit the right to exercise any right or remedy provided under this Agreement or any other Definitive Document.

5.02.    Commitments with Respect to Marketing Process.    During the Agreement Effective Period, each Consenting Lender and its professionals agree that they shall:

(a)    promptly inform the Company Parties and/or the Company Professionals in the event that they are contacted by a Potential Purchaser regarding the Company Parties or the Marketing Process; and

(b)    not directly or indirectly communicate with the Potential Purchasers regarding the Company Parties or the Marketing Process without the Company Parties' prior written consent, which consent shall not be unreasonably withheld.

5.03.    Commitments with Respect to Chapter 11 Cases.

(a)    During the Agreement Effective Period, each Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    not opt out of, object to, or otherwise hinder or delay approval of the Debtor and third-party releases, injunctions, discharge, and exculpation provisions provided in the Plan, which provisions, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Term Lenders;

(iii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iv)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)    During the Agreement Effective Period, each Consenting Lender, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.    *Commitments of the Consenting Sponsors*.**

6.01.    <u>Affirmative Commitments</u>.  During the Agreement Effective Period, each of the Consenting Sponsors severally, and not jointly, agrees to:

(a)    use commercially reasonable efforts and take all reasonable actions necessary to support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are not inconsistent with this Agreement to which it is required to be a party in order for the Restructuring Transactions to be implemented; and

(c)    negotiate in good faith any reasonable and appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

6.02.    <u>Negative Commitments</u>.   During the Agreement Effective Period, each of Consenting Sponsors severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(d)    object to, delay, impede, or take any other action to interfere with entry of any Sale Document and/or consummation of any Sale Transaction;

(e)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to

enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(f)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided that* nothing in this Agreement shall limit any of the Consenting Sponsors' right to exercise any right or remedy provided under this Agreement or any other Definitive Document.

6.03.   Commitments with Respect to Chapter 11 Cases.   During the Agreement Effective Period, each of the Consenting Sponsors severally, and not jointly, agrees that it shall, for the duration of the Agreement Effective Period:

(a)      if solicited, timely vote or cause to be voted its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot or ballots on a timely basis following the commencement of the solicitation;

(b)      not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (a) above or release described in clause (c) below;

(c)      not opt out of, object to, or otherwise hinder or delay approval of the releases set forth in the Plan with respect to each Released Party, which provisions shall be in the form and substance acceptable to the Consenting Sponsors;

(d)      if solicited, timely vote (or cause to be voted) its Company Claims/Interests against any Alternative Restructuring Proposal;

(e)      not directly or indirectly, through any person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; and

(f)      support and take all actions reasonably necessary or reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

6.04.   Additional Provisions Regarding the Consenting Sponsors' Commitments.

(a)      Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(i)      impair or waive the rights of any Consenting Sponsor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(ii)     affect the ability of any Consenting Sponsor to consult with any Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(iii)     restrict any Consenting Sponsor in its capacity as the manager or operator of fund Entities other than the Company Parties; or

(iv)     prevent any Consenting Sponsor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 7.**     *Commitments of the Company Parties*.

7.01.    <u>Affirmative Commitments</u>.    Except as set forth in <u>Section 7.03</u>, during the Agreement Effective Period, the Company Parties agree to:

(a)     use best efforts to (i) pursue the Restructuring Transactions on the terms, and in accordance with the Milestones set forth in this Agreement, and (ii) obtain necessary Bankruptcy Court approval of the Definitive Documents to consummate the Restructuring Transactions;

(b)     consult with the AHG Professionals regarding the Marketing Process, subject to the AHG Professionals' non-disclosure agreements, and the AHG Professionals may suggest additional Potential Purchasers, <u>provided </u>that in no event shall the AHG Professionals disclose to the AHG the identity of Potential Purchasers;

(c)     continue reaching out to Potential Purchasers, including Potential Purchasers suggested by the AHG Professionals, in the Company Parties' business judgment and in good faith;

(d)     share with the AHG Professionals any marketing materials used in the Marketing Process and provide regular updates to the AHG Professionals regarding the status thereof, including, among other things, a list of Potential Purchasers contacted by the Company Parties;

(e)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(f)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary or desirable to address and resolve any such impediment;

(g)     support and seek approval of all of the debtor and third-party releases, injunctions, discharge, indemnity, and exculpation provisions provided in the Plan, which shall be in form and substance acceptable to the Required Consenting Term Lenders and the Consenting Sponsors;

(h)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(i)     negotiate in good faith and use commercially reasonable efforts to execute, deliver, and perform its obligations under the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement and the other Definitive Documents;

(j)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(k)     to the extent reasonably practicable, provide counsel for the AHG and counsel for the Consenting Sponsors a review period of (i) at least three (3) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company Parties intend to file any Definitive Document with the Bankruptcy Court and (ii) at least one (1) calendar day (or such shorter review period as necessary or appropriate) prior to the date when the Company intends to file any other material pleading with the Bankruptcy Court (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto);

(l)     provide a reasonable opportunity to counsel to any Consenting Stakeholders materially affected by any filing to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court, as applicable;

(m)     to the extent applicable, object to any motion filed with the Bankruptcy Court by any person (i) seeking the entry of an order terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization or (ii) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief was granted, would have a material adverse effect on or delay the consummation of the Restructuring Transactions; and

(n)     to the extent applicable, not file any pleading seeking entry of an order, and object to any motion filed with the Bankruptcy Court by any person seeking the entry of an order, (i) directing the appointment of an examiner or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) for relief that (x) is inconsistent with this Agreement in any material respect or (y) would reasonably be expected to frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Restructuring Transactions.

7.02.   Negative Commitments.   Except as set forth in Section 7.03, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     incur any material indebtedness or equity financing without prior written consent of the Required Consenting Term Lenders;

(c)     sell or dispose of any material assets without prior written consent of the Required Consenting Term Lenders;

(d)     transfer any assets, other than cash, outside of the ordinary course of business to any person or Entity that is not a Loan Party or Guarantor (as such terms are defined in the First Lien Credit Agreement);

(e)     assume or reject any executory contract or lease without prior written consent of the Required Consenting Term Lenders;

(f)     take any action, or encourage any other person or Entity to take any action, directly or indirectly, that would reasonably be expected to breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with, or impede acceptance or approval of, implementation and consummation of the Restructuring Transactions, this Agreement, the Confirmation Order, or the Plan;

(g)     subject to Section 7.03 hereof, propose, file, support, or vote for any Alternative Restructuring Proposal;

(h)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(i)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

7.03.    Additional Provisions Regarding Company Parties' Commitments.

(a)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including any special committee of such governing body, as applicable), after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.03(a) shall not be deemed to constitute a breach of this Agreement; provided that notwithstanding anything to the contrary herein, each Consenting Stakeholder reserves its rights to challenge any action taken by the Company Parties in reliance on this Section 7.03(a).

(b)     Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.03(a)), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider and respond to Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise respond to and participate in any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations

with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; provided that if any Company Party receives or responds to an Alternative Restructuring Proposal, the Company Parties shall provide a copy of any such Alternative Restructuring Proposal or response to the AHG Professionals and Consenting Sponsors' Professionals no later than one (1) Business Day following receipt or delivery thereof by any of the Company Parties.

(c)     Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.     *Additional Provisions Regarding the Consenting Stakeholders' Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or (d) require the Consenting Lenders or the Consenting Sponsors to incur any unreimbursed fees, out-of-pockets costs or other monetary obligations in connection with giving effect to any commitment or covenant of the Consenting Lenders or the Consenting Sponsors hereunder.

**Section 9.     *Transfer of Interests and Securities*.**

9.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)     either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties and the Required Consenting Term Lenders at or before the time of the proposed Transfer. Notwithstanding the foregoing, during the Agreement Effective Period, in the case of any Equity

24

Interests, no Consenting Stakeholder shall Transfer any Equity Interests, other than as part of a Sale Transaction in accordance with the terms of this Agreement, that would, in the reasonable determination of the Company Parties, result in an "ownership change" within the meaning of Section 382 of the Internal Revenue Code of 1986, as amended.

9.02.    Upon compliance with the requirements of <u>Section 9.01</u>, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of <u>Section 9.01</u> shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; <u>provided</u>, <u>however</u>, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of the closing of such acquisition.

9.04.    This <u>Section 9</u> shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding <u>Section 9.01</u>, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently Transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under <u>Section 9.01</u>; and (iii) the Transfer otherwise is a permitted Transfer under <u>Section 9.01</u>.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06.    The Company Parties understand that the Consenting Lenders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Lender that

principally manage and/or supervise the Consenting Lender's investment in the Company Parties and shall not apply to any other trading desk or business group of the Consenting Lender so long as they are not acting at the direction or for the benefit of such Consenting Lender or in connection with such Consenting Lender's investment in the Company Parties.

9.07.    Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Consenting Stakeholder that is a Qualified Marketmaker before the occurrence of conditions giving rise to the effective date for the obligations and the support hereunder, such Consenting Stakeholder shall be a Consenting Stakeholder hereunder solely with respect to the Company Claims/Interests listed on such signature pages and shall not be required to comply with this Agreement for any other Company Claims/Interests it may hold from time to time in its role as a Qualified Marketmaker.

9.08.    Notwithstanding anything to the contrary in this <u>Section 9</u>, the restrictions on Transfer set forth in this <u>Section 9</u> shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.**     *Representations and Warranties of Consenting Stakeholders*.  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)     it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9);

(b)     it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)     such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, Transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and Transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)     solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not

26

with a view to distribution or resale in violation of the Securities Act, (iii) it understands that the securities contemplated by this Agreement have not been registered under the Securities Act as of the date hereof and may not be resold without registration under the Securities Act except pursuant to a specific exemption from the registration provisions of the Securities Act, and (iv) it will not be acquiring the securities contemplated by this Agreement as a result of any advertisement, article, notice, or other communication regarding such securities published in any newspaper, magazine, or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

**Section 11.** *Mutual Representations, Warranties, and Covenants*.   Each of the Parties severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Restructuring Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Purchase Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)    the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.** *Termination Events*.

12.01.  Consenting Lender Termination Events.  This Agreement may be terminated by the Required Consenting Term Lenders by the delivery to the Company Parties of a written notice in accordance with Section 16.11 hereof upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Lenders seeking termination pursuant to this provision and (ii)

remains uncured for five (5) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 16.11 hereof detailing any such breach;

(b)     the making publicly available, modification, amendment, or filing of any of the Definitive Documents without the consent of the Required Consenting Term Lenders in accordance with this Agreement;

(c)     any Company Party (i) withdraws the Plan, (ii) publicly announces its intention not to support the Restructuring Transactions, or (iii) files, publicly announces, executes, responds to, or supports an Alternative Restructuring Proposal or definitive agreement with respect thereto;

(d)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 16.11 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)     the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of a terminating Consenting Lender in violation of its obligations under this Agreement;

(f)     the Company Parties fail to timely pay in full the AHG Professional's reasonable, documented fees and expenses in accordance with Section 13 hereof;

(g)     any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement, unless waived by the Required Consenting Term Lenders, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(h)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(i)     upon the occurrence of a termination event in Section 12.02 of this Agreement;

28

(j)    any Company Party files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within five (5) Business Days of receipt by the Company Parties of written notice from the Required Consenting Term Lenders that such motion or pleading is inconsistent with this Agreement;

(k)    entry of a DIP Order that is not acceptable to the Required Consenting Term Lenders;

(l)    the Company Parties file any Definitive Document that is not acceptable to the Required Consenting Term Lenders;

(m)    a Company Party files any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Company Claims/Interests or asserts any other cause of action against the Consenting Lenders or with respect or relating to such Company Claims/Interests, the First Lien Credit Agreement, any Bridge Facility Documents, or any Loan Document (as such term is defined in each of the foregoing credit agreements or documents) or the prepetition liens securing the Company Claims/Interests or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Company Claims/Interests or asserting any other cause of action against the Consenting Lenders or with respect or relating to such Company Claims/Interests or the prepetition liens securing the Company Claims/Interests other than a claim or cause of action arising from or related to such Consenting Lenders' breach of this Agreement or any other Definitive Documents;

(n)    the occurrence of any default or event of default under the Bridge Facility Documents, First Lien Credit Documents, DIP Documents, or DIP Order, as applicable, that has not been cured or waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the Bridge Facility Documents, DIP Documents or DIP Order, as applicable;

(o)    the Company Parties lose the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(p)    the Bankruptcy Court enters an order denying confirmation of the Plan;

(q)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement; or

(r)    the Consenting Sponsors terminate this Agreement pursuant to Section 12.03 hereof.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.11 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect of any provision set forth in this Agreement by one or more of the Consenting Lenders holding an amount of First Lien Claims that would result in non-breaching Consenting Lenders holding less than fifty percent (50%) of the aggregate outstanding principal amount of First Lien Claims that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of written notice of such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party (including any special committee of such governing body, as applicable) determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, it is required to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.11 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan.

12.03.  Consenting Sponsor Termination Events.  This Agreement may be terminated by a Consenting Sponsor in respect of such Consenting Sponsor by the delivery to the Company Parties of a written notice in accordance with Section 16.11 of this Agreement upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party or Consenting Stakeholders of any of the representations, warranties, or covenants of the Company Parties or Consenting Stakeholders, as applicable, set forth in this Agreement that (i) materially and adversely affects the treatment, rights, or obligations under this Agreement or the Plan of any Consenting Sponsor and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Sponsors transmit a written notice in accordance with Section 16.11 of this Agreement detailing any such breach;

(b)      the making publicly available, modifying, amending, or filing of any of the Definitive Documents without the consent of the Consenting Sponsors to the extent required under this Agreement;

(c)      the Required Consenting Term Lenders terminate this Agreement pursuant to Section 12.01; or

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment, or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after such terminating Consenting Sponsors transmit a written notice in accordance with Section 16.11 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Consenting Sponsor that sought or requested such ruling or order in contravention of any obligation set out in this Agreement.

12.04.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

12.05.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after either (a) the Plan Effective Date or (b) in the event that the Sale Transaction is effectuated out of court, the Sale Closing Date.

12.06.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party, and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 12.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant

to Section 12.02(b) or Section 12.02(d).    Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

12.07.  The Company Parties acknowledge that after the Petition Date, the giving of notice of termination by any Party pursuant to this Agreement shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code; provided that nothing herein shall prejudice any Party's right to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**Section 13.**    *Fees and Expenses*.  The Company Parties shall pay or reimburse all reasonable and documented fees and expenses of the AHG Professionals related to the Restructuring Transactions or the Chapter 11 Cases, whether incurred prior to, on or after the Agreement Effective Date, Petition Date, or Restructuring Effective Date, within five (5) Business Days of receipt of an invoice therefor.  The Company Parties shall pay or reimburse all reasonable and documented fees and expenses of the Consenting Sponsors' Professionals related to the Restructuring Transactions or the Chapter 11 Cases, and incurred prior to or on the Agreement Effective Date, within five (5) Business Days of receipt of an invoice therefor; provided, however, that such reimbursement shall not exceed $100,000.

**Section 14.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party, (b) the Required Consenting Term Lenders, (c) solely to the extent any such modification, amendment, supplement or waiver would have a material, adverse, and disproportionate impact on the Consenting RCF Lenders, the Required Consenting RCF Lenders, (d) solely to the extent any such modification, amendment, supplement or waiver would have a material, adverse, and disproportionate (relative to the Company Parties, the Consenting Term Lenders, or the Consenting RCF Lenders) impact on the Consenting Sponsors, the Consenting Sponsors, and (e) solely to the extent any such modification, amendment, supplement, or waiver would have a material, adverse, and disproportionate impact on a particular Consenting Stakeholder, such impacted Consenting Stakeholders.

(c)    Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies

under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.     *Mutual Releases*.**

15.01. <u>Releases</u>.

(a)     <u>Releases by the Company Releasing Parties</u>.  Except as expressly set forth in this Agreement, effective on (and only upon) the Plan Effective Date or the Sale Closing Date (if the Sale Transaction occurs out of court), as applicable, and only with respect to each Party that has not terminated its obligations under this Agreement except to the extent set forth in <u>Section 12.06</u> hereof, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party shall hereby be deemed released and discharged by each and all of the Company Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Company Releasing Parties that such of the foregoing Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or interest in, a Company Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Company Releasing Parties (including the management, ownership, or operation of the Company Parties), the purchase, sale, or rescission of any security of the Company Parties, the subject matter of, or the transactions or events giving rise to, any Company Claim/Interest that is treated in the Plan, the business or contractual arrangements between any Company Party and any Released Party, the Company Parties' in or out of court restructuring efforts, intercompany transactions, the DIP financing, the exit financing, the Sale Transaction, the Chapter 11 Cases, this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date or the Sale Closing Date, as applicable.

(b)     <u>Releases by the Consenting Stakeholder Releasing Parties</u>.  Except as expressly set forth in this Agreement, effective on (and only upon) the Plan Effective Date or the Sale Closing Date (if the Sale Transaction occurs out of court), as applicable, and only with respect to each Party that has not terminated its obligations under this Agreement except to the extent set forth in <u>Section 12.06</u> hereof, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed released and discharged by each and all of the Consenting Stakeholder Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the

Company Parties that the Consenting Stakeholder Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or interest in, a Company Parties, based on or relating to, or in any manner arising from, in whole or in part, the Company Parties (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Company Parties or the reorganized Company Parties, the subject matter of, or the transactions or events giving rise to, any Company Claim/Interest that is treated in the Plan, the business or contractual arrangements between any Company Party and any Released Party, the Company Parties' in- or out-of-court restructuring efforts, intercompany transactions, the DIP financing, the exit financing, the Sale Transaction, the Chapter 11 Cases, this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date or the Sale Closing Date, as applicable.

15.02. <u>No Additional Representations and Warranties</u>.   Each of the Parties agrees and acknowledges that, except as expressly provided in this Agreement and the Definitive Documents, no other Party, in any capacity, has warranted or otherwise made any representations concerning any Released Claim (including any representation or warranty concerning the existence, nonexistence, validity, or invalidity of any Released Claim).   Notwithstanding the foregoing, nothing contained in this Agreement is intended to impair or otherwise derogate from any of the representations, warranties, or covenants expressly set forth in this Agreement or any of the Definitive Documents.

15.03. <u>Releases of Unknown Claims</u>.   Each of the Releasing Parties in each of the Releases contained in this Agreement expressly acknowledges that although ordinarily a general release may not extend to Released Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above Releases the possible existence of such unknown losses or claims.   Without limiting the generality of the foregoing, each Releasing Party expressly waives and relinquishes any and all rights such Party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the Release or which may in any way limit the effect or scope of the Releases with respect to Released Claims which such Party did not know or suspect to exist in such Party's favor at the time of providing the Release, which in each case if known by it may have materially affected its settlement with any Released Party.   Each of the Releasing Parties expressly acknowledges that the Releases and covenants not to sue contained in this Agreement are effective regardless of whether those released matters or Released Claims are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.

15.04. <u>Turnover of Subsequently Recovered Assets</u>.   In the event that any Releasing Party (including any successor or assignee thereof and including through any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar Entity) is successful in pursuing or receives, directly or indirectly, any funds, property, or other value on account of any claim, Cause of Action, or litigation against any Released Party that was released pursuant to the Release (or would have been released pursuant to the Release if the party bringing such claim were a Releasing Party), such Releasing Party (i) shall not commingle any such recovery with any of its other assets and (ii) agrees that it shall promptly turnover and assign any such recoveries to, and hold them in trust for, such Released Party.

15.05. <u>Certain Limitations on Releases</u>.   For the avoidance of doubt, nothing in this Agreement and the Releases contained in this <u>Section 15</u> shall or shall be deemed to result in the waiving or limiting by (a) the Company Parties, or any officer, director, member of any governing body, or employee or other Related Party thereof, of (i) any indemnification against any Company Party, any of their insurance carriers, or any other Entity, (ii) any rights under or as beneficiaries of any insurance policies or any contract or agreement with any Company Party or any of its Affiliates, (iii) wages, salaries, compensation, or benefits, (iv) intercompany claims, or (v) any interest held by a Company Party or other Related Party thereof; (b) the Consenting Stakeholders or the Prepetition Agent of any claims or "Obligations" under and as defined in each of the DIP Documents, Exit Facility Documents, or any other financing document (except as may be expressly amended or modified by the Plan, or any other financing document under and as defined therein); and (c) any Party or other Entity of any post-Agreement Effective Date obligations under this Agreement or post-Plan Effective Date obligations under the Plan, the Confirmation Order, the Restructuring Transaction, or any other Definitive Document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Restructuring Transactions.

15.06. <u>Covenant Not to Sue</u>.   Each of the Releasing Parties hereby further agrees and covenants not to, and shall not, commence or prosecute, or assist or otherwise aid any other Entity in the commencement or prosecution of, whether directly, derivatively or otherwise, any Released Claims.

**Section 16.**    *Miscellaneous*

16.01. <u>Acknowledgement</u>.   Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02. <u>Exhibits Incorporated by Reference; Conflicts</u>.   Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  <u>Further Assurances</u>.  Subject to the terms of this Agreement, each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Restructuring Transactions, the Sale Transaction, the Recapitalization Transaction, and the Plan.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  Other than with respect to the Released Parties and the Parties referenced in <u>Section 16.12</u>, there are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity.

16.10.  <u>Relationship Among the Parties</u>.  It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in Company Claims/Interests without the consent of the Company Parties, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable non-disclosure agreement, and the terms of this Agreement; <u>provided</u> that no Party shall have any responsibility for any such trading by any other Party by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

16.11.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Company
Cyxtera Technologies, Inc.
Attention:  Victor Semah, Chief Legal Counsel
E-mail address:  victor.semah@cyxtera.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Christopher Marcus, Derek I. Hunter
E-mail addresses:      christopher.marcus@kirkland.com
                      derek.hunter@kirkland.com

(b)      if to a Consenting Term Lender, to:

Gibson, Dunn & Crutcher LLP
200 Park Ave
New York, NY 10166
Attention:  Scott J. Greenberg, Steven Domanowski
E-mail addresses:      sgreenberg@gibsondunn.com,
                      sdomanowski@gibsondunn.com

(c)      if to a Consenting Sponsor, to:

37

Latham & Watkins LLP
1271 6th Avenue
New York, NY 10020
Attention:  George A. Davis, Joseph C. Celentino
E-mail addresses:   george.davis@lw.com,
joe.celentino@lw.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.12.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms for the benefit of the Company Parties (including for the benefit of any Party acting on behalf of any of the Company Parties, including any financial or other professional advisors of any of the foregoing) that (i) it has the requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of the securities that may be acquired by it pursuant to the Restructuring Transactions contemplated hereby and has had such opportunity as it has deemed adequate to obtain such information as is necessary to permit such Party to evaluate the merits and risks of the securities that may be acquired by it pursuant to the Restructuring Transactions contemplated hereby, and (ii) that its decision to execute this Agreement and participate in any of the Restructuring Transactions contemplated hereby has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties and/or the Restructuring Transactions, and such decision is not in reliance upon any representations or warranties of any other Party (or such other Party's financial or other professional advisors) other than those contained in the Definitive Documents.

16.13.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.14.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.15.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.16.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.17.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.18.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.19.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

16.20.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 15</u> and the Confidentiality Agreements (in accordance with their terms) shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  Notwithstanding the foregoing, the Parties acknowledge and agree that if this Agreement is terminated prior to the Sale Closing Date (if the Sale Transaction occurs out of court) or the Plan Effective Date, then <u>Section 15</u> shall not survive such termination, and the Releases set forth therein shall have no force or effect.

16.21.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3</u>, <u>Section 14</u>, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**CYXTERA COMMUNICATIONS, LLC
CYXTERA DATA CENTERS, INC.
CYXTERA DC HOLDINGS, INC.
CYXTERA DC PARENT HOLDINGS, INC.
CYXTERA FEDERAL GROUP, INC.
CYXTERA MANAGEMENT, INC.
CYXTERA NETHERLANDS B.V.
CYXTERA TECHNOLOGIES, INC.
CYXTERA TECHNOLOGIES MARYLAND, INC.
CYXTERA HOLDINGS, LLC
CYXTERA EMPLOYER SERVICES, LLC
CYXTERA TECHNOLOGIES, LLC
CYXTERA CANADA, LLC
CYXTERA DIGITAL SERVICES, LLC
CYXTERA COMMUNICATIONS CANADA, ULC
CYXTERA CANADA TRS, ULC
CYXTERA TECHNOLOGY UK LIMITED
CYXTERA UK TRS LIMITED**

By: _____

Name:  Carlos I. Sagasta

Authorized Signatory

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**[CONSENTING STAKEHOLDER]**

_____

Name:
Title:

Address:

E-mail address(es):

| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
|---|---|
| RCF Claims | |
| Term Loan Claims | |
| Equity Interests | |

## <u>EXHIBIT A</u>

### Company Parties

1.      Cyxtera Communications, LLC
2.      Cyxtera Data Centers, Inc.
3.      Cyxtera DC Holdings, Inc.
4.      Cyxtera DC Parent Holdings, Inc.
5.      Cyxtera Federal Group, Inc.
6.      Cyxtera Management, Inc.
7.      Cyxtera Netherlands B.V.
8.      Cyxtera Technologies, Inc.
9.      Cyxtera Technologies Maryland, Inc.
10.     Cyxtera Holdings, LLC
11.     Cyxtera Employer Services, LLC
12.     Cyxtera Technologies, LLC
13.     Cyxtera Canada, LLC
14.     Cyxtera Digital Services, LLC
15.     Cyxtera Communications Canada, ULC
16.     Cyxtera Canada TRS, ULC
17.     Cyxtera Technology UK Limited
18.     Cyxtera UK TRS Limited

## **EXHIBIT B**

**Restructuring Term Sheet**

## CYXTERA TECHNOLOGIES, INC., *ET AL.*

## RESTRUCTURING TERM SHEET

### May 4, 2023

This term sheet (the "***Term Sheet***") summarizes the material terms and conditions of proposed transactions (the "***Restructuring Transactions***") to restructure the existing indebtedness of, and equity interests in, Cyxtera Technologies, Inc. and its direct and indirect subsidiaries ("***Cyxtera***," or the "***Company***").  The Restructuring Transactions will be consummated through a Sale Transaction or the Plan filed in the Chapter 11 Cases on the terms, and subject to the conditions, set forth in the Restructuring Support Agreement (together with the exhibits and schedules attached to such agreement, including this Term Sheet, each as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***RSA***").[1]

THIS TERM SHEET IS NEITHER AN OFFER WITH RESPECT TO ANY SECURITIES NOR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY.  THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH THE PROPOSED RESTRUCTURING TRANSACTIONS OR THAT WILL BE SET FORTH IN THE DEFINITIVE DOCUMENTATION.

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of definitive documentation acceptable to the Company and the Consenting Lenders, as applicable.  The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring Transactions and any related restructuring or similar transaction have not been fully evaluated and any such evaluation may affect the terms and structure of any Restructuring Transactions or related transactions.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

---

[1]    Terms used but not defined herein shall have the meanings ascribed to them elsewhere in this Term Sheet or in the RSA to which this Term Sheet is attached.

| **OVERVIEW** | |
|---|---|
| **Restructuring Summary** | The Restructuring Transactions will be accomplished through either (i) a potential Sale Transaction or (ii) a potential recapitalization of the Company's balance sheet (the "***Recapitalization Transaction***") implemented through cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court pursuant to the RSA. |
| | To the extent the Company pursues the Recapitalization Transaction, the RSA will obligate the Company and Consenting Lenders to support a plan of reorganization (the "***Plan***") that will effectuate the Restructuring Transactions on the terms and conditions set forth in this Term Sheet.  To the extent the Company pursues a Sale Transaction, the Restructuring Transactions may be effectuated either out of court or in the Chapter 11 Cases, including pursuant to the Plan. |
| | This Term Sheet contemplates a restructuring in two potential phases: |
| | i.   **The Marketing Process (Phase 1).**  In late March / early April 2023, the Company, with the assistance of their investment banker, Guggenheim Securities, LLC, launched a marketing process (the "***Marketing Process***") to determine the highest and best *bona fide* offer, in the Company's business judgment, to purchase some or all of the Company's business enterprise (the "***Sale Transaction***").  The Sale Transaction may be implemented, at the reasonable discretion of the Company and the Required Consenting Term Lenders, either out of court or in court through the Chapter 11 Cases, including through the Plan. |
| | ii.   **Recapitalization Transaction (Phase 2).**  To the extent the Marketing Process does not result in an Acceptable Transaction by the Sale Closing Date, or if one or more of the other Toggle Trigger Events occurs, the Company shall promptly terminate the Marketing Process (unless otherwise agreed by the Required Consenting Term Lenders) and, within 5 Business Days of the Toggle Date, commence the Chapter 11 Cases to implement the Recapitalization Transaction as set forth in this Term Sheet, the RSA, and the other Definitive Documents. |
| | In the event that the Company Parties and Required Consenting Term Lenders agree to continue the Marketing Process and/or consummate a Sale Transaction in the Chapter 11 Cases, including through the Plan, then the Company Parties and Required Consenting Term Lenders agree to negotiate, in good faith, any necessary and conforming changes to the terms hereunder. |
| **Current Indebtedness** | The Company is subject to the following prepetition obligations: |
| | •   **RCF Claims.**  The Company is party to that certain first lien, multi-currency revolving credit facility (the "***Revolving Credit Facility***") issued pursuant to that certain First Lien Credit Agreement, dated as of May 1, 2017, by and among Cyxtera DC Parent Holdings, Inc., Colorado Buyer Inc., as borrower, the first lien lenders party thereto, and Citibank, N.A. as administrative and collateral agent (as amended, supplemented, or otherwise modified from time to time, the "***First Lien Credit Agreement***").  As of the date hereof, |

2

| | |
|---|---|
| | approximately $102,053,125 in unpaid aggregate principal amount is outstanding under the Revolving Credit Facility, plus accrued but unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the Revolving Credit Facility (such amounts, the "***RCF Claims***");<br><br>• **Term Loan Claims.** The Company is party to that certain first lien term loan credit facility issued pursuant to the First Lien Credit Agreement (the "***Term Loan Facility***," and the Term Loan Facility together with the Revolving Credit Facility, the "***First Lien Facilities***").    As of the date hereof, approximately $864,387,500 in aggregate principal amount is outstanding under the Term Loan Facility, plus accrued but unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the Term Loan Facility (such amounts the "***Term Loan Claims***," and the Term Loan Claims together with the RCF Claims, the "***First Lien Claims***");<br><br>• **Receivables Facility Claims.**    The Company participates in an Accounts Receivable Sales Program with PNC Bank, National Association, and certain other parties (the "***A/R Program***").   As of the date hereof, the Company owes an aggregate of approximately $37,500,000 in connection with the A/R Program (such amounts, the "***Receivables Facility Claims***");<br><br>• **Lease Claims.**   The Company is party to certain finance and operational leases, installment sale agreements, conditional sale agreements, hire purchase agreements, or similar instruments or secured loans that the Company enters into, as lessee, buyer, or debtor in relation to the equipment subject thereto (the "***Leases***," and claims under such Leases, the "***Lease Claims***"); and<br><br>• **Existing Equity Interests.**   The Company has issued Class A common stock, which common stock trades on the Nasdaq Stock Market LLC under ticker symbol CYXT (the "***Existing Common Stock***," and any interests arising from the Existing Common Stock at any given time prior to the Plan Effective Date, if any, the "***Equity Interests***"). |
| **THE MARKETING PROCESS (PHASE 1)** | |
| **Sale Process and Selection of a Winning Bid** | The Company shall conduct the Marketing Process, in consultation with the AHG, according to the Out-of-Court Milestones and commitments set forth in the RSA and in a manner intended to minimize time, risk, and cost of execution in the Company's business judgment and to maximize value.<br><br>The Company will review each Final Bid that contemplates an Acceptable Transaction ("***Acceptable Bids***").   If the Company determines, in its business judgment and consistent with its fiduciary duties, and in consultation with the AHG, that any Acceptable Bid constitutes the most value maximizing transaction available to the Company, the Company shall select the applicable Acceptable Bid as the winning bid (the "***Winning Bid***") and, upon consent of the Required |

| | |
|---|---|
| | Consenting Term Lenders, work expeditiously to consummate the transaction contemplated thereby (the "**Winning Transaction**"). |
| **First Lien Credit Agreement Amendment** | The First Lien Credit Agreement shall be amended (such amendment, the "**First Lien Credit Agreement Amendment**") to include, among other things, and in each case as reasonably acceptable to the AHG and the Company, (i) the Liability Management Protections; (ii) the removal or limitation of all non-ordinary course capacity with respect to negative covenants, including permitted indebtedness, permitted liens, permitted investments, restricted payments, asset dispositions and reinvestment rights, affiliate transactions, fundamental changes, and sale leaseback transactions; and (iii) a limited carve out to permit incurrence of the Bridge Facility.<br><br>The First Lien Credit Agreement Amendment shall close concurrently with the Bridge Facility. |
| **Bridge Financing** | In support of the Marketing Process and the Restructuring Transactions, certain of the Consenting Term Lenders shall provide the Company, concurrently with entry into the RSA, with a super-senior secured term loan financing facility in an aggregate principal amount of $50 million (the "**Bridge Facility**," and such lenders, the "**Bridge Facility Lenders**") on terms reasonably acceptable to the AHG and the Company, which terms shall in any event include:<br><br>• <u>Timing</u>:  The documents governing the Bridge Facility shall become effective, and proceeds thereof shall be disbursed, concurrently with the First Lien Credit Agreement Amendment and in any event no later than May 4, 2023.  A portion of the Bridge Facility proceeds may, at the election of the Company and Required Consenting Term Lenders, be funded into escrow and/or subject to a delayed draw mechanic.<br><br>• <u>Participation</u>:  At the election of the Required Consenting Term Lenders, participation may be made available to all holders of First Lien Claims on a *pro rata* basis, subject to a customary backstop by certain of the Consenting Term Lenders (the "**Backstop Parties**"), which shall be in form and substance acceptable to the AHG and the Company.<br><br>• <u>Maturity</u>:  Coterminous with the existing maturity date of the Term Loan Facility.<br><br>• <u>Interest</u>:  SOFR *plus* 500 bps.<br><br>• <u>Backstop Fee</u>:   600 bps, payable in cash at closing pro rata to the Backstop Parties.<br><br>• <u>Commitment Fee</u>:  300 bps, payable in cash at closing pro rata to the Bridge Facility Lenders, including, for the avoidance of doubt, the Backstop Parties.<br><br>• <u>Priority</u>:  The Bridge Facility shall be senior in right of payment to the Term Loan Facility and shall be secured by a *pari passu* lien on all collateral securing the Term Loan Facility (the "**Bridge Financing Liens**"). |

4

|  | • Collateral:  In addition to the Bridge Financing Liens, the Bridge Facility shall be secured by (i) deposit account control agreements over certain of the Company's bank accounts, and (ii) additional collateral and guarantees from additional guarantors in any case mutually acceptable to both the AHG and the Company.<br><br>• Covenants:  Covenants shall, among other things, (i) not permit non-ordinary course capacity with respect to negative covenants unless otherwise agreed by the AHG and (ii) include the Liability Management Protections.<br><br>• Rating Requirement.  The Company shall use commercially reasonable efforts to obtain a rating for the Bridge Facility from each of Moody's and S&P. |
|---|---|
| **Staple Financing[2]** | In connection with any Sale Transaction and at the option of the Company, and provided that the Winning Transaction contemplates an equity investment of no less than 40% of the Sale Enterprise Value (unless otherwise agreed to by the Required Consenting Term Lenders), the Term Loan Lenders shall provide a staple financing facility according to the following terms (the "***Staple Financing Facility***" and the loans advanced pursuant thereto, the "***Staple Financing Loans***"):<br><br>• Lenders:  The Term Loan Lenders.<br><br>• Principal Amount:  No greater than $600 million.<br><br>• Priority/Collateral:  The Staple Financing Facility shall be secured by first priority liens on (i) all Collateral and (ii) all Unencumbered Assets of the Loan Parties.   Certain non-Loan Parties acceptable to the Required Consenting Term Lenders (the "***Additional Guarantors***") shall also provide additional guarantees for the benefit of the Staple Financing Facility.<br><br>• Loan Parties:   All Loan Parties and Guarantors, plus the Additional Guarantors<br><br>• Interest:  The Staple Financing Loans shall bear interest (such interest, the "***Staple Interest***") at a rate equal to (a) if the Company achieves the Staple Rating Requirement, SOFR *plus* 500bps *plus* a credit spread adjustment of 0.26161%; or (b) if the Company fails to achieve the Staple Rating Requirement, SOFR *plus* 550bps *plus* a credit spread adjustment of 0.26161%.  In the event that the Staple Interest is determined in accordance with clause (a) of the preceding sentence, 50–150 bps shall be payable in kind at the option of the Company and the balance shall be payable in cash; in the event that the Staple Interest is determined in accordance with clause (b) of the preceding sentence, 50–200 bps shall be payable in kind at the option of |

---

[2]   Terms used but not defined in this section shall have the meanings set forth in that certain First Lien Collateral Agreement dated as of May 1, 2017, by and among Cyxtera DC Parent Holdings, Inc., Colorado Buyer Inc., the other guarantors from time to time party thereto, and Citibank, N.A., as collateral agent ("***First Lien Collateral Agreement***").

|  | the Company and the balance shall be payable in cash.  In any event, the Staple interest shall be paid quarterly. |
|  | • OID:  1.5 percent |
|  | • Amortization:  The Staple Financing Loans shall amortize at 1 percent per annum, paid in quarterly installments. |
|  | • Maturity:  Five years from the effective date of the Staple Financing Effective Date. |
|  | • Call Protection:  The Staple Financing Facility shall be callable (i) at a 1 percent penalty for the first year following the Staple Financing Effective Date and (ii) without penalty thereafter. |
|  | • Covenants:  Covenants shall be determined by mutual agreement between the Company and the AHG but in any event shall include:  (a) a carve-out to allow for the incurrence of a new money revolving credit facility in a minimum amount to be agreed by the Company and the Required Consenting Term Lenders; (b) no non-ordinary course capacity with respect to negative covenants, subject to certain exceptions satisfactory to the Required Consenting Term Lenders; (c) the Liability Management Protections, which shall be included as sacred rights; and (d) financial covenants acceptable to the Required Consenting Term Lenders, including, in any event, a minimum cash or liquidity covenant acceptable to the Required Consenting Term Lenders. |
|  | • Rating Requirement.  The Company shall use commercially reasonable efforts to obtain a rating for the Staple Financing Facility of no worse than B3 and B- from Moody's and S&P, respectively, within 30 days of the Staple Financing Effective Date (the "**Staple Rating Requirement**"). |
| **Treatment of Claims and Interests** | The Company's balance sheet shall be unaffected by the Sale Transaction except as otherwise set forth below: |
|  | • Revolving Credit Facility:  Following the Sale Closing Date (if the Sale Transaction closes out of court), either (i) the Revolving Credit Facility shall be refinanced in full; or (ii) the First Lien Credit Agreement shall be amended such that the maturity date of the Revolving Credit Facility is extended to be coterminous with the Staple Financing Facility. |
|  | • Bridge Facility:  Following the Sale Closing Date (if the Sale Transaction closes out of court), unless otherwise agreed to by Bridge Facility Lenders holding at least two-thirds in aggregate principal amount of the then-outstanding Bridge Facility Loans, each holder of Bridge Facility Loans shall receive its Pro Rata share of the Par Plus Recovery, and (ii) solely to the extent such holder is a Consenting Term Lender, its Pro Rata share of the Excess Term Loan Recovery, if applicable. |
|  | • Term Loan Facility:  Following the Sale Closing Date (if the Sale Transaction closes out of court), unless otherwise agreed to by the Required Consenting |

| | |
|---|---|
| | Term Lenders, each holder of a Term Loan Claim shall receive (i) its Pro Rata share of the Par Plus Recovery and (ii) solely to the extent such holder is a Consenting Term Lender, its Pro Rata share of the Excess Term Loan Recovery, if applicable. <br><br> • <u>Existing Common Stock</u>:  Following the Sale Closing Date (if the Sale Transaction closes out of court), holders of the Existing Common Stock shall receive (i) their *pro rata* share of the Sale Equity Distribution and (ii) their *pro rata* share of the Excess Equity Recovery, if applicable; *provided* that if holders of Existing Common Stock receive or retain, following a Sale Transaction, value in excess of the Minimum Equity Value, such excess shall reduce the Minimum Equity Value on a dollar-for-dollar basis unless holders of Bridge Facility Claims and Term Loan Claims have received their Pro Rata share of the Par Plus Recovery. |
| **Company Status** | The Company may be public or private following consummation of the Sale Transaction, if any. |
| **THE RECAPITALIZATION TRANSACTION (PHASE 2)** | |
| **General** | Unless otherwise agreed to by the Required Consenting Term Lenders, the Company shall toggle from pursuing the Sale Transaction to pursuing the Recapitalization Transaction upon the occurrence of one or more of the following (each, a "***Toggle Trigger Event***"): <br><br> i.    any Out-of-Court Milestone is breached; <br><br> ii.    no Acceptable IOI is received by the IOI Deadline; <br><br> iii.    no Acceptable Bid is received by the Final Bid Deadline; <br><br> iv.    on the Sale Closing Date, the Company is unable to, or in the reasonable judgment of both the Company and the Required Consenting Term Lenders will not be able to (a) satisfy the Minimum Sale Proceeds Requirement and/or (b) retain the Minimum Required Liquidity as contemplated in this Term Sheet; or <br><br> v.    the Marketing Process is terminated. <br><br> Notwithstanding anything to the contrary herein or in the RSA, unless otherwise agreed to by the Required Consenting Term Lenders, the Company shall file the Chapter 11 Cases on the earlier of (a) May 14, 2023, and (b) within 5 Business Days following the Toggle Date. |
| **DIP Financing** | Pursuant to the Recapitalization Transaction, the Company shall seek approval of a non-amortizing, super-senior secured debtor-in-possession financing facility (the "***DIP Facility***," the loans advanced thereunder, the "***DIP Loans***," and the lenders thereunder, the "***DIP Lenders***") subject to a competitive marketing process. <br><br> If the DIP Facility is provided by certain Consenting Term Lenders, then (i) the DIP Facility shall be made available to all Consenting Lenders on a *pro rata* basis; (ii) the DIP Facility shall convert into the First-Out Take-Back Debt Facility on the Plan Effective Date; (iii) the adequate protection provided by the Company to |

7

|  | the DIP Lenders shall include (x) current payment in cash of default interest on account of such DIP Lenders' Term Loan Claims and, as applicable, Bridge Facility Claims, and (y) payment of the DIP Lenders' reasonable, documented professional fees incurred during the Chapter 11 Cases, among other adequate protection acceptable to the DIP Lenders, the Required Consenting Term Lenders, and the Company; and (iv) the Company shall use commercially reasonable efforts to obtain a rating for the DIP Facility from each of Moody's and S&P.<br><br>Subject to a standard market check, unless otherwise consented to by the Required Consenting Term Lenders, the Bridge Facility shall, at the election of the Required Consenting Term Lenders, either be (i) refinanced by the DIP Facility or (ii) roll into the DIP Facility on a *pari passu* or senior basis upon entry of the final DIP Order. Any roll-up ratio shall be acceptable to the Required Consenting Term Lenders and the Company. |  |
|---|---|---|
| **Exit Financing** | On the Plan Effective Date, the reorganized Company (the "***Reorganized Cyxtera***") shall enter into the following Exit Facilities: (i) a senior secured, first lien "first-out" term loan facility (the "***First-Out Take-Back Debt Facility***"), and (ii) a senior secured, first lien "second-out" term loan facility (the "***Second-Out Take-Back Debt Facility***" and, together with the First-Out Take-Back Debt Facility, the "***Exit Facilities***"). The terms, conditions, structure, and principal amount of the Exit Facilities shall be in form and substance acceptable to the Required Consenting Term Lenders and the Company.<br><br>In any event, the aggregate quantum of the First-Out Take-Back Debt Facility and the Second-Out Take-Back Debt Facility shall not exceed 60 percent of Standalone Enterprise Value, unless otherwise agreed by the Required Consenting Term Lenders and the Company. |  |

| CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE RECAPITALIZATION TRANSACTION | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | |
| **DIP Claims** | On the Plan Effective Date, each holder of an allowed DIP Claim shall receive either (i) its *pro rata* share of the First-Out Take-Back Debt Facility or (ii) payment in full in cash. | N/A |
| **Administrative Claims** | Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code to the extent such claim has not already been paid during the Chapter 11 Cases (each, an "***Administrative Claim***"), shall receive payment in full, in cash, of the unpaid portion of its allowed Administrative Claim on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as | N/A |

| | may be agreed to by the holder of such Administrative Claim and the Company. | |
| --- | --- | --- |
| **Priority Tax Claims** | Each holder of an allowed claim described in section 507(a)(8) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases (collectively, the "***Priority Tax Claims***"), shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| | **Classified Claims and Interests** | |
| **Other Priority Claims** | Each holder of an allowed claim described in section 507(a) of the Bankruptcy Code other than a Priority Tax Claim, to the extent such claim has not already been paid during the Chapter 11 Cases (collectively, the "***Other Priority Claims***"), shall receive payment in full, in cash, of the unpaid portion of its Other Priority Claim on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Other Priority Claim and the Company. | Unimpaired / Deemed to Accept |
| **Other Secured Claims** | Each holder of an allowed prepetition secured claim other than a First Lien Claim (each, an "***Other Secured Claim***"), shall receive, in the discretion of the Company Parties and the Required Consenting Term Lenders, either (i) payment in full in cash of the unpaid portion of its Other Secured Claim on the Plan Effective Date or as soon as reasonably practicable thereafter (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **First Lien Claims** | **Allowance.**   The First Lien Claims shall be allowed in an aggregate principal amount of no less than $966,440,625, plus interest, fees, premiums, and all other obligations, amounts and expenses due and owing under the First Lien Facilities as of the Plan Effective Date pursuant to the First Lien Credit Agreement or related documents (including accrued but unpaid post-petition interest at the default contract rate). <br><br> **Treatment.**   On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of a First Lien Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed First Lien Claim, each holder of a First Lien Claim shall receive its *pro rata* share of (a) the Second-Out Take-Back Debt Facility; and (b) 100 percent of the New Common Stock, subject to dilution by (i) the Recapitalization MIP, (ii) the Equity Recovery Stock | Impaired / Entitled to Vote |

9

| | | |
|---|---|---|
| | Component, and (iii) any rights offering acceptable to the Required Consenting Term Lenders and the Company. | |
| **Receivables Facility Claims** | In full and final satisfaction of their claims, on the Plan Effective Date, holders of Receivables Facility Claims shall receive treatment sufficient to render them unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **General Unsecured Claims** | Except to the extent that a holder of an allowed general unsecured claim (each, a "***General Unsecured Claim***") agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed General Unsecured Claim, each holder of a General Unsecured Claim shall receive, in the discretion of the Company Parties and the Required Consenting Term Lenders:<br><br>(A) in the event the Recapitalization Transaction is consummated through Pre-Packaged Chapter 11 Cases, either (i) reinstatement of such allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; (ii) payment in full in cash on (a) the Plan Effective Date or as soon as reasonably practicable thereafter, or (b) the date on which such payment would be due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such allowed General Unsecured Claim; or (iii) such other recovery as may be agreed to by the holder of a General Unsecured Claim, the Company, and the Required Consenting Term Lenders; or<br><br>(B) in the event the Recapitalization Transaction is not consummated through Pre-Packaged Chapter 11 Cases, to-be-determined treatment acceptable to the Required Consenting Term Lenders and the Company. | Unimpaired / Deemed to Accept<br><br>or<br><br>Impaired / Entitled to Vote<br><br>or<br><br>Impaired / Deemed to Reject |
| **Section 510(b) Claims** | On the Plan Effective Date, allowed claims arising under section 510(b) of the Bankruptcy Code (each, a "***510(b) Claim***"), if any, shall be cancelled without any distribution, and such holders of 510(b) Claims will receive no recovery. | Impaired / Deemed to Reject |
| **Intercompany Claims** | Claims held by one Company Entity against another Company Entity (each, an "***Intercompany Claim***") may be reinstated as of the Plan Effective Date or, at Cyxtera's or Reorganized Cyxtera's option, may be cancelled, and no distribution shall be made on account of such claims. | Unimpaired / Deemed to Accept<br><br>or<br><br>Impaired / Deemed to Reject |

10

| Intercompany Interests | Interests in a Company Entity held by another Company Entity (each, an "***Intercompany Interest***") may be reinstated as of the Plan Effective Date or, at Cyxtera's or Reorganized Cyxtera's option, be cancelled, and no distribution shall be made on account of such interests. | Unimpaired / Deemed to Accept<br><br>or<br><br>Impaired / Deemed to Reject |
|---|---|---|
| Existing Equity Interests | On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of an Equity Interest agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Equity Interest, each holder of an Equity Interest shall receive:<br><br>(A) in the event the Recapitalization Transaction is consummated through Pre-Packaged Chapter 11 Cases, its *pro rata* share of the Equity Recovery Pool. In such case, the Plan shall provide for the funding of a value recovery pool in an amount no less than the Equity Plan Recovery Amount for distribution to holders of Equity Interests on a *pro rata* basis (the "***Equity Recovery Pool***"). The Equity Recovery Pool shall be in a form acceptable to the Required Consenting Term Lenders; or<br><br>(B) in the event the Recapitalization Transaction is not consummated through Pre-Packaged Chapter 11 Cases, no recovery. In such case, the Equity Interests shall be cancelled and extinguished. | Impaired / Entitled to Vote<br><br>or<br><br>Impaired / Deemed to Reject |
| **OTHER TERMS OF THE PLAN** | | |
| Management Equity Incentive Plan | In the event of a Recapitalization Transaction, the Plan shall provide that up to 10% of the value of the New Common Stock as of the Plan Effective Date on a fully diluted basis shall be issued in connection with a management incentive plan (the "***Recapitalization MIP***") on terms acceptable to the Required Consenting Term Lenders and the Company.  The issuance of any awards under the Recapitalization MIP shall be at the discretion of the new board of directors of reorganized Cyxtera. | |
| Executory Contracts and Unexpired Leases | The Plan shall provide that executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code.<br><br>Allowed claims arising from the rejection of any of the Company's executory contracts and unexpired leases shall be classified as General Unsecured Claims.<br><br>Cyxtera shall seek to reject such leases as may be determined by the Company with the consent of the Required Consenting Term Lenders. | |

11

| **Retained Causes of Action** | Reorganized Cyxtera shall retain all rights to commence and pursue any causes of action other than any causes of action released or exculpated in the Plan (including, without limitation, by the Company) pursuant to the release and exculpation provisions outlined in this Term Sheet, the RSA, or any other Definitive Document. |
|---|---|
| **Plan Releases and Exculpations** | The Plan shall include customary exculpation provisions and releases of claims, litigations, or other causes of action arising on or before the Plan Effective Date. |
| **Corporate Governance Documents** | In connection with the Plan Effective Date, and consistent with section 1123(a)(6) of the Bankruptcy Code, Reorganized Cyxtera shall adopt customary corporate governance documents, including amended and restated certificates of incorporation, bylaws, and shareholders' agreements in form and substance reasonably acceptable to Reorganized Cyxtera and the Required Consenting Term Lenders. |
| **New Board of Directors** | On and immediately following the Plan Effective Date, the board of directors of Reorganized Cyxtera shall be acceptable to the Required Consenting Term Lenders, including, without limitation, with respect to the number and identity of the directors. |
| **Tax Issues** | The Parties will use commercially reasonable efforts to structure the Restructuring Transactions to preserve favorable tax attributes. The tax structure of the Restructuring Transactions shall otherwise be acceptable to the Required Consenting Term Lenders and the Company. |

| **DEFINITIONS** | |
|---|---|
| *"Acceptable IOI"* | means an IOI that contemplates an Acceptable Transaction. |
| *"Acceptable Transaction"* | means, unless otherwise agreed to by the Required Consenting Term Lenders, a Sale Transaction that, at a minimum: (i) provides the Company with Net Sale Proceeds no less than the Par Plus Value and (ii) leaves the Company with no less than the Minimum Required Liquidity. |
| *"AHG"* | means an ad hoc group of certain holders of Term Loan Claims represented by Gibson, Dunn & Crutcher LLP and Houlihan Lokey Capital, Inc. |
| *"Bridge Facility Claims"* | means claims arising on account of the Bridge Facility Loans. |
| *"Bridge Facility Loans"* | means loans issued pursuant to the Bridge Facility. |
| *"DIP Claims"* | means claims arising on account of a DIP Loan. |
| *"Equity Plan Recovery Amount"* | means an amount equal to the lesser of (i) $20 million, and (ii) 4.75% of Plan Equity Value, subject to dilution by the Recapitalization MIP and any rights offering acceptable to the Required Consenting Term Lenders and the Company. |
| *"Equity Recovery Cash Component"* | means an amount of cash equal to the Equity Plan Recovery Amount *less* the value of the Equity Recovery Stock Component. |
| *"Equity Recovery Stock Component"* | means an amount of New Common Stock to be determined by the Required Consenting Term Lenders and the Company, subject to dilution by the Recapitalization MIP. |
| *"Excess Equity Recovery"* | means 0.925 *multiplied* by the amount by which Net Sale Proceeds exceed the Par Plus Value. |
| *"Excess Term Loan Recovery"* | means 0.075 *multiplied* by the amount by which Net Sale Proceeds exceed the Par Plus Value. |
| *"Liability Management Protections"* | means (i) a provision prohibiting payment or lien subordination of the Term Loan Claims, (ii) a "Chewy protection" provision, (iii) a "J. Crew protection" provision, which shall be applicable to both unrestricted subsidiaries and non-loan parties, (iv) an "Incora protection" provision, and (v) a provision prohibiting the Company from engaging in non-cash open market purchases, each of which shall be acceptable to the Required Consenting Term Lenders. |
| *"Loan Parties"* | has the meaning set forth in the First Lien Credit Agreement. |

| | |
|---|---|
| *"Minimum Equity Value"* | means an amount no less than $30 million, *provided* that the same may be reduced to no less than $25 million pursuant to a scale mutually agreed to by the Required Consenting Term Lenders and the Company in the event that the Winning Transaction does not result in Net Sale Proceeds that exceed the Par Plus Value.<br><br>For the avoidance of doubt, in no event shall the Minimum Equity Value be construed to limit the value that the holders of Existing Common Stock may receive from the Sale Transaction. |
| "*Minimum Required Liquidity*" | means, as of the Sale Closing Date, liquidity in an amount acceptable to the Required Consenting Term Lenders. |
| "*Minimum Sale Proceeds Requirement*" | means Net Sale Proceeds in an amount equal to Par Plus Value. |
| *"Net Sale Proceeds"* | means proceeds of the Winning Transaction in the form of cash and/or takeback debt (excluding any takeback debt in respect of the Revolving Credit Facility) *less* the sum of: (i) all fees and expenses incurred in connection with the Winning Transaction and (ii) Minimum Equity Value. |
| *"New Common Stock"* | means, a single class of common equity interests issued by Reorganized Cyxtera on the Plan Effective Date. |
| *"Par Plus Recovery"* | means value no less than the Par Plus Value. |
| *"Par Plus Value"* | means, unless otherwise agreed by the Company and the Required Consenting Term Lenders, value equal to the aggregate value of all principal, accrued but unpaid interest, and fees on all (i) Term Loan Claims, (ii) Bridge Facility Claims, and (iii) DIP Claims outstanding as of the Sale Closing Date, if applicable. |
| *"Plan Effective Date"* | means the date on which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with its terms and this Term Sheet, the RSA, and the other Definitive Documents. |
| *"Plan Equity Value"* | means the equity value of Reorganized Cyxtera as of the Plan Effective Date, calculated in accordance with generally accepted accounting principles |
| *"Pre-Packaged Chapter 11 Cases"* | means Chapter 11 Cases effectuated through confirmation of a Plan, votes for which have been solicited on a prepetition basis and consummation of which shall occur on a Plan Effective Date occurring no later than 60 days after the Petition Date. |
| *"Pro Rata"* | means, as applicable, (i) with respect to recoveries on account of Term Loan Claims and Bridge Facility Claims following a Sale Transaction, the ratio that any Term Loan Claim or Bridge Facility Claim bears to the aggregate amount of all Term Loan Claims and Bridge Facility Claims; or (ii) with |

2

| | respect to recoveries on account of Term Loan Claims or Bridge Facility Claims held by Consenting Term Lenders following a Sale Transaction, the ratio that any Term Loan Claim or Bridge Facility Claim held by any such Consenting Term Lender bears to the aggregate amount of Term Loan Claims and Bridge Facility Claims held by all Consenting Term Lenders. |
|---|---|
| "***Required Consenting Term Lenders***" | means, as of the relevant date, Consenting Term Lenders holding at least two-thirds in aggregate outstanding principal amount of the Term Loan Claims that are held by Consenting Term Lenders. |
| "***Sale Enterprise Value***" | means the *pro forma* enterprise value of the Company following consummation of the Winning Transaction, calculated in accordance with generally accepted accounting principles, *excluding* any liabilities arising in connection with Leases that are capital leases. |
| "***Sale Equity Distribution***" | means value no less than the Minimum Equity Value in a form to be determined by the Required Consenting Term Lenders. |
| "***Standalone Enterprise Value***" | means the enterprise value of Reorganized Cyxtera as of the Plan Effective Date, calculated in accordance with generally accepted accounting principles, *excluding* any liabilities arising in connection with Leases that are capital leases. |
| "***Staple Financing Credit Agreement***" | means the credit agreement governing the terms of the Staple Financing Facility. |
| "***Staple Financing Effective Date***" | means the effective date of the Staple Financing Credit Agreement. |
| "***Term Loan Lenders***" | means the lenders under the Term Loan Facility. |
| "***Toggle Date***" | means, as applicable, (i) the day on which a Toggle Trigger Event occurs or (ii) the day the Company Parties determine, in their reasonable business judgment, and the Required Consenting Term Lenders agree, to toggle to a Recapitalization Transaction. |
| "***Unencumbered Assets***" | means, at any given time, all assets of a given Company Entity or Entities that are not subject to a validly perfected lien, including, without limitation, the equity of all first tier Foreign Subsidiaries (as defined in the First Lien Collateral Agreement) of the Loan Parties, deposit account control agreements, and any other asset not previously pledged to secure a loan in favor of the Company. |

## <u>EXHIBIT C</u>

**Form of Transfer Agreement**

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**<u>Agreement</u>**"),[1] by and among Cyxtera Technologies, Inc. and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a ["Consenting Lender"] ["Consenting Sponsor"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| RCF Claims | |
| Term Loan Claims | |
| Equity Interests | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT D

### Form of Joinder Agreement

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as [●], 2023, by and among the Company Parties and the Consenting Stakeholders (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"),[1] and agrees to be bound by the terms and conditions thereof to the extent that the other Parties are thereby bound, and shall be deemed a ["Consenting Lender"] ["Consenting Sponsor"] under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date this Joinder Agreement is executed and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| RCF Claims | |
| Term Loan Claims | |
| Equity Interests | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit C**

**Organizational Structure Chart**





**Exhibit D**

**Liquidation Analysis**

[Filed at Docket No. 492]

**Exhibit E**

**Financial Projections**

[Filed at Docket No. 492]

# Exhibit B

**Redline**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| CYXTERA TECHNOLOGIES, INC., *et al.*, | Case No. 23-14853 (JKS) |
| Debtors.[1] | (Jointly Administered) |

<div align="center">

**DISCLOSURE STATEMENT RELATING TO THE AMENDED JOINT JOINT PLAN OF REORGANIZATION OF CYXTERA TECHNOLOGIES, INC. AND ITS ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

</div>

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera.  The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is:  2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE **AMENDED** JOINT PLAN OF REORGANIZATION OF CYXTERA TECHNOLOGIES, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.[2]

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the ~~Joint~~ Plan ~~of Reorganization of Cyxtera Technologies, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code~~ (as may be amended, supplemented or modified from time to time, the "Plan"), attached hereto as **Exhibit A**.

HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT

ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND
FORWARD-LOOKING STATEMENTS**

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the SEC or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws").  Any representation to the contrary is a criminal offense.  The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock under the Plan (other than any New Common Stock underlying the Management Incentive Plan), and to the extent such exemption is not available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.  Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws.  Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements."  However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms.  Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates. These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- Business strategy;

- Technology;

- Financial condition, revenues, cash flows, and expenses;

- The adequacy of the Debtors' capital resources and liquidity;

- Levels of indebtedness, liquidity, and compliance with debt covenants;

- Financial strategy, budget, projections, and operating results;

- The amount, nature, and timing of capital expenditures;

- Availability and terms of capital;

- Successful results from the Debtors' operations;

- The integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- Costs of conducting the Debtors' other operations;

- General economic and business conditions;

- Effectiveness of the Debtors' risk management activities;

- Counterparty credit risk;

- The outcome of pending and future litigation;

- Uncertainty regarding the Debtors' future operating results;

- Plans, objectives, and expectations;

- Risks in connection with acquisitions;

- The potential adoption of new governmental regulations; and

- The Debtors' ability to satisfy future cash obligations.

**Statements concerning these and other matters are not guarantees of the ~~Reorganized Debtors'~~Company's future performance. There are risks, uncertainties, and other important factors that could cause the ~~Reorganized~~Post-Effective Date Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional**

post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors'; (l) the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the New Takeback Facility and the New Common Stock, to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with landlords, suppliers, partners, among others; (v̶t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement.  Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ........................................................................................................ **1**

II.     PRELIMINARY STATEMENT ................................................................................. **1**

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
        AND THE PLAN ........................................................................................................ **3**

        A.     What is chapter 11? ........................................................................ 3
        B.     Why are the Debtors sending me this Disclosure Statement? .............. 3̶4
        C.     Am I entitled to vote on the Plan? .................................................. 3̶4
        D.     What is the "toggle" feature of the Plan? .......................................... 4
        D̶E.    What is the Recapitalization Transaction under the Plan? .................... 4̶5
        E̶F.    What is a̶n̶ ̶E̶q̶u̶i̶t̶y̶ ̶I̶n̶v̶e̶s̶t̶m̶e̶n̶t̶a Sale Transaction under the Plan? .......... 4̶5
        G.     When will I be informed if the Debtors "toggle" to a Sale Transaction? ..... 5
        F̶H.    What will I receive from the Debtors if the Plan is consummated? .......... 4̶5
        G̶I.    What will I receive from the Debtors if I hold an Allowed Administrative Claim,
               DIP Claim, or a Priority Tax Claim? ............................................... 6̶8
        H̶J.    Are any regulatory approvals required to consummate the Plan? ........... 9̶10
        I̶K.    What happens to my recovery if the Plan is not confirmed or does not go
               effective? .................................................................................. 9̶10
        J̶L.    If the Plan provides that I get a distribution, do I get it upon Confirmation or
               when the Plan goes effective, and what is meant by "Confirmation," "Effective
               Date," and "Consummation?" ....................................................... 9̶11
        K̶M.    What are the sources of Cash and other consideration required to fund the Plan? ... 9̶11
        L̶N.    Are there risks to owning the New Common Stock upon the Debtors' emergence
               from chapter 11? ....................................................................... 9̶11
        M̶O.    Is there potential litigation related to the Plan? ................................ 10̶1
        N̶P.    What is the Management Incentive Plan and how will it affect the distribution
               I receive under the Plan? ............................................................. 10̶1
        O̶Q.    Does the Plan preserve Causes of Action? ....................................... 10̶2
        P̶R.    Will there be releases, exculpation, and injunction granted to parties in interest
               as part of the Plan? .................................................................... 11̶2
        Q̶S.    When is the deadline to vote on the Plan? ....................................... 15̶7
        R̶T.    How do I vote on the Plan? .......................................................... 15̶7
        S̶U.    Why is the Bankruptcy Court holding a Confirmation Hearing? ............. 15̶7
        T̶V.    What is the purpose of the Confirmation Hearing? ............................ 15̶7
        U̶W.    What is the effect of the Plan on the Debtors' ongoing businesses? ........ 16̶7
        V̶X.    Will any party have significant influence over the corporate governance and
               operations of the R̶e̶o̶r̶g̶a̶n̶i̶z̶e̶dPost-Effective Date Debtors? ................. 16̶8
        W̶Y.    Who do I contact if I have additional questions with respect to this Disclosure
               Statement or the Plan? ................................................................ 16̶8
        X̶Z.    Do the Debtors recommend voting in favor of the Plan? ...................... 17̶9
        Y̶AA.   Who Supports the Plan? ............................................................... 17̶9

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
        OVERVIEW ................................................................................................ **17̶9**

        A.     Cyxtera's Business Operations and Services .................................... 17̶9
        B.     Corporate History ...................................................................... 21̶9

C.      The Debtors' Prepetition Corporate and Capital Structure ............................ 21~~2~~

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS ....................................... 24~~5~~

    A.      The Precipitous Rise in Interest Expense Undermines Liquidity .................. 24~~5~~
    B.      Pursuit of All Reasonable Alternatives ......................................................... 25~~6~~

VI.     MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE
        CHAPTER 11 CASES ........................................................................................... 27~~8~~

    A.      First Day Relief and Other Case Matters ..................................................... 27~~8~~
    B.      Appointment of Unsecured Creditors' Committee ....................................... 28~~9~~
    C.      Lease Rejections and Optimization ............................................................. ~~28~~30
    D.      Sale Process and Bidding Procedures ......................................................... ~~29~~31
    E.      Approval of the DIP Facility. ...................................................................... 30~~1~~
    F.      Bar Date Motion .......................................................................................... 30~~2~~
    G.      The Special Committee's Independent Investigation .................................. 31~~2~~
    H.      The Canadian CCAA Recognition Proceedings ........................................... 31~~3~~
    I.      Proposed Confirmation Schedule ................................................................ 32~~4~~

VII.    SUMMARY OF THE PLAN .................................................................................. 33~~4~~

    A.      General Settlement of Claims and Interests ................................................. 33~~4~~
    B.      Restructuring Transactions .......................................................................... 34~~6~~
    C.      ~~New~~The Equity Investment <u>Transaction or Recapitalization Transaction</u> ............... 34~~6~~
    D.      The ~~Reorganized Debtors~~                                               <u>Asset Sale</u>       34~~9~~
    E.      ~~Sources of Consideration for Plan Distributions~~<u>Preservation of Causes of Action</u> .......... 34~~2~~
    F.      ~~Corporate Existence~~ .................................................................................... ~~35~~
    ~~G~~E.  Vesting of Assets in the ~~Reorganized~~<u>Post-Effective Date</u> Debtors ..................... 43~~6~~
    ~~H~~G.  Cancellation of Existing Agreements and Interests ...................................... 36~~44~~
    ~~I~~H.  Corporate Action ......................................................................................... 36~~44~~
    ~~J.~~     ~~New Organizational Documents~~ ................................................................ ~~37~~
    ~~K~~I.  Directors and Officers of the ~~Reorganized~~<u>Post-Effective Date</u> Debtors~~:~~ ......... 37~~44~~
    ~~L~~J.  Effectuating Documents; Further Transactions ........................................... 37~~45~~
    ~~M.~~     ~~Certain Securities Law Matters~~ ............................................................... ~~38~~
    ~~N~~K.  Section 1146 Exemption .............................................................................. 38~~45~~
    ~~O.~~     ~~Management Incentive Plan~~ ..................................................................... ~~38~~
    ~~P.~~     ~~Employment Obligations~~ .......................................................................... ~~39~~
    ~~Q.~~     ~~Preservation of Causes of Action~~ ............................................................. ~~39~~
    ~~R~~L.  Private Company .......................................................................................... 40~~5~~
    ~~S~~M.  Closing the Chapter 11 Cases ...................................................................... 40~~6~~
    ~~T~~N.  Director and Officer Liability Insurance ..................................................... 40~~6~~

VIII.   OTHER KEY ASPECTS OF THE PLAN ............................................................. 40~~6~~

    A.      Treatment of Executory Contracts and Unexpired Leases ........................... 40~~6~~
    B.      Conditions Precedent to Confirmation and Consummation of the Plan ....... 44~~9~~

IX.     RISK FACTORS .................................................................................................... 45~~1~~

    A.      Bankruptcy Law Considerations .................................................................. 45~~1~~
    B.      Risks Related to Recoveries Under the Plan ............................................... 49~~55~~
    C.      Risks Related to the Debtors' and the ~~Reorganized~~<u>Post-Effective Date</u> Debtors'
            Businesses ................................................................................................... 51~~7~~

D.       Risks Related to the Offer and Issuance of Securities Under the Plan ............ 5966

X.       SOLICITATION AND VOTING PROCEDURES ........................................ 618

A.       Holders of Claims Entitled to Vote on the Plan ........................................ 618
B.       Voting on the Plan ......................................................................... 618
C.       Ballots Not Counted ....................................................................... 628
D.       Votes Required for Acceptance by a Class .............................................. 628
E.       Certain Factors to Be Considered Prior to Voting ..................................... 629
F.       Solicitation Procedures .................................................................... 639

XI.      CONFIRMATION OF THE PLAN ......................................................... 6370

A.       The Confirmation Hearing ................................................................. 6370
B.       Requirements for Confirmation of the Plan ............................................. 6470
C.       Feasibility ................................................................................... 71
CD.      Acceptance by Impaired Classes ......................................................... 6471
DE.      Confirmation Without Acceptance by All Impaired Classes ......................... 6572
F.       Valuation .................................................................................... 72
G.       Liquidation Analysis ....................................................................... 73

XII.     CERTAIN SECURITIES LAW MATTERS ............................................... 6573

A.       New Common Stock ....................................................................... 6573
B.       Exemption from Registration Requirements; Issuance of New Common Stock
         under the Plan .............................................................................. 6674
C.       Resales of New Common Stock; Definition of "Underwriter" Under Section
         1145(b) of the Bankruptcy Code ......................................................... 674

XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
         THE PLAN .................................................................................. 6977

A.       Introduction ................................................................................. 6977
B.       Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and
         the ReorganizedPost-Effective Date Debtors ........................................... 719
C.       Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders ...... 7482
D.       Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders .. 816
E.       Information Reporting and Back-Up Withholding ...................................... 8690

XIV.     CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE
         PLAN ........................................................................................ 8690

A.       Introduction ................................................................................. 8690
B.       Residents of Canada ....................................................................... 8791
C.       Non-Residents of Canada .................................................................. 892
D.       Consequences to the Canadian Debtors .................................................. 893

XV.      RECOMMENDATION OF THE DEBTORS .............................................. 893

**EXHIBITS**[1]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      RSA

EXHIBIT C      Organizational Structure Chart

EXHIBIT D      Liquidation Analysis

EXHIBIT E      Financial Projections

---

[1]    Each Exhibit is incorporated herein by reference.

## I.     INTRODUCTION

Cyxtera Technologies, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Cyxtera" or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTORS AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RSA BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Cyxtera filed these Chapter 11 Cases to implement a comprehensive financial and operational restructuring.  Founded in 2017 through a carve-out acquisition from Lumen Technologies, Inc. (f/k/a CenturyLink, Inc.), Cyxtera is a global leader in data center colocation and interconnection services.  Cyxtera provides an innovative suite of connected and intelligently-automated infrastructure and interconnection solutions to more than 2,300 leading enterprises, service providers, and government agencies around the world.  From its founding in 2017, Cyxtera's core business performance has remained strong, generating revenue growth from $695 million in 2017 to $746 million in 2022.

Despite its strong core business performance, the Company has recently faced significant headwinds owing primarily to inflation and macroeconomic volatility, which have driven up interest rates and energy prices.  As inflation swelled in 2021 and 2022, the Federal Reserve reacted by raising interest rates at the fastest pace in decades.  This contributed to the ballooning of Cyxtera's annualized interest expense on funded debt from $35.9 million in Q1 2022 to $75.7 million in Q1 2023.

These challenges, along with the impending maturity of the Company's revolving and term loans, placed increasing pressure on Cyxtera's capital-intensive business, straining the Company's liquidity profile and its ability to invest in the business.  Accordingly, starting in late 2021, the Company began to explore all strategic alternatives, including an investment in or sale of some or all of its business, and, thereafter, a further equity investment from its existing sponsor.

As part of these efforts, the Company—with the assistance of Kirkland & Ellis, LLP ("Kirkland") as legal counsel, Guggenheim Securities, LLC ("Guggenheim Securities") as investment banker, and, later, AlixPartners, LLP ("AlixPartners," and together with Kirkland and Guggenheim Securities, the "Advisors") as financial advisor—engaged with an ad hoc group of First Lien Lenders (the "Ad Hoc Group"), represented by Gibson, Dunn & Crutcher LLP as legal counsel and Houlihan Lokey, Inc. as financial advisor, to chart a value-maximizing path forward.  In parallel, on March 27, 2023, the Company, with the assistance of Guggenheim Securities, launched a marketing process (the "Marketing Process") to engage potential interested parties concerning a significant investment in or purchase of some or all of the Company's assets and/or equity (the "Sale Transaction").

These discussions with the Ad Hoc Group proved successful, culminating in the entry into a restructuring support agreement (the "RSA") on May 4, 2023, which enjoys the broad support of Holders

whose claims represent approximately 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement, as well as the Consenting Sponsors. Concurrently with the entry into the RSA, members of the Ad Hoc Group provided Cyxtera with a new money, $50 million term loan Bridge Facility, of which $36 million was drawn prior to the Petition Date, to bridge the Company's financing needs, continue the prepetition Marketing Process, provide time to prepare for a potential chapter 11 filing, and otherwise avoid a value destructive, free fall bankruptcy filing.

One month after the RSA became effective, on June 4, 2023, Cyxtera initiated a prearranged court-supervised process under chapter 11 of the United States Bankruptcy Code on June 4, 2023, in the U.S. Bankruptcy Court for the District of New Jersey ("the Bankruptcy Court"). The bankruptcy filing represented a continuation of the agreement embodied in the RSA, and the Debtors entered these Chapter 11 Cases on sound footing with a commitment of approximately $200.5 million in debtor-in-possession financing from certain members of the Ad Hoc Group. At the "First Day" Hearing on June 6, 2023, the Bankruptcy Court granted interim approval to access approximately $90.5 million of the $200.5 million, $40 million of which constituted new money, approximately $36.5 million of which consisted of a "roll up" of prepetition obligations on account of the Bridge Facility (as defined herein), and $14 million of which consisted of escrowed proceeds funded pursuant to the Bridge Facility (as defined herein). On July 19, 2023, the Bankruptcy Court granted final approval of the DIP Facility. The details of the DIP Facility are discussed in greater detail herein.

To facilitate the Marketing Process postpetition, the Debtors filed a motion to establish procedures to govern an efficient, public, and flexible auction process to realize the full value of existing assets and/or equity, which the Bankruptcy Court approved on June 29, 2023 [Docket No. 180] (the "Bidding Procedures Order" and the bidding procedures approved thereby, the "Bidding Procedures"). In accordance with the process outlined in the Bidding Procedures, the Debtors received at least one acceptable non-binding written proposal prior to the July 10, 2023, Acceptable Bidder (as defined in the Bidding Procedures) deadline. Accordingly, the Debtors extended the sale timeline whereby all binding bids must be actually received by no later than July 31, 2023, at 5:00 p.m. (prevailing Eastern Time). On July 31, 2023As the Marketing Process progressed, the Debtors, in consultation with the Consultation Parties (as defined in the Bidding ProceduresAd Hoc Group and the official committee of unsecured creditors (the "Committee"), determined the significant and increasing interest in the assetsSale Package (as defined below) warranted an extension of certain deadlines. Accordinglythe sale schedule. To that end, the Debtors filed the *Notices of Amended Sale Schedule* [Docket NoNos. 353 and 450] extending certain deadlines and providing the Debtors with additional time to complete their comprehensive saleMarketing pProcess, to receive and evaluate bids, and, if necessary, to hold an Auction to determine the highest and best bid for some or substantially all of the New Common Stock of Reorganized Cyxtera and/or some or substantially all of the Debtors' assets (the "Sale Package").

On August 7, 2023, the Debtors filed their Plan with the Bankruptcy Court, which allows the Debtors' sale process to continue in parallel while simultaneously progressing these Chapter 11 Cases in accordance with the milestones provided in the DIP Orders and the RSA (as amended from time to time).

The Debtors have received multiple bids for the Sale Package, but none of these bids were Qualified Bids (as defined in the Bidding Procedures). The Debtors do not believe at this time that any of the bids received to date are more value-maximizing than the Recapitalization Transaction proposed under the Plan. Accordingly, on August 29, 2023, the Debtors filed a *Notice of Cancellation of Auction* [Docket No. 472] notifying parties-in-interest that the Debtors, in accordance with the Bidding Procedures Order and in consultation with the Ad Hoc Group and the Committee, had cancelled the Auction scheduled to occur on August 30, 2023. However, negotiations with certain bidders remain ongoing as of the filing of this Disclosure Statement, and, as discussed further below, the Plan provides

flexibility for the Debtors to "toggle" to a Sale Transaction should one develop that is more value-maximizing than the Recapitalization Transaction.

The Plan provides that the Debtors will pursue the Recapitalization Transaction unless a more value-maximizing Sale Transaction materializes with a third party prior to the Confirmation Hearing. The Debtors' goal from the outset of these Chapter 11 Cases has been to maximize value for all stakeholders on the most expeditious timeline possible. Accordingly, while the Plan contemplates the Recapitalization Transaction as the baseline transaction by which holders of claims should evaluate the Plan, the Debtors continue to engage with multiple bidders, and therefore, the Debtors may "toggle" to a Sale Transaction if a higher or otherwise better Sale Transaction materializes prior to the Confirmation Hearing. If the Debtors "toggle" to a Sale Transaction pursuant to the Plan, the Debtors will file and serve a notice of such Sale Transaction in advance of the Confirmation Hearing.

The Plan incorporates a "sale toggle" mechanism whereby the Debtors will pursue aUnder the Recapitalization Transaction unless a higher or otherwise better transaction materializes as a result of the ongoing Marketing Process. The Recapitalization Transaction would result in: (i) Holders of First Lien Claims shall receivinge their *pro rata* share of one hundred100 percent of the New Common Stock, subject to dilution by the Management Incentive Plan, (ii) the conversion ofHolders of General Unsecured Claims shall receive their *pro rata* share of the GUC Recovery Pool, and (iii) all DIP Claims shall be converted on the Effective Date on a dollar-for-dollar basis into New Takeback Facility Loans (unless such DIP Claims are paid in full in cash), (iii) the elimination of. The Recapitalization Transaction would deleverage Cyxtera's prepetition indebtedness by more than $950 million of Cyxtera's prepetition indebtedness, and (iv)and provide Cyxtera with enhanced flexibility for Cyxtera to invest in its business.

If the Plan "toggles" to a Sale Transaction, then under a Sale Transaction: (i) Holders of First Lien Claims shall receive their *pro rata* share of the Distributable Consideration, (ii) Holders of General Unsecured Claims shall receive their *pro rata* share of the GUC Recovery Pool, and (iii) Holders of DIP Claims shall receive payment in full in Cash or, with the consent of the Required Consenting Term Lenders, such other treatment rending such Allowed DIP Claims Unimpaired.

As of the filing of this Disclosure Statement, the scope of the GUC Recovery Pool remains undetermined and subject to continued negotiation with the Committee. Since the appointment of the official committee of unsecured creditors (the "Committee") on June 21, 2023 [Docket No. 133], the Debtors have devoted significant time and resources to providing diligence and engaging with the Committee and its advisors to bring them up to speed on the developments in the Debtors' Chapter 11 Cases. The Debtors have been particularly diligent regarding certain key issues regarding the DIP Facility and the Plan—in the days and weeks immediately following the Committee's appointment, the Debtors and the Committee engaged in constant dialogue regarding certain key issues including the establishment of an escrow account for certain "stub" rent amounts, the scope of DIP liens, implications, and potential impact of a Sale Transaction.

Discussions with the Committee have been, and continue to be, constructive, and although such discussions remain ongoing, and therefore, the Plan does not currently contemplate a definite recovery for Holders of General Unsecured Claims. While the Committee is not yet supportive of the Plan, the Debtors continue to actively engage with the Committee and hope to come to an agreement with the Committee and the Consenting Stakeholders regarding the Plan in advance of the Confirmation Hearing.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [September 14], 2023).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 8 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What is the "toggle" feature of the Plan?**

The Plan will implement the Recapitalization Transaction unless the Debtors, with the consent of the Required Consenting Term Lenders, pivot or "toggle" to a Sale Transaction that results from the Marketing Process and the Debtors' ongoing negotiations with certain bidders.  If the Debtors "toggle" to a Sale Transaction, Claims and Interests will receive the proposed treatment under the Plan for a Sale Transaction.  As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Plan did not include a "toggle" feature, which reduces expenses and permits the Debtors to emerge in either scenario on the expedited timeline currently contemplated.

A vote to accept the Plan is a vote to approve both the Recapitalization Transaction and a Sale Transaction.  If the Debtors "toggle" to a Sale Transaction pursuant to the Plan, the Debtors will file and serve a notice of such Sale Transaction in advance of the Confirmation Hearing.

**E.      ~~D.~~ What is the Recapitalization Transaction under the Plan?**

The proposed Plan contemplates ~~the Debtors pursuing two parallel paths to maximize value and creditor recoveries.  Under this "toggle" approach,~~ that the Debtors will pursue a balance sheet recapitalization unless the Debtors, ~~in consultation with the Consultation Parties, determines that the~~ with the consent of the Required Consenting Term Lenders, determine that a Sale Transaction presents a higher and/or more value-maximizing opportunity.  If the Recapitalization Transaction is consummated, more than $950 million of the Debtors' prepetition funded debt obligations would be eliminated—Holders of First Lien Claims would receive, in full and final satisfaction of their First Lien Claims, their *pro rata* share of 100 percent of the Reorganized Cyxtera's New Common Stock, subject to dilution by a Management Incentive Plan, and Holders of General Unsecured Claims would receive their *pro rata* share of the GUC Recovery Pool.

**F.      ~~E.~~ What is ~~an Equity Investment~~ a Sale Transaction under the Plan?**

As the Debtors pursue the Recapitalization Transaction, the~~y Debtors~~ will continue ~~their Marketing Process of a sale transaction for~~ to engage with all parties regarding a sale of the Sale Package.  Should ~~the Marketing Process~~ a Sale Transaction materialize that proves more value maximizing, the Debtors will "toggle" and pursue such a sale.  ~~The Debtors' sale process is currently ongoing, and the Company has received multiple non-binding written proposals to date.  The final bid deadline is August 18, 2023.~~

In the event of a Sale Transaction, a Purchaser would purchase all or substantially all of the New Common Stock in exchange for the Purchase Price (such transaction, an "Equity Investment Transaction") or all or substantially all of the Debtors' assets (such transaction, an "Asset Sale").  If a Sale Transaction is consummated, Holders of First Lien Claims would receive, in full and final satisfaction of their First Lien Claims, their *pro rata* share of the Distributable Consideration, Holders of General Unsecured Claims would receive their *pro rata* share of the GUC Recovery Pool, and Holders of the DIP Claims would receive payment in full in Cash or, with the consent of Required Consenting Term Lenders, such other treatment rendering Allowed DIP Clams Unimpaired in accordance with section 1124 of the Bankruptcy Code.  Further, depending on the type of transaction, whether an Asset Sale or Equity Investment Transaction, either the Post-Effective Date Debtors or the Purchaser, as applicable, would operate the Debtors' businesses after the Effective Date.

**G.** **When will I be informed if the Debtors "toggle" to a Sale Transaction?**

While the Debtors are pursuing the Recapitalization Transaction, the Debtors continue to engage with multiple bidders regarding a potential Sale Transaction.  If the Debtors "toggle" to a Sale Transaction in accordance with the Plan and with the consent of the Required Consenting Term Lenders, then the Debtors will file and serve a notice of such Sale Transaction in advance of the Confirmation Hearing.

**H.** **F. What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[2]

| SUMMARY OF EXPECTED RECOVERIES | | | | |
| --- | --- | --- | --- | --- |
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Allowed Amount of Claims | Estimated % Recovery Under the Recapitalization Transaction |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim and at the option of the Debtors and the Required Consenting Term Lenders, either: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) Reinstatement of its Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or (iii) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $40,000,000 | 100% |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $0 | 100% |

---

[2]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim/ Interest** | **Projected Allowed Amount of Claims** | **Estimated % Recovery** ~~Under the Recapitalization Transaction~~ |
| Class 3 | First Lien Claims | On the Effective Date, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive, in full and final satisfaction of such Claim: (i) in the event of a Recapitalization Transaction, its *pro rata* share of 100 percent of the New Common Stock, subject to dilution by the Management Incentive Plan; or (ii) in the event of ~~an Equity Investment~~a Sale Transaction, its *pro rata* share of the ~~Net Sale~~Distributable Consideration (including, for the avoidance of doubt, the Residual Cash). | $969,387,346.74 *plus* $4,943,699.00 of letter of credit obligations | [ ]%Unspecified [3] |
| Class 4 | General Unsecured Claims | [Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each Holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Recovery Pool.][34] | $80,000,000 - $90,000,000 | [ ]%To Be Determined[5] |
| Class 5 | Section 510 Claims | On the Effective Date, all Section 510 Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510 Claims will not receive any distribution on account of such Section 510 Claims. | $0 | N/A |

---

[3] As described herein, the Debtors continue to engage with multiple bidders with respect to a potential Sale Transaction. Because the Debtors do not want to prejudice the sale process by disclosing the estimated recoveries for First Lien Claims or General Unsecured Claims, such recoveries are not estimated herein. The Plan is broadly supported by Holders whose claims represent approximately 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement, as well as the Consenting Sponsors. For more detail about the projected recovery on account of the First Lien Claims, please see Art. III.B.3 of the Plan and Article XI.F of this Disclosure Statement entitled, "Valuation."

[34] Treatment of General Unsecured Claims subject to continued negotiation with the Committee.

[5] The Plan does not currently contemplate a definite recovery for Holders of General Unsecured Claims. The GUC Recovery Pool remains subject to continued negotiation with the Committee, and the recoveries for Holders of General Unsecured Claims are dependent on the resolution of these negotiations. For more detail about the projected recovery on account of the General Unsecured Claims, please see Art. III.B.4 of the Plan and Article IX.B.9 of this Disclosure Statement, entitled "The Debtors' General Unsecured Creditors May Not Receive Any Recovery."

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Allowed Amount of Claims | Estimated % Recovery ~~Under the Recapitalization Transaction~~ |
| Class 6 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or ~~Reorganized~~Post-Effective Date Debtor, with the consent of the Required Consenting Term Lenders (not to be unreasonably withheld), and, in the event of ~~an Equity Investment~~a Sale Transaction, in consultation with the ~~Plan Sponsor~~Purchaser, either: (i) Reinstated; or (ii) canceled,~~ or released without any distribution on account of such Claim. | N/A | 0% or 100% |
| Class 7 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be, at the election of the applicable Debtor or ~~Reorganized~~Post-Effective Date Debtor, with the consent of the Required Consenting Term Lenders (not to be unreasonably withheld), and, in the event of ~~an Equity Investment~~a Sale Transaction, in consultation with the ~~Plan Sponsor~~Purchaser, either: (i) Reinstated; or (ii) cancelled ~~and~~or released without any distribution on account of such Interests. | N/A | 0% or 100% |
| Class 8 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Interests shall receive no recovery or distribution on account of their Existing Equity Interests. | N/A | 0% |

**I.**    ~~G.~~ **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Receivables Program Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**1.    Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Professional Fee Claims, ~~DIP Claims,~~ Receivables Program Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such

Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or ~~Reorganized~~the Post-Effective Date Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party ~~no later than sixty days after the Effective Date~~by the Claims Objection Deadline. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

### 2.    DIP Claims

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim:  (i) in the event of a Recapitalization Transaction, either (a) the DIP Loan giving rise to such Allowed DIP Claim shall be refinanced by means of a cashless settlement whereby such DIP Loan shall be converted on a dollar-for-dollar basis into New Takeback Facility Loans in accordance with the DIP Documents and the New Takeback Facility Documents, and all collateral that secures the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall be reaffirmed, ratified, and shall automatically secure all [Obligations] (as defined in the New Takeback Facility Documents) under the New Takeback Facility Documents, subject to the priorities of liens and payment set forth in the New Takeback Facility Documents, or (b) such DIP Claim shall be paid in full in Cash; or (ii) in the event of ~~an Equity Investment~~a Sale Transaction, Holders of the DIP Claims shall receive payment in full in Cash or, with the consent of Required Consenting Term Lenders, such other treatment rendering Allowed DIP Clams Unimpaired in accordance with section 1124 of the Bankruptcy Code.

### 3.    Professional Fee Claims

### a.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The ~~Reorganized~~Post-Effective Date Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.  The ~~Reorganized~~Post-Effective Date Debtors shall establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

**b. Professional Fee Escrow Account**

On the Effective Date, the ~~Reorganized~~Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount~~, which shall be funded by the Reorganized Debtors~~. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors ~~or the Reorganized Debtors~~, the Post-Effective Date Debtors, or the Plan Administrator, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the ~~Reorganized~~Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the ~~Reorganized~~Post-Effective Date Debtors, without any further action or order of the Bankruptcy Court; *provided, however*, in the event of a Sale Transaction, any remaining amount in the professional Fee Escrow Account shall constitute Residual Cash and be distributable to Holders of Allowed First Lien Claims.

**c. Professional Fee Amount**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date~~,~~ and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or ~~Reorganized~~the Post-Effective Date Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

**d. Post-Confirmation Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Post-Effective Date Debtors, and/or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**4. Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**5. Payment of Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and

subject to, the terms set forth herein and in the RSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the ~~Reorganized~~Post-Effective Date Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation~~,~~ thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court ~~and for review or approval by the Bankruptcy Court~~.

### 6.    Receivables Program Claims

All Receivables Program Claims shall be Allowed Claims.  On the Effective Date, unless otherwise agreed by the Holder of a Receivables Program Claim and the applicable Debtor or ~~Reorganized~~Post-Effective Date Debtor, Allowed Receivables Program Claims will be satisfied in full in accordance with the terms of the Receivables Program Documents.  On the Effective Date, or as soon as reasonably practicable thereafter, all fees and expenses incurred by the advisors to the parties to the Receivables Program shall be paid in full in Cash to the extent required under the Final Receivables Program Order.

### J.    ~~H.~~Are any regulatory approvals required to consummate the Plan?

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.  In the case of ~~an Equity Investment~~a Sale Transaction, a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (and expiration or early termination of the waiting period thereunder) may be required as a condition precedent to any asset sale that exceeds the applicable size of the transaction threshold.

### K.    ~~I.~~What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.

### L.    ~~J.~~If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date.  *See* Article VIII.B of this Disclosure Statement, entitled "Conditions Precedent to

Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**M.** ~~K.~~ **What are the sources of Cash and other consideration required to fund the Plan?**

~~The~~If the Recapitalization Transaction or the Equity Investment Transaction is consummated, the Debtors shall fund distributions under the Plan, as applicable, with:  (i) the issuance of New Takeback Facility Loans under the New Takeback Facility, (ii) the proceeds from the ~~sale of the Plan Sponsor~~ Equity ~~Share:~~Investment Transaction, (iii) the New Common Stock, and (iv) the Debtors' Cash on hand.

If the Asset Sale is consummated, the Debtors shall fund distributions under the Plan with: (i) the proceeds from the Asset Sale, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors.

**N.** ~~L.~~ **Are there risks to owning the New Common Stock upon the Debtors' emergence from chapter 11?**

Yes.  *See* Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**O.** ~~M.~~ **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article ~~XI.D~~XI.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**P.** ~~N.~~ **What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On or as soon as reasonably practicable following the Effective Date, the ~~Reorganized~~Post-Effective Date Debtors shall adopt and implement the Management Incentive Plan, which will provide that up to ~~10%~~ten percent of the value of the New Common Stock as of the Effective Date, on a fully diluted basis, shall be issued in connection with the Management Incentive Plan on terms acceptable to the Required Consenting Term Lenders and the Debtors, and, in the event of an Equity Investment Transaction, the ~~Plan Sponsor~~Purchaser.  The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

**Q.** ~~O.~~ **Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the ~~Reorganized~~Post-Effective Date Debtors, shall retain and may enforce (or the Plan Administrator may enforce, if applicable) all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically

enumerated in the Schedule of Retained Causes of Action, and the ~~Reorganized Debtors'~~ rights of the Post-Effective Date Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the ~~Reorganized~~Post-Effective Date Debtors, as applicable, as of the Effective Date.

The ~~Reorganized~~Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the ~~Reorganized~~Post-Effective Date Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the ~~Reorganized~~Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the ~~Reorganized~~Post-Effective Date Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The ~~Reorganized~~Post-Effective Date Debtors and/or the Plan Administrator, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding ~~Reorganized~~Post-Effective Date Debtor, as applicable, except as otherwise expressly provided in the Plan, including Article ~~VIII~~VII of the Plan. The ~~Reorganized~~Post-Effective Date Debtors and/or the Plan Administrator, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The ~~Reorganized~~Post-Effective Date Debtors and/or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.E of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

### R. ~~P.~~ Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in

interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (I) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND (II) ALL OTHER HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT (1) VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN OR (2) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION DEADLINE. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

**1.    Release of Liens**

**Except as otherwise provided in the New Takeback Facility Documents, the Plan, the Confirmation Order, the Purchase Agreement (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the ~~Reorganized~~Post-Effective Date Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the ~~Reorganized~~Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder)~~,~~ and to take such actions as may be reasonably requested by the ~~Reorganized~~Post-Effective Date Debtors or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**2.    Releases by the Debtors[46]**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed**

---

[46] Release provisions subject to ongoing review, including as part of the Special Committee's Independent Investigation.

conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors ~~and the~~, their Estates, and, if applicable, the Post-Effective Date Debtors and the Plan Administrator, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors ~~or the Estates~~, their Estates, the Post-Effective Date Debtors, or the Plan Administrator), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, ~~the~~their Estates, the Post-Effective Date Debtors, if applicable, the Plan Administrator, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the ~~Plan Sponsor~~Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the New Organizational Documents, the Receivables Program Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the ~~Reorganized Debtors, or the~~ Debtors' Estates, or, if applicable, the Post-Effective Date Debtors or the Plan Administrator, asserting any Claim or Cause of Action released pursuant to the Debtor Release.

3.      **Releases by Holders of Claims and Interests**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons

that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the ~~Plan Sponsor~~Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the New Organizational Documents, the Receivables Program Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

4.    Exculpation

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Bridge Facility Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the ~~Plan Sponsor~~Purchase Agreement (if applicable), the Plan and related agreements, instruments, and other documents, the New Takeback Facility Documents, the Receivables Program Documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the

property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

**5.      Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the ~~Reorganized~~Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue ~~an Exculpated~~a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of ~~an Exculpated Claim~~a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such ~~Exculpated~~ Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such

**Person or Entity to bring such ~~Exculpated~~ Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, ~~as applicable~~or Released Party.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**S. ~~Q.~~ When is the deadline to vote on the Plan?**

The Voting Deadline is [October 2~~4~~6], 2023, at 4:00 p.m. (prevailing Eastern Time).

**T. ~~R.~~ How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent, Kurtzman Carson Consultants LLC (the "Claims and Noticing Agent") **on or before the Voting Deadline, *i.e.*, [October 2~~4~~6], 2023, at 4:00 p.m., prevailing Eastern Time**. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**U. ~~S.~~ Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**V. ~~T.~~ What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**W. ~~U.~~ What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code or pursuing a going-concern sale. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be

liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the ~~Reorganized~~Post-Effective Date Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### X.      ~~V.~~ Will any party have significant influence over the corporate governance and operations of the ~~Reorganized~~Post-Effective Date Debtors?

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of Cyxtera shall expire, and, if applicable, the members for the initial term of the New Board shall be appointed; *provided*, that the disinterested directors of Cyxtera ~~Technologies, Inc.~~, comprising the special committee of Cyxtera's ~~b~~Board ~~of directors~~, shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan. The disinterested directors of Cyxtera ~~Technologies, Inc.~~ shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the ~~Reorganized~~Post-Effective Date Debtors, the ~~Plan Sponsor (if any)~~Purchaser, or any other Entity without their prior written consent.

The ~~i~~Initial members of the New Board, if applicable, will be identified in the Plan Supplement to the extent known at the time of filing. In the event of a Recapitalization Transaction or an Equity Investment Transaction, ~~E~~each such member and officer of the ~~Reorganized~~Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the ~~Reorganized~~Post-Effective Date Debtors. The members of the New Board shall be chosen by the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, subject to the applicable terms of the RSA, and, if applicable, the ~~Plan Sponsor~~Purchase Agreement.

~~Assuming that the Effective Date occurs, Holders of Allowed Claims that receive distributions representing a substantial percentage of outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.~~

### Y.      ~~W.~~ Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kurtzman Carson Consultants LLC, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Cyxtera Ballot Processing Center
> c/o KCC
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, CA 90245
>
> *By electronic mail at:*
> https://www.kccllc.net/cyxtera/inquiry
>
> *By telephone (toll free) at:*
> 877-726-6510 (domestic) or 424-236-7250 (international) and request to speak with a member of the Solicitation Team.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://www.kccllc.net/cyxtera (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

### Z. ~~X.~~ Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe that the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims and Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  A Recapitalization Transaction will significantly delever the Debtors' balance sheet, and a Sale Transaction, if any, will only allow for a ~~greater~~higher or otherwise better recovery.  Either a Recapitalization Transaction or a Sale Transaction will allow for a quick confirmation by no later than November ~~3~~6, 2023.

### AA. ~~Y.~~ Who Supports the Plan?

The Plan is supported by the Debtors and the Holders of 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement (the "Consenting Lenders"), and the Holders of Existing Equity Interests that are signatories to the RSA or any subsequent Holder of Existing Equity Interests that becomes party thereto in accordance with the terms of the RSA, each solely in their capacity as such (the "Consenting Sponsors", and together with the Consenting Lenders, the "Consenting Stakeholders").

## IV.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   Cyxtera's Business Operations and Services

#### 1.   The Company's Products and Services

Cyxtera's global data center platform provides speed, scale, and agility for its customers' business demands by offering a complete suite of space, power, interconnection, bare metal, and remote management solutions.  Cyxtera's software-defined platform and highly interconnected ecosystem provides enterprises with the foundation they need to compete in today's digital world.  Over 90 percent of Cyxtera's revenue is derived from recurring, fixed term customer contracts.  Cyxtera's primary service and product offerings are described below.

*Colocation*.  (83 percent of revenue in 2022).  Cyxtera offers retail colocation services in ~~over~~approximately sixty high-quality, highly-connected data centers on three continents.  The Company's colocation services provide customers space and power in reliable, redundant, and secure data centers to host their critical applications and workloads in an integrated ecosystem.  Colocation space and power services are offered under fixed-duration contracts (typically three years) and generate monthly recurring revenue.  Colocation services are highly customizable and can range from a standard colocation rack or cabinet to a custom-designed cage, rack layout, and rack elevation, in addition to structured cabling solutions.

In certain of its locations, Cyxtera also offers smart cabinets ("SmartCabs"), which are on-demand, dedicated colocation cabinets, complete with built-in power and integrated, configurable, core network fabric.  SmartCabs allow customers to instantly deploy and dynamically configure their end-to-end colocation infrastructure in a cloud-like model with direct access to a robust ecosystem of technology and service providers, enabling customers to achieve rapid connectivity without requiring them to bring in additional network hardware.

*Interconnection*.  (11 percent of revenue in 2022).  Cyxtera enables enterprises to reap the benefits of fast networks, high-performance connections, and efficient, multi-network cloud-connect solutions by offering direct interconnection capabilities to global-reaching networks and major cloud providers.  By providing direct connectivity to every major cloud provider through virtual and physical connections, Cyxtera eliminates the volatility of the public internet, enabling enterprises to reduce network costs, increase bandwidth, and improve network performance and reliability.

Cyxtera's densely connected global data center footprint can be provisioned through Cyxtera's "Digital Exchange," which is Cyxtera's connected data center fabric that allows enterprises to deploy their information technology infrastructure on-demand.  These offerings provide customers (i) the ability to establish fast, convenient, affordable, and highly reliable connections to their preferred network of service providers, (ii) low latency public cloud entry points that connect customers to other carriers, content providers, cloud providers, financial exchanges, and other enterprise customers, and (iii) a wide range of technology and network service providers and business partners.  Interconnection services are offered on month-to-month contract terms and generate monthly recurring revenue.

*Enterprise Bare Metal*.  (1 percent of revenue in 2022).  For customers that do not own their own servers and other information technology equipment, Cyxtera Enterprise Bare Metal provides customers with on-demand access to Cyxtera-owned servers and information technology infrastructure that allows customers to consume Cyxtera's data center services in a cloud-like fashion.  Cyxtera's fully automated platform also enables customers to seamlessly connect to partner services, including single-tenant, private bare metal servers from NVIDIA, Nutanix, Fujitsu, HPE and Dell.  Enterprise Bare Metal services are offered under fixed duration contracts and generate monthly recurring revenue.

*Deployment and Other Support Services*.  (5 percent of revenue in 2022).  Cyxtera offers a variety of value-added services to help customers streamline data center deployment.  These services include custom data center installation and set-up, access to secure cages and cabinets, integrated structured cabling solutions, and the ability to deliver a turnkey environment.  Deployment services are one-time in nature and generally billed at the time of completion or delivery.  Cyxtera provides these services through a team of industry-recognized professionals that are available 24-7 to assist customers with routine management of their environments, such as server reboots, telecommunications support, equipment racking and stacking, operating system loading, and backups of critical data.  These support services can be consumed on an ad hoc basis or in pre-paid blocks, in each case generating non-recurring revenue.  Customers can also elect to purchase recurring monthly blocks of support hours, which generate monthly recurring revenue.

### 2. The Company's Broad Global Presence

Cyxtera provides its colocation and related solutions to its customers through the operation of its ~~more than~~approximately sixty data centers, the majority of which are leased. Cyxtera's data center platform has a global footprint with data centers located in twenty-three large metropolitan areas in North America, Europe, and Asia. These data centers are in proximity to major business and financial hubs, core clusters of connectivity, and a wide range of data center customers, including a diverse collection of global enterprises and leading hyperscale cloud providers, positioning Cyxtera for continued growth.

### 3. The Company's Customers

Cyxtera has more than 2,300 customers across all major industry verticals, including: (i) retail; (ii) transport and logistics; (iii) manufacturing and natural resources; (iv) healthcare; (v) business services; (vi) media and content; (vii) banking and securities, (viii) network service providers; and (ix) cloud and information technology services. ~~The Company's~~Cyxtera's customer base ~~is~~ comprise~~d~~s ~~of~~ approximately 90 percent private and public industry leading enterprises~~—companies~~ that generate at least one billion dollars in revenue and/or have more than one thousand employees~~—~~, and 10 percent small businesses. Cyxtera has a diverse customer mix with ~~8~~10 percent of its ~~monthly recurring~~ revenue ~~("MRR")~~ generated by its largest customer, Lumen, 32 percent of its ~~MRR~~revenue generated by its top twenty customers (excluding Lumen), and the remaining ~~60~~58 percent of its ~~MRR~~revenue generated by all other customers.[7] Cyxtera's customers are long-tenured with many of its top twenty customers having contracted with ~~the Company~~Cyxtera for at least sixteen years, dating back to ~~the Company's~~Cyxtera's prior ownership. Additionally, approximately 30 percent of Cyxtera's customers are deployed in more than one data center.

The Company generates its customer base through promotions and specials for existing and new customers, as well as through a channel-led sales model that leverages third-party partners located around the world to engage in referrals, resales, or strategic alliances with respect to the Cyxtera's products and services. On average, direct sales to end-users make up approximately 75 percent of the Company's total bookings. The Company generates these direct sales using Cyxtera-employed salespersons and sales agents who offer certain promotions and special incentives. Indirect sales and promotions via channel partners make up approximately 25 percent of total bookings.

## B. Corporate History

Cyxtera was founded in 2017 by affiliates of private equity firms BC Partners and Medina Capital for the purpose of acquiring Lumen's data center and colocation business.[58] The Lumen data center portfolio consisted of high-quality, strategically located, and well-maintained data center assets that were under-optimized as a relatively small business unit within a large telecommunications carrier focused on its core networking business. Cyxtera's founders therefore saw an opportunity to transform Lumen's assets into a next-generation carrier-neutral global data center platform under a proven data center management team.

On May 1, 2017, with the completion of the acquisition, and in combination with Medina Capital's security and data analytics colocation business, Cyxtera was born. The Cyxtera management team took the underutilized assets and improved the business by developing Cyxtera's existing

---

[7] Based on 2022 revenue.

[58] Lumen retained an equity stake in the Company following the transaction and currently holds approximately 6.4 percent of Cyxtera Technologies' equity.

infrastructure through strategic investments in the platform, including by adding sellable capacity based on customer demand, broadening the scope of Cyxtera's interconnection offerings to further drive the carrier-neutral advantages of the platform, adding new service provider developments, and developing innovative bare-metal offerings.

On November 14, 2019, Starboard Value Acquisition Corp. ("SVAC") was incorporated in Delaware as a special purpose acquisition vehicle (or SPAC) for the purpose of effectuating a merger, capital stock exchange, asset acquisition, or other business combination with one or more businesses. On September 14, 2020, SVAC completed its initial public offering ("IPO") on the Nasdaq stock exchange (NASDAQ: SVAC), issuing approximately thirty-six million units of class A common stock at $10.00 per unit.  Simultaneously with the closing of the IPO, SVAC completed a private placement of an aggregate of 6,133,333 warrants to SVAC Sponsor LLC, at a purchase price of $1.50 per warrant.

On February 21, 2021, SVAC entered into subscription agreements with Fidelity Management & Research Company LLC and clients of Starboard Value LP (collectively, the "PIPE Investors"), pursuant to which, among other things, SVAC agreed to issue and sell in a private placement, an aggregate of twenty-five million shares of Class A common stock to the PIPE Investors, for a purchase price of $10.00 per share (the "PIPE Investment").  On July 29, 2021, SVAC consummated its business combination (the "de-SPAC") with Cyxtera Technologies, Inc. (now known as Cyxtera Technologies, LLC) ("Legacy Cyxtera").  As a result of the de-SPAC, Legacy Cyxtera became a wholly-owned subsidiary of SVAC and SVAC changed its name to Cyxtera Technologies, Inc (NASDAQ: CYXT).  Upon completion of the de-SPAC, the Company received proceeds of approximately $654 million, including $250 million on account of the PIPE Investment.  The proceeds of the de-SPAC, including the PIPE Investment, were used for general corporate purposes, retirement of certain outstanding funded indebtedness, and payment of expenses incurred in connection with the de-SPAC.

Since the de-SPAC, Cyxtera has continued to grow its business.  Throughout 2021 and 2022, Cyxtera announced various strategic industry partnerships to help expand its services.  Today, Cyxtera's platform consists of over 40,000 physical and virtual cross-connects, more than 300 network service providers, more than 1,400 networks, and offers low latency connectivity to major public cloud zones from virtually all of its data centers.

### C.    The Debtors' Prepetition Corporate and Capital Structure

#### 1.    Corporate Structure

The below chart depicts a simplified version of the Debtors' current corporate structure.  Cyxtera has twenty-nine wholly-owned subsidiary entities, fifteen of which are Debtors in these Chapter 11 Cases.  A more detailed corporate organizational structure chart, attached hereto as **Exhibit F**~~**C**~~, depicts the Debtors' corporate structure, as well as the Debtors' various prepetition debt obligations.



#### 2.    Cyxtera's Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $1.020 billion in aggregate outstanding principal and accrued interest for funded debt obligations, as reflected below:

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued Interest | Approximate Outstanding Amount |
|---|---|---|---|---|
| **Bridge Facility** | May 1, 2024 | $50.0 million | $0.5 million | $50.5 million |
| **Revolving Credit Facility** | April 2, 2024 | $97.1 million | $1.1 million | $98.3 million |
| **2019 First Lien Term Facility** | May 1, 2024 | $96.3 million | $0.8 million | $97.0 million |
| **2017 First Lien Term Facility** | May 1, 2024 | $768.1 million | $6.0 million | $774.1 million |
| *Total Funded Debt Obligations:* | | *$1,011.5 million* | *$8.3 million* | *$1,019.9 million* |

These obligations are discussed below:

### a.    Term Loan Facilities

The Debtors are party to a first lien term loan credit facility under that certain first lien credit agreement dated as of May 1, 2017 (as amended by that first amendment dated as of April 30, 2018, as further amended by that certain second amendment, dated as of December 21, 2018, as further amended by that certain third amendment, dated as of May 13, 2019, as further amended by that certain fourth amendment, dated as of May 7, 2021, as further amended by that certain fifth amendment, dated as of July 6, 2021, as further amended by Amendment No. 6 (as defined herein), dated as of March 14, 2023, as further amended by Amendment No. 7 (as defined herein), dated as of May 2, 2023, as further amended by Amendment No. 8 (as defined herein), dated as of May 4, 2023, and as may be further amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time) (the "First Lien Credit Agreement"), by and between Cyxtera DC Holdings, Inc. (the "Borrower"), Cyxtera DC Parent Holdings, Inc. ("Holdings"), Cyxtera Communications, LLC ("Cyxtera Communications"), and Cyxtera Data Centers, Inc. (together with Cyxtera Communications and Holdings, the "Guarantors"), the first lien lenders from time to time party thereto (the "First Lien Lenders"), and Citibank, N.A., as administrative agent and collateral agent.  Pursuant to the First Lien Credit Agreement, the Debtors obtained credit facilities of up to $1.275 billion consisting of: (i) a $150 million first lien multi-currency revolving credit facility (the "Revolving Credit Facility"); and (ii) an $815 million first lien term loan facility (the "2017 First Lien Term Facility").  On May 13, 2019, the Debtors borrowed an additional $100 million in incremental first lien term loans under the First Lien Credit Agreement (the "2019 First Lien Term Facility" and together with the 2017 First Lien Term Facility, the "Term Loan Facilities").

The Term Loan Facilities mature on May 1, 2024, and are secured by liens on the collateral on a senior priority basis by substantially all of the Debtors' equity interests and material real property.  As of the Petition Date, an aggregate amount of approximately $871.1 million in unpaid principal and accrued but unpaid interest is outstanding under the Term Loan Facilities.

### b.    Revolving Credit Facility

The First Lien Credit Agreement also provides the Debtors with a first lien, multi-currency Revolving Credit Facility.  As of the Petition Date, the Revolving Credit Facility borrowing base was $102.1 million with $4.9 million letters of credit outstanding.  Pursuant to Amendment No. 6, the Debtors requested, among other things, that the Revolving Credit Facility be extended and, in connection with such extension, the Debtors agreed to reduce the aggregate extended revolving commitments by 15 percent.  The Revolving Credit Facility matures on April 2, 2024, and is secured by liens on the collateral on a senior priority basis by substantially all of the Debtors' equity interests and material real property.  As of the Petition Date, an aggregate of approximately $98.3 million in unpaid principal and accrued but unpaid interest is outstanding under the Revolving Credit Facility.

### c.    Bridge Facility

On May 4, 2023, and in connection with entry into the Restructuring Support Agreement, the Borrower, Holdings, and the other loan parties and lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for such lenders entered into a first lien priority credit agreement that provided up to $50 million in new first lien term loans pursuant to the Bridge Facility.  The guarantors under the Bridge Facility include the Guarantors under the First Lien Credit Agreement, in addition to Cyxtera Canada TRS, ULC, Cyxtera Canada, LLC, Cyxtera Communications Canada, ULC, Cyxtera Digital Services, LLC, Cyxtera Technology UK Limited, and Cyxtera UK TRS Limited.

The Bridge Facility is senior in right of payment to outstanding borrowings under the Term Loan Facilities and is secured on a *pari passu* basis with respect to all collateral securing the Term Loan Facilities. The Bridge Facility matures on the earliest of (i) May 1, 2024, (ii) the date on which the obligations under such facility become due and payable pursuant to the terms of the Bridge Facility, (iii) the effective date of the Debtors' chapter 11 plan, and (iv) the date of consummation of a sale of all or substantially all of any loan party's assets under Section 363 of the Bankruptcy Code. As of the Petition Date, an aggregate amount of approximately $50.5 million in obligations, including unpaid principal, accrued but unpaid interest, and escrowed but undrawn proceeds, was outstanding under the Bridge Facility, all of which was "rolled up" on a dollar-for-dollar basis into postpetition superpriority obligations under the DIP Facility pursuant to the Interim and Final DIP Orders.

### d.   The Receivables Program

In 2020, the Company formed a wholly owned bankruptcy remote special purpose entity, Cyxtera Receivables Holdings, LLC ("Cyxtera Receivables Holdings"), to continuously receive, either through the purchase or the contribution of, trade receivables generated by Cyxtera Communications, LLC and Cyxtera Federal Group Inc. on account of their business operations (together, the "Originators," and the trade receivables the Originators generate, the "Receivables") pursuant to that certain purchase and sale agreement, dated as of August 31, 2022 (as the same may be amended, amended and restated, or otherwise modified from time to time) (the "Purchase and Sale Agreement"). Accordingly, pursuant to the Purchase and Sale Agreement, the Originators may either sell or contribute Receivables to Cyxtera Receivables Holdings on a daily basis at a fair market discount. Where a Receivable is sold to Cyxtera Receivables Holdings, Cyxtera Receivables Holdings makes certain payments to the Originators, payable at any time upon demand by the Originators, subject to the availability of funds by Cyxtera Receivables Holdings. Such transactions are either a true sale or an absolute contribution and conveyance of the Receivable by the Originators to Cyxtera Receivables Holdings, providing Cyxtera Receivables Holdings with the full benefits of ownership of the Receivables.

Further, Cyxtera Receivables Holdings, as seller, Cyxtera Communications, as Servicer, PNC Bank, National Association ("PNC Bank"), as Administrative Agent, and PNC Capital Markets LLC, as Structuring Agent, are each party to that certain receivables purchase agreement, dated as of August 31, 2022 (as the same may be amended, amended and restated, or otherwise modified from time to time) (the "Receivables Purchase Agreement," and, together with the Purchase and Sale Agreement, the "Receivables Program"). Pursuant to the Receivables Purchase Agreement, upon request by Cyxtera Receivables Holdings, PNC Bank makes capital investment payments to Cyxtera Receivables Holdings, subject to certain restrictions.

In consideration for PNC Bank's agreement to make such capital investment payments, Cyxtera Receivables Holdings, on the date of each investment payments, sells, assigns, or transfers to PNC Bank, all of Cyxtera Receivables Holdings' newly acquired rights, title, and interest in, to, and under the Receivables designated as sold, including all proceeds and collections with respect thereto. Cyxtera Receivables Holdings then designates certain of the Receivables to be sold by Cyxtera Receivables Holdings to PNC Bank and Cyxtera Receivables Holdings grants a security interest in any remaining, un-sold Receivables to PNC Bank as collateral. Additionally, Cyxtera Receivables Holdings makes certain servicing fee payments to PNC Bank of 1.00 percent per annum based on the daily average aggregate outstanding principal balance of the then outstanding Receivables transferred to Cyxtera Receivables Holdings, as well as certain other yield and fee payments.

The Receivables Program is a critical component ~~too~~of the Debtors' liquidity position and serves as a material source of day-to-day operating liquidity for the Debtors. The Originators are responsible for generating approximately 95 percent of the Debtors' annual receivables. As such, if the Receivables

Program were forced to cease, the Debtors would lose access to much of their revenue collections until PNC Bank's outstanding capital funded to Cyxtera Receivables Holdings were to be repaid (such "capital" is analogous to the outstanding principal of a loan made by PNC Bank to Cyxtera Receivables Holdings), a figure totaling $37.5 million dollars.

### e.   Equity

Cyxtera Technologies' certificate of incorporation authorizes the board of directors to issue 500 million shares of Class A common stock ("Common Shares") and 10 million shares of preferred stock ("Preferred Shares"). Approximately 180 million Common Shares are outstanding as of the Petition Date. The Common Shares trade on the Nasdaq under the ticker symbol "CYXT." To date, Cyxtera has not issued any Preferred Shares.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    The Precipitous Rise in Interest Expense Undermines Liquidity

In recent years, Cyxtera has continued its strong operating performance, stable revenue growth, and low customer churn. In 2021 and 2022, Cyxtera met or exceeded its revenue guidance as of the de-SPAC transaction. Unfortunately, the de-SPAC transaction coincided with a rapid increase in inflation. In January 2021, the year-over-year change in the Consumer Price Index ("CPI") in the United States stood at approximately 1.4 percent.[69] By the time the de-SPAC closed, CPI in the United States had grown to approximately 5.4 percent, far ahead of the Federal Reserve's 2 percent inflation target.[710] This number ultimately peaked at over 9 percent in June 2022, and inflation remains elevated today.[811]

The Federal Reserve responded to this inflationary environment by aggressively raising interest rates. As a result, beginning in mid-2022, the interest expense on Cyxtera's funded debt more than doubled and began to significantly undermine liquidity, despite core business performance remaining strong. The annualized interest expense on the Debtors' funded debt facilities, all of which are variable interest rate facilities, rose from $35.9 million as of March 31, 2022 to $75.7 million as of March 31, 2023, calculated based on the balances and rates prevailing at the end of each quarter. This rise in inflation and interest rates coincided with impending maturities under the Company's funded debt—the Revolving Credit Facility was scheduled to mature on November 1, 2023, and the Term Loan Facilities on May 1, 2024. Therefore, a regular-way refinancing, something that likely would be justified by the core business performance, was not feasible.

---

[69] U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer Price Index - January 2021 (Feb. 10, 2021, 8:30 AM), https://www.bls.gov/news.release/archives/cpi_02102021.pdf.

[710] U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer prices up 5.4 percent in 12 months ended July 2021 (Aug. 16, 2021), https://www.bls.gov/opub/ted/2021/consumer-prices-up-5-4-percent-in-12-months-ended-july-2021.htm#:~:text=Over%20the%2012%20months%20ended, over%20the%20last%2012%20months.

[811] U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer prices up 9.1 percent over the year ended June 2022, largest increase in 40 years, (July 18, 2022), https://www.bls.gov/opub/ted/2022/consumer-prices-up-9-1-percent-over-the-year-ended-june-2022-largest-increase-in-40-years.htm#:~:text=SUBSCRIBE-Consumer %20 prices%20up%209.1%20percent%20over%20the%20year%20ended%20June,largest%20increase%20in%2040%20years&text=Over%20the%2012%20months%20endedUrban%20Consumers%20increased%209.1%20percent.

During this period, the Company attempted to offset its escalating interest costs with operational improvements aimed at increasing occupancy at existing data centers, deploying capital efficient growth strategies, and optimizing its organizational structure. Despite these measures, the continued strain on the balance sheet due to rising interest rates and Cyxtera's substantial debt service obligations continued to diminish Cyxtera's liquidity.

## B.    Pursuit of All Reasonable Alternatives

The Company was proactive in seeking to address its balance sheet issues. Throughout 2022, the Company worked with advisors to explore interest in an acquisition of the Company or an investment in connection with a financing or refinancing transaction. However, in large part due to the Company's mounting capital structure challenges and market volatility, the process did not result in any actionable proposals.

In November 2022, the Company retained Kirkland as counsel, and in December 2022, the Company retained Guggenheim Securities to assist in exploring various alternatives for its capital structure, including amending and/or refinancing its Term Loan Facilities and raising equity capital. With respect to the capital raise, the Company, with the assistance of Guggenheim Securities, explored such transaction with, among others, the Company's three largest equity holders. And, in connection with its refinancing efforts, the Company, with the assistance of Guggenheim Securities, also considered a comprehensive amend and extend transaction with respect to its Term Loan Facilities and commenced discussions with the Ad Hoc Group with respect to such transactions.

The Company also focused its efforts on extending the near-term Revolving Credit Facility maturity on November 1, 2023. Failure to address this upcoming maturity could have given rise to a going concern qualification in the Company's audited financial statements due March 16, 2023. Receiving a going concern qualification would have caused significant harm by disrupting the Company's day-to-day business operations and potentially resulting in an event of default under the Company's Term Loan Facilities. On March 14, 2023, the Company successfully negotiated an extension of the maturity date under the Revolving Credit Facility to April 2, 2024, pursuant to that certain sixth amendment to the First Lien Credit Agreement ("Amendment No. 6"). Although the extension bought Cyxtera essential breathing room, more comprehensive restructuring measures needed to be taken in light of continued liquidity deterioration and a major looming maturity wall in spring 2024.

On March 25, 2023, the Company hired AlixPartners as restructuring advisor to assist with its restructuring efforts. The Company, with the assistance of its advisors continued to engage with the Ad Hoc Group and certain other key prepetition stakeholders on the terms of a more comprehensive solution. As part of these discussions, the Company explored the possibility of implementing a consensual restructuring or sale transaction on an out-of-court basis, pivoting to an in-court chapter 11 process, or pursuing both alternatives simultaneously. With respect to the possibility of an in-court process, the Company evaluated tools that could be utilized to enhance its operational performance, including the rejection of undesirable leases and contracts.

In parallel, on March 27, 2023, the Company, with the assistance of Guggenheim Securities, launched a marketing process to engage potential interested parties concerning a sale or investment transaction with the Company. While the marketing process was underway, the Company and the Ad Hoc Group continued to negotiate a broader restructuring deal to be memorialized in a restructuring support agreement.

~~The~~Prior to the Petition Date, the board of directors of Cyxtera Technologies, Inc. (the "Board") unanimously adopted resolutions (a) appointing Fred Arnold, Roger Meltzer, and Scott Vogel as disinterested directors of the Board, and (b) appointing Messrs. Arnold, Meltzer, and Vogel as the sole

members of a Special Committee of the Board (the "Special Committee"). The Special Committee was delegated sole authority on all matters related to consideration and negotiation of a restructuring, reorganization, or other transaction ("Transaction"). In addition, the Board delegated sole authority to the Special Committee to conduct an independent investigation with respect to: (a) matters related to a Transaction in which a conflict of interest exists or is reasonably likely to exist between Cyxtera, on the one hand, and any rRelated pParty,[12] on the other hand (the "Conflict Matters"); (b) whether any matter constitutes a Conflict Matter; and (c) potential claims or causes of action of the Debtors, if any, against the Related Parties (collectively, the "Independent Investigation"). In connection with this delegation, the Special Committee has been conducting an independent investigation with respect to Conflicts Matters (the "the Independent Investigation"), which remains ongoing as of the date hereof.

In late April 2023, the Company opted to utilize the five business-day grace period (the "Grace Period") permitted under the First Lien Credit Agreement with respect to the interest payment due on April 25, 2023. The Company utilized the Grace Period to continue to engage in discussions with the Ad Hoc Group around the terms of a restructuring support agreement and bridge financing solution. The Company ultimately negotiated and entered into a seventh amendment to the First Lien Credit Agreement ("Amendment No. 7"), under which the lenders refrained from exercising their rights and remedies under the First Lien Credit Agreement as a result of the missed interest payment until May 4, 2023, at 5:00 p.m. (prevailing Eastern time).

Following entry into Amendment No. 7, the Company, with the assistance of its Advisors worked around the clock with the Ad Hoc Group to finalize a restructuring support agreement and obtain financing necessary to fund operations prior to the filing of these chapter 11 cases. On May 4, 2023, after extensive, arm's-length negotiations, the Debtors and the Ad Hoc Group entered into the RSA, attached hereto as **Exhibit B**, by and between the Debtors, the Consenting Lenders that, at the time, held approximately 64 percent of the First Lien Claims, and the Consenting Sponsors.[913] The RSA contemplated a two-phase toggle approach whereby the Company would continue its out-of-court Marketing Process in pursuit of a Sale Transaction or toggle to an in-court restructuring, pursuant to which the Company would continue to pursue the Marketing Process or, if such process does not maximize value for stakeholders, pursue a standalone recapitalization of its balance sheet (the "Recapitalization Transaction," and together with the Sale Transaction, the "Restructuring Transactions").

In connection with the Marketing Process, which remains ongoing, eighty-eight parties have been contacted. As of the date of the filing of this Disclosure Statement, the Company has executed forty-five non-disclosure agreements with potential investors and has received seven letters of intent from seven potential investors.

Concurrently with entry into the RSA, the Company entered into the Bridge Facility, which provided an incremental $50 million in liquidity.[1014] The Bridge Facility offered the Company necessary

---

[12] As used herein, "Related Party" means the Company or any of its equityholders, affiliates, subsidiaries, directors, managers, officers, or other stakeholders.

[913] Since the initial execution of the RSA on May 4, 2023, Holders of an additional 22 percent of First Lien Claims have signed the RSA, bringing the total support from Holders of First Lien Claims to 86 percent.

[1014] To facilitate the Company's entry into the Bridge Facility, the Company also entered into an eighth amendment to the First Lien Credit Agreement ("Amendment No. 8") with the First Lien Lenders wherein, among other changes, the First Lien Lenders agreed to amend the First Lien Credit Agreement to permit the Company to enter into the Bridge Facility. Relatedly, each of Cyxtera Canada TRS, ULC, Cyxtera Canada, LLC, Cyxtera Communications Canada, ULC, Cyxtera Digital Services, LLC, Cyxtera Technology UK Limited, and Cyxtera UK TRS Limited were joined as guarantors under the First Lien Credit Agreement such that the guarantors thereunder aligned with the guarantors under the Bridge Facility.

breathing room for the parties to progress the Marketing Process while preparing for a possible in-court Recapitalization Transaction. Without the critical funding provided by the Bridge Facility, the Company would have been unable to fulfill its interest payment obligations due on the 2017 First Lien Term Facility, while funding its operations.

On May 5, 2023, as contemplated by the RSA, Eric Koza of AlixPartners was engaged as Chief Restructuring Officer, and Raymond Li was engaged as Deputy Chief Restructuring Officer. *Details regarding Mr. Koza's and Mr. Li's retention are described in the Debtors' Application for Entry of an Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief [Docket No. 173], which was approved by the Court on July 19, 2023 [Docket No. 300].*

## VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A. First Day Relief and Other Case Matters

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. At a hearing on June 6, 2023, (the "First Day Hearing") the Bankruptcy Court granted all of the relief initially requested in the First Day Motions, and on June 29, 2023, and July 19, 2023, as applicable, the Bankruptcy Court granted certain of the First Day Motions on a final basis, including:[~~114~~][15]

- **Bar Date Motion**: Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief [Docket No. 172]. On June 19, 2023, the Court entered an Order approving the Bar Date Motion [Docket No. 298].

- **Critical Vendors Motion**: Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief [Docket No. 16]. On June 6, 2023, the Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 65], and on June 29, 2023, the Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 182].

- **DIP Motion**: Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay,

---

[~~114~~][15] The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/cyxtera.

(VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [Docket No. 23].  On June 6, 2023, the Court entered an Order approving the DIP Motion on an interim basis [Docket No. 70], and on July 19, 2023, the Court entered an Order approving the DIP Motion [Docket No. 297].

- **Foreign Representative Motion**:  Debtors' Motion for Entry of an Order (I) Authorizing Cyxtera Technologies, Inc. to Act as Foreign Representative, and (II) Granting Related Relief [Docket No. 14].  On June 6, 2023, the Court entered an Order approving the Foreign Representative Motion [Docket No. 66].

- **Receivables Facility Motion**:  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Rights Pursuant to the Receivables Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief [Docket No. 23].   On June 6, 2023, the Court entered an Order approving the Receivables Facility Motion on an interim basis [Docket No. 68], and on July 19, 2023, the Court entered an Order approving the Receivables Facility Motion [Docket No. 295].

## B.      Appointment of Unsecured Creditors' Committee

On June 21, 2023, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 133] appointing the Committee.  The five-member Committee has retained Pachulski Stang Ziehl & Jones LLP as its legal counsel and Alvarez and Marsal North America LLC as its financial advisor.  The Committee includes the following entities:

- CBRE Investment Management;

- Iron Mountain Data Centers, LLC;

- Pivot Technology Services Corp.;

- Securitas Security Services USA, Inc.; and

- Menlo Equities.

Immediately after the Committee's appointment, the Debtors began sharing diligence with the Committee, which has been substantial.  The Debtors have also proactively engaged the Committee regarding the key components of these Chapter 11 Cases, including the Sale Process, the Final DIP Order, and the substance of the Plan, which has been productive.  As a result of such discussions, information transfer and dialogue between the Debtors and the Committee remains robust and ongoing.

## C.      Lease Rejections and Optimization

In preparation for the filing of these Chapter 11 Cases, and continuing on a postpetition basis, the Debtors, with the assistance of their advisors, undertook a comprehensive review of their lease portfolio, including an analysis of each of their data center locations and the associated revenues and expenses attendant thereto.  As a result of that analysis, the Debtors have determined in their business judgment that the costs incurred under certain leases constitute an unnecessary burden on the Debtors' Estates and that rejection of such leases would maximize the value of the Debtors' reorganized business.  As of the

date hereof, the Debtors have taken the following steps with respect to their lease rejection and optimization strategy.

- On June 8, 2023, the Debtors filed (i) the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief [Docket No. 79] (the "Rejection Procedures Motion," and the procedures contemplated thereby, the "Rejection Procedures"), through which the Debtors sought approval of certain procedures for rejecting or assuming executory contracts and unexpired leases; and (ii) the Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date and (II) Granting Related Relief [Docket No. 78] (the "First Omnibus Rejection Motion"), whereby the Debtors sought to reject two data center leases in Moses Lake, Washington as of June 4, 2023, and one data center lease in Halfweg, Netherlands as of September 6, 2023.

- On June 29, 2023, the Court entered Orders approving the Rejection Procedures Motion [Docket No. 186] and the First Omnibus Rejection Motion [Docket No. 184].

- On June 30, 2023, the Debtors filed a *Notice of Rejection of an Unexpired Lease* [Docket No. 190], pursuant to which the Debtors provided notice in accordance with the Rejection Procedures that they will reject one data center lease in Elk Grove Village, IL as of September 4, 2023, and abandon certain property therein (the "Elk Grove Rejection Notice").  The Elk Grove Rejection became effective as of September 5, 2023 [Docket No. 487].

- On July 20, 2023, the Court entered the *Supplemental Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases and (B) the Abandonment of Certain Personal Property, if any, Each Effective as of the Rejection Date and (II) Granting Related Relief* [Docket No. 302], which authorized the rejection of the Halfweg, Netherlands lease, as well as the abandonment of any property therein.

- On July 31, 2023, the Debtors filed a *Notice of Rejection of Certain Unexpired Lease*s [Docket No. 348], pursuant to which the Debtors provided notice in accordance with the Rejection Procedures that they will reject two data center leases in Santa Clara, CA as of July 31, 2023.  On August 11, 2023, the Court entered the *Second Order Approving the Rejection of Certain Unexpired Leases and the Abandonment of Certain Personal Property, if any* [Docket No. 415] rejecting the two Santa Clara, CA data center leases.

Further, on July 3, 2023, the Debtors filed an application [Docket No. 199] with the Bankruptcy Court requesting authorization to retain and employ Hilco Real Estate, LLC ("Hilco") to, among other things, represent the Debtors' interests in lease negotiations and strategic planning in connection with the lease optimization strategy, and on July 18, 2023, the Bankruptcy Court entered an order [Docket No. 291] approving the retention of Hilco as real estate consultant and advisor to the Debtors effective as of the Petition Date.  As of the date hereof, Hilco continues to advise the Debtors on its lease optimization and rejection strategy.

**D.      Sale Process and Bidding Procedures**

As described above, in March 2023, the Debtors, with the assistance of Guggenheim Securities, launched a comprehensive Marketing Process to engage interested third parties in a potential Sale

Transaction.  The Marketing Process ran in parallel with the Company's engagement with the Ad Hoc Group regarding the terms of a comprehensive restructuring transaction.

In connection with the Marketing Process, the Debtors, with the assistance of Guggenheim Securities, performed an initial outreach on a prepetition basis to approximately seventy-five ~~potential~~ financial and strategic part~~ni~~ers to solicit interest in acquiring some or all of the assets and/or interests in the company.  In total, the Debtors, with the assistance of Guggenheim Securities, have engaged with approximately eighty-~~seven~~eight potential financial and strategic part~~ni~~ers (the "Potential Purchasers").  The Debtors also executed forty-five non-disclosure agreements with these Potential Purchasers, and ~~six~~seven Potential Purchasers submitted non-binding letters of intent ~~prepetition~~.

On June 29, 2023, the Court entered the Bidding Procedures Order, authorizing the Debtors to, among other things, continue the Marketing Process postpetition, and, if necessary, to conduct an auction (the "Auction").  The Bidding Procedures also allow the Debtors flexibility with respect to the structure of a potential Sale Transaction.  On July 10, 2023, pursuant to the Bidding Procedures Order, the Debtors received at least one non-binding written proposal (a "Proposal").  Upon review, and in consultation with the Committee and the Ad Hoc Group, the Debtors determined that they had received multiple acceptable Proposals from Acceptable Bidders.  Accordingly, the Debtors extended the Marketing Process timeline in accordance with the Bidding Procedures, such that binding bids ~~must~~were to be submitted by no later than July 31, 2023.  On July 31, 2023, and August 22, 2023, the Debtors filed the *Notices of Amended Sale Schedule* [Docket ~~No~~Nos. 353 and 450] modifying the sale schedule to provide the Debtors with additional time to complete their comprehensive sale process, to receive and evaluate bids, and, if necessary, to hold an Auction to determine the highest and otherwise best bid for the Sale Package and maximize value for the Debtors' stakeholders and their Estates.  ~~Accordingly~~Consequently, final bids ~~are~~were due on August ~~18, 2023, and an Auction, if necessary, will be held on August 2~~30, 2023.

As described above, the Debtors have received multiple bids for the Sale Package, but none of these bids were Qualified Bids (as defined in the Bidding Procedures).  The Debtors do not believe at this time that any of the bids received to date are more value-maximizing than the Recapitalization Transaction proposed under the Plan.  Accordingly, on August 29, 2023, the Debtors filed a *Notice of Cancellation of Auction* [Docket No. 472] notifying parties-in-interest that the Debtors, in accordance with the Bidding Procedures Order and in consultation with the Ad Hoc Group and the Committee, had cancelled the Auction scheduled to occur on August 30, 2023.  However, negotiations with certain bidders remain ongoing as of the filing of this Disclosure Statement, and the Plan provides flexibility for the Debtors to "toggle" to a Sale Transaction should one develop that is more value-maximizing than the Recapitalization Transaction.

**E.**    **Approval of the DIP Facility.**

On July 19, 2023, the Bankruptcy Court entered an order [Docket No. 297] approving, on a final basis, the relief requested in the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Final DIP Order").  The Final DIP Order approved, among other things, a superpriority senior secured term loan credit facility in the aggregate principal amount of $200,468,511.87, consisting of: (i) a new money superpriority senior secured term loan credit facility in the principal amount of $150 million, (ii) a "roll-up" superpriority term loan facility in the principal amount of $36,468,511.87 (which includes accrued and unpaid interest as of the Petition Date on account

of the Prepetition Priority Loans), and (iii) a superpriority term loan facility in the principal amount of $14 million that consisted of escrowed proceeds funded on account of the Bridge Facility.

The relief granted in the Final DIP Order incorporates the terms of a settlement with the Committee, which engaged in constructive dialogue with the Debtors with respect thereto. As a result of arm's-length, good faith negotiations in the days and weeks that immediately followed the Committee's appointment, the Debtors, the Ad Hoc Group, and the Committee reached a negotiated settlement on various issues relating to, among other things, an increase in the Committee's investigation budget, to $250,000, additional reporting obligations in favor of the Committee, the agreement to negotiate a wind-down budget in good-faith in the event of a Sale Transaction, and establishing the priority in which the Debtors, the DIP Lenders, and the Prepetition First Lien Secured Parties liquidate, or seek recovery from, as applicable, the DIP collateral.

## F.    Bar Date Motion

On ~~January 9~~June 28, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 172] (the "Bar Date Motion"). On July 10, 2023, the Debtors filed their Schedules [Docket Nos. 213-243], and on July 19, 2023, the Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 298] (the "Bar Date Order"). Pursuant to the Bar Date Order, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases ~~is~~was August 15, 2023, at 4:00 p.m. (prevailing Eastern Time) (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is December 1, 2023, at 4:00 p.m. (prevailing Eastern Time). On July 24, 2023, the Debtors published the *Notice of Bar Dates for Submitting Proofs of Claim and Claims Under Section 503(b)(9) of the Bankruptcy Code Against the Debtors* [Docket No. 333] in *The New York Times (National Edition).* On July 24, 2023, the Debtors, through Kurtzman Carson Consultants LLC, caused the *Notice of Deadline Requiring Submission of Proofs of Claim on or Before August 15, 2023, and Related Procedures for Submitting Proofs of Claim in the Above-Captioned Chapter 11 Cases* [Docket No. 357] to be served on relevant parties in interest.

## G.    The Special Committee's Independent Investigation

As described in Article V.B herein, the Board established the Special Committee and delegated sole authority to the Special Committee (i) on all matters related to a Transaction and Conflict Matters, and (ii) to conduct the Independent Investigation related thereto. Specifically, the Special Committee has the authority to, on behalf of the entire Board, take any action with respect to the Conflict Matters, including, but not limited to: (a) any release or settlement of potential claims or causes of action of the Company or its subsidiaries, if any, against the Related Parties; (b) any decision regarding all or part of a Transaction to the extent it constitutes a Conflict Matter; and (c) any other transaction implicating the Debtors involving Conflict Matters. The disinterested directors serving on the Special Committee retained Katten Muchin Rosenman LLP ("Katten") to provide independent legal counsel in connection with the Independent Investigation.

In furtherance of the Independent Investigation, the Special Committee has, to date, issued document and information requests to, among others, the Debtors and certain of the Debtors' significant

equity holders.  To date, Katten has received and reviewed approximately ~~1,742~~4,300 documents, comprising ~~22,744~~approximately 49,000 pages, relevant to the Independent Investigation.  Katten has also interviewed certain members of Company management and board of directors, as well as representatives of certain of the Debtors' significant equity holders.  The Special Committee is continuing to investigate matters in accordance with the authority it has been given by the Board and in accordance with the disinterested directors' fiduciary obligations.  Accordingly, the Independent Investigation remains ongoing as of the date hereof.

**H.      The Canadian CCAA Recognition Proceedings**

Debtors Cyxtera Communications Canada, ULS and Cyxtera Canada TRS, ULC are Alberta unlimited liability corporations, and Cyxtera Canada LLC, which is the shareholder of Cyxtera Communications Canada, ULC is a Delaware limited liability corporation (collectively, the "Canadian Debtors").  On June 6, 2023, Cyxtera Technologies, Inc. and the Canadian Debtors commenced an ancillary recognition proceeding (the "Canadian Proceeding") in the Court of King's Bench of Alberta (the "Canadian Court") pursuant to the *Companies' Creditors Arrangement Act* (Canada) R.S.C. 1985, c. C-36 (as amended, the "CCAA").   The purpose of the initial recognition hearing for the Canadian Proceeding was to seek an initial recognition order and supplemental order~~:~~.

- declaring Cyxtera Technologies, Inc. as the "foreign representative" of the Canadian Debtors in the Canadian Proceeding;

- declaring the Canadian Debtors' Chapter 11 Cases as "foreign main proceedings" under the applicable provisions of the CCAA to, among other things, protect the Debtors' assets and operations in Canada;

- staying all proceedings with respect to the Canadian Debtors' business and property;

- recognizing in Canada certain interim and final orders entered by the Bankruptcy Court in the Chapter 11 Cases which are applicable to the Canadian Debtors, including the *Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and* Ipso Facto *Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* [Docket No. 75];

- granting a superpriority interim financing charge over the property of the Canadian Debtors in favor of the DIP Lenders; and

- obtaining other orders necessary for the protection of the Canadian Debtors' property or the interests of the Canadian Debtors' creditors.

On June 7, 2023, the Canadian Court granted the order declaring Debtor Cyxtera Technologies, Inc. as the "foreign representative"[1216] on behalf of the Canadian Debtors' estates (the "Foreign Representative") in the Canadian Proceeding and granted the other declarations and orders referenced above.  Thereafter, on July 12 and July 31, 2023, the Canadian Court recognized certain other orders entered by the Bankruptcy Court, including final Bankruptcy Court Orders, the Bidding

---

[1216] A "foreign representative" is defined in section 45(1) of the CCAA to mean "a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding respect of a debtor company, to (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or (b) act as a representative in respect of the foreign proceeding."

Procedures Order, the Bar Date Order, and the Final DIP Order.  The Canadian Debtors, through the Foreign Representative, will continue to seek formal recognition of relevant Bankruptcy Court orders for the remainder of these Chapter 11 Cases.

## I.    Proposed Confirmation Schedule

Under the RSA, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions.  The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs.  To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | [September 14], 2023 |
| Solicitation Mailing Deadline | Three (3) business days following entry of the Order (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Five (5) business days following entry of the Order (or as soon as reasonably practicable thereafter) |
| Plan Supplement Filing Deadline | The date that is no later than seven (7) days prior to the Confirmation Hearing |
| Voting Deadline | [October 2~~4~~6], 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Objection Deadline | [October 2~~4~~6], 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Voting Report | [~~October 30~~November 2], 2023 |
| Confirmation Brief and Confirmation Reply Deadline | [~~October 30~~November 2], 2023 |
| Confirmation Hearing Date | [November ~~2~~6], 2023, or such other date as may be scheduled by the Court |

## VII.    SUMMARY OF THE PLAN

The Plan contemplates the following key terms described below.  In addition, the Plan contains additional detail, including descriptions of the provisions governing distributions under the Plan, the procedures for resolving contingent, unliquidated, and disputed claims, and provisions related to modification, revocation, or withdrawal of the Plan, among others.

## A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's

approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

Before, on, and after the Effective Date, the Debtors or ~~Reorganized~~the Post-Effective Date Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions (which, for the avoidance of doubt, shall be in form, substance, and structure reasonably acceptable to the Required Consenting Term Lenders) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, the RSA, and the other Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, the RSA, and the other Definitive Documents; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the execution and delivery of the New Takeback Facility Documents and entry into the New Takeback Facility; (v) the issuance and distribution of the New Common Stock as set forth in the Plan; (vi) the implementation of the Management Incentive Plan; (vii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each ~~Reorganized~~Post-Effective Date Debtor (including all actions to be made, undertakings to be made, ~~and~~ obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the ~~Reorganized~~Post-Effective Date Debtors, as applicable); (viii) such other transactions that, in the reasonable business judgment of the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, the Required Consenting Term Lenders (in the event of a Recapitalization Transaction), and the ~~Plan Sponsor~~Purchaser (in the event of ~~an Equity Investment~~a Sale Transaction), are required to effectuate the Restructuring Transactions; and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

~~For the avoidance of doubt, in the event there is no Plan Sponsor, the Debtors shall pursue a Recapitalization Transaction.~~

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to ~~effect~~effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

~~C. New Equity Investment~~

The Debtors shall pursue the Recapitalization Transaction unless the Debtors determine, with the consent of the Required Consenting Term Lenders, to pursue an Equity Investment Transaction or an Asset Sale.

In the event of an Equity Investment Transaction, on the Effective Date, the ~~Plan Sponsor~~Purchaser shall purchase ~~the Plan Sponsor Equity Share~~substantially all of the New Common

Stock free and clear of all Liens, Claims, Interests, charges, or other encumbrances in exchange for the Purchase Price ~~committed in the Successful Bid pursuant to the Plan Sponsor Agreement.~~ set forth in the Purchase Agreement.  The Confirmation Order shall authorize the Debtors, the Purchaser, and the Post-Effective Date Debtors, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Equity Investment Transaction pursuant to the terms of the Purchase Agreement and the Plan.  On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

**C.**     **The Equity Investment Transaction or Recapitalization Transaction**

If the Equity Investment Transaction or Recapitalization Transaction occurs, the following provisions shall govern.

**1.** ~~D.~~ The ~~Reorganized~~Post-Effective Date Debtors

On the Effective Date, the New Board shall be established, and each ~~Reorganized~~Post-Effective Date Debtor shall adopt its New Organizational Documents.  The ~~Reorganized~~Post-Effective Date Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

**2.** ~~E.~~ Sources of Consideration for Plan Distributions

The Debtors shall fund or make distributions under the Plan, as applicable, with:  (i) the issuance of New Takeback Facility Loans under the New Takeback Facility, (ii) the proceeds from the ~~sale of the Plan Sponsor~~ Equity ~~Share:~~Investment Transaction, (iii) the New Common Stock, and (iv) the Debtors' Cash on hand.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock, will be exempt from Securities Act registration, as described more fully in Article IV.~~M~~C.5 of the Plan.

**(a)** ~~1.~~ The New Takeback Facility

~~On~~In the event of a Recapitalization Transaction, on the Effective Date, the ~~Reorganized~~Post-Effective Date Debtors shall enter into the New Takeback Facility Credit Agreement.  Confirmation of the Plan shall be deemed approval of the New Takeback Facility and the New Takeback Facility Documents, as applicable, and all transactions contemplated thereby; all actions to be taken, undertakings to be made, and obligations to be incurred by the ~~Reorganized~~Post-Effective Date Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and authorization ~~of the Reorganized~~for the Post-Effective Date Debtors to enter into and execute the New Takeback Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Takeback Facility.  Execution of the New Takeback Facility

Credit Agreement by the New Takeback Facility Agent shall be deemed to bind all Holders of DIP Claims as if each such Holder had executed the New Takeback Facility Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Takeback Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Takeback Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Takeback Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The ~~Reorganized~~Post-Effective Date Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required)~~,~~ and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**(b)** ~~2.~~ **New Common Stock**

Reorganized Cyxtera shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents and any options or other equity awards, if any, reserved for the Management Incentive Plan. The issuance of the New Common Stock shall be authorized without the need for any further corporate action. On the Effective Date, the New Common Stock shall be issued and distributed pursuant to, and in accordance with, the Plan, and, in the event of an Equity Investment Transaction, the ~~Plan Sponsor~~Purchase Agreement.

All of the shares of New Common Stock issued pursuant to the Plan and, if applicable, the ~~Plan Sponsor~~Purchase Agreement shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Common Stock shall be deemed ~~as~~to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable ~~Reorganized~~Post-Effective Date Debtor(s). ~~[~~The New Common Stock will not be registered under the Securities Act or on any national securities exchange as of the Effective Date.~~]~~

**3.** ~~F.~~ **Corporate Existence**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are

amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the ~~Reorganized~~Post-Effective Date Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the ~~Reorganized~~Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 4.    New Organizational Documents

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Effective Date Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Organizational Documents will prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Post-Effective Date Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Post-Effective Date Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents.  For the avoidance of doubt, any claimant's acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Post-Effective Date Debtors.

### 5.    Certain Securities Law Matters

Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Common Stock, as contemplated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities.

The shares of New Common Stock to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Stock in the New Organizational Documents.

The shares of New Common Stock that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be

considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

### 6.     Management Incentive Plan

On or as soon as reasonably practicable following the Effective Date, the Post-Effective Date Debtors shall adopt and implement the Management Incentive Plan, which will provide that up to ten percent of the value of the New Common Stock as of the Effective Date, on a fully diluted basis, shall be issued in connection with the Management Incentive Plan on terms acceptable to the Required Consenting Term Lenders and the Debtors, and, in the event of an Equity Investment Transaction, the Purchaser. The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

### 7.     Employment Obligations

Unless otherwise provided herein, and subject to Article V of the Plan, if applicable, all employee wages, compensation, retiree benefits (as defined in 11 U.S.C. § 1114(a) of the Bankruptcy Code), and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Post-Effective Date Debtors and shall remain in place as of the Effective Date, and the Post-Effective Date Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. On the Effective Date, the Post-Effective Date Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees; or (b) enter into new agreements with such employees on terms and conditions acceptable to the Post-Effective Date Debtors, such employee, and the Required Consenting Term Lenders, and, in the event of an Equity Investment Transaction, the Purchaser.

### D.     The Asset Sale

If the Asset Sale occurs, the following provisions shall govern.

### 1.     The Asset Sale

On the Effective Date, the Purchaser shall purchase substantially all of the Debtors' assets free and clear of all Liens, Claims, Interests, charges, or other encumbrances (except for those Liens, Claims, Interests, charges, or other encumbrances assumed by the Purchaser pursuant to the terms of the Purchase Agreement) in exchange for the Purchase Price as set forth in the Purchase Agreement. The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, and the Purchaser, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

Subject to the consent rights set forth in the RSA, the Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Asset Sale pursuant to the terms of the Purchase Agreement and the Plan. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors or the Purchaser, as applicable, may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain

jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

**2.     Sources of Consideration for Plan Distributions**

The Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Asset Sale, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**3.     Post-Effective Date Debtors**

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible as authorized by the Bankruptcy Court, (ii) resolving Disputed Claims, (iii) making distributions on account of Allowed Claims as provided hereunder, (iv) establishing and funding the Distribution Reserve Accounts, (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (vi) filing appropriate tax returns, (vii) complying with any continuing obligations under the Purchase Agreement, and (viii) administering the Plan in an efficacious manner.  The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Post-Effective Date Debtors and shall be subject to administration by the Plan Administrator, and the net proceeds thereof shall be Distributable Consideration.

**4.     Plan Administrator**

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Post-Effective Date Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers.  The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer.  The Debtors, after the Confirmation Date, and the Post-Effective Date

Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator and upon three (3) Business Days' notice to counsel to the AHG, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind-Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including:  (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (viii) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.E of the Plan; (ix) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (x) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (xi) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

### (a)    Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors.  The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Post-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

### (b)    Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement, reasonably acceptable to the Required Consenting Term Lenders, and paid out of the Wind-Down Reserve.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

### (c)    Plan Administrator Expenses

All costs, expenses, and obligations incurred by the Plan Administrator or the Post-Effective Date Debtors in administering the Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

### (d)    Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors. The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

### (e)    Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

### (f)    Dissolution of the Post-Effective Date Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

To the extent the Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed, such Cash or other property shall constitute Residual Cash and shall be immediately allocated and distributable to the Holders of Allowed First Lien Claims.

### 5.    Wind Down

As soon as practicable after the Effective Date, the Plan Administrator shall: (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with and abide by the terms of the Purchase Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of one or more of the Debtors or the Post-Effective Date

Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Existing Equity Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

**E.     Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Post-Effective Date Debtors, shall retain and may enforce (or the Plan Administrator may enforce, if applicable) all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Post-Effective Date Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Post-Effective Date Debtors, as applicable, as of the Effective Date.

The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Post-Effective Date Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Post-Effective Date Debtor except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Post-Effective Date Debtors and/or the Plan

Administrator, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Post-Effective Date Debtors and/or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.E of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

**F.**    ~~G.~~ **Vesting of Assets in the ~~Reorganized~~Post-Effective Date Debtors**

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan, the Plan Supplement, or the New Takeback Facility, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective ~~Reorganized~~Post-Effective Date Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each ~~Reorganized~~Post-Effective Date Debtor may operate its business and ~~may~~ use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**G.**    ~~H.~~ **Cancellation of Existing Agreements and Interests**

On the Effective Date, except with respect to the New Takeback Facility or to the extent otherwise provided in the Plan, including in Article V.A of the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding the foregoing or anything to the contrary herein, any rights of each Agent to indemnification under the DIP Documents, the Receivables Program Documents, the First Lien Credit Documents, and the Bridge Facility Documents shall remain binding and enforceable in accordance with the terms of such documents and shall not be subject to discharge, impairment, or release under the Plan or the Confirmation Order.

**H.**    ~~I.~~ **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including, as and if applicable:  (i) selection of the directors, officers, or managers for the ~~Reorganized~~Post-Effective Date Debtors; (ii) the issuance and distribution of the New Common Stock; (iii) implementation of the Restructuring Transactions; (iv) entry into the New Takeback Facility Documents; (v) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) adoption by the New Board of the Management Incentive Plan; ~~and~~ (ix) consummation of the Sale Transaction pursuant to the Purchase Agreement; (x) formation of the Post-Effective Date Debtors and selection of the Plan Administrator; and (xi) all other acts or actions contemplated or reasonably

necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the ~~Reorganized~~Post-Effective Date Debtors~~,~~ and any corporate action required by the Debtors or the ~~Reorganized~~Post-Effective Date Debtors~~, as applicable,~~ in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the ~~Reorganized~~Post-Effective Date Debtors~~, as applicable~~.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the ~~Reorganized~~Post-Effective Date Debtors, including, in the event of a Recapitalization Transaction or an Equity Investment Transaction, the New Common Stock, the New Organizational Documents, the New Takeback Facility, ~~and~~ the New Takeback Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.~~I~~H of the Plan shall be effective notwithstanding any requirements under non-~~-~~bankruptcy law.

**~~J. New Organizational Documents~~**

~~On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Organizational Documents will prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents.  For the avoidance of doubt, any claimant's acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than Reorganized Debtors.~~

**I.**      **~~K.~~ Directors and Officers of the ~~Reorganized~~Post-Effective Date Debtors~~.~~**
**=**

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of Cyxtera shall expire, and, if applicable, the members for the initial term of the New Board shall be appointed; *provided*, that the disinterested directors of Cyxtera, comprising the Special Committee ~~of Cyxtera's board of directors~~, shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan.  The disinterested directors of Cyxtera shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the ~~Reorganized~~Post-Effective Date Debtors, the ~~Plan Sponsor~~Purchaser, or any other Entity without their prior written consent.

The initial members of the New Board, if applicable, will be identified in the Plan Supplement to the extent known at the time of filing. In the event of a Recapitalization Transaction or an Equity Investment Transaction, Eeach such member and officer of the ReorganizedPost-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the ReorganizedPost-Effective Date Debtors. In the event of an Equity Investment Transaction, theThe members of the New Board shall be chosen by the Debtors or the ReorganizedPost-Effective Date Debtors, subject to the applicable terms of the RSA, and, if applicable, the Plan SponsorPurchase Agreement.

## J. L. Effectuating Documents; Further Transactions

On and after the Effective Date, the ReorganizedPost-Effective Date Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the ReorganizedPost-Effective Date Debtors without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

## M. Certain Securities Law Matters

The offering of any New Common Stock before the Petition Date shall be exempt from the registration requirements of the Securities Act in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act

The offering, issuance, and distribution of the New Common Stock, as contemplated by Article III of the Plan, after the Petition Date, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code, and to the extent such exemption is not available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Such New Common Stock, to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC, Blue-Sky Laws, or foreign securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

## K. N. Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a ReorganizedPost-Effective Date Debtor, as applicable, or to any other Person) of property under the Plan or pursuant to: (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the ReorganizedPost-Effective Date Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the

making, assignment, or recording of any lease or sublease; (v) the grant of collateral as security for the New Takeback Facility; or (vi) the Sale Transaction; or (vii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### O. Management Incentive Plan

On or as soon as reasonably practicable following the Effective Date, the Reorganized Debtors shall adopt and implement the Management Incentive Plan, which will provide that up to 10% of the value of the New Common Stock as of the Effective Date, on a fully diluted basis, shall be issued in connection with the Management Incentive Plan on terms acceptable to the Required Consenting Term Lenders and the Debtors, and, in the event of an Equity Investment Transaction, the Plan Sponsor.  The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

### P. Employment Obligations

Unless otherwise provided herein, and subject to Article V of the Plan, all employee wages, compensation, retiree benefits (as defined in 11 U.S.C. § 1114(a) of the Bankruptcy Code), and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  On the Effective Date, the Reorganized Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees; or (b) enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors, such employee, and the Required Consenting Term Lenders, and, in the event of an Equity Investment Transaction, the Plan Sponsor.

### Q. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and

exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.Q of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

### L. ~~R.~~ Private Company

The ~~Reorganized~~Post-Effective Date Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without Securities Act or Exchange Act reporting obligations upon emergence or as soon as practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

### M. ~~S.~~ Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, the ~~Reorganized~~Post-Effective Date Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the ~~Reorganized~~Post-Effective Date Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

### N. ~~T.~~ Director and Officer Liability Insurance

After the Effective Date, none of the ~~Reorganized~~Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior

to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

## VIII.   OTHER KEY ASPECTS OF THE PLAN

### A.      Treatment of Executory Contracts and Unexpired Leases

#### 1.      Assumption of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (i) was assumed or rejected previously by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the foregoing assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors, ~~or~~ the ~~Reorganized~~Post-Effective Date Debtors, and/or the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including ninety (90) days after the Effective Date, *provided* that in the event of a Recapitalization Transaction, such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth in the RSA.

#### 2.      Indemnification Obligations

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (ii) remain intact, in full force and effect, and irrevocable, (iii) not be limited, reduced, or terminated after the Effective Date, and

(iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date.  All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the ~~Reorganized~~Post-Effective Date Debtors and/or the Plan Administrator, as applicable.

### 3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the ~~Reorganized~~Post-Effective Date Debtors no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claims is not Filed with the Claims and Noticing Agent within such time will be automatically disallowed~~,~~ and forever barred from assertion~~,~~ and shall not be enforceable against the Debtors, the ~~Reorganized~~Post-Effective Date Debtors, the Estates, or their property without the need for any objection by the Debtors ~~or Reorganized~~, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 4.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, ~~all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before~~ any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, including pursuant to the Plan, or related cure amount must be filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than thirty (30) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion~~,~~ and shall not be enforceable against any ~~Reorganized~~Post-Effective Date Debtor~~,~~ without the need for any objection by the ~~Reorganized~~Post-Effective Date Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, of the Cure; *provided* that nothing herein shall prevent the ~~Reorganized~~Post-Effective Date Debtors from

paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The ~~Reorganized~~Post-Effective Date Debtors may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. ~~In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.~~ Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or ~~Reorganized~~the Post-Effective Date Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or ~~Reorganized~~the Post-Effective Date Debtors, ~~for~~as applicable, with respect to which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the ~~Reorganized~~Post-Effective Date Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.D of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

### 5.    Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the ~~Reorganized~~Post-Effective Date Debtors.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the ~~Reorganized~~Post-Effective Date Debtors) or draw on any collateral or security therefor.

6.    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the ~~Reorganized~~Debtors or the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

7.    **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any ~~such~~ contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the ~~Reorganized~~Debtors or the Post-Effective Date Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter ~~its~~the treatment of such contract or lease under the Plan.

8.    **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

9.    **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtors or the ~~Reorganized~~Post-Effective Date Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

B.    **Conditions Precedent to Confirmation and Consummation of the Plan**

1.    **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

1.    the Restructuring Transactions shall have been implemented in accordance with the Restructuring Transactions Memorandum in all material respects;

2.    in the event of an Asset Sale, the Distribution Reserve Accounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind-Down Amount;

3.    ~~2.~~ the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall have become a Final Order;

4.   ~~3.~~ each document or agreement constituting the applicable Definitive Documents, the form and substance of which shall be subject to the consent rights set forth in the RSA (and, in the event of ~~an Equity Investment~~a Sale Transaction, the form and substance of which shall be reasonably acceptable to the ~~Plan Sponsor~~Purchaser), shall have been executed and/or effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied or waived by the applicable party or parties prior to or contemporaneously with the occurrence of the Effective Date;

5.   ~~4.~~ the New Takeback Facility Documents, if applicable, the form and substance of which shall be subject to the consent rights set forth in the RSA, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the Required Consenting Term Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

6.   ~~5.~~ the DIP Claims shall have been indefeasibly paid in full in Cash or, solely to the extent set forth herein, satisfied by the New Takeback Facility;

7.   ~~6.~~ the New Common Stock shall have been issued;

8.   ~~7.~~ all Restructuring Expenses, to the extent invoiced, shall have been paid in full;

9.   ~~8.~~ the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Restructuring Transactions;

10.   ~~9.~~ if and as applicable, the ~~Plan Sponsor~~Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of the Plan;

11.   ~~10.~~ if and as applicable, the ~~Plan Sponsor~~Purchaser shall deliver the Purchase Price to the Debtors in exchange for the ~~Reorganized~~Post-Effective Date Debtors' distribution of the ~~Plan Sponsor Equity Share~~substantially all of the New Common Stock or transfer of substantially all of the Debtors' assets or as otherwise agreed to by the Debtors and the ~~Plan Sponsor~~Purchaser;

12.   ~~11.~~ the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed;

13.   ~~12.~~ the RSA shall remain in full force and effect;

14.   ~~13.~~ none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

15.   ~~14.~~ no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors; and

16.   ~~15.~~ all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court.

2.      **Waiver of Conditions**

The conditions to the Effective Date set forth in Article IX of the Plan, except for the condition set forth in Article IX.A.~~7~~8 and 1~~5~~6 of the Plan (each of which may not be waived without the consent of the affected parties), may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Term Lenders and, in the event of ~~an Equity Investment~~a Sale Transaction, the ~~Plan Sponsor~~Purchaser, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

3.      **Effect of Failure of Conditions**

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by the Debtors~~,~~ or other Claims~~,~~ or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity~~,~~ in any respect; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

## IX.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE ~~REORGANIZED~~POST-EFFECTIVE DATE DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.      **Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates.  The terms of any alternative restructuring proposal may be less favorable

to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors′   ability to raise additional capital;

- the Debtors′   liquidity;

- how the Debtors′   business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors′   enterprise value; and

- the Debtors′   business relationship with customers and vendors.

### 2. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3. The RSA May Be Terminated

As more fully set forth in the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Required Consenting Stakeholders of their respective obligations under the documents.  In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

### 4. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan.  If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

5.      **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6.      **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7.      **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of

nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

**8.      Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, and increasing expenses. See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the ~~Reorganized~~Post-Effective Date Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**9.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**10.      The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to

an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 11. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 12. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 13. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, ~~Reorganized~~Post-Effective Date Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to the Independent Investigation and objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties ~~is~~are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

## B. Risks Related to Recoveries Under the Plan

### 1. Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the ~~Reorganized~~Post-Effective Date Debtors Following the Effective Date

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the ~~Reorganized~~Post-Effective Date Debtors.  The holders may have interests that differ from those of the

other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the ~~Reorganized~~Post-Effective Date Debtors and consequently impact the value of the shares of New Common Stock. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the ~~Reorganized~~Post-Effective Date Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the ~~Reorganized~~Post-Effective Date Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the ~~Reorganized~~Post-Effective Date Debtors' businesses, financial condition, and operating results.

### 2. Estimated Valuations of the Exit Facilities, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

### 3. The ~~Reorganized~~Post-Effective Date Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful

The ~~Reorganized~~Post-Effective Date Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the ~~Reorganized~~Post-Effective Date Debtors' control. The ~~Reorganized~~Post-Effective Date Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facilities.

If cash flows and capital resources are insufficient to fund the ~~Reorganized~~Post-Effective Date Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the ~~Reorganized~~Post-Effective Date Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

### 4. The New Common Stock is Subject to Dilution

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with

the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

### 5. The Terms of the Exit Facilities Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court

The terms of the Exit Facilities Documents have not been finalized and are subject to negotiations between the Debtors and the Consenting Stakeholders. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations, and the results of such negotiations may affect the rights of the holders of the New Common Stock following the Effective Date. As a result, the final terms of the Exit Facilities Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

### 6. A Decline in the ~~Reorganized~~Post-Effective Date Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt

The Debtors' or the ~~Reorganized~~Post-Effective Date Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the ~~Reorganized~~Post-Effective Date Debtors, as applicable. Downgrades in the ~~Reorganized~~Post-Effective Date Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

### 7. Certain Tax Implications of the Plan May Increase the Tax Liability of the ~~Reorganized~~Post-Effective Date Debtors

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the ~~Reorganized~~Post-Effective Date Debtors and Holders of certain Claims.

### 8. The Closing Conditions of ~~an Equity Investment~~a Sale Transaction May Not be Satisfied

It is possible that the Debtors may not satisfy the closing conditions of ~~an Equity Investment~~a Sale Transaction if the Debtors ~~select a Successful Bid pursuant to the Bidding Procedures~~determine to pursue a Sale Transaction. A failure to satisfy any of the closing conditions of the ~~s~~Sale ~~t~~Transaction related thereto could prevent the ~~Equity Investment~~Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

### 9. The Debtors' General Unsecured Creditors May Not Receive Any Recovery

The Debtors, the Committee and the Consenting Term Lenders continue to negotiate the terms of a GUC Recovery Pool. There is a possibility that these parties may not be able to reach an agreement on the contents of a GUC Recovery Pool, in which case Holders of General Unsecured Claims may not receive any recovery under the Plan.

C.    **Risks Related to the Debtors' and the ~~Reorganized~~Post-Effective Date Debtors' Businesses**

1.    **The ~~Reorganized~~Post-Effective Date Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The ~~Reorganized~~Post-Effective Date Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the ~~Reorganized~~Post-Effective Date Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the ~~Reorganized~~Post-Effective Date Debtors' control. The ~~Reorganized~~Post-Effective Date Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the ~~Reorganized~~Post-Effective Date Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facilities and upon emergence.

2.    **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.    **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key

personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the ~~Reorganized~~Post-Effective Date Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4.    Financial Results May Be Volatile and May Not Reflect Historical Trends

The Financial Projections attached hereto as **Exhibit E** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, Uunanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

### 5.    The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws and evolving environmental standards.  The Debtors may

be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the ~~Reorganized~~Post-Effective Date Debtors.

**6.      The ~~Reorganized~~Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the ~~Reorganized~~Post-Effective Date Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the ~~Reorganized~~Post-Effective Date Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the ~~Reorganized~~Post-Effective Date Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the ~~Reorganized~~Post-Effective Date Debtors' businesses and financial stability, however, could be material.

**7.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors may experience increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**8.      The Debtors' Business Depends on Their Ability to Keep Pace with Rapid Technological Changes That Impact Their Industry, and Ability to Grow and Retain the Debtors' Customer Base**

The Debtors operate in a complex and rapidly shifting industry characterized by swift, and sometimes disruptive, technological developments, evolving industry standards, frequent new product introductions and enhancements, and changes in customer requirements.  The Debtors' future success depends in part on their ability to continue to provide data center solutions that keep pace with evolving industry standards and changing customer demands.  Although the positioning of their businesses is currently strong, changes in technology, standards, and in the Debtors' customers' businesses continue to occur rapidly and at unpredictable intervals, and the Debtors may not be able to respond adequately.  The impact of these changes may be magnified by the intense competition in the Debtors' industry.  If the Debtors are unable to successfully update and integrate their offerings to adapt to these changes, or if the Debtors do not successfully develop new capabilities needed by their customers to keep pace with these changes, the Debtors' business and financial results may suffer.

The Debtors' ability to keep up with technology and business changes is subject to a number of risks, and the Debtors may find it difficult or costly to, among other things: (i) update or expand their data centers fast enough to meet customers' needs; (ii) update the Debtors' products and services to keep pace with business, regulatory, and other developments in the industries where the Debtors' customers operate; and (iii) update the Debtors' offerings to keep pace with advancements in hardware, software, and data center technology.

The Debtors could also incur substantial costs if they need to modify their services or infrastructure in order to adapt to these changes. For example, the Debtors' data center infrastructure could require improvements due to (i) the development of new systems to deliver power to or eliminate heat from the servers they house, (ii) the development of new server technologies that require levels of critical load and heat removal that the Debtors' facilities are not designed to provide; or (iii) a fundamental change in the way in which the Debtors deliver services. The Debtors may not be able to timely adapt to changing technologies, if at all. The Debtors' ability to sustain and grow their business would suffer if they fail to respond to these changes in a timely and cost-effective manner.

9. **Acquisitions of Companies, Products, or Technologies, or Internal Restructuring and Cost Savings Initiatives May Disrupt the Debtors' Ongoing Business**

The Debtors have acquired and may continue to acquire companies, products, data center assets, and technologies that complement their strategic direction. Acquisitions involve significant risks and uncertainties, including:

- inability to successfully integrate the acquired technology and operations into the Debtors' business and maintain uniform standards, controls, policies, and procedures;

- inability to realize synergies expected to result from an acquisition;

- challenges retaining the key employees, customers, resellers and other business partners of the acquired operation; and

- the internal control environment of an acquired entity may not be consistent with the Debtors' standards and may require significant time and resources to improve.

Acquisitions and divestitures are inherently risky. The Debtors' transactions may not be successful and may, in some cases, harm operating results or their financial condition. In addition, if the Debtors use debt to fund acquisitions or for other purposes, their interest expense and leverage may significantly increase. If the Debtors issue equity securities as consideration in an acquisition, current shareholders' percentage ownership and earnings per share may be diluted.

In addition, from time to time, the Debtors may undertake internal restructurings and other initiatives intended to reduce expenses. These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention. Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs. If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

10. **Cyberattacks or the Improper Disclosure or Control of Personal Information Could Result in Liability and Harm the Debtors' Reputation, Which Could Adversely Affect Its Business**

The Debtors are dependent on networks and systems to process, transmit and store electronic information and to communicate among the Debtors' locations around the world, and they may be required to store sensitive or confidential client data in connection with the services they provide. As a result, the Debtors are subject to contractual terms and numerous U.S. and foreign laws and regulations designed to protect this information. Furthermore, data privacy is subject to frequently changing rules and regulations, which sometimes conflict among the various jurisdictions and countries in which the

Debtors provide services.  Although the Debtors have implemented appropriate policies and procedures to reduce the possibility of physical, logical and personnel security breaches, no such measures can completely eliminate the risk of cybersecurity attacks, especially in light of advances in criminal capabilities (including cyber-attacks or cyber intrusions over the internet, malware, computer viruses and the like), discovery of new vulnerabilities or attempts to exploit existing vulnerabilities in interconnected third party systems that are beyond the Debtors' control systems.

Unauthorized disclosure, either actual perceived, of sensitive or confidential client or customer data, whether through systems failure, system intrusion, employee negligence, fraud, or otherwise could damage the Debtors' reputation and cause the Debtors to lose clients.  Similarly, unauthorized access to or through the Debtors' information systems or those the Debtors develop for clients, whether by the Debtors' employees or third parties, could result in negative publicity, legal liability and damage to the Debtors' reputation, business, financial condition, results of operations and cash flows.

While the Debtors have not experienced a significant compromise to date, significant data loss or material financial losses related to cyber security attacks that has had an adverse effect on the Debtors' operations, there is no assurance that there may not be a material adverse effect in the future.  Although the Debtors maintain cyber liability insurance, such insurance may not adequately or timely compensate the Debtors for all losses they may incur as any of the Debtors' client contracts do not contain limitations of liability for such losses.

### 11.    The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 12.    The Debtors May Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products and services, including renewals of current contracts.  This is particularly important, given that over 90 percent of Cyxtera's revenue is derived from recurring, fixed term customer contracts.  Existing customers may decide not to renew or to reduce their contracts with the Debtors or not to purchase additional products or services from the Debtors in the future, which could have a material adverse effect on the Debtors' business and results of operations.  In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products and services, the level of customer spending for data center and colocation technology, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products and services needed by customers, and the Debtors'

ability to integrate and manage any acquired businesses.  Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.  The Debtors' revenue, which has been largely recurring in nature, comes from the sale of the Debtors' products and services under fixed-term contracts.  The Debtors do not have a unilateral right to extend these contracts at the end of their term.  If customers cancel or decide not to renew their contracts, the Debtors' business and financial results could be adversely and materially affected.

13. **The Debtors' Business is Highly Dependent on Third Parties and the Failure of their Physical or Customer Infrastructure Within their Data Centers Could Lead to Significant Cost and Disruption that Could Reduce their Revenue and Harm their Business Reputation and/or Financial Results**

The Debtors' business depends on providing customers with highly reliable data center solutions. The Debtors must safehouse their customers' infrastructure and equipment located in their data centers by ensuring that they remain operational at all times.  Problems at one or more data centers, whether or not they are within the Debtors' control, could result in service interruptions or significant infrastructure or equipment damage.  These could result from numerous externalities, including, but not limited to:

- human error;

- maintenance lapses and/or failures;

- equipment failure;

- availability of parts and materials necessary to appropriately maintain their infrastructure;

- cybersecurity incidents, including physical and electronic breaches;

- fires, earthquakes, hurricanes, floods, tornados or other nature disasters;

- extreme temperatures;

- water damage;

- fiber cuts;

- power loss, water loss and/or the loss of other local utilities;

- terrorist acts;

- sabotage and vandalism; and

- civil disorder.

The Debtors have service-level obligations to their customers.  As a result, service interruptions or significant equipment damage in their data centers could result in difficulty maintaining service-level commitments to these customers and may invite potential claims related to such failures.  Because the Debtors' data centers are critical to many of their customers' businesses, service interruptions or significant equipment damage in could also result in lost profits or other indirect or consequential damages to their customers.  There can be no assurance that a court would enforce any contractual

limitations on the Debtors' liability in the event that one of their customers brings a lawsuit as a result of a problem at one of their data centers. Furthermore, the Debtors may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue. In addition, any loss of service, equipment damage or inability to meet their service-level commitment obligations could reduce the confidence of their customers and could consequently impair their ability to obtain and retain customers, which would adversely affect both their ability to generate revenues and their operating results.

Furthermore, the Debtors are dependent upon internet service providers, telecommunications carriers and other website operators in North America, Europe, and Asia, some of which have experienced significant system failures and electrical outages in the past. The Debtors' customers may in the future experience difficulties due to system failures unrelated to their systems and offerings. If, for any reason, these providers fail to provide the required services, the Debtors' business, financial condition, and results of operations could be materially and adversely impacted.

### 14. The Debtors May Overestimate or Underestimate Their Data Center Capacity Requirements, and their Operating Margins and Profitability Could Be Adversely Affected

The Debtors incur various costs of construction, leasing, and maintenance for their data centers, which constitute a significant portion of the Debtors' capital and operating expenses. In order to manage growth and ensure adequate capacity for new and existing customers while minimizing unnecessary excess capacity costs, the Debtors continuously evaluate their short- and long-term data center capacity requirements. If the Debtors overestimate the demand for their services and secure excess data center capacity, their operating margins could be materially reduced, which would materially impair the Debtors' profitability. Conversely, if the Debtors underestimate their data center capacity requirements, the Debtors may not be able to service the expanding needs of their existing customers and may be required to limit new customer acquisition, which may materially impair the Debtors' revenue growth. Substantial lead time is necessary to ensure that available space is adequate for the Debtors' needs and maximizes the Debtors' investment return. If the Debtors inaccurately forecast their space needs, the Debtors may be forced to enter into a data center lease that may not properly fit their needs and may potentially be required to pay more to secure the space if the current customer demand were to require immediate space expansion.

### 15. The Debtors May Not Be Able to Renew the Leases on Their Existing Facilities on Beneficial Terms, if at all, Which Could Adversely Affect the Debtors' Operating Results

The Debtors lease the space that houses their data centers in all but two of their locations. Their data center leases are typically long-term, non-cancellable leases. As of December 31, 2022, their data center leases have remaining lease terms of one year to thirty-two years. As of December 31, 2022, five of the Debtors' leased facilities had a lease term expiring in fewer than five years, and an additional three leased facilities had lease terms expiring in fewer than ten years.

The Debtors' landlords could attempt to evict them for reasons beyond their control. If the Debtors were forced to vacate any leased data center space, they would incur significant expense due to the high cost of relocating data center equipment and installing the necessary infrastructure elsewhere. They may also lose customers that chose their services based on the location of the relevant data center. In addition, the Debtors cannot provide any assurance that they will be able to renew their data center leases on or prior to their expiration dates on favorable terms, if at all. Certain of the Debtors' landlords may view them as a competitor, which may impact their willingness to extend their leases beyond their contracted expiration dates. If the Debtors are unable to renew their lease agreements, they could lose a

significant number of customers who are unwilling to relocate their equipment to another one of their data center properties, which could have a material adverse effect on them.  Yet, even if they are able to renew their lease agreements, the terms and costs of renewal may be less favorable than the existing lease arrangements.  Failure to sufficiently increase revenue from customers at these facilities to offset these potentially higher costs could have a material adverse effect on the Debtors' financial performance.  Further, they may be unable to maintain good working relationships with their landlords, which could potentially result in the loss of current customers.  Such potentially strained relationships would have a significant impact on customer satisfaction, which would greatly reduce the Debtors' chances retaining their business.

### 16.    Power Rate Increases, Power Outages, and Limited Availability of Electrical Resources May Adversely Affect the Debtors' Operating Results

The Debtors' data centers are occasionally affected by disruptions related to their electricity sources, such as planned or unplanned power outages and limitations on transmission or distribution.  Unplanned power outages, including, but not limited to, those as a result of large storms, earthquakes, fires, tsunamis, cyberattacks could harm their customers and business.  Some of the Debtors' data centers are located in leased buildings where, depending upon the lease requirements and number of tenants therein, they may not control some or all of the infrastructure, including generators and fuel tanks.  As a result, in the event of a power outage, the Debtors may be dependent upon the landlord, as well as the utility company, to restore the power.

In each of their markets, the Debtors rely on third parties to provide a sufficient amount of power to support the needs of their current and future customers.  At the same time, power and cooling requirements are increasing per unit of equipment.  As a result, some customers are consuming an increasing amount of power for the same amount of infrastructure.  The Debtors generally do not control the amount of power that their customers draw from their installed circuits, which can result in growth in the aggregate power consumption of their facilities beyond their original planning and expectations.  This means that limitations on the capacity of electrical delivery systems and equipment could limit customer utilization of the data centers.  These limitations could have a negative impact on the effective available capacity of a given data center and limit the Debtors' ability to grow their business, which could have a negative impact on their financial performance, operating results, and cash flows.

Recently, the cost of electricity has generally risen due to macroeconomic natural gas supply and demand constraints.  These constraints initially began as a result of inadequate natural gas reserves in Europe to meet European demand in light of sanctions on Russian as a result of the ongoing military conflict between Russia and Ukraine.  The Debtors' costs of electricity may also increase as a result of the physical effects of climate change, increased regulations driving alternative electricity generation, or as a result of their election to use renewable energy sources.  To the extent the Debtors incur increased utility costs, such increased costs could materially impact their overall financial performance.

As current and future customers increase their power footprint in the Debtors' data centers over time, the corresponding reduction in available power could limit the Debtors' ability to increase occupancy rates or network density within existing data centers.  Furthermore, at certain data centers, the aggregate maximum contractual obligation to provide power and cooling may exceed the physical capacity at such data centers if customers were to quickly increase their demand for power and cooling.  If the Debtors are unable to increase the available power and/or cooling or move the customer to another data center with sufficient power and cooling, they could lose the customer and invite liability under their agreement with such customer.  In addition, power and cooling systems are difficult and expensive to upgrade.  Accordingly, the Debtors may not be able to efficiently upgrade or change these systems to meet new demands without incurring significant costs that they may not be able to pass on to their

customers. Any such material loss of customers, liability, or additional costs could adversely affect the Debtors' business and overall financial condition.

### 17.   The Wind-Down Budget, If Any, May Change Materially

In the event of an Asset Sale, the Debtors, the Committee, and the Required DIP Lenders will negotiate in good faith to establish a wind down budget to fund costs associated with pursuing confirmation of a chapter 11 plan, the wind down of any remaining assets of the Debtors' Estates, and otherwise administering the Debtors' Estates (the "Wind-Down Budget"). The Wind-Down Budget will be the Debtors' best estimates of actual expenses and revenues for the time period after the Debtors affirmatively elect to pursue an Asset Sale to the remainder of the Chapter 11 Cases. Creditors should be aware that such numbers may change, potentially materially, and any changes to the actual expenses and revenues will ultimately impact the amount of Asset Sale proceeds available to be paid to creditors under the Plan.

### D.   Risks Related to the Offer and Issuance of Securities Under the Plan

### 1.   The Debtors Do Not Intend to Register the Offer or Sale of New Common Stock and Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities

The New Common Stock will not be registered under the Securities Act or any Blue-Sky Laws. As summarized in Article XII of this Disclosure Statement, entitled "Certain Securities Laws Matters," certain of the New Common Stock may not be re-offered or resold except pursuant to an exemption from the registration requirements of the Securities Act and applicable Blue-Sky Laws. The Debtors do not intend currently to register the New Common Stock under the Securities Act. As a result, certain of the New Common Stock may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

The Debtors believe that all shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above will satisfy the requirements of section 1145(a) of the Bankruptcy Code. Accordingly, the Debtors believe that such New Common Stock (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws. Holders of such restricted securities may not be entitled to have their restricted securities registered and are not permitted to resell them except in accordance with an available exemption from registration under the Securities Act. Generally, Rule 144 of the Securities Act would permit the resale of securities received by a Person after a specified holding period if current information regarding the issuer is publicly available and, under certain circumstances, volume limitations, manner of sale requirements and certain other conditions are met. These conditions vary depending on whether the issuer is a

reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Equity Interests by affiliates of the issuer.  Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

The Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell such securities.  *See* Article XII of this Disclosure Statement, entitled "Certain Securities Law Matters."

## 2.    A Liquid Trading Market for the Shares of New Common Stock May Not Develop

Although the Debtors may apply to relist the New Common Stock on a national securities exchange (subject to the terms of the Restructuring Support Agreement or other agreements that govern the Debtors after the Effective Date), the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Common Stock will develop.  The liquidity of any market for New Common Stock will depend upon, among other things, the number of holders of shares of New Common Stock, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

In addition, the ~~Reorganized~~Post-Effective Date Debtors do not expect to be subject to the reporting requirements of the Securities Act, and Holders of the New Common Stock will not be entitled to any information except as expressly required by the Governance Documents.  As a result, the information which the Debtors are required to provide in order to issue the New Common Stock may be less than the Debtors would be required to provide if the New Common Stock were registered.  Among other things, the Debtors may not be required to provide:  (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of Cyxtera; (c) selected quarterly financial data of Cyxtera; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership and impair the marketability of the New Common Stock.

## 3.    Certain Securities will be Subject to Resale Restrictions

The New Common Stock underlying the Management Incentive Plan to be issued under the Plan has not been registered under the Securities Act, any state securities laws, or the laws of any other jurisdiction.  Such securities will be issued and sold, if at all, pursuant to an exemption from registration under the applicable securities laws.  Accordingly, such securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and subject to resale restrictions and may be resold,

exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act, and other applicable law.  In addition, holders of New Common Stock issued pursuant to Section 1145(a) of the Bankruptcy Code who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions. See Article XII of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the securities.

### 4. The Trading Price for the New Common Stock May Be Depressed Following the Effective Date

Following the Effective Date of the Plan, certain shares of the New Common Stock may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of Claims that receive the New Common Stock may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Common Stock available for trading could cause the trading price for the New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

## X.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.   Holders of Claims Entitled to Vote on the Plan

Holders of Claims in Classes 3 and 4 (the "Voting Classes") are entitled to vote to accept or reject the Plan.  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.  The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, or 8.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN ~~THIS DISCLOSURE STATEMENT~~THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### B.   Voting on the Plan

The Voting Deadline is **[October 2~~4~~6], 2023, at 4:00 p.m. (prevailing Eastern Time**).  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is actually received by the Solicitation Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted.

### C.   Ballots Not Counted

No ballot will be counted toward Confirmation if, among other things:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall

be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims and Noticing Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described in the Disclosure Statement Order and the Solicitation Procedures attached thereto.

### D.      Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### E.      Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

### F.      Solicitation Procedures

#### 1.      Claims and Noticing Agent

The Debtors have retained Kurtzman Carson Consultants LLC to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

2.      **Solicitation Package**

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Class (collectively, the "Solicitation Package"):  (a) the Solicitation Procedures; (c) the applicable forms of Ballots, together with detailed voting instructions and instructions on how to submit the Ballots; (d) the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Classes to vote to accept the Plan; (e) the Confirmation Hearing Notice; (f) this Disclosure Statement (and the exhibits hereto, including the Plan); (g) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); (h) a pre-addressed, postage pre-paid reply envelope; and (i) any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Classes.

3.      **Distribution of the Solicitation Package and Plan Supplement**

The Debtors are causing the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Class on [September 26], 2023, which is [28] days before the Voting Deadline (*i.e.*, 4:00 p.m. (prevailing Eastern Time) on [October 246], 2023), and will complete the hard-copy mailing of all Solicitation Packages on or before [September 268], 2023.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by:  (a) calling the Debtors' restructuring hotline at 877-726-6510 (domestic) or 424-236-7250 (international), (b) emailing https://www.kccllc.net/cyxtera/inquiry, and/or (c) writing to the Claims and Noticing Agent at Cyxtera Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.  You may also obtain copies of any pleadings Filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://www.kccllc.net/cyxtera (free of charge), or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

## XI.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.      Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### C.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Post-Effective Date Debtors.

On September 8, 2023, the Debtors filed the *Notice of Filing Liquidation Analysis and Financial Projections as Exhibits to the Disclosure Statement* [Docket No. 492].  The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.      C.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[1317]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or

---

[1317]  A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**E.** ~~D.~~ **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

**1.    No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**2.    Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the

Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**F.**      **Valuation**

As described above, the Debtors continue to engage with multiple bidders with respect to a potential Sale Transaction.  Because the Debtors do not want to prejudice the competitive sale process by disclosing expected recoveries for First Lien Claims or General Unsecured Claims, this Disclosure Statement does not include a valuation analysis.  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. June 9, 2023) (ECF No. 378) (order approving disclosure statement without a valuation analysis); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (same); *In re Z Gallerie, LLC.*, No. 19-10488 (LSS) (Bankr. D. Del. May 2, 2019) (ECF No. 259) (same); *In re PES Holdings, LLC.*, No. 19-11626 (KG) (Bankr. D. Del. Dec. 11, 2019) (ECF No. 259) (same).  If the Debtors determine not to pursue a Sale Transaction, then the Plan will implement the Recapitalization Transaction, and the Debtors intend to file a valuation analysis with respect to the Recapitalization Transaction in advance of the Confirmation Hearing, to the extent necessary to obtain confirmation of the Plan.

**G.**      **Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

On September 8, 2023, the Debtors filed the *Notice of Filing Liquidation Analysis and Financial Projections as Exhibits to the Disclosure Statement* [Docket No. 492].  Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors' financial and restructuring advisors, AlixPartners or Kirkland.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## XII.   CERTAIN SECURITIES LAW MATTERS

### A.   New Common Stock

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Stock to certain Holders of prepetition Claims against the Debtors.  The Debtors believe that the class of New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws.

The Debtors further believe that the issuance of the New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) after the Petition Date pursuant to the restructuring transactions under the Plan is, and subsequent transfers of such New Common Stock by the

holders thereof that are not "underwriters" (which definition includes "Controlling Persons") will be, exempt from federal and state securities registration requirements under the Bankruptcy Code, Securities Act and any applicable state securities laws as described in more detail below, except in certain limited circumstances.

In addition, any New Common Stock underlying the Management Incentive Plan will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, and will also be considered "restricted securities." Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

The following discussion of the issuance and transferability of the New Common Stock relates solely to matters arising under federal securities laws and state securities laws.  The rights of holders of New Common Stock, including the right to transfer such interests, will also be subject to any restrictions in the Governance Documents to the extent applicable.  Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

## B.      Exemption from Registration Requirements; Issuance of New Common Stock under the Plan

All shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) will be issued after the Petition Date without registration under the Securities Act, state securities laws or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property.  The Debtors believe that all shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of New Common Stock. Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.  As discussed below, the exemptions provided for in section 1145(a) do not apply to an

entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

## C.    Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code

### 1.    Resales of New Common Stock Issued Pursuant to Section 1145

New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock issued in exchange for First Lien Claims pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of such New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would

permit the public sale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely trade such New Common Stock.  However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 may not be available for resales of such New Common Stock by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ~~REORGANIZED~~POST-EFFECTIVE DATE DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW COMMON STOCK CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

2.      **Resales of New Common Stock Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, ~~and/or~~ Regulation S under the Securities Act, and/or Other Available Exemptions from Registration**

To the extent the exemption set forth Section 1145(a) of the Bankruptcy Code is unavailable, New Common Stock will be offered, issued, and distributed in reliance of Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.  Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Common Stock by affiliates of the Debtors.  Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the

Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Stock offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Stock are exempt from the registration requirements of Section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Stock will also be subject to any applicable transfer restrictions contained in the Governance Documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON STOCK MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.    Introduction**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the ~~Reorganized~~Post-Effective Date Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal

income tax purposes) of Allowed First Lien and General Unsecured Claims.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders of Allowed First Lien and General Unsecured Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Claims whose functional currency is not the U.S. dollar, Holders of Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction).  Moreover, this summary does not address any aspect of U.S. non-income (including state or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income).  Furthermore, this summary assumes that a Holder of an Allowed Claim holds only Claims in a single class and holds such Claims, and New Common Stock and New Takeback Facility Loans, as applicable, as "capital assets" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Post-Effective Date Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This discussion also assumes that none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes and that the New Takeback Facility Loans are not treated as a "short-term" debt instruments, "variable rate debt instruments," or a "contingent payment debt instruments," for U.S. federal income tax purposes, and that each of the Allowed Claims and the New Takeback Facility Loans are denominated in U.S. dollars.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of an Allowed First Lien Claim and/or a General Unsecured Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal

income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "<u>Non-U.S. Holder</u>" is any Holder of an Allowed First Lien Claim or a General Unsecured Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of an Allowed First Lien Claim or a General Unsecured Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Allowed First Lien Claim and/or a General Unsecured Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

B.     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the** ~~Reorganized~~Post-Effective Date **Debtors**

1.     **Characterization of the Restructuring Transactions**

The Debtors expect that the Restructuring Transactions will be structured in one of two ways: (a) a recapitalization of the existing Debtors (referred to as a Recapitalization Transaction), or (b) a sale transaction for some or substantially all of the New Common Stock of Reorganized Cyxtera (referred to as an Equity Investment Transaction) and/or substantially all of the Debtors' assets (referred to as an Asset Sale and together with an Equity Investment Transaction, a Sale Transaction).  The Debtors have not yet determined whether the Restructuring Transactions will be consummated as a Recapitalization Transaction ~~or,~~ an Equity Investment Transaction or an Asset Sale.  Such decision will depend on, among other things, finalizing certain modeling and analytical determinations.  This discussion assumes that the Restructuring Transactions will not be structured in a manner intended to constitute a tax-free reorganization pursuant to sections 368(a)(1)(G) and 354 of the IRC.

The Debtors generally do not expect to recognize any gain or loss as a result of consummating ~~the Restructuring Transactions.  In either~~a Recapitalization Transaction or an Equity Investment Transaction.  In an Asset Sale, the Debtors will generally realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets sold.  Any such gain generally will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining gain will be

recognized by the Debtors and result in a cash tax obligation.  In either a Recapitalization Transaction or a Sale Transaction, the Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income") and, other than in an Asset Sale, the limitations on net operating losses ("NOLs"), deferred deductions under section 163(j) of the IRC ("163(j) Deductions") and other tax attributes.

Whether If the Restructuring Transactions are structured as a Recapitalization Transaction or an Equity Investment Transaction, the Debtors expect to (i) structure the transaction such that any New Common Stock that is to be received by the Holders of Allowed First Lien Claims will first be issued and contributed by Reorganized Cyxtera to the Prepetition Borrower and, thereafter, such New Common Stock will be transferred by the Prepetition Borrower to such Holders in exchange for their Allowed First Lien Claims pursuant to the Plan, and (ii) treat such transactions as occurring in the same order described in the immediately preceding clause (i) (*i.e.*, issuance followed by contribution followed by exchange) for U.S. federal income tax purposes.  The Debtors believe, and intend to take the position that, this treatment applies for U.S. federal income tax purposes, and the remainder of the discussion assumes such treatment.  The tax consequences to the Debtors, the Reorganized Post-Effective Date Debtors, and Holders of Allowed First Lien Claims described herein could be materially different in the event this characterization is not respected for U.S. federal income tax purposes.

**2.      Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the issue price of the New Takeback Facility Loans and (ii) the fair market value of the New Common Stock and/or Cash and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Post-Effective Date Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  163(j) Deductions are not subject to reduction under these rules.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

As noted above, in connection with the Restructuring Transactions, the Debtors expect to realize COD Income.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the New Takeback Facility Loans and the fair market value of the New Common Stock and any other consideration, none of which can be determined until after the Plan is consummated.

### 3.    Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the ~~Reorganized~~Post-Effective Date Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.[1418]

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the ~~Reorganized~~Post-Effective Date Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### a.   General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the ~~3~~three-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.01 percent for July 2023). The annual limitation may be increased to the

---

[1418] The IRS issued proposed regulations in September 2019 that would revoke IRS Notice 2003-65 and make substantial changes to the way limitations under section 382 of the IRC are calculated. The changes would decrease the limitation set forth in section 382 of the IRC in most cases and potentially cause entities that would have had a net unrealized built-in gain under Notice 2003-65 to instead have a net unrealized built-in loss, which would result in additional limitations on the ability to deduct Pre-Change Losses (as defined below). Additionally, the IRS issued further proposed regulations in January 2020 that would provide certain transition relief for the application of any finalized regulation. Under such transition relief, any finalized regulations would apply only to ownership changes occurring 31 days after the regulations are finalized and certain specified and identifiable transactions would be subject to a "grandfathering" rule that allows for application of the prior IRS Notice 2003-65 rules. Additionally, the "grandfathering" rule would also apply as long as a company files its chapter 11 case within 31 days of the issuance of final regulations, even where the applicable ownership change occurs more than 31 days after finalization of the regulations. The Debtors anticipate that the Effective Date will occur before any such finalized regulations would be applicable (or that such a "grandfathering" rule would apply to the Restructuring Transactions) and, accordingly, the remainder of this discussion assumes that Notice 2003-65 will apply to the ~~Reorganized~~Post-Effective Date Debtors. In the event the proposed regulations are finalized more than 31 days prior to the Effective Date, and the "grandfather" rule does not apply to prevent the finalized regulations from being applied to the Debtors and/or ~~Reorganized~~Post-Effective Date Debtors, the Debtors will make a supplemental filing to explain the potential effect of such finalized regulations.

extent that the ~~Reorganized~~Post-Effective Date Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### b. Special Bankruptcy Exceptions

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the ~~Reorganized~~Post-Effective Date Debtors undergo another "ownership change" within two years after the Effective Date, then the ~~Reorganized~~Post-Effective Date Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the ~~Reorganized~~Post-Effective Date Debtors will elect out of its application.

## C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.      **Consequences of the Restructuring Transactions to U.S. Holders of Allowed First Lien Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed First Lien Claim will receive its *pro rata* share of, (a) in the event of the Recapitalization Transaction, 100 percent of the New Common Stock issued pursuant to the Plan on the Effective Date, subject to dilution on account of the Management Incentive Plan, and (b) in the event of the ~~Equity Investment~~Sale Transaction, the ~~Net Sale~~Distributable Consideration~~, which may consist of, among other things, New Common Stock, New Takeback Facility Loans and/or Cash~~.

The U.S. federal income tax consequences to a U.S. Holder of Allowed First Lien Claims in ~~either~~ a Recapitalization ~~Transaction or an Equity Investment~~ Transaction will depend, in part, on whether for U.S. federal income tax purposes the (a) Allowed First Lien Claim surrendered by such U.S. Holder constitutes a "security" of a Debtor, and (b) the New Common Stock ~~or New Takeback Facility Loans~~ received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity).  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

In general, as discussed in more detail below, for U.S. federal income tax purposes, ~~the Restructuring~~a Recapitalization Transactions ~~are~~is expected to be at least partially taxable (and may be a fully taxable) to holders of Allowed First Lien Claims because the New Common Stock is expected to be issued by an entity other than the issuer of the Allowed First Lien Claims for U.S. federal income tax purposes and, therefore, the holders of such Claims are not exchanging a "security" for stock of the same issuer.

***Due to the inherently factual nature of the determination of whether a debt instrument constitutes a "security", U.S. Holders of Allowed First Lien Claims are urged to consult their tax advisors regarding the status of the Allowed First Lien Claims*** ~~***and New Takeback Facility Loans***~~ ***as "securities" for U.S. federal income tax purposes.***

a.      **Treatment of U.S. Holders of Allowed First Lien Claims if the Restructuring Transactions are structured as a Recapitalization Transaction**

In a Recapitalization Transaction, the entity issuing the New Common Stock under the Plan will not be the same entity as the Debtor against which the Allowed First Lien Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes). Accordingly, the exchange of such Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC.  A U.S. Holder of an Allowed First Lien Claim generally should recognize gain or loss equal to (a) the fair market value of the New Common Stock received less (b) the U.S. Holder's adjusted tax basis in its Allowed First Lien Claim.  The adjusted tax basis of a U.S. Holder's Allowed

First Lien Claims generally will equal a U.S. Holder's purchase price for such Allowed First Lien Claims, reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to such Allowed First Lien Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed First Lien Claim in such U.S. Holder's hands, whether such Claim constitutes a capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim.  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in the New Common Stock equal to the fair market value of the New Common Stock as of the date such New Common Stock is distributed to such U.S. Holder.  The holding period for any such New Common Stock should begin on the day following the receipt of such New Common Stock.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest~~, original issue discount ("OID")~~ or market discount, which differs from the treatment described above, is discussed below.

**b.  Treatment of U.S. Holders of Allowed First Lien Claims if the Restructuring Transactions are structured as ~~an Equity Investment~~a Sale Transaction**

If the Restructuring Transactions are structured as ~~an Equity Investment~~a Sale Transaction ~~and each of the Allowed First Lien Claims and the New Takeback Facility Loans (or if no New Takeback Facility Loans are received as part of the Net Sale Consideration) constitute "securities", then~~, then the exchange of such Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. In such case, a U.S. Holder of an Allowed First Lien Claim ~~is expected to be treated as receiving its distribution under the Plan in a transaction treated as a "recapitalization" for U.S. federal income tax purposes, with the receipt of the New Common Stock and/or Cash treated as "boot" (and for purposes of this section "boot") in such recapitalization.  A U.S. Holder of such Claim~~generally should recognize gain~~, but not~~ or loss~~,~~ equal to ~~the lesser of (a) the sum of the fair market value of the New Common Stock received and the~~(a) the amount of Cash received, if any, ~~and~~less (b) the ~~gain realized by such U.S. Holder (i.e., the excess of (i) the sum of the fair market value of the New Common Stock and the amount of Cash, if any, plus the "issue price" (as discussed below) of the New Takeback Facility Loans received, if any, over (ii) such~~ U.S. Holder's adjusted tax basis in its Allowed First Lien Claim~~)~~. The adjusted tax basis of a U.S. Holder's Allowed First Lien Claims generally will equal a U.S. Holder's purchase price for such Allowed First Lien Claims, ~~as~~ reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to such Allowed First Lien Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed First Lien Claim in such U.S. Holder's hands, whether such Claim constitutes a capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim.  If ~~such~~ recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term

capital gains.  The ~~U.S. Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the New Takeback Facility Loans received equal to (a) the tax basis of the Allowed First Lien Claim surrendered by such U.S. Holder, increased by (b) gain recognized (if any) by such U.S. Holder, and decreased by (c) the fair market value of any boot received.  Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the New Takeback Facility Loans received should include the holding period for the exchanged Allowed First Lien Claim.  A U.S. Holder should obtain a tax basis in the New Common Stock equal to the fair market value of the New Common Stock as of the date such New Common Stock is distributed to such U.S. Holder.  The holding period for any such New Common Stock should begin on the day following the receipt of such New Common Stock.~~deductibility of capital losses is subject to certain limitations.

~~If either of the Allowed First Lien Claims or the New Takeback Facility Loans (if such New Takeback Facility Loans are received as part of the Net Sale Consideration) do not constitute "securities", then the exchange of such Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC.  In such case, a U.S. Holder of an Allowed First Lien Claim generally should recognize gain or loss equal to (a) the sum of (i) the fair market value of the New Common Stock received, (ii) the issue price of the New Takeback Facility Loans received, if any, (determined as discussed below) and (iii) the amount of Cash received, if any, less (b) the U.S. Holder's adjusted tax basis in its Allowed First Lien Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed First Lien Claim in such U.S. Holder's hands, whether such Claim constitutes a capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim.  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  Such U.S. Holder should obtain a tax basis in the New Common Stock received and the New Takeback Facility Loans received, if any, equal to the fair market value of the New Common Stock and the "issue price" of the New Takeback Facility Loans as of the date such consideration is distributed to such U.S. Holder.  The holding period for the New Common Stock and the New Takeback Facility Loans should begin on the day following the receipt of such consideration.~~

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, ~~OID~~ or market discount, which differs from the treatment described above, is discussed below.

## 2. Consequences of the Restructuring Transactions to U.S. Holders of Allowed General Unsecured Claims

Except to the extent that a U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Recovery Pool in Cash. Accordingly, subject to the discussion of ~~A~~accrued ~~I~~interest~~,~~ and ~~M~~market ~~D~~discount below, each Holder of a General Unsecured Claim would generally recognize gain or loss in the exchange in an amount equal to the difference between (i) the sum of the amount of cash received from its share of the GUC Recovery Pool and (ii) such Holder's adjusted tax basis in its General Unsecured Claim.  Generally, this gain or loss will be subject to the rules described above in "~~1.~~ Consequences of the Restructuring Transactions~~a. Treatment of~~ to U.S. Holders of Allowed First Lien Claims ~~if the Restructuring Transactions are structured as a Recapitalization Transaction~~."

### 3. Accrued Interest

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan is attributable to accrued but unpaid interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest. Certain Treasury Regulations, however, allocates payments first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.*

### 4. Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such accrued Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with ~~OID~~original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of an Allowed Claim (determined as described above) which was acquired with market discount should be treated as ordinary income to the extent of the amount of market discount that accrued thereon while such Allowed Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim.*

**5. Consequences to U.S. Holders of Ownership and Disposition of the New Takeback Facility Loans**

**a. Payments of Stated Interest**

Stated interest paid to a U.S. Holder of an Allowed First Lien Claim on the New Takeback Facility Loans will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.

**b. Original Issue Discount**

It is possible that the New Takeback Facility Loans will be issued with OID for U.S. federal income tax purposes. In general, the amount of OID with respect to the New Takeback Facility Loans will be equal to the excess of the "stated redemption price at maturity" of the New Takeback Facility Loans exceeds the "issue price" of such Loans to the extent such excess exceeds a statutorily defined de minimis amount.

The issue price of the New Takeback Facility Loans may depend on whether a U.S. Holder of Allowed First Lien Claims receives solely New Takeback Facility Loans in exchange for its Allowed First Lien Claims or a combination of New Takeback Facility Loans and New Common Stock. If a U.S. Holder of Allowed First Lien Claims receives solely New Takeback Facility Loans, the determination of the "issue price" of the New Takeback Facility Loans will depend, in part, on whether the New Takeback Facility Loans or the Allowed First Lien Claims are traded on an "established securities market" for U.S. federal income tax purposes. Pursuant to applicable U.S. Treasury Regulations, an "established market" need not be a formal market and, in general, a debt instrument can be treated as being traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes available with respect to such items. Additionally, when determining fair market value under these rules, actual trades and firm quotes will generally be dispositive, while it may be possible to refute the application of mere "indicative" quotes if such indicative quotes "materially misrepresent the fair market value of the property" being valued. In the case where the New Takeback Facility Loans are traded on an established market, the issue price of the New Takeback Facility Loans will be the fair market value of such debt instrument on the issue date as determined by such trading. In the case where the Allowed First Lien Claims (but not the New Takeback Facility Loans) are traded on an established market, the issue price of the New Takeback Facility Loans will be the fair market value of the Allowed First Lien Claims on the issue date as determined by such trading. In the case where neither the New Takeback Facility nor the Allowed First Lien Claims are so traded the issue price would be the stated principal amount of the New Takeback Facility Loans (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

If a U.S. Holder of Allowed First Lien Claims receives a combination of New Takeback Facility Loans and New Common Stock, the "investment unit" rules may apply to the determination of the "issue price" for the New Takeback Facility Loans. In such case, the issue price of the New Takeback Facility Loans will depend, in part, on the issue price of the "investment unit" (*i.e.*, the New Takeback Facility Loans and New Common Stock), and the respective fair market values of the components of such investment unit. For this purpose, the issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument, as described above. As a result, the issue price of the investment unit will depend on whether the investment unit (or the debt instrument for which it is

being exchanged) is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an "established market."

If none of the components of the investment unit (i.e., the New Common Stock or the New Takeback Facility Loans) nor the debt instrument for which it is exchanged (i.e., the Allowed First Lien Claims) are traded on an established market, then the issue price of the New Takeback Facility Loans should be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). If neither the New Common Stock nor the New Takeback Facility Loans are traded on an established market, but the Allowed First Lien Claims are so traded, then the issue price of the investment unit will be determined by the fair market value of the Allowed First Lien Claims as determined by such trading. If the investment unit received in exchange for Allowed First Lien Claims is considered to be traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit as determined by such trading. The law is somewhat unclear on whether an investment unit is treated as traded for these purposes if some, but not all, elements of such investment unit are traded on an established market. In the event that the New Takeback Facility Loans are traded but the New Common Stock are not treated as traded, the determination of the issue price of the loans under the New Takeback Facility Loans is unclear. Such issue price could be based on (i) in the case where the Allowed First Lien Claims are also traded on an established market, the trading value of such Allowed First Lien Claims, allocated as described above, (ii) the demonstrated trading price of the New Takeback Facility Loans, or (iii) the stated redemption price at maturity of the New Takeback Facility Loans. If an issue price is determined for the investment unit received in exchange for surrendered Allowed First Lien Claims under the above rules, then the issue price of the investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the New Takeback Facility Loans.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

As discussed above, a debt instrument, such as the New Takeback Facility Loans, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. The terms of any New Takeback Facility Loans have not yet been determined; to the extent not all of the interest on the New Takeback Facility Loans is unconditionally payable in cash at least annually, the New Takeback Facility Loans may be considered to be issued with OID. Moreover, the New Takeback Facility Loans could be treated as issued with OID to the extent the allocation rules described above result in the New Takeback Facility Loans having an issue price that is less than their stated redemption price at maturity.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the New Takeback Facility Loans multiplied by the remaining number of complete years to maturity from their original issue date, or if the New Takeback Facility Loans provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the New Takeback Facility Loans are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Takeback Facility Loans, in advance of the receipt of the cash attributable to such OID and regardless of such U.S. Holder's method of accounting for U.S. federal income tax purposes,

but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the New Takeback Facility Loans that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the New Takeback Facility Loans is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the New Takeback Facility Loans, and a pro rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Takeback Facility Loans.

### c. Sale, Taxable Exchange, or other Taxable Disposition

Upon the disposition of the New Takeback Facility Loans by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder of Allowed First Lien Claims will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the New Takeback Facility Loans, as applicable (as discussed above).  A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income.  Subject to the treatment of a portion of any gain as ordinary income to the extent of any market discount carried over to the New Takeback Facility Loans from the Allowed First Lien Claims (discussed above), a U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such New Takeback Facility Loans for longer than one year.  Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.

### 5. ~~6.~~ Consequences to U.S. Holders of the Ownership and Disposition of New Common Stock

#### a. Dividends on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Cyxtera as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Cyxtera has sufficient earnings and profits and certain holding period requirements are satisfied.  The length of time that a U.S. Holder has held its stock is reduced for any period during which such U.S. Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

#### b. Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock.  Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other

taxable disposition, the U.S. Holder has held the New Common Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.  Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock, as applicable as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed First Lien Claims or recognized an ordinary loss on the exchange of its Allowed First Lien Claims for New Common Stock.

**D.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed First Lien Claims and General Unsecured Claims.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock and the New Takeback Facility Loans.

**1.      Gain Recognition by Non-U.S. Holders of Allowed first Lien Claims**

Any gain realized by a Non-U.S. Holder of an Allowed First Lien Claim on the exchange of its Allowed First Lien Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Payments of Accrued Interest") generally will not be subject to U.S. federal income taxation unless the Restructuring Transaction does not constitute a "recapitalization" qualifying for tax-deferral, as described above in "—C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed First Lien Claims", and (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**2. Gain Recognition by Non-U.S. Holders of Allowed General Unsecured Claims**

Except to the extent that a Non-U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of

the GUC Recovery Pool in Cash and will generally be subject to the rules described above in "— 1. Gain Recognition by Non-U.S. Holders of Allowed First Lien Claims."

**3. Consequences to Non-U.S. Holders of the Ownership and Disposition of New Takeback Facility Loans**

**2. a. Payments of Accrued Interest**

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such paymouents paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, that are attributable to accrued but untaxed interest (or original issue discount, if any) with respect to Allowed First Lien Claims generally will not be subject to U.S. federal income tax or withholding tax, *provided* that the Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

• (a) the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in Reorganized Cyxtera (or, in the case of interest received pursuant to the Plan, the Debtors) within the meaning of section 871(h)(3) of the IRC and Treasury Regulations thereunder; owns ten percent or more of the total combined voting power of all classes of Debtor's stock entitled to vote;

• (b) the Non-U.S. Holder is not a "controlled foreign corporation related to Reorganized Cyxtera (or, in the case of interest received pursuant to the Plan, the Debtors), actually or constructively through the ownership rules under section 864(d)(4)" that is a "related person" with respect to Debtor (each, within the meaning of the IRC);

• (c) the Nnon-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; andreceiving interest described in section 881(c)(3)(A) of the IRC; or

• the Non-U.S. Holder gives Reorganized Cyxtera (or, as applicable, the Debtors) or Reorganized Cyxtera's (or, as applicable, the Debtors') paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the New Takeback Facility Loans paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If(d) such interest on the New Takeback Facility Loans or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried onthe conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder will be required(x) generally will not be subject to withholding

tax, but (y) will be subject to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement is provided to Reorganized Cyxtera (or, with respect to interest received pursuant to the Plan, the Debtors) or Reorganized Cyxtera's (or, as applicable, the Debtors') paying agent unless an applicable income tax treaty provides otherwise).  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If, and a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to that is a corporation for U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing a properly completed and duly executed appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe).  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for the accrued interest at a rate of thirty percent (or at a reduced rate or exemption from tax under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.)).

**b. Sale, Taxable Exchange, or Other Disposition of New Takeback Facility Loans**

A Non-U.S. Holder will that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest (or original issue discount, if any) that is not effectively connected income generally not will be subject to withholding of U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the New Takeback Facility Loans (other than any amount representing at a thirty percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest (or original issue discount, if any).  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on the loan)unless:such Allowed Claims, if any.

**3.    Gain Recognition by Non-U.S. Holders of Allowed General Unsecured Claims**

• the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

• in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

~~If~~ Except to the extent that a Non-U.S. Holder ~~falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the New Takeback Facility Loans under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "Payments of Interest." To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable income tax treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.~~ of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Recovery Pool in Cash and will generally be subject to the rules described above in "Gain Recognition by Non-U.S. Holders of Allowed First Lien Claims."

### 3.   Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Stock

#### a.   Dividends

Any distributions made with respect to New Common Stock (other than certain distributions of stock of Reorganized Cyxtera) will constitute distributions for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Cyxtera, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain). Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not ECI (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS may prescribe), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are ECI (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If Reorganized Debtor is considered a "U.S. real property holding corporation" (a "USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding by Reorganized Debtor at a rate of 15 percent to the extent they are not treated as dividends. In the event the New Common Stock are regularly traded on an established market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of equity interests that includes New Common Stock during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S.

Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. The Debtors believe they are, and will be, USRPHCs, in light of the nature of their assets and business operations, but no formal study has been or will be conducted in this regard.

### b. Sale, Redemption, or Repurchase of New Common Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of Reorganized Cyxtera unless:

(i)     such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)    such gain is ECI (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)   the issuer of such New Common Stock is or has been during a specified testing period a "USRPHC."

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a non-U.S. Holder of New Common Stock generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder ("FIRPTA"). Taxable gain from a non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the non-U.S. Holder's adjusted tax basis in such interest) would constitute ECI. A non-U.S. Holder would also be subject to withholding tax equal to 15%fifteen percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return. The amount of any such withholding may be allowed as a credit against the non-U.S. Holder's U.S. federal income tax liability and may entitle the non-U.S. Holder to a refund if the non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50%fifty percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) the non-U.S. Holder's holding period for its interests in the corporation. As discussed above, the Debtors believe they are, and will be, USRPHCs, in light of the nature of their assets and business operations, but no formal study has been or will be conducted in this regard.

In general, FIRPTA will not apply upon a non-U.S. Holder's disposition of its New Common Stock if (x) the New Common Stock is treated as "regularly traded" on an established market and continue to be regularly traded on an established market and (y) the non-U.S. Holder did not directly or indirectly own more than 5%five percent of the value of the New Common Stock during a specified testing period.

4.    **FATCA**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder are urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

E.    **Information Reporting and Back-Up Withholding**

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## XIV.   CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following is a summary of the principal Canadian federal income tax consequences of the Plan to a Holder of General Unsecured Claims who, at all relevant times for purposes of the Income Tax Act (Canada) (the "Canadian Tax Act"), deals at arm's length with and is not affiliated with Cyxtera or any other entity related to Cyxtera, and holds its General Unsecured Claims as capital property. The General Unsecured Claims will generally be considered to be capital property to a Holder thereof unless either the Holder of General Unsecured Claims holds (or will hold) such securities in the course of carrying on a business, or the Holder of General Unsecured Claims has acquired (or will acquire) such securities in a transaction or transactions considered to be an adventure in the nature of trade.

This summary does not apply to (a) a Holder of General Unsecured Claim an interest in which is a "tax shelter investment" as defined in the Canadian Tax Act, (b) a Holder of General Unsecured Claim that is a "financial institution" for purposes of the "mark-to-market" rules as defined in the Canadian Tax Act, (c) a Holder of General Unsecured Claim that is a "specified financial institution" as defined in the Canadian Tax Act, (d) a Holder of General Unsecured Claims that has made the "functional currency" reporting election, or (e) a Canadian Holder (as defined below) in relation to which Cyxtera is a "foreign affiliate" as defined in the Canadian Tax Act. Such Holders of General Unsecured Claims should consult with their own tax advisors.

This summary is based on the current provisions of the Canadian Tax Act, the regulations thereunder (the "Canadian Regulations") and the understanding of the current published administrative policies and assessing practices of the Canada Revenue Agency (the "CRA") publicly available prior to the date of the filing of this Disclosure Statement. The summary also takes into account all specific proposals to amend the Canadian Tax Act and Canadian Regulations publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date of the filing of this Disclosure Statement (the "Canadian Tax Proposals") and assumes that all such Canadian Tax Proposals will be enacted in the form proposed. No assurance can be given that the Canadian Tax Proposals will be enacted in the form proposed or at all. This summary does not take into account or anticipate any changes in law or administrative policies or assess practices of the CRA, whether by way of judicial, governmental or legislative action or decisions, nor does it address any provincial, territorial or foreign tax legislation or considerations.

This summary is of a general nature only, is not exhaustive of all Canadian federal income tax consequences, and is not intended to be, nor should it be construed as, legal or tax advice to any particular Holder of General Unsecured Claims. Holders of General Unsecured Claims are urged to consult their own tax advisors as to the tax consequences to them of the Plan in their particular circumstances.

For purpose of the Canadian Tax Act, all amounts, including cost, proceeds of disposition, interest or dividends received and accrued must be determined in Canadian currency at applicable exchange rates as determined in accordance with the Canadian Tax Act. The amount of interest and any capital gain or capital loss of a Holder of General Unsecured Claims may be affected by fluctuations in Canadian dollar exchange rates.

### B.   Residents of Canada

This portion of the summary applies to a Holder of General Unsecured Claim who, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention, and at all relevant times, is or is deemed to be resident of Canada (a "Canadian Holder"). Certain Canadian Holders whose

General Unsecured Claims issued by Canadian Debtors that might not otherwise qualify as capital property may, in certain circumstances, treat the General Unsecured Claims issued by Canadian Debtors as capital property by making an irrevocable election pursuant to subsection 39(4) of the Canadian Tax Act, to the extent such General Unsecured Claims are "Canadian securities" as defined in the Canadian Tax Act. Therefore, this election will not apply to the General Unsecured Claims that are not Canadian securities. Canadian Holders are advised to consult their own tax advisors regarding such an election.

### 1.    Exchange of the General Unsecured Claim

A Canadian Holder will be considered to have disposed of its General Unsecured Claims upon the exchange of such General Unsecured Claims for cash. Under the Plan, any cash received will be allocated first to the principal amount of the General Unsecured Claims, and the balance, if any, to the accrued interest with respect to the General Unsecured Claims.

A Canadian Holder that is a corporation, partnership, unit trust, or any trust of which a corporation or partnership is a beneficiary will generally be required to include in income the amount of interest accrued or deemed to accrue on the General Unsecured Claims up to the Effective Date or that became receivable or was received on or before the Effective Date, to the extent that such amounts have not otherwise been included in the Canadian Holder's income for the taxation year or a preceding taxation year. Any other Canadian Holder, including an individual, will be required to include in income for a taxation year any interest on the General Unsecured Claims received or receivable by such Canadian Holder in the taxation year (depending upon the method regularly followed by the Canadian Holder in computing income) except to the extent that such amount was otherwise included in its income for the taxation year or a preceding taxation year. In addition, if such Canadian Holder has not otherwise included interest in the General Unsecured Claims in computing the Canadian Holder's income at periodic intervals of not more than one year, such Canadian Holder will be required to include in computing income for a taxation year any interest that accrues to the Canadian Holder on the General Unsecured Claims up to the end of any "anniversary day" (as defined in the Canadian Tax Act) in that taxation year to the extent such interest was not otherwise included in computing the Canadian Holder's income for that taxation year or a preceding taxation year. Generally, a Canadian Holder should be entitled to deduct in computing income for the year of disposition, amounts that were included in computing the Canadian Holder's income for the year of disposition or a preceding taxation year as interest in respect of the General Unsecured Claims, to the extent that such amounts were not received or receivable by the Canadian Holder and were not deducted by the Canadian Holder in computing income for the year of disposition or a preceding taxation year.

In general, a Canadian Holder will realize a capital gain (or capital loss) on the exchange of the General Unsecured Claims equal to the amount by which any cash received, net of any amount included in the Canadian Holder's income as interest, exceeds (or is exceeded by) the adjusted cost base to the Canadian Holder of such General Unsecured Claims, *plus* any reasonable costs of disposition. The tax treatment of any capital gain (or capital loss) realized is described below under the heading "Taxation of Capital Gains and Capital Losses."

### 2.    Taxation of Capital Gains and Capital Losses

Generally, one-half of any capital gain (a "Taxable Capital Gain") realized by a Canadian Holder for a taxation year must be included in the Canadian Holder's income in the year. A Canadian Holder is required to deduct one-half of any capital loss (an "allowable capital loss") realized in the taxation year from Taxable Capital Gains realized in that year, and allowable capital losses in excess of Taxable Capital Gains may be carried back and deducted in any of the three preceding taxation years or carried

forward and deducted in any subsequent year, from net Taxable Capital Gains realized in such years to the extent and under the circumstances described in the Canadian Tax Act.

### 3. Additional Refundable Tax

A Canadian Holder that is throughout the year a "Canadian-controlled private corporation" (as defined in the Canadian Tax Act) may be liable to pay an additional refundable tax of 6 and 2/3 percent on certain investment income, including amounts in respect of interest, certain dividends and Taxable Capital Gains.

## C. Non-Residents of Canada

This portion of the summary applies to a Holder of General Unsecured Claims that, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention and at all relevant times, is not and will not be deemed to be resident of Canada and does not use or hold the General Unsecured Claims in carrying on a business in Canada (a "Non-Canadian Holder").  In addition, this summary does not apply to an insurer who carries on an insurance business in Canada and elsewhere or an authorized foreign bank that carries on a Canadian banking business.

### 1. Exchange of the General Unsecured Claims

Upon the exchange by a Non-Canadian Holder of the General Unsecured Claims for cash, no taxes will be payable under the Canadian Tax Act by such a Non-Canadian Holder.

## D. Consequences to the Canadian Debtors

The exchange of General Unsecured Claims will result in the settlement or extinguishment of the General Unsecured Claims.  The "forgiven amount", as defined in the Canadian Tax Act, arising from the settlement or extinguishment will reduce, in prescribed order, certain tax attributes of the relevant Canadian Debtors, including non-capital losses, net capital losses, cumulative eligible capital, undepreciated capital cost of depreciable property and the adjusted cost base of certain capital property (the "Canadian Tax Shield").  Generally, one half of the amount by which the forgiven amount exceeds the Canadian Tax Shield (such amount, the "Excess") will be required to be included in the relevant Canadian Debtor's income for the taxation year in which the Effective Date takes place, unless the Excess was otherwise assigned by such relevant Canadian Debtor to other Canadian Debtors that are "eligible transferees" as defined in the Canadian Tax Act for reduction of such other Canadian Debtors' Canadian Tax Shield.

## XV. RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: ~~August~~September 1~~5~~3, 2023

Cyxtera Technologies, Inc.
on behalf of itself and all other Debtors


By:  _/s/ Eric Koza_ _____

Eric Koza
Chief Restructuring Officer

## Exhibit A

**Plan of Reorganization**

**Exhibit B**

**RSA**

## **Exhibit C**

**Organizational Structure Chart**

**Exhibit D**

**Liquidation Analysis**

[Filed at Docket No. 492]

*[Link-to-previous setting changed from off in original to on in modified.].*

**Exhibit E**

**Financial Projections**

[Filed at Docket No. 492]