**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CYXTERA TECHNOLOGIES, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-14853 (JKS)<br><br>(Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW**
**IN SUPPORT OF THE DEBTORS' FOURTH**
**AMENDED JOINT PLAN OF REORGANIZATION**
**OF CYXTERA TECHNOLOGIES, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera.  The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is:  2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement .................................................................................................... 1

I.    Procedural History of the Plan and Objections ................................................ 5

    A.    Procedural History. ................................................................................ 5

    B.    The Restructuring Transactions. ........................................................... 10

        1.    The Sale Transaction ................................................................ 10

        2.    The Wind Down ........................................................................ 11

    C.    The Plan Solicitation and Notification Process. .................................... 11

    D.    The Objections. ...................................................................................... 14

    E.    Plan Modifications. ................................................................................ 15

Argument ....................................................................................................................... 16

II.    The Plan Satisfies Each Requirement for Confirmation. .................................. 16

    A.    The Plan Complies with the Applicable Provisions of the Bankruptcy
        Code (Section 1129(a)(1)). .................................................................... 17

        1.    The Plan Satisfies the Classification Requirements of Section 1122
            of the Bankruptcy Code. .......................................................... 17

        2.    The Plan Satisfies the Mandatory Plan Requirements of
            Section 1123(a) of the Bankruptcy Code ................................. 20

    B.    The Debtors Have Complied with the Applicable Provisions of the
        Bankruptcy Code (Section 1129(a)(2)) ................................................. 23

        1.    The Debtors Have Complied with the Disclosure and Solicitation
            Requirements of Section 1125 .................................................. 24

        2.    The Debtors Have Satisfied the Plan Acceptance Requirements of
            Section 1126 ............................................................................. 25

    C.    The Debtors Proposed the Plan in Good Faith and Not by Any Means
        Forbidden by Law (Section 1129(a)(3)). .............................................. 27

    D.    The Plan Provides That the Debtors' Payment of Professional Fees and
        Expenses Are Subject to Court Approval (Section 1129(a)(4)). ........... 27

**TABLE OF CONTENTS (CONT'D)**

**Page**

E.   The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ................................................... 28

F.   The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ................................................................................. 29

G.   The Plan is In the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ................................................................................. 29

H.   The Plan Satisfies the Bankruptcy Code's Voting Requirements of Section 1129(a)(8) of the Bankruptcy Code. ......................................... 31

I.   The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ................................................................................. 31

J.   At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10)). ............................................................................ 33

K.   The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11))....................................... 33

L.   The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ............................................................................ 35

M.   Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ............................................................................ 36

N.   The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ................... 36

   1.   The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))............................... 37

   2.   The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)). ............................................................................ 38

O.   The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). .......................................... 39

III.   The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ............................................................................ 40

   A.   The Sale Transaction Should Be Approved Under Sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code as Sound Exercise of the Debtors' Business Judgment.............................................................................. 40

   B.   The Plan Complies with Section 1123(d) of the Bankruptcy Code...................... 45

**TABLE OF CONTENTS (CONT'D)**

**Page**

C.    The Plan Appropriately Incorporates Settlements of Claims and Interests. ......... 46

D.    The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.............................................................. 48

    1.    The Third-Party Release Is Wholly Consensual and Is Appropriate........ 48

    2.    The Debtor Release Is Appropriate............................................................ 50

    3.    The Exculpation Provision Is Appropriate. ............................................... 57

    4.    The Injunction Provision is Appropriate.................................................... 59

IV.    The Objections Should Be Overruled. ................................................................. 60

A.    The Third-Party Release Is Consensual and Appropriate..................................... 61

B.    The Debtor Release is Appropriate...................................................................... 75

C.    The Gatekeeping Provision is Integral to the Plan and Should be Approved............................................................................................................... 77

Waiver of Bankruptcy Rule 3020(e)........................................................................................ 85

Conclusion ................................................................................................................................ 85

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 CIV. 844 (LJF), 1993
WL 316183 (S.D.N.Y. May 21, 1993) ...................................................................18

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ..........................51, 53

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019)....................................................................58

*In re A.H. Robins Co.*,
88 B.R. 742 (Bankr. E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989) ..............................16

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)......................34, 38

*In re Alex & Ani, LLC*,
No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) ...................................... *passim*

*In re Arsenal Intermediate Holdings, LLC*,
No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)............................49

*In re Avaya Inc.*,
No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) ........................................................78

*In re Bakalis*,
220 B.R. 525 (Bankr. E.D.N.Y. 1998)....................................................................43

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)...................................................................................30

*Baron v. Sherman (In re Ondova Co.,)*,
2017 Bankr. LEXIS 325 (Bankr. N.D. Tex. Feb. 1, 2017)......................................................79

*Barton v. Barbour*,
104 U.S. 126 (1881)....................................................................................79

*In re Bed Bath & Beyond Inc.*,
No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) ......................................... *passim*

*Berkley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden
Motel & Apartments)*,
195 B.R. 294 (D.N.J. 1996) ...............................................................................33

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re BlockFi Inc.*,
No. 22-19361 (MBK) (Bankr. D.N.J. Aug. 3, 2023) ...................................................... *passim*

*Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr.
Inc.)*,
410 F.3d 100 (1st Cir. 2005) .................................................................................81

*In re Carestream Health, Inc.*,
No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) ..................................................... *passim*

*Carter v. Rodgers*,
220 F.3d 1249 (11th Cir. 2000) .................................................................................79

*In re Ctr. For Autism & Related Disorders, LLC*,
No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) ................................................. *passim*

*In re Century Glove, Inc.*,
No. Civ. A. 90-400-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993) .....................................27

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) .........................................................................28

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015) .........................................................................63

*In re Cineworld Group plc*,
No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) ..................................................... *passim*

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007) .......................................................................57, 76

*In re Conseco, Inc.*,
301 B.R. 525 (Bankr. N.D. Ill. 2003) .........................................................................62

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) .......................................................................53, 63

*Crestar Bank v. Walker (In re Walker)*,
165 B.R. 994 (E.D. Va. 1994) ................................................................................34

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) .........................................................................30

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) *aff'd*, No. 09 CIV. 10156 (LAK), 2010
WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other
grounds*, 627 F.3d 496 (2d Cir. 2010) .........................................................................62

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Diocese of Camden, New Jersey,*
No. 20-21257 (JNP), 2023 WL 5605156 (Bankr. D.N.J. Aug. 29, 2023) ..............................27

*In re Dow Corning Corp.*,
237 B.R. 374 (Bankr. E.D. Mich. 1999) ................................................................................16

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................................................18

*In re Emerge Energy Servs. LP,*
No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) .................65, 71, 72

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................................75

*In re Extraction Oil & Gas, Inc.*,
No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) .................................................... *passim*

*In re Filene's Basement, LLC,*
11-13511 (KJC), 2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014)....................................41

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans
Ltd. P'ship)*
116 F.3d 790 (5th Cir. 1997) ..............................................................................................27

*Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),*
10 F.3d 944 (2d Cir. 1993)...................................................................................................18

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988)...................................................................................28

*In re G–I Holdings Inc.,*
420 B.R. 216 (D.N.J. 2009) .................................................................................................34

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) .....................................................................................75

*Gillman v. Continental Airlines (In re Continental Airlines)*,
203 F.3d 203 (3d Cir. 2000)..................................................................................................75

*In re Great Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ......................................................................................18

*In re GSC, Inc.*,
453 B.R. 132 (Bankr. S.D.N.Y. 2011) ..................................................................................41

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*,
   167 B.R. 389 (Bankr. D. Md. 1994) ......................................................................79

*Helmer v. Pogue*,
   212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) .....................................79

*In re Hercules Offshore, Inc.*,
   565 B.R. 732 (Bankr. D. Del. 2016) .........................................................54, 76, 77

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................................18

*In re Highland Capital Management, L.P.*,
   No.19-34054-SGJ (Bankr. N.D. Tex. Nov. 24, 2020)............................................78

*In re Indianapolis Downs*,
   486 B.R. 286 (Bankr. D. Del. 2013) ............................................................. *passim*

*In re Integrated Res., Inc.*,
   147 B.R. 650 (S.D.N.Y. 1992)................................................................................41

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987).................................................................................18

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37 Bus. Park Assocs.)*,
   987 F.2d 154 (3d Cir. 1993)..............................................................................18, 37

*In re Johns-Manville Corp.*,
   60 B.R. 612 (Bankr. S.D.N.Y. 1986) ......................................................................41

*In re Lannett Co.*,
   No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) ...................................... *passim*

*Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*,
   722 F.2d 1063 (2d Cir. 1983)..................................................................................41

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
   329 B.R. 491 (Bankr. D.N.J. 2005) ........................................................................28

*Lowenbraun v. Canary* (*In re Lowenbraun*),
   453 F.3d 314 (6th Cir. 2006) ..................................................................................79

*In re Master Mortg. Inv. Fund, Inc.*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994)...................................................................51

*In re Mallinckrodt PLC*,
   639 B.R. 837 (Bankr. D. Del. 2022) .............................................................. *passim*

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Mallinckrodt PLC*,
No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) ........................................................ *passim*

*In re Midway Gold US, Inc.*,
575 B.R. 475 (Bankr. D. Colo. 2017) ..................................................................................53

*In re Modell's Sporting Goods, Inc.*,
No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020) ...........................................................80

*In re Motors Liquidation Co.*,
541 B.R. 104 (Bankr. S.D.N.Y. 2015) ..................................................................................80

*In re MTE Holdings LLC*,
No. 19-12269 (CTG), 2021 WL 3743201 (Bankr. D. Del. Aug. 17, 2021) ...........................43

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996) ..................................................................................41, 46, 51

*In re Nat'l Realty Inv. Advisors, LLC*,
No. 22-14539 (JKS) (Bankr. D. N.J. Aug. 10, 2023) ...........................................................78

*In re Nautical Solutions, L.L.C.*,
No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) .......................................................79

*NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital
Mgmt, L.P.)*,
48 F.4th 419 (5th Cir. 2022) ................................................................................................81

*In re Nickels Midway Pier, LLC*,
No. 03-49462 (GMB), 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010) ...........................18

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ....................................................................................27

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................................17

*In re Ocean View Motel, LLC*,
No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) ........................39

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ..................................................................................................46, 51

*In re Premier Int'l Holdings, Inc.*,
2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ....................................................16, 53, 58

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Princeton Alternative Income Fund, LP*,
    No. 18-14603 (MBK) (Bankr. D. N.J. Feb. 19, 2020) ............................................................78

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...................................................................................33

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)..................................................................23, 27, 58, 59

*In re Revel AC, Inc.*,
    No. 14-22654 (MBK) (Bankr. D.N.J. June 30, 2014) ............................................................40

*In re Riverbed Tech., Inc.*,
    No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) ........................................ *passim*

*In re Rochem, Ltd.*,
    58 B.R. 641 (Bankr. D.N.J. 1985) .........................................................................17

*In re rue21, inc.*,
    575 B.R. 314 (Bankr. W.D. Pa. 2017) ...................................................................76

*In re S B Bldg. Assocs. Ltd. P'ship*,
    621 B.R. 330 (Bankr. D.N.J. 2020) ..............................................................37, 39, 46, 51

*SEC v. Drexel Burnham Lambert Grp. (In re Drexel Burnham Lambert Grp.)*,
    960 F.2d 285 (2d Cir. 1992).................................................................................60

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff)*,
    546 B.R. 284 (Bankr. S.D.N.Y. 2016) ...................................................................80

*In re Sentinel Mgmt. Grp., Inc.*,
    398 B.R. 281 (Bankr. N.D. Ill. 2008) ...................................................................15

*In re SiO2 Medical Products, Inc.*,
    No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) ....................................... *passim*

*In re SLT Holdco, Inc.*,
    No 20-18368 (MBK) (Bankr. D. N.J. Oct. 22, 2020) ....................................... *passim*

*In re Spansion, Inc.*,
    No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. 2010) ...........................................58

*In re Specialty Equip. Cos., Inc.*,
    3 F. 3d 1043 (7th Cir. 1993) ...............................................................................63

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*,
    416 F.3d 229 (3d Cir. 2005)....................................................................................41

*Su v. Offshore Investment Ltd. (In re Vantage Drilling Int'l)*,
    603 B.R. 538 (D. Del. 2019)..............................................................................54, 76

*In re Swan Transportation Co.*,
    596 B.R. 127 (Bankr. D. Del. 2018) ...................................................................79

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ............................................................. *passim*

*In re The Great Atl. & Pac. Tea Co., Inc.*,
    544 B.R. 43 (Bankr. S.D.N.Y. 2016)...................................................................43

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
    B.R. 208 (Bankr. D. Del. 2011) ...........................................................33, 53, 76

*In re Union Cnty. Wholesale Tobacco & Candy Co.*,
    8 B.R. 442 (Bankr. D.N.J. 1981) .........................................................................24

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*,
    426 B.R. 114 (Bankr. D. Del. 2010) ............................................................ *passim*

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012), *aff'd,* 729 F.3d 311 (3d Cir. 2013) ...........................27

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..................................................48, 51, 52, 57

*In re WebSci Technologies, Inc.*,
    234 Fed. Appx. 26 (3d Cir. 2007)...................................................................46, 51

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
    434 F.3d 639 (3d Cir. 2006)...........................................................................46, 51

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ............................................................... *passim*

**Statutes**

11 U.S.C. §§ 101-1532 ...................................................................................................1

11 U.S.C. § 105.............................................................................................................78

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

11 U.S.C. § 363(b) ......................................................................................................40, 41, 42

11 U.S.C. § 363(b)(1) .................................................................................................40, 41, 42

11 U.S.C. § 365(f) .....................................................................................................................85

11 U.S.C. § 503(b) ................................................................................................................5, 31

11 U.S.C. § 507(a)(1) ...............................................................................................................32

11 U.S.C. § 507(a)(2) .........................................................................................................31, 35

11 U.S.C. § 507(a)(4)–(7) ........................................................................................................32

11 U.S.C. § 507(a)(8) ...............................................................................................................32

11 U.S.C. § 1114(a) ..................................................................................................................36

11 U.S.C. § 1122 ................................................................................................................*passim*

11 U.S.C. § 1122(a) ..................................................................................................................17

11 U.S.C. § 1123(a)(1) .............................................................................................................20

11 U.S.C. § 1123(a)(2) .............................................................................................................20

11 U.S.C. § 1123(a)(3) .............................................................................................................21

11 U.S.C. § 1123(a)(4) .............................................................................................................21

11 U.S.C. § 1123(a)(5) .......................................................................................................21, 22

11 U.S.C. § 1123(a)(6) .......................................................................................................22, 23

11 U.S.C. § 1123(a)(7) .............................................................................................................23

11 U.S.C. § 1123(a)(8) .............................................................................................................20

11 U.S.C. § 1123(b) ......................................................................................................40, 48, 60

11 U.S.C. § 1123(b)(3) .......................................................................................................46, 51

11 U.S.C. § 1123(b)(3)(A) .................................................................................................46, 51

11 U.S.C. § 1123(b)(4) .......................................................................................................40, 44

11 U.S.C. § 1123(b)(6) .............................................................................................................78

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

11 U.S.C. § 1123(d) ....................................................................................................45

11 U.S.C. § 1125(a) ....................................................................................................25

11 U.S.C. § 1125(b) ....................................................................................................24

11 U.S.C. § 1125(c) ....................................................................................................25

11 U.S.C. § 1126 ................................................................................................*passim*

11 U.S.C. § 1126(c) ....................................................................................................26

11 U.S.C. § 1126(g) ....................................................................................................26

11 U.S.C. § 1126(f) ..............................................................................................25, 26

11 U.S.C. § 1127(a) ....................................................................................................15

11 U.S.C. § 1129(a)(1) ..........................................................................................17, 60

11 U.S.C. § 1129(a)(2) ....................................................................................23, 26, 58

11 U.S.C. § 1129(a)(3) ..........................................................................................27, 58

11 U.S.C. § 1129(a)(4) ..........................................................................................27, 28

11 U.S.C. § 1129(a)(5) ..........................................................................................28, 29

11 U.S.C. § 1129(a)(5)(A)(i) ......................................................................................29

11 U.S.C. § 1129(a)(5)(A)(ii) .....................................................................................29

11 U.S.C. § 1129(a)(6) ................................................................................................29

11 U.S.C. § 1129(a)(7) ..........................................................................................29, 30

11 U.S.C. § 1129(a)(8) ....................................................................................31, 33, 36

11 U.S.C. § 1129(a)(9)(A) .....................................................................................31, 32

11 U.S.C. § 1129(a)(9)(B) ...........................................................................................32

11 U.S.C. § 1129(a)(9)(C) ...........................................................................................32

11 U.S.C. § 1129(a)(10) ...............................................................................................33

11 U.S.C. § 1129(a)(11) ....................................................................................33, 34, 35

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1129(a)(12) ...................................................................................................35

11 U.S.C. § 1129(a)(13) ...................................................................................................36

11 U.S.C. § 1129(a)(14) ...................................................................................................36

11 U.S.C. § 1129(a)(15) ...................................................................................................36

11 U.S.C. § 1129(a)(16) ...................................................................................................36

11 U.S.C. § 1129(b) ..................................................................................................... *passim*

11 U.S.C. § 1129(b)(1) ..........................................................................................36, 38, 39

11 U.S.C. § 1129(b)(2)(B)(i) ............................................................................................37

11 U.S.C. § 1129(b)(2)(B)(ii) ...........................................................................................37

11 U.S.C. § 1129(c) ..........................................................................................................39

11 U.S.C. § 1129(d) ..........................................................................................................39

11 U.S.C. § 1129(e) ..........................................................................................................39

11 U.S.C. § 1141(a)–(c) ....................................................................................................78

28 U.S.C. § 1930 ..............................................................................................................35

Bankruptcy Code chapter 7............................................................................................ *passim*

Bankruptcy Code chapter 11.......................................................................................... *passim*

Securities Act of 1933 section 5 ......................................................................................39

**Rules**

Bankruptcy Rule 3019 ......................................................................................................15

Bankruptcy Rule 3020(e) ..................................................................................................85

Bankruptcy Rule 6004(h)..................................................................................................85

Bankruptcy Rule 6006(d)..................................................................................................85

Bankruptcy Rule 9019 ............................................................................................46, 47, 51

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Hearing Transcripts**

*In re Bed Bath & Beyond Inc.*,
No. 23-13359 (VFP) Hr'g Tr. (Bankr. D.N.J. Sept. 12, 2023) .........................................64, 82

*In re BlockFi Inc.*,
No. 22-19361 (MBK) Hr'g Tr. (Bankr. D.N.J. Sept. 26, 2023) ......................................65, 83

*In re Cobalt Int'l Energy, Inc.*,
No. 17-36709 (MI), Hr'g Tr. (Bankr. S.D. Tex. Apr. 4, 2018) ................................................69

*In re EV Energy Partners*,
No. 18-0814 (CSS), Hr'g Tr. (Bankr. D. Del. May 16, 2018)............................49, 65, 67, 73

*In re Extraction Oil and Gas, Inc.*,
No. 20-11548 (CSS) Hr'g Tr. (Bankr. D. Del. Dec. 22, 2020).........................................71, 74

*In re Lannett Co.*,
No. 23-10559 (JKS) Hr'g Tr. (Bankr. D. Del. June 8, 2023) ..................................................67

*In re RCS Cap. Corp.*,
No. 16-10223 (MFW), Hr'g Tr. (Bankr. D. Del. Mar. 21, 2016) ...........................................63

*In re RTW Retailwinds*,
No. 20-18445 (JKS), Hr'g Tr. (Bankr. D. N.J. Feb. 2, 2021)...........................................66, 73

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978
U.S.C.C.A.N. 5936 .......................................................................................................17, 24

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978
U.S.C.C.A.N. 5787 .......................................................................................................17, 24

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this memorandum of law (this "Memorandum") in support of confirmation of the *Fourth Amended*

*Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to*

*Chapter 11 of the Bankruptcy Code* [Docket No. 694] (as modified, amended, or supplemented

from time to time, the "Plan")[2] pursuant to sections 1125, 1126, and 1129 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").[3]  In support of confirmation of the

Plan, and in response to the Objections thereto, the Debtors respectfully state as follows.

## Preliminary Statement

1.      The Court should confirm the Plan.  The Plan satisfies the applicable standards

under the Bankruptcy Code, embodies a value-maximizing sale transaction following months of

robust marketing and negotiation, and enjoys near-unanimous support from voting creditors and

parties to the RSA.  It is the best and only alternative for the Debtors to emerge promptly from

chapter 11 and get back to providing sophisticated colocation services to its many customers.

2.      The Debtors entered these Chapter 11 Cases with a RSA that bound 64% of the

Holders of First Lien Claims and the Consenting Sponsors to support a restructuring process

---

[2]      [Docket No. 649].

[3]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, the Plan Supplement, the Disclosure Statement, the Koza Declaration, the Meltzer Declaration, or the Bojmel Declaration.

A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth in greater detail in the *Declaration of Eric Koza, Chief Restructuring Officer of Cyxtera Technologies, Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 20].  On June 4, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On June 6, 2023, the Bankruptcy Court entered an order [Docket No. 71] authorizing the joint administration and procedural consolidation of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On June 21, 2023, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 133].

whereby the Debtors would equitize their capital structure unless a higher or otherwise better alternative transaction emerged as part of the Debtors' ongoing marketing process.  The Debtors' marketing process was extensive and led to vigorous, arm's length negotiations with several bidders over multiple months.

3.      Following months of arm's-length, good faith negotiations with multiple parties, the Debtors determined that the Sale Transaction with Phoenix Data Center Holdings LLC (the "Purchaser"), an affiliate of Brookfield Infrastructure Partners L.P. ("Brookfield"), was the value-maximizing offer available for substantially all of the Debtors' Assets.[4]  Accordingly, on October 31, 2023, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of Brookfield's bid (as may be amended from time to time in accordance with the terms thereof, the "Purchase Agreement"), a copy of which is attached to the *Notice of Sale Transaction*[5] (the "Sale Transaction Notice") as Exhibit A.[6]  On November 1, 2023, the Debtors filed the Sale Transaction Notice disclosing the material terms of the Purchase Agreement, including (a) that the consideration thereunder was $775 million in cash, subject to certain adjustments, in exchange for substantially all of the Debtors' Assets, and (b) that the resulting implied recovery for Holders of Class 3 First Lien Claims was approximately 67.6% on account of such Claims.[7]

---

[4]    *See* Koza Decl. ¶ 12.

[5]    [Docket No. 648].

[6]    *See* Koza Decl. ¶ 12.

[7]    On November 3, 2023, the Debtors also filed the *Notice of Bid Protections* [Docket No. 651] (the "Bid Protections Notice"), which disclosed that the Purchase Agreement also provides for (a) a break up fee in an amount equal to $23,500,000 (*i.e.*, 3% of the proposed Purchase Price) (the "Break Up Fee") and (b) an expense reimbursement provision for reasonable and documented out-of-pocket expenses (including fees and expenses of counsel) incurred by Brookfield or its affiliates in connection with the negotiation, diligence, execution, performance, and enforcement of the Purchase Agreement, in an amount not to exceed $7,750,000 (the "Expense Reimbursement" and together with the Break Up Fee, the "Bid Protections").  On November 13, 2023, the Bankruptcy Court entered the *Order (I) Approving the Bid Protections and (II) Granting Related Relief* [Docket No. 687] approving the Bid Protections.

4.      The Sale Transaction is the culmination of a multi-party negotiation that creates value far in excess of the headline purchase price of $775 million in cash.

- As described in the First Day Declaration filed on the first day of these Chapter 11 Cases, long term lease costs were a major issue for the Debtors' prepetition business model.  The Sale Transaction with Brookfield is premised on the success of several separate deals that will allow Brookfield to purchase certain of the Debtors' currently leased properties.[8]  The business will, therefore, emerge from chapter 11 with not only a deleveraged balance sheet, but also greatly reduced long-term lease liabilities without having to reject those sites.

- The Debtors also struck a comprehensive deal with Digital Realty Trust, Inc. ("DLR"), to amend the terms of multiple leases to allow the Debtors to exit those sites in 2024.

- The Purchase Agreement also contemplates the consummation of a separate transaction where the Debtors have agreed to sell certain of its Canadian assets, which are not strategic to the Debtors' long-term plan and the Sale Transaction, to Cologix Canada, Inc. for $10 million in Cash.[9]

Together, these deals represent a comprehensive transformation of the Debtors' business for the benefit of all the Debtors' stakeholders.

5.      In addition to the value-maximizing Sale Transaction, the Plan reflects the settlement with the Committee, whereby Holders of General Unsecured Claims will receive up to $8.65 million in Cash on account of their General Unsecured Claims.  The Plan also includes debtor releases and third-party releases following an extensive independent investigation by the Debtors' Special Committee.  These releases, which are being proposed only after an impartial

---

[8]     *See* Bojmel Decl. ¶ 15.

[9]     *See Debtors' Motion for Entry of an Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 653] (the "Cologix Sale Motion").

special committee investigation concluded no claims existed that were worth pursuing,[10] are part

of the comprehensive *quid pro quo* embodied in the prepetition RSA and the Purchase Agreement.

With the support of the Committee, Holders of 100 percent in amount of the Debtors First Lien

Claims who voted, 85 percent in amount of the Debtors' General Unsecured Claims who voted,

the Consenting Sponsors, and the Purchaser, the Plan faces almost no opposition.  Nine formal

objections to Confirmation of the Plan were filed (collectively, the "Objections").[11]   As of the

filing of this Memorandum, the Debtors have resolved certain of these Objections received.  As

explained in detail below, to the extent not resolved prior to the Confirmation Hearing, the

Bankruptcy Court should overrule these Objections, confirm the Plan, and set in motion the final

steps needed to fulfill the Sale Transaction to bring the Debtors' Chapter 11 Cases to a conclusion.

      6.     This Memorandum is divided into four parts.  Part I provides the procedural history

of the Plan, the Debtors' solicitation efforts and voting results, and a summary of the various

Objections filed with respect to the Plan.  Parts II and III establish the Plan's compliance with each

of the applicable requirements for Confirmation, including that certain of the discretionary

contents of the Plan, such as the Releases, are appropriate and should be approved.  Part IV

establishes that the Objections to the Plan should be overruled.  In further support of Confirmation

of the Plan, the Debtors have filed contemporaneously herewith:

- the *Declaration of James Lee with Respect to the Tabulation of Votes Cast on the Second Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Report");

---

[10]   *See* Meltzer Decl. ¶ 19.

[11]   A summary of the Objections to the Plan and the Debtors' responses thereto are attached as **Exhibit A** (the "Objection Chart").

- the *Declaration of Eric Koza in Support of the Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Koza Declaration");

- the *Declaration of Roger Meltzer in Support of the Fourth Amended Joint Chapter 11 Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Meltzer Declaration"); and

- the *Declaration of Ronen Bojmel in Support of the Fourth Amended Joint Chapter 11 Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Bojmel Declaration").

7.      For the reasons stated herein, the Debtors respectfully request that the Bankruptcy

Court find that the Debtors have satisfied all relevant burdens and approve the Plan.

## I.      Procedural History of the Plan and Objections.

### A.      Procedural History.

8.      On June 4, 2023, the Debtors filed voluntary petitions for relief under chapter 11

of the Bankruptcy Code.[12]  On June 28, 2023, the Debtors filed the *Debtors' Motion for Entry of*

*an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment*

*Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection*

*Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim,*

*(IV) Approving Notice Thereof, and (V) Granting Related Relief.*[13]  On July 19, 2023, the

Bankruptcy Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim,*

*Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules*

*Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures*

*for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* (the

---

[12]    [Docket No. 1].

[13]    [Docket No. 172].

"Bar Date Order"),[14] which established August 15, 2023, as the General Claims Bar Date and

December 1, 2023, as the Governmental Bar Date (each as defined therein) and provided that any

Holder of a Claim that fails to timely submit a Proof of Claim by the applicable bar date shall not

be treated as a creditor with respect to such Claim for the purposes of either (a) voting on any plan

of reorganization filed in these Chapter 11 Cases, (b) participating in any distribution in the

Debtors' Chapter 11 Cases on account of such Claim, or (c) receiving further notices regarding

such Claim.

9.    On August 7, 2023, the Debtors filed the *Joint Plan of Reorganization of Cyxtera*

*Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*,[15] and

on August 15, 2023, the Debtors filed the *Disclosure Statement Relating to the Joint Plan of*

*Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of*

*the Bankruptcy Code*[16] and the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy*

*of the Disclosure Statement, (II) the Solicitation Procedures, (III) the Forms of Ballots and Notices*

*in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "Disclosure Statement

Motion").[17]  On September 13, 2023, the Debtors filed the *Amended Joint Plan of Reorganization*

*of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy*

*Code*[18] and the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of*

---

[14]    [Docket No. 298].

[15]    [Docket No. 372].

[16]    [Docket No. 407].

[17]    [Docket No. 408].

[18]    [Docket No. 501].

*Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.*[19]

10.     On September 22, 2023, the Debtors, the Committee, and the Required Consenting Term Lenders reached an agreement regarding the Committee's potential challenges under the Final DIP Order and the Committee's potential objection to the Disclosure Statement and the Plan. The resolution with the Committee is reflected in the Plan and provides substantial value to Holders of General Unsecured Claims in the form of GUC Trust Assets of $8.65 million in Cash (the "Committee Settlement").

11.     Since the beginning of these Chapter 11 Cases, discussions with the Committee have been constructive, and the Committee Settlement is the value-maximizing outcome for those few trade creditors and landlords that will not have their contract assumed as part of the Sale Transaction.  The Committee is supportive of the Plan and has recommended that Holders of Class 4 General Unsecured Claims vote in favor of the Plan.  Accordingly, approximately 95 percent in number of General Unsecured Claims who voted and approximately 85 percent in amount of General Unsecured Claims who voted accepted the Plan.

12.     Following the Committee Settlement, on September 24, 2023, the Debtors filed (a) the *Second Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Second Amended Plan"),[20] (b) the *Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

---

[19]    [Docket No. 502].

[20]    [Docket No. 551].

(the "Disclosure Statement"),[21] and (c) the *Revised Proposed Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto*.[22]   Among other things, both the Second Amended Plan and the Disclosure Statement incorporated the terms of the Committee Settlement.

13.     On September 26, 2023, the Bankruptcy Court entered an order (the "Disclosure Statement Order")[23] (i) approving the adequacy of the Disclosure Statement, (ii) scheduling a hearing to consider confirmation of the Second Amended Plan, and (iii) approving (a) the Solicitation and Voting Procedures, (b) certain notices and certain dates and deadlines in connection with solicitation and confirmation of the Second Amended Plan, and (c) the manner and form of the Solicitation Packages and the materials contained therein.

14.     On September 28, 2023, the Debtors caused the Claims and Noticing Agent, to serve the Solicitation Packages in accordance with the terms of the Disclosure Statement Order.[24] The Debtors also published the Publication Notice (as defined in the Disclosure Statement Order) in *The New York Times* and the *Financial Times* on October 2, 2023, and October 3, 2023, respectively, as evidenced by each *Affidavit of Publication*.[25]   Simultaneously, the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Voting*

---

[21]   [Docket No. 552].

[22]   [Docket No. 553].

[23]   [Docket No. 563].

[24]   *See Certificate of Service* [Docket No. 592] (the "Affidavit of Solicitation").

[25]   *See Affidavits of Publication* [Docket Nos. 572 and 573].

*and Objection Deadlines* was posted to the website maintained by the Claims and Noticing Agent in these Chapter 11 Cases.

15.    On November 1, 2023, the Debtors filed the Sale Transaction Notice, notifying parties in interest that the Debtors had "toggled" to an Asset Sale under the Plan and disclosing the material terms of the Purchase Agreement.  On November 3, 2023, the Debtors filed (a) the *Third Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,*[26] (b) the *Plan Supplement for the Third Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan Supplement"),[27] which included (i) the Schedule of Retained Causes of Action, (ii) the Restructuring Transactions Memorandum, (iii) the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases, (iv) the GUC Trust Agreement; (v) the Plan Administrator Agreement, and (vi) the Purchase Agreement, and (c) the Bid Protections Notice.

16.    On November 3, 2023, the Debtors filed (a) the *Notice of Assumption of Certain Executory Contracts and/or Unexpired Leases,*[28] in connection with the Debtors' transaction with DLR and (b) the Cologix Sale Motion, together with the declaration of Raymond Li in support of the Cologix Sale Motion,[29] and the related *Notice of Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases*[30].  On November 9, 2023, the Debtors filed the

---

[26]    [Docket No. 649].

[27]    [Docket No. 650].

[28]    [Docket No. 652].

[29]    [Docket No. 654].

[30]    [Docket No. 656].

*Supplemental Notice of Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases* in connection with the Cologix Sale.[31]

17.     On November 13, 2023, the Debtors filed the Plan.  The deadline (a) to file objections to the Plan and (b) for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots was November 7, 2023, at 4:00 p.m., prevailing Eastern Time.  The Confirmation Hearing is scheduled for November 16, 2023, at 2:00 p.m., prevailing Eastern Time.  Concurrently with this Memorandum, the Debtors have submitted the proposed *Findings of Fact, Conclusions of Law, and Order Confirming the Fourth Amended Joint Plan of Reorganization Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Proposed Confirmation Order"), which contemplates, among other things, confirmation of the Plan.

**B.     The Restructuring Transactions.**

18.     The Restructuring Transactions set forth in the Plan and the Restructuring Transactions Memorandum provide for, among other things, all transactions necessary to effectuate the purchase of the Acquired Assets by Purchaser under the Purchase Agreement and all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Purchase Agreement, including making filings or recordings that may be required by applicable law.

**1.     The Sale Transaction.**

19.     As discussed above, the Purchase Agreement provides that the Purchaser shall acquire the Acquired Assets free and clear of all Encumbrances (other than Permitted Post-Closing

---

31     [Docket No. 674].

Encumbrances and Assumed Liabilities) in exchange for a cash payment of $775 million, subject to certain adjustments, and the assumption of the Assumed Liabilities.

20.     Following consummation of the Asset Sale, the Plan Administrator shall cause the wind down and dissolution of the Debtors' Estates as set forth in Article IV.D.5 of the Plan.

### 2.     The Wind Down.

21.     As soon as practicable after the Effective Date, the Plan Administrator shall: (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with and abide by the terms of the Purchase Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of one or more of the Debtors or the Post-Effective Date Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the GUC Trust Fees and Expenses from the GUC Trust Assets.

### C.     The Plan Solicitation and Notification Process.

22.     In compliance with the Bankruptcy Code, only Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims were entitled to vote on the Plan.[32]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired or if they are not receiving or retaining any property under the Plan.  The following Classes of Claims

---

[32]   *See* 11 U.S.C. § 1126.

and Interests were *not* entitled to vote on the Plan, and the Debtors did not solicit votes from

Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

23.    The Debtors solicited votes on the Plan from Holders of Claims in Classes 3 and 4,

which were entitled to vote to accept or reject the Plan (collectively, the "Voting Classes").  The

voting results, as reflected in the Voting Report, are summarized as follows:

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|-------|-----|-----|-----|-----|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 3 – First Lien Claims | 100% | 100% | 0% | 0% |
| Class 4 – General Unsecured Claims | 85% | 95% | 15% | 5% |

24.    Stakeholders in the Voting Classes had notice and opportunity to "opt out" of the

Third-Party Release (as defined herein) by checking the appropriate box on the Ballots.  All

non-voting stakeholders were also given the opportunity to opt out of the Third-Party Release and

received notice and instructions for doing so in their applicable Non-Voting Status Notice.  Such

stakeholders could opt out by checking the appropriate box on the Non-Voting Status Notice or

objecting on or before the Opt Out Deadline (November 7, 2023, at 4:00 p.m., prevailing Eastern

Time).  The affirmative opt outs received by the Debtors are summarized as follows:

| CLASS | VOTING RIGHTS | TOTAL OPT OUTS RECEIVED |
|---|---|---|
| Classes 1, 2, Unclassified | Not Entitled to Vote | 12 |
| Class 3 – First Lien Claims | Entitled to Vote | 0 |
| Class 4 – General Unsecured Claims | Entitled to Vote | 19 |
| Class 8 – Existing Equity Interests | Not Entitled to Vote (Deemed to Reject) | 190 |

25.    The Debtors now intend to implement the Sale Transaction through confirmation

of the Plan.  The Plan, among other things:

- contemplates payment in full of Administrative Claims, Priority Tax Claims, DIP Claims, and Other Priority Claims, as well as the payment in full or Reinstatement of Other Secured Claims;

- provides for the treatment of Receivables Program Claims, which will be satisfied in full in accordance with the terms of the Receivables Program Documents;

- provides for the *pro rata* distribution of the Distributable Consideration to the Holders of First Lien Claims;

- provides for distributions from the GUC Trust Assets of $8.65 million in Cash *less* the GUC Trust Fees and Expenses to Holders of Allowed General Unsecured Claims in respect of their interests in the GUC Trust in accordance with the GUC Trust Agreement[33];

- provides for Intercompany Claims and Intercompany Interests, at the option of the applicable Debtor with the consent of the Purchaser, to be either Reinstated or canceled or released without any distribution on account of such Claim; and

- designates a Plan Administrator to wind down the Debtors' affairs in accordance with the Plan.

---

[33]  *See* GUC Trust Agreement, attached as <u>Exhibit D</u> to the Plan Supplement.

26.     The Debtors strongly believe that the Plan is in the best interests of the Debtors, their Estates, and other parties in interest.  As shown above, Holders of First Lien Claims and General Unsecured Claims overwhelmingly agree—100 percent of Holders of First Lien Claims who voted and 100 percent in amount of First Lien Claims who voted accepted the Plan.  Further, approximately 95 percent of Holders of General Unsecured Claims who voted and approximately 85 percent in amount of General Unsecured Claims who voted accepted the Plan.

27.     The transactions contemplated by the Plan represent a significant achievement for the Debtors and are the direct result of a thorough marketing process.  The voting results demonstrate that the vast majority of stakeholders agree.  The transactions embodied in the Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests.

### D.     The Objections.

28.     Formal Objections were filed by (i) the U.S. Trustee (such Objection, the "U.S. Trustee Objection");[34] (ii) Oracle Canada ULC and Oracle America, Inc. ("Oracle," and such Objection, the "Oracle Objection");[35] (iii) EastGroup Properties, LP ("Eastgroup," and such Objection, the "EastGroup Objection");[36] (iv) ACPF Nova Data Center, LLC ("ACPF") and RREEF CPIF 2425 Busse Road, LLC ("RREEF," and such Objection, the "ACPF/RREEF Objection");[37] (v) the Maricopa County Treasurer ("Maricopa County," and such Objection, the "Maricopa Objection");[38] (vi) Nvidia Corporation ("Nvidia," and such Objection, the "Nvidia

---

[34]    [Docket No. 646].

[35]    [Docket No. 660].

[36]    [Docket No. 661].

[37]    [Docket No. 662].

[38]    [Docket No. 670].

Objection");[39] (vii) SI POR02 ABS LLC ("SI") and DCCO Tukwila, LLC ("DCCO," and such

Objection, the "SI/DCCO Objection");[40] (viii) 1919 Park Avenue Associates, LLC ("1919 Park,"

and such Objection, the "1919 Park Objection");[41] and (ix) Microsoft Corporation ("Microsoft,"

and such Objection, the "Microsoft Objection").[42]

29.    To the extent the Debtors are unable to consensually resolve such Objections prior

to the Confirmation Hearing, the Debtors request that the Bankruptcy Court overrule such

Objections.  A detailed response to each of the outstanding Objections is set forth in Part IV of this

Memorandum.

E.    **Plan Modifications.**

30.    A plan proponent may modify its plan at any time before confirmation if the

modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[43]  Once

filed, "the plan as modified becomes the plan."[44]  Pursuant to Bankruptcy Rule 3019, courts

consistently have held that a proposed modification to a previously accepted plan will be deemed

accepted where the proposed modification is not material or does not adversely affect the way

creditors and stakeholders are treated.[45]

---

[39]    [Docket No. 680].

[40]    [Docket No. 686].

[41]    [Docket No. 688].

[42]    [Docket No. 689].

[43]    11 U.S.C. § 1127(a).

[44]    *Id.*

[45]    *See In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class's distribution was not sufficiently material to require re-solicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The

31.    Accordingly, only those modifications that are "material" require resolicitation.  A plan modification is not material unless it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.[46]  Here, to clarify and address certain claimant concerns, the Debtors filed an amended Plan.  The modifications to the Plan are not material changes.  Rather, they are permissible, technical modifications to the Plan, each of which either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.

## **Argument**

32.    For the reasons set forth herein, the Debtors respectfully request that the Bankruptcy Court overrule the remaining Objections and confirm the Plan.

**II.    The Plan Satisfies Each Requirement for Confirmation.**

33.    To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the requirements of section 1129 of the Bankruptcy Code.[47]  As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.

---

Bankruptcy Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan."), *aff'd*, 880 F.2d 694 (4th Cir. 1989).

[46]    *See In re A.H. Robins Co.*, 88 B.R. at 750 ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Court concludes that the modifications do not require resolicitation of acceptances or rejections.").

[47]    *See In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 'plan has a reasonable probability of success,' and is more than a visionary scheme [].'") (citing *Wiersma v. Bank of the West (In re Wiersma)*, 227 F. App'x 603, 606 (9th Cir. 2007)) (internal quotation marks omitted).

### A.   The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

34.   Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[48]   The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[49]   As explained below, the Plan complies with the requirements of sections 1122 and 1123 in all respects.

### 1.   The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

35.   The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[50]

36.   Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[51]   Moreover, the requirement of substantial similarity does not mean that claims or

---

[48]   11 U.S.C. § 1129(a)(1).

[49]   S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("As confirmed by legislative history, 11 U.S.C. § 1129(a)(1), which provides that the plan must "compl[y] with the applicable provisions of this title," requires that a plan comply with 11 U.S.C. §§ 1122 and 1123.").

[50]   11 U.S.C. § 1122(a).

[51]   *See, e.g.*, *In re Rochem, Ltd.*, 58 B.R. 641, 642 (Bankr. D.N.J. 1985) ("Although Section 1122(a) of the Code requires that claims be substantially similar within a particular class, there is no requirement within Section 1122 or elsewhere in the Code that all substantially similar claims be included within a particular class.").   Courts have

interests within a particular class must be identical or that all similarly situated claims must receive the same treatment under a plan.[52]

37.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into eight separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[53] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

---

identified grounds justifying separate classification, including:  (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis related to the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (holding that, although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted), *aff'd*, No. 93 CIV. 844 (LJF), 1993 WL 316183 (S.D.N.Y. May 21, 1993); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together.").

[52]    *See, e.g.*, *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) ("Separate classification of similar claims has been found to be permissible where the classification is offered in good faith, does not foster an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11."); *In re Nickels Midway Pier, LLC*, No. 03-49462 (GMB), 2010 WL 2034542, at *7 (Bankr. D.N.J. May 21, 2010) (proffering just one rule regarding classification of separate classification of similar classes under section 1122, which is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

[53]    *See* Plan Art. III.

| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | First Lien Claims |
| Class 4 | General Unsecured Claims |
| Class 5 | Section 510 Claims |
| Class 6 | Intercompany Claims |
| Class 7 | Intercompany Interests |
| Class 8 | Existing Equity Interests |

38.    Here, each of the Claims and Interests in each particular Class is substantially similar to the other Claims and Interests in such Class.[54]  The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between secured and unsecured claims.  Other aspects of the classification scheme are related to the different legal or factual circumstances of the Claims or Interests within each Class.[55]  For instance, First Lien Claims consist of secured Claims arising out of the Term Loan Facilities under the First Lien Credit Agreement while the Other Secured Claims consist primarily of finance lease claims.  Although both Classes of Claims are secured, Holders of First Lien Claims are the Debtors' largest group of stakeholders in these Chapter 11 Cases and were likely to have a significant ongoing relationship with the Debtors in the event of the Recapitalization Transaction.  Other aspects of the classification scheme recognize the different legal or factual nature of Claims or Interests.

---

[54]    *See* Koza Decl. ¶ 19.

[55]    *See* Koza Decl. ¶ 21.

39.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class, and the distinctions among Classes are based on valid business, factual, and legal distinctions. The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

### 2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

40.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.[56] The Plan satisfies each of these requirements.[57]

i.      Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).

41.     For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[58]

ii.     Specification of Unimpaired Classes (§ 1123(a)(2)).

42.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[59]

---

[56]    11 U.S.C. § 1123(a)(1)–(7).

[57]    *See* 11 U.S.C. § 1123(a)(1)–(8).  Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

[58]    *See* Koza Decl. ¶¶ 20–22.

[59]    *See* Plan Art. III; Koza Decl. ¶ 23.

iii.      Treatment of Impaired Classes (§ 1123(a)(3)).

43.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.[60]

iv.      Equal Treatment within Classes (§ 1123(a)(4)).

44.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[61] The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[62]

v.      Means for Implementation (§ 1123(a)(5)).

45.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[63] The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented.[64] Among other things, Article IV of the Plan provides for:

- the general settlement of Claims and Interests;[65]

- the means for implementing the Asset Sale, including the sources of consideration under the Plan and distributions related thereto, the existence of the Post-Effective Date Debtors, the appointment of a Plan Administrator for the purpose of, among other things, winding down the business and affairs of the Debtors and Post-Effective Date

---

[60]   *See id.*

[61]   11 U.S.C. § 1123(a)(4).

[62]   *See* Koza Decl. ¶ 24.

[63]   11 U.S.C. § 1123(a)(5).

[64]   *See* Koza Decl. ¶¶ 25–26.

[65]   *See* Plan Art. IV.A.

Debtors, and the authorization for the Debtors, or Post-Effective Date Debtors, as applicable, to take corporate actions necessary to effectuate the Plan;[66]

- the preservation of certain Causes of Action not otherwise assigned via the Purchase Agreement;[67]

- the cancellation of certain notes, instruments, certificates, licenses, and other documents;[68]

- the vesting of Assets in the Post-Effective Date Debtors;[69] and

- the establishment of the GUC Trust, which shall have the sole power and authority to distribute the GUC Trust Net Assets to Holders of Allowed General Unsecured Claims in accordance with the treatment set forth in the Plan for Class 4.[70]

46.    The terms governing the execution of these transactions are set forth in greater detail in the Plan and the Plan Supplement,[71] as applicable.    Thus, the Plan satisfies section 1123(a)(5), and no party has asserted otherwise.

vi.    Issuance of Non-Voting Securities (§ 1123(a)(6)).

47.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[72]  As the Debtors and the Post-Effective Date Debtors, as applicable, are winding down, there will not be any issuance

---

[66]    *See id.* Art. IV.D.

[67]    *See id.* Art. IV.E.

[68]    *See id.* Art. IV.F.

[69]    *See id.* Art. IV.K.

[70]    *See id.* Art. IV.M.

[71]    *See* Plan Supplement.

[72]    11 U.S.C. § 1123(a)(6).

of non-voting equity securities.[73]    Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code, and no parties have asserted otherwise.

vii.    Directors and Officers (§ 1123(a)(7)).

48.    Section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[74]    The Plan satisfies this requirement by providing for the discharge of all of the Debtors' directors, managers, and officers from their duties and the appointment of the Plan Administrator, as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, as applicable, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers.[75]    The Plan Supplement identifies the Plan Administrator and sets forth the terms of the compensation thereof.[76]    Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

**B.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

49.    The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of a plan.[77]    The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended

---

[73]    *See* Koza Decl. ¶ 27.

[74]    11 U.S.C. § 1123(a)(7).

[75]    *See* Plan Art. IV.D.4.

[76]    *See* Plan Supplement Ex. E.

[77]    *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 170 (Bankr. D.N.J. 2010) ("Section 1129(a)(2) requires that '[t]he proponent of the plan compl[y] with the applicable provisions of this title.'") (citing 11 U.S.C. § 1129(a)(2)); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("§ 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125").

to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan

acceptance requirements set forth in section 1126 of the Bankruptcy Code.[78]  As set forth below,

the Debtors have complied with these provisions, including sections 1125 and 1126 of the

Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure

Statement and soliciting acceptances of the Plan through their Claims and Noticing Agent in

accordance with the Disclosure Statement Order.[79]

### 1.    The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.

50.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or

rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement

approved, after notice and a hearing, by the court as containing adequate information."[80]

Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so

that they may make an informed decision whether to approve or reject the plan.[81]

51.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the

Bankruptcy Court approved the Disclosure Statement.[82]  The Bankruptcy Court also approved the

Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting

---

[78]    *See In re TCI 2 Holdings*, 428 B.R at 170; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936; S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (collectively, the legislative history refers to section 1125, regarding disclosure, as an example of one of those "applicable provisions").

[79]    *See* Koza Decl. ¶ 30.

[80]    11 U.S.C. § 1125(b).

[81]    *See In re Union Cnty. Wholesale Tobacco & Candy Co.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) (holding that the standards of section 1125 "essentially require information sufficient to enable a hypothetical reasonable investor to make an informed judgment re acceptance or rejection of the plan").

[82]    *See* Disclosure Statement Order.

materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[83]    As stated in the Voting Report, the Debtors, through the Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order, satisfying sections 1125(a) and (b) of the Bankruptcy Code.[84]    The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.    Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and all parties deemed to accept or reject the Plan.[85]

52.    Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

**2.    The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.**

53.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[86]    As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

- Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims), which are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[87]    Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes

---

[83]    *See generally* Disclosure Statement Order.

[84]    *See* Voting Report; *see also Certificate of Service* [Docket No. 592] (the "Certificate of Solicitation").

[85]    *See* Voting Report; *see also generally* Certificate of Solicitation.

[86]    *See* 11 U.S.C. § 1126.

[87]    *See* Plan, Art. III.B.

are deemed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Class 8 (Existing Equity Interests), which is Impaired and receiving no recovery under the Plan (the "Deemed Rejecting Class").[88]   Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Deemed Rejecting Class are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

- Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.   Pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, Holders of Claims in Classes 6 and 7 are deemed to have accepted the Plan or rejected the Plan, as applicable, and, therefore, were not entitled to vote on the Plan.[89]

54.    Accordingly, the Debtors solicited votes only from Holders of Allowed Claims in the Voting Classes—Classes 3 and 4—because each of these Classes is Impaired and entitled to receive a distribution under the Plan.[90]   With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[91]

55.    The Voting Report, summarized above, demonstrates that the Plan has been accepted by each of the Voting Classes in accordance with section 1126 of the Bankruptcy Code.[92] Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

---

[88]    *See id.*

[89]    Class 5 (Section 510 Claims) does not include any Claims and was omitted from service.

[90]    Plan, Art. III.B*; see generally* Certificate of Solicitation.

[91]    11 U.S.C. § 1126(c).

[92]    *See generally* Voting Report, Ex. A.

**C.      The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

56.      Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[93]   Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[94]   To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the Plan.[95]

57.      The Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries.  Throughout these Chapter 11 Cases, the Debtors, the Debtors' board of directors, and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.  Importantly, the Plan is supported by the Committee, the Consenting Stakeholders, and all Voting Classes.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

**D.      The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4))**.

58.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under

---

[93]   11 U.S.C. § 1129(a)(3); *see also In re Diocese of Camden, New Jersey*, No. 20-21257 (JNP), 2023 WL 5605156, at *25 (Bankr. D.N.J. Aug. 29, 2023) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)); *In re TCI 2 Holdings*, 428 B.R. at 134.

[94]   *See, e.g.*, *In re PWS Holding*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re Century Glove, Inc.*, No. Civ. A. 90-400, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[95]   *See, e.g.*, *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013); *In re Century Glove*, 1993 WL 239489, at *4.

the plan, be subject to approval by the Bankruptcy Court as reasonable.[96]  Courts in this district and elsewhere have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[97]

59.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[98]  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.[99]  Article II.C.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than forty-five (45) days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.[100] Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

### E.    The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).

60.    The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under

---

[96]    11 U.S.C. § 1129(a)(4).

[97]    *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[98]    *See* Koza Decl. ¶ 34.

[99]    *See* Plan, Art. II.

[100]    *See id.*

the plan.[101]  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[102]

61.     The Plan satisfies section 1129(a)(5)(A)(i) of the Bankruptcy Code because the Debtors have disclosed the identities of the Plan Administrator and the responsibilities and compensation thereof, in the Plan Supplement.    Therefore, the requirements under section 1129(a)(5) of the Bankruptcy Code are satisfied, and no party has asserted otherwise.

**F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

62.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  The Plan does not provide for any rate changes and the Debtors are not subject to any such regulation.[103]  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases, and no party has asserted otherwise.

**G.     The Plan is In the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

63.     The "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than that which such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7

---

[101]   11 U.S.C. § 1129(a)(5)(A)(i).

[102]   11 U.S.C. § 1129(a)(5)(A)(ii).

[103]   *See* Koza Decl. ¶ 36.

liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[104]

64.     To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of AlixPartners, the Debtors' restructuring advisors, prepared a liquidation analysis (the "Liquidation Analysis"),[105] which is discussed further in the Koza Declaration.[106]  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[107]  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions regarding a hypothetical conversion to a chapter 7 liquidation as of a certain date.[108]

65.     Based on the Liquidation Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan.[109]  Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

---

[104]  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

[105]  [Docket No. 492].

[106]  *See* Koza Decl. ¶¶ 38–39.

[107]  *See id.* ¶ 39.

[108]  *See id.* ¶ 38.

[109]  *See id.* ¶ 39.

**H.      The Plan Satisfies the Bankruptcy Code's Voting Requirements of Section 1129(a)(8) of the Bankruptcy Code**.

66.      Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[110]  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[111]

67.      Both Voting Classes (Classes 3 and 4) voted to accept the Plan.  However, because certain Classes are deemed to reject the Plan, the Debtors do not satisfy section 1129(a)(8) of the Bankruptcy Code.  Yet, even though certain Classes are deemed to reject the Plan, the Debtors still satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code because, as discussed below, the Plan does not discriminate unfairly and is fair and equitable with respect to the deemed rejecting Classes.

**I.       The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9))**.

68.      Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[112]  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code— must receive on the effective date cash equal to the allowed amount of such claims.[113]

---

[110]  11 U.S.C. § 1129(a)(8).

[111]  11 U.S.C. § 1129(b).

[112]  11 U.S.C. § 1129(a)(9).

[113]  11 U.S.C. § 1129(a)(9)(A).

Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

69.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. **First**, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter. **Second**, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course.[114] **Third**, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

---

[114]  *See* 11 U.S.C. § 1129(a)(9)(A).

**J.      At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10))**.

70.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[115]

71.     As set forth above, Holders of Claims in all Voting Classes—which are each an Impaired Class under the Plan—overwhelmingly voted to accept the Plan independent of any insiders' votes.[116]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

**K.      The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11))**.

72.     Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization is proposed in the Plan.  The debtor bears the burden of demonstrating the feasibility of the plan by a preponderance of the evidence.  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[117]  The Bankruptcy Court need not require a

---

[115]    11 U.S.C. § 1129(a)(10).

[116]    *See* Voting Report, Ex. A.

[117]    *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *Berkley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464 B.R. 208 (Bankr. D. Del. 2011).

guarantee of success to find the Plan feasible.[118]  Instead, the Bankruptcy Court must find that the

"plan offers a reasonable expectation of success."[119]

73.    In determining standards of feasibility, courts have identified the following

probative factors:

- the adequacy of the capital structure;

- the earning power of the business;

- the economic conditions;

- the ability of management;

- the probability of the continuation of the same management; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[120]

74.    The Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code and

should be confirmed.  Following consummation of the Sale Transaction, the Plan provides for an

orderly wind down and dissolution of the Debtors and the Post-Effective Date Debtors.  The

Debtors project that the Sale Transaction will provide sufficient value to satisfy all Priority and

Administrative Claims under the Plan, including all Professional Fee Claims.[121]  The Debtors have

worked with their advisors to ensure that the Post-Effective Date Debtors maintain, with the

leadership of the Plan Administrator, adequate liquidity and the necessary staffing in order to

effectively wind down the Debtors' Estates.  The Plan provides closure and assurance that the

---

[118]  *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1004 (E.D. Va. 1994) (noting that the "plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success").

[119]  *See In re G–I Holdings Inc.*, 420 B.R. 216, 267 (D.N.J. 2009) ("[The] key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed.").

[120]  *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

[121]  *See* Koza Decl. ¶ 43.

assets of the Debtors' Estates are being distributed to creditors in a value maximizing manner without the need for any further financial restructuring.  Thus, if confirmed as proposed, the Plan satisfies the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code.

**L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12))**.

75.      Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

76.      The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.C of the Plan provides that all fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Post-Effective Date Debtor (or the Disbursing Agent on behalf of the Post-Effective Date Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

77.      The U.S. Trustee took issue with the Plan language regarding statutory fees.[122]  The Debtors have accepted the U.S. Trustee's comments to resolve this issue.

78.      Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

---

[122]   *See* U.S. Trustee Objection, ¶¶ 74–75.

**M.     Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan**.

79.     Several of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan.  Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).[123]  The Debtors have no obligations to pay retiree benefits after the Effective Date and, as such, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not subject to any domestic support obligations.[124]  Section 1129(a)(15) is inapplicable to the Plan because none of the Debtors are "individuals" as that term is defined in the Bankruptcy Code.[125]  Section 1129(a)(16) of the Bankruptcy Code is also inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[126]

**N.     The Plan Satisfies the Cramdown Requirements (Section 1129(b))**.

80.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the

---

[123]   11 U.S.C. § 1129(a)(13).  Section 1114(a) of the Bankruptcy Code defines "retiree benefits" as: "[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(a).

[124]   11 U.S.C. § 1129(a)(14).

[125]   11 U.S.C. § 1129(a)(15).

[126]   *See id.* § 1129(a)(16).

plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[127]

81.    As noted above, all Impaired Classes of Claims entitled to vote on the Plan voted in favor of the Plan.  However, the Deemed Rejecting Class have or are deemed to have rejected the Plan.  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

### 1.    The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

82.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[128] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[129]

83.    The Plan satisfies section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that the Deemed Rejecting Classes are deemed to have rejected the Plan, the Plan is confirmable.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan until all senior Classes have received a 100 percent

---

[127]    *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (holding that a plan must be "'fair and equitable' and may not unfair[ly] discriminat[e] under the requirements of section 1129(b)").

[128]    *Bank of Am. Nat. Trust & Sav. Ass'n*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[129]    11 U.S.C. § 1129(b)(2)(B)(ii).

recovery or agreed to receive a different treatment under the Plan, except for Class 4, pursuant to the terms of the Committee Settlement.

> **2.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1))**.

84.     Unlike the concept of "fair and equitable," which is defined under the Bankruptcy Code, the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.  Courts typically examine the facts and circumstances of the particular case to make the determination.[130]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[131]  A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[132]

85.     Here, the Plan's treatment of the non-accepting Impaired Classes (*i.e.*, the Deemed Rejecting Classes) is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Claims in the Deemed Rejecting Classes are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests.

---

[130]   *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 158 (Bankr. D.N.J. 2010) (neglecting to apply a set standard or test to ascertain whether a plan unfairly discriminates, instead opting to consider "various standards" for a general analysis of unfair discrimination including whether the discrimination is "supported by a reasonable basis" and is "proposed in good faith"); *In re S B Bldg. Assocs.*, 621 B.R. at 375 (considering the unique factual circumstances to determine whether the requirements of section 1129(b) are satisfied).

[131]   *See In re Ocean View Motel, LLC*, No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment") (internal citations omitted).

[132]   *See Aleris Int'l*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. 111, 121 (Bankr. D. Del. 2006)).

The Plan's treatment of the Deemed Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.  Furthermore, where the Plan provides differing treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so.

86.    For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

**O.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

87.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. ***First***, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan.[133]  ***Second***, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[134]  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.[135]  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. ***Finally***, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases is a "small business case."[136]  Accordingly, the Plan satisfies the requirements of section 1129(c), (d), and (e) of the Bankruptcy Code, and no party has asserted otherwise.

---

[133]   *See* Koza Decl. ¶ 47.

[134]   *See id.* ¶ 49.

[135]   *See id.*

[136]   *See id.* ¶ 48.

### III.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

88.    Finally, as discussed above, the Plan contains provisions implementing certain releases and exculpations, compromising claims and interests, and enjoining certain causes of action.  These provisions are substantially consistent with those approved by the Bankruptcy Court in precedent chapter 11 plans.[137]  Each of these provisions is appropriate because, as applicable, they (a) are the product of arm's-length negotiations, (b) were critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, their Estates, and these Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.[138]  Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

### A.    The Sale Transaction Should Be Approved Under Sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code as Sound Exercise of the Debtors' Business Judgment.

89.    The Bankruptcy Court may authorize the Debtors to sell the Acquired Assets (as defined in the Purchase Agreement) and all other assets transferred to the Purchaser under the Purchase Agreement pursuant to sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Similarly, section 1123(b)(4) provides that a "plan may provide for the sale of all

---

[137]    *See, e.g., In re BlockFi Inc.*, No-22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming liquidating chapter 11 plan with third party and debtor releases substantially consistent with those in the Plan); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Revel AC, Inc.*, No. 14-22654 (MBK) (Bankr. D.N.J. June 30, 2014) (same).

[138]    *See* Koza Decl. ¶ 50.

or substantially all of the property of the estate." To approve a sale under section 363(b)(1) of the

Bankruptcy Code, the debtor is required to show that the decision to sell the property outside of

the ordinary course of business was based on a sound exercise of the debtor's business judgment.[139]

Accordingly, for the purpose of selling property of the Estates, the Debtors need only show a

legitimate business justification for the proposed action.[140]

90.     The business judgment rule shields a debtor's management decisions from judicial

second guessing.[141] Once a debtor articulates a valid business justification, the law vests the

debtor's decision to use property outside of the ordinary course of business with a strong

presumption that "in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company."[142] Parties challenging a debtor's decision must make a showing of "bad faith,

self-interest or gross negligence."[143] Generally, if a debtor's actions satisfy the business judgment

---

[139]     *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("[U]nder normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification.") (citation omitted); *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task"); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted).

[140]     *See, e.g.*, *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

[141]     *In re Johns-Manville Corp.*, 60 B.R. at 615–16 (discussing how a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).

[142]     *In re GSC, Inc.*, 453 B.R. 132, 174 (Bankr. S.D.N.Y. 2011) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Filene's Basement*, 2014 WL 1713416, at *12 ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

[143]     *In re Integrated Res.*, 147 B.R. at 656 (citations omitted).

rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

91.    The Debtors' sale of the Acquired Assets under the Purchase Agreement represents a sound exercise of the Debtors' business judgment, is the value-maximizing alternative under the Plan, and is justified under section 363(b) of the Bankruptcy Code.[144]  As set forth in greater detail in the Bojmel Declaration, the Debtors and their advisors organized a comprehensive Marketing Process in support of a possible Sale Transaction.[145]  Throughout the summer, the Debtors received multiple initial bids, but the Debtors determined that none of the bids constituted a Qualified Bid.  However, the Debtors and their advisors continued to engage in arms' length negotiations with certain bidders, including the Purchaser, and their advisors to enhance their proposals and attempt to develop a bid that the Debtors considered to be more value-maximizing than the Recapitalization Transaction.[146]

92.    Throughout these Chapter 11 Cases, the Debtors and the Consenting Term Lenders have stood ready to consummate the Recapitalization Transaction and launched solicitation on the Plan prepared for no value-maximizing sale alternative to materialize.  However, shortly after solicitation of the Plan commenced, and following extensive good faith, hard fought negotiations, Brookfield and the Debtors came to an agreement in principle on the framework of a deal.[147]  Accordingly, the Debtors spent the next five weeks working around the clock to negotiate and finalize the Purchase Agreement with Brookfield.  These rounds of robust arms' length and good

---

[144]  *See* Koza Decl. ¶ 65.

[145]  *See* Bojmel Decl. ¶ 7.

[146]  *Id.* at ¶ 10.

[147]  *Id.* at ¶ 12.

faith negotiations with the Debtors and their advisors resulted in numerous, material improvements in value and culminated in the Purchase Agreement, which provides that Brookfield will (i) purchase the Acquired Assets free and clear of any Encumbrances, except Permitted Post-Closing Encumbrances and Assumed Liabilities, and (ii) assume the Assumed Liabilities (each as defined in the Purchase Agreement) in exchange for a cash payment of $775 million, subject to certain adjustments.[148]

93.     This cash payment provides substantial value to the Debtors' Estates, maximizes the value of all of the Acquired Assets, and provides for a substantial recovery to all Holders of Claims.  The Acquired Assets were subject to competing bids, which enhanced the Debtors' ability to receive the highest or otherwise best value for such Acquired Assets.  Consequently, the Asset Sale constitutes, in the Debtors' reasonable business judgment, the highest or otherwise best offers for the Acquired Assets and will provide a greater recovery for their Estates than any known or practicably available alternatives, including the Recapitalization Transaction.[149]

94.     The multi-party negotiations required to consummate the Sale Transaction also resulted in a several separate deals that will allow Brookfield to purchase certain of the Debtors' currently leased properties.[150]  The business will, therefore, emerge from chapter 11 with not only

---

[148]   *See* Koza Decl. at ¶ 12.

[149]   Courts in the Third Circuit and elsewhere have recognized that a formal auction is not a prerequisite for the approval of a sale of Debtor assets under the Bankruptcy Code.  *See, e.g., In re MTE Holdings LLC*, No. 19-12269 (CTG), 2021 WL 3743201, at *6 (Bankr. D. Del. Aug. 17, 2021) ("While the Bankruptcy Code requires court approval of a sale of estate property outside the ordinary course of a debtor's business . . . it does not by its terms require an auction."); *see also In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[T]here is no rule that . . . asset sales are . . . conditioned on such a requirement [a formal auction], which does not appear in the Bankruptcy Code or Bankruptcy Rules.").  Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold.  *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).

[150]   *See* Bojmel Decl. at ¶ 15.

a deleveraged balance sheet, but also greatly reduced long-term lease liabilities without having to reject additional sites. The Debtors also struck a comprehensive deal with DLR to amend the terms of multiple leases to allow the Debtors to exit those sites in 2024.[151] The Purchase Agreement also contemplates the consummation of a separate transaction where the Debtors have agreed to sell certain of its Canadian assets to Cologix Canada, Inc. Moreover, because the Purchase Agreement contemplates the assumption of substantially all of the Debtors' contracts, unexpired leases, and other obligations of the Debtors' Estates that constitute Assumed Liabilities under the Purchase Agreement, the Sale Transaction will result in payment in full for many of the Debtors' unsecured creditors.[152]

95.    The proceeds of the Sale Transaction will be used to fund distributions under the Plan and the Debtors will wind down and dissolve their remaining operations.[153]

96.    The Debtors believe that the Sale Transaction is more value-maximizing than the Recapitalization Transaction and represents the most efficient and appropriate means of maximizing the value of the Debtors' Estates. The Sale Transaction is appropriate under section 1123(b)(4) as it is to be effectuated pursuant to the Plan, which, for the reasons set forth herein, satisfies all of the requirements to be confirmed. For the foregoing reasons, the Debtors believe that entering into the Sale Transaction is a sound exercise of their business judgment and represents the best path forward for the Debtors, their creditors, and other parties in interest. Thus, the Sale Transaction should be approved.

---

[151]   *See* Cologix Sale Motion.

[152]   Meltzer Decl. ¶ 13.

[153]   *See* Koza Decl. ¶ 14.

### B.     The Plan Complies with Section 1123(d) of the Bankruptcy Code.

97.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[154]  The Plan complies with section 1123(d) of the Bankruptcy Code.   The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article V.D of the Plan or the Confirmation Order.[155]  In accordance with Article V.D of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.  The Plan also sets forth procedures for counterparties to assumed Executory Contracts or Unexpired Leases to follow in the event they submit a request for payment that differs from ordinary course amounts paid or proposed to be paid by the Debtors.  The Debtors continue to engage with certain parties regarding their objections to the Debtors' proposed Cures.  To the extent not resolved prior to the Confirmation Hearing, the Debtors plan to resolve such Cure Objections shortly thereafter without impacting confirmation of the Plan.

98.     Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

---

[154]   11 U.S.C. § 1123(d).

[155]   *See* Plan Art. V.D.

## C.    The Plan Appropriately Incorporates Settlements of Claims and Interests.

99.    The Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[156] The Plan provides for a general settlement of all Claims and Interests to the extent provided for by the Bankruptcy Code.

100.    The standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019.[157] Generally, courts in the Third Circuit will approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."[158] The Third Circuit has provided the following four criteria that a bankruptcy court should consider when approving a settlement pursuant to Bankruptcy Rule 9019:  (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of creditors.[159] In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate.[160]

101.    The Debtors believe the settlement embodied in the Plan satisfies the above factors. The Plan and Confirmation Order embody a settlement of Claims and Interests between the

---

[156]   11 U.S.C. § 1123(b)(3)(A).

[157]   *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3).").

[158]   *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").

[159]   *See In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).

[160]   *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").

Debtors and certain other parties in interest, including the Debtors, the Debtors' directors and officers, the Consenting Stakeholders, the DIP Agent, the DIP Lenders, and the Committee.  The settlement embodied in the Plan and the Confirmation Order, including the settlement with the Committee, is fair and equitable and consistent with the Bankruptcy Code.  The Plan and Confirmation Order resolve a host of alleged Claims and Interests, which were thoroughly analyzed by the Debtors, the Special Committee, the Consenting Stakeholders, and each of their advisors.

102.    The Debtors and their advisors have worked diligently to ensure the Debtors' creditors are receiving the greatest value possible on their Claims or Interests through the Plan, in the best interest of all stakeholders.  If the Debtors were forced to litigate the issues necessary to resolve such Claims and Interests outside of the Plan, such litigation would be costly, protracted, inherently uncertain, and would leave the Debtors and all stakeholders in a substantially worse-off position.  Litigation would prolong the Debtors' bankruptcy process, draining the Debtors' Estates and distracting the Debtors' key personnel and advisors, who would otherwise be focused on implementing the Restructuring Transactions.  As reflected by the overwhelming support of creditors for the Plan, this settlement is in the best interests of creditors and all parties in interest.

103.    The U.S. Trustee argued in their objection that the Plan was not a settlement subject to approval under Bankruptcy Rule 9019.[161]  To address the U.S. Trustee's concerns, the Debtors have incorporated Plan revisions provided by the U.S. Trustee which resolves these concerns.  Accordingly, the Plan's discretionary general settlement provisions satisfy the requirements of section 1123 of the Bankruptcy Code and no party is asserting otherwise.

---

[161]    *See* U.S. Trustee Objection ¶¶ 66–71.

D.    **The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

104.    The Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.  These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, were a material inducement for parties to enter into the RSA and the Purchase Agreement, are overwhelmingly supported by the Debtors and their key stakeholders (including support from a supermajority Holders of First Lien Claims[162]) and are consistent with applicable precedent.  Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Confirmation Hearing Notice, the Ballots, and the Non-Voting Status Notice which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

1.    **The Third-Party Release Is Wholly Consensual and Is Appropriate.**

105.    The Plan provides for the Releasing Parties' release of the Released Parties to the extent set forth in the Plan (the "Third-Party Release").[163]  The U.S. Trustee objects to the Plan's Third-Party Release, arguing that it is not consensual.[164]  The Debtors disagree and believe the Third-Party Release is appropriate and consensual.  Courts in the Third Circuit routinely approve such release provisions if, as here, they are consensual and appropriately tailored.[165]  The

---

[162]    Voting Report, Ex. A.

[163]    *See* Plan, Art. VIII.D.

[164]    U.S. Trustee Objection, ¶ 39.

[165]    *See, e.g., In re Indianapolis Downs,* 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (same); *In re Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105, 111 (Bankr. D. Del. 1999) (approving non-debtor releases for creditors that voted in favor of the plan); *In re Mallinckrodt PLC*, 639 B.R. 837, 877 (Bankr. D. Del. 2022) (approving third-party release that applied to shareholders deemed to reject the plan and unsecured creditors who were unimpaired or who did not return a ballot with the opt out box checked or otherwise submit an opt out form as consensual).

determination as to whether a third-party release is consensual depends on the particular circumstances at issue in a particular case.[166]  Affirmative consent to a third-party release is not required for such release to be "consensual."[167]  Rather, a third-party release is consensual against non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail to do so.[168]  Courts recognize that "shareholders and creditors have an obligation to read their mail."[169]

106.    Here, all parties in interest had ample opportunity to evaluate and opt out of the Third-Party Release.  For example, stakeholders in the Voting Classes had notice and opportunity to "opt out" of the Third-Party Release by checking the appropriate box on the Ballots, and an overwhelming percentage of stakeholders voted in favor of the Plan, including the Third-Party Release.  As described above, the Claims and Noticing Agent served the Solicitation Packages as instructed, which included services to beneficial equity holders,[170] the Publication Notice (as defined in the Disclosure Statement Order) was published in *The New York Times* and the *Financial Times*,[171] and the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines* was posted to the website maintained by the Claims and Noticing Agent in these Chapter 11 Cases.

---

[166]    *See In re Indianapolis Downs*, 486 B.R. at 305.

[167]    *See id.*; *U.S. Bank*, 426 B.R. at 144.

[168]    *See In re Indianapolis Downs*, 486 B.R. at 305–06; *U.S. Bank*, 426 B.R. at 144.

[169]    *In re Mallinckrodt*, 639 B.R. at 880 (quoting *In re EV Energy Partners*, No. 18-10814, Hr'g Tr. at 214 (Bankr. D. Del. May 16, 2018) ("[S]hareholders and creditors have to read legal notices; that's just the way it is. And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.")); *see also In re Arsenal Intermediate Holdings, LLC,* No. 23-10097 (CTG), 2023 WL 2655592, at *7 (Bankr. D. Del. Mar. 27, 2023) ("[T]he creditor who throws away the plan unopened is barred from arguing that the third-party release failed to meet the *Continental* standard.").

[170]    *See Affidavit of Solicitation* [Docket No. 592].

[171]    *See Affidavits of Publication* [Docket Nos. 572, 573].

107.    Furthermore, all voting stakeholders have certified that they read and understood the election they were making in the Ballot.  All non-voting stakeholders were given the opportunity to opt out of the Third-Party Release and received notice and instructions for doing so in their applicable Non-Voting Status Notice.  Such stakeholders could opt out by checking the appropriate box on the Non-Voting Status Notice or objecting on or before the Opt Out Deadline (November 7, 2023, at 4:00 p.m., prevailing Eastern Time).  221 parties, including 190 Holders of Existing Equity Interests holding approximately 5.4 million shares, have exercised their right to opt out of the Third-Party Release, so these measures clearly worked.[172]  For these reasons, and as courts in New Jersey, the Third Circuit, and across the country have held,[173] the Third-Party Release is consensual as to all creditors and interest holders who did not opt out or object, including those deemed to reject the Plan.[174]

### 2.    The Debtor Release Is Appropriate.

108.    Article VIII.C of the Plan also provides for releases by the Debtors, their Estates, the Post-Effective Date Debtors, and the Plan Administrator of Claims and Causes of Action against each Released Party (the "Debtor Release").  The Debtors filed, concurrently with this Memorandum the Meltzer Declaration and the Koza Declaration, both of which support the need

---

[172] *See* Voting Report, Ex. A.

[173] *See, e.g.*, *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote), were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. For Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same).

[174] The U.S. Trustee objected to the Third-Party Release.  The Debtors respond to the U.S. Trustee's objection in section IV.A.

for the Debtor Release.[175]   The Debtors submit that the Debtor Release is a vital component of the

Plan, a sound exercise of the Debtors' business judgment, and it should be approved.

109.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may

provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the

estate."[176]   A debtor may release claims under section 1123(b)(3)(A) "if the release is a valid

exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the

estate."[177]

110.    Courts in this jurisdiction and elsewhere generally analyze five factors when

determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage*

factors.[178]   The analysis includes an inquiry into whether there is:  (1) identity of interest between

---

[175]   *See* Meltzer Decl. ¶¶ 21–29; Koza Decl. ¶ 51.

[176]   *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3)."). Generally, courts in the Third Circuit will approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). Additionally, the Third Circuit has held that, to approve a settlement pursuant to Rule 9019, the court must balance:  "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'"  *In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)). In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").

[177]   *U.S. Bank*, 426 B.R. at 143; *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[178]   *See In re Indianapolis Down*, 486 B.R. at 303 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994). The *Master Mortgage* factors have been adopted by the Third Circuit, including application by the Bankruptcy Court of the District of New Jersey as "neither exclusive nor conjunctive requirements, but . . . guidance in the Court's determination of fairness."  *See In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Wash. Mut.*, 442 B.R. at 346).

the debtor and non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the plan; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[179]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[180]  The Debtor Release easily meets the applicable standard and should be approved.

111.    *First*, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been highly unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan (or to participate in the ultimate implementation of it) without the Debtor Release.  For example, the Purchaser required the release of Avoidance Actions and the release of claims against certain other stakeholders as part of the negotiation of the Purchase Agreement.  Moreover, with respect to certain of the releases—*e.g.*, those releasing the Debtors' current and former directors and officers—there is a clear identity of interest supporting the releases because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Post-Effective Date Debtors and/or the Plan Administrator.[181]  The Debtor Release provides finality to those parties critical to effectuating the Sale Transaction and to the wind down efforts of the Debtors, underpins the settlement and compromise of issues achieved by the Plan,

---

[179]  *See In re Wash. Mut.,* 442 B.R. at 346 (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110; *In re Master Mortg.*, 168 B.R. at 937).

[180]  *Id.* at 346 (citing *In re Master Mortg.*, 168 B.R. at 935).

[181]  *See In re Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

maximizes value for creditors, and actually permits the Estates to consummate the Plan; therefore, the inclusion of the Debtor Release inures to the benefit of all the Debtors' stakeholders.

112.    **Second**, the substantial contributions are clear.  As courts in this jurisdiction have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[182]    For example, without the Debtor Release, it is highly unlikely that the DIP Lenders would have been willing to provide the DIP Facility, which injected $150 million of new money to fund the Debtors' operations during these Chapter 11 Cases.[183]    Likewise, the Purchaser is a Released Party.   The Purchaser has proposed, negotiated in good faith, and ultimately, will consummate the value-maximizing Sale Transaction for the benefit of the Debtors, their Estates, and all parties in interest.  As discussed at length herein, the Sale Transaction is the central feature of the Plan that the Debtors propose to confirm, which certainly constitutes a substantial contribution.[184]    Additionally, the Consenting Sponsor and the Debtors' directors, officers, professionals, and other agents have been instrumental in negotiating, formulating, and

---

[182]    *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring, (b) plan sponsor funded the plan and agreed to compromise its claim, and (c) a committee negotiated the plan and assisted in the solicitation of its constituents); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (finding non-debtor party had substantially contributed where non-debtor parties entered into a settlement where non-debtor parties agreed to reduce their claim); *In re Long Ridge Road*, 2014 WL 886433, at *14 (finding that the non-debtor party had substantially contributed by providing financial support, without which the plan would not be feasible).

[183]    *See In re Midway Gold US, Inc.*, 575 B.R. 475, 510 (Bankr. D. Colo. 2017) (finding that without the contributions of the third parties being granted releases by the debtors, which include the provision of financing for the chapter 11 cases and consent to the use of their cash collateral by the debtors, the chapter 11 cases would not likely have reached confirmation); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) ("[T]he releases are an integral part of the agreement with the [non-debtor parties] to finance the chapter 11 cases and to fund the [p]lan.").

[184]    *See In re Long Ridge Road*, 2014 WL 886433, at *14 (finding that providing funding so as to provide distributions to claimants under the plan was a substantial contribution); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (same).

implementing both the RSA and the restructuring transactions contemplated by the Plan.[185]  In the absence of these parties' contributions, for which the Debtor Release was a material inducement, the Debtors would not have the substantial support of voting creditors, and the transactions contemplated by the Plan would not be possible.  The Debtor Release, therefore, is essential to the Debtors' restructuring.

113.    ***Third***, the Debtor Release is essential to the success of the Debtors' Plan.  Absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan, and highly unlikely that the RSA, the Purchase Agreement, or the Plan would exist at all.[186]  As described above, each Released Party contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors subject to a Special Committee investigation.  In the absence of Released Parties' support, the Debtors would not be in a position to confirm the Plan, consummate the Sale Transaction, implement the Plan, and maximize value for creditors.  The Debtor Release, therefore, is essential to the Debtors' Restructuring Transaction.

114.    ***Fourth***, as evidenced by the Voting Report and discussed herein, the Debtors' stakeholders overwhelmingly support the Plan.  Every single Voting Class voted to accept the Plan, with 100 percent of Holders of First Lien Claims who voted, 100 percent in amount of First

---

[185]    *See Su v. Offshore Investment Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by . . . facilitating the debtor's reorganization."); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring and (b) plan sponsor funded the plan and agreed to compromise its claim); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 757–58 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the special committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders").

[186]    *See* Koza Decl. at ¶ 51.

Lien Claims who voted, approximately 95 percent of General Unsecured Claims who voted, and approximately 85 percent in amount of General Unsecured Claims who voted accepting the Plan.[187]  Given the critical nature of the Debtor Release, the degree of consensus evidences the Debtors' stakeholders' support of the Debtor Releases and Plan.

115.    *Fifth*, the Plan provides for meaningful recoveries for creditors in exchange for, among other things, the Debtors giving up potential claims that would range from weak to frivolous under the releases.  As demonstrated by the Liquidation Analysis,[188] the ranges of recoveries for Holders of Claims and Interests are materially higher under the Plan than they would have been in a chapter 7 liquidation scenario.[189]  The Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

116.    Furthermore, the Debtors, through the Special Committee of the Board (the "Special Committee"), conducted an independent investigation with respect to potential claims or causes of action of the Debtors, if any, against the Related Parties[190] (the "Independent Investigation").[191]  In furtherance of the Independent Investigation, the Special Committee issued document and information requests to, among others, the Debtors and certain of the Debtors' significant equity holders.  In total, counsel to the Special Committee received and reviewed approximately 4,300 documents, comprising approximately 49,100 pages, relevant to the

---

[187]    *See* Voting Report, Ex. A.

[188]    [Docket No. 492].

[189]    *See* Koza Decl. at ¶ 39.

[190]    For the purposes of the Independent Investigation, "Related Party" means the Company or any of its equity holders, affiliates, subsidiaries, directors, managers, officers, or other stakeholders.

[191]    *See* Meltzer Decl. ¶ 6.

Independent Investigation.[192]  Counsel to the Special Committee also interviewed certain members of Company management and board of directors, as well as representatives of certain of the Debtors' significant equity holders.

117.    Throughout the Independent Investigation, the Debtors worked closely with their advisors, in consultation with other parties in interest, to analyze whether to pursue, release, retain, or settle all potential estate claims.[193]  The Committee also conducted its own parallel investigation of potential claims and causes of action held by the Debtors' Estates and engaged in informal discovery with the Debtors.  The Special Committee concluded that the Debtors' Estates do not have viable causes of action against Related Parties that are worthy of pursuit, particularly in the context of the value-maximizing Plan and underlying Sale Transaction supported with material contributions by the Related Parties.[194]  No objector presents any argument to the contrary, and the fact that after making a meaningful expenditure on behalf of creditors in its own parallel investigation, the Committee now fully supports the Plan, speaks volumes.

118.    For the reasons set forth above, and as supported by the Meltzer Declaration and the Voting Report, the *Zenith* factors support approval of the Debtor Release.  The Debtors have easily satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release is fair, reasonable, overwhelmingly supported by creditors, and in the best interests of the Debtors' Estates.  For these reasons, the Debtors' agreement to provide the Debtor Release

---

[192]    *See id.* ¶ 16.

[193]    *See id.* ¶ 7.

[194]    *See id.* ¶ 19.

is in the best interests of creditors and all stakeholders and is an integral part of the Plan. The
Debtor Release should be approved.[195]

### 3.    The Exculpation Provision Is Appropriate.

119.    Article VIII.E of the Plan provides that each Exculpated Party shall be released and
exculpated from any causes of action arising out of acts or omissions in connection with these
Chapter 11 Cases and certain related transactions, except for acts or omissions that are found to
have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation").
The Exculpation is intended to prevent collateral attacks against estate fiduciaries that have acted
in good faith to help facilitate the Debtors' restructuring. The Exculpation is an integral part of
the Plan and otherwise satisfies the governing standards in the Third Circuit. This provision
provides necessary and customary protections to estate fiduciaries whose efforts were and continue
to be vital to implementing the Plan.

120.    Courts evaluate the appropriateness of exculpation provisions based on a number
of factors, including whether the plan was proposed in good faith, whether liability is limited, and
whether the exculpation provision was necessary for plan negotiations.[196] Exculpation provisions
that are limited to claims not involving a criminal act, actual fraud, willful misconduct, or gross
negligence, are customary and generally approved in this district under appropriate
circumstances.[197] Unlike third-party releases, exculpation provisions do not affect the liability of

---

[195]   The Debtors' respond to the U.S. Trustee's objection against the Debtor release in section IV.B.

[196]   *See In re Congoleum Corp.*, 362 B.R. 167, 195–97 (Bankr. D.N.J. 2007) (evaluating the appropriateness of the plan's exculpation provisions based on whether the parties played a significant role in the negotiations that led to the plan and whether the exculpation is necessary to the plan).

[197]   *See In re Wash. Mut., Inc.,* 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming plan where exculpation provision covered the debtors and wind down debtors, the creditors' committee, and related parties, including current and former control

third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[198]  Exculpation for parties participating in the Plan process is appropriate where Plan negotiations could not have occurred without protection from liability.[199]

121.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.[200] Moreover, the Exculpation provision and the liability standard it sets represent a conclusion of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals. Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

---

persons and professionals); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same).

[198]    *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[199]    *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

[200]    *See* Meltzer Decl. ¶ 30.

122. Here, the Debtors and their officers, directors, and professionals actively negotiated the Plan with the Committee and others.[201] Such negotiations were extensive, and the resulting Committee Settlement, embodied in the Plan, will maximize value for all stakeholders, and enable the Debtors to emerge swiftly from chapter 11 while giving finality to all stakeholders. Furthermore, the Exculpation provision is limited to acts during these Chapter 11 Cases and does not extend beyond such time period. Accordingly, the Bankruptcy Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

123. The U.S. Trustee took issue with the Exculpation Provision, asserting that (a) the "Exculpated Parties" included "numerous entities that are not fiduciaries of the estate" and (b) the inclusion of the Plan Administrator within such definition was not permissible because it did not exist during the time period addressed by the Exculpation Provision.[202] To resolve the U.S. Trustee's concerns, the Debtors narrowed the definition of "Exculpated Parties" as requested.

124. Under the circumstances, it is appropriate for the Bankruptcy Court to approve the Exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[203]

### 4. The Injunction Provision is Appropriate

125. The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Persons and Entities from commencing or pursuing any Cause of Action against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the

---

[201] *See id.*

[202] *See* U.S. Trustee Objection ¶ 24.

[203] *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, or arising out of a Claim or Cause of Action discharged, released, exculpated, or settled under the Plan.  Thus, the Injunction Provision is a necessary part of the Plan precisely because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.[204] Further, the injunction provided for in the Plan is narrowly tailored to achieve its purpose.

126.    The U.S. Trustee objected to the Debtor discharge contained within the Injunction Provision.[205]  To resolve this issue, the Debtors narrowed the period in which Entities subject to the Injunction Provision are enjoined.  To the extent the Bankruptcy Court finds that the Plan's exculpation and release provisions are appropriate, the Bankruptcy Court should approve the Injunction Provision.[206]

127.    The Debtors submit that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code.  In light of the foregoing, because the Plan fully complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

## IV.    The Objections Should Be Overruled.

128.    The Debtors received nine formal objections to Confirmation of the Plan, as described in **Exhibit A**.  As of the filing of this Memorandum, the Debtors have resolved certain of the formal and informal Objections received.  The Debtors continue to work diligently with all

---

[204]  *See SEC v. Drexel Burnham Lambert Grp. (In re Drexel Burnham Lambert Grp.)*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve an injunction provision where such provision "plays an important part in the debtor's reorganization plan").

[205]  U.S. Trustee Objection ¶¶ 54–56.

[206]  The Debtors respond to the U.S. Trustee's remaining Injunction Provision objection in Section IV.C.

objecting parties and resolve their remaining Objections before the commencement of the Confirmation Hearing. The U.S. Trustee's Objection has been substantially narrowed and it is the Debtors' understanding that the only remaining issues are the propriety of the Third-Party Release, the Debtor Release, and the "gatekeeper" provision. As discussed below, the U.S. Trustee's Objection should be overruled.[207]

### A.    The Third-Party Release Is Consensual and Appropriate.

129.    The Third-Party Release is a consensual, narrowly tailored release that benefits, and is in exchange for, the Released Parties' substantial contributions to the Debtors' reorganization. The U.S. Trustee, however, has objected on the grounds that the Third-Party Release is not consensual.[208]    In an effort to alleviate some of the U.S. Trustee's concerns, the Debtors agreed to make certain revisions to the definition of "Released Party" to reflect that any Holders of Claims that were not sent a Ballot or Opt Out Form are not a Released Party. The Debtors understand that this has resolved the U.S. Trustee's objection to the inclusion of Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided for in the Plan as a "Releasing Party."[209]

130.    Notwithstanding the U.S. Trustee's remaining concerns, the Third-Party Release complies with Third Circuit law and is supported by the facts and circumstances of these Chapter 11 Cases. The Bankruptcy Court unambiguously has the authority to approve the Third-Party Release, and courts in this district, other courts in the Third Circuit, and courts across

---

[207]    The Debtors continue to engage with certain parties regarding language to be included in the Confirmation Order to resolve such parties' objections. To the extent not resolved prior to the Confirmation Hearing, the Debtors are prepared to present oral argument in response to the Objections.

[208]    *See* U.S. Trustee Objection ¶¶ 39–45.

[209]    *See id.* ¶¶ 46–48.

the country routinely exercise that authority by confirming plans containing third-party releases similar to those contained in the Plan.[210]

131.    The Third-Party Release is consensual.  The U.S Trustee's contention that the Third-Party Release is not consensual is belied by the plain language of the Plan, robust service of Bankruptcy Court-approved notices to Holders of Claims and Interests, and the fact that 221 parties in interest, including 190 Holders of Existing Equity Interests, have availed themselves of the opt out mechanism to opt-out of the Third-Party Release.  The law is clear that a release is consensual where parties have received sufficient notice of a plan's release provisions and have had an opportunity to object to or opt out of the release and failed to do so (including where such holder abstains from voting altogether).[211]  The Debtors clearly and explicitly included the full text of the Third-Party Release in the Confirmation Hearing Notice, the Ballots, the Opt-Out Form, and the Non-Voting Status Notice, which were sent to all creditors and equity holders, as applicable, and

---

[210]    *See, e.g.*, *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote) were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. For Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same).

[211]    *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218–19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third-Party Release provision consensual and within the scope of releases permitted in the Second Circuit.") *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010); *In re Conseco, Inc*., 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release.  Therefore, the Article X release is purely consensual and within the scope of releases that Specialty Equipment permits.").

explicitly alerted such parties (i) of the deadlines to vote on and object to the Plan and (ii) that unless a party expressly opts-out, it shall be deemed a Releasing Party under the Plan.[212] Accordingly, all stakeholders had proper notice of their rights and could have chosen to object to the release, opt-out of the release, or object to confirmation of the Plan.

132.    Further, because the Third-Party Release applies only to Holders of Claims or Interests that vote affirmatively for the Plan or do not opt out, it is consensual under the weight of authority (in this district and others) of what constitutes consent in the context of a third-party release.[213]    Generally, voting in favor of a plan is sufficient to demonstrate consent to any third-party release contained therein.[214]

133.    Recently, in *In re Bed Bath & Beyond Inc.*, the Debtors sought approval of a plan that included an opt-out mechanism for holders of claims deemed to accept the Plan or those who

---

[212]    *See Affidavit of Solicitation.*

[213]    *In re RCS Cap. Corp.*, No. 16-10223 (MFW), Hr'g Tr. 59:21–60:2 (Bankr. D. Del. Mar. 21, 2016) ("[T]here's enough affirmative action required to allow the mechanism the debtor is suggesting because it's clear in the ballot that, if they vote yes on the plan, they are granting a release.  If a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote.  So I think affirmatively voting on the plan is enough action to be an acceptance of third-party releases"); *In re Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved.").

[214]    *See, e.g.*, *In re Coram Healthcare Corp., Inc.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("To the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the [creditors], they are bound by that."); *In re Zenith Elecs. Corp.*, 241 B.R. 92 111 (Bankr. D. Del. 1999) (finding that a third-party release binds those voting in favor of the plan); *see also In re Specialty Equip. Cos., Inc.*, 3 F. 3d 1043, 1047 (7th Cir. 1993) ("Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors.  It binds only those creditors voting in favor of the plan of reorganization."); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) (holding that releasing parties "should include creditors who voted in favor of the Plan" and that "case law in this District and elsewhere supports the conclusion that the creditors' vote for the Plan constitutes a consent to the releases.").

voted to reject the plan but who did not opt out.[215]  The court overruled the U.S. Trustee's objection

to the third-party releases, holding that:

> The requirement to check a box electronically or on paper is minimal. It's a minimal task to preserve one's rights when faced with the need to protect one's interests. Within the law, we expect that of parties all the time… What is essential, though, is that the parties be given notice of that obligation. That is critical. And here there can be no question that there was adequate clear and conspicuous notice. The obligation to affirmatively opt out appears in the plan, in the disclosure statement, in the ballots. It should come as no surprise. And I'll note, anecdotally, again, we seem to accept a very low threshold for notice these days. You can scroll through on your phone an agreement and just scrolling through is deemed it gives you sufficient notice. Anybody who watches TV sees the tiniest of print, disclaimers, boilerplate, that last on a screen for 25 milliseconds and that's deemed sufficient notice. Let alone, those who listen on a radio and hear voice overs do disclaimers that are virtually incomprehensible they're so quick. This is not the situation here with these notices. Again, they've been conspicuous. They've been clear. There's transparency and I don't view it as burdensome in order to protect their interests. The ability to opt out and pursue claims exists. It takes the simple task of reading a document, either digitally or in paper, and exercising opt out. So, I'm overruling the objections consistent with prior ruling within this circuit, prior rulings within this court and, specifically prior cases that I've had.[216]

134.    Similarly in *In re BlockFi Inc.*, the Debtors also sought approval of a plan that

included an opt-out mechanism.[217]  "Releasing Parties" under the *BlockFi* Plan was defined to

include "all Holders of Claims that are deemed to accept the Plan and who do not affirmatively

opt out of the releases provided by the Plan; . . . all Holders of Claims who abstain from voting on

the Plan and who do not affirmatively opt out of the releases provided by the Plan [and] . . . all

Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases

---

[215]   *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023).

[216]   *Id.*, Hr'g Tr. at 38–40 (Bankr. D.N.J. Sept. 12, 2023).

[217]   *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Aug. 3, 2023).

provided by the Plan."[218]  Again, the court overruled the U.S. Trustee's objection to the third-party

releases, holding that:

> This court, I, as well as my colleagues within the district,
> have approved opt-out releases, the lynchpin being the
> proper notice.  And in here, there's no question, in this
> court's view, that there is proper notice to the creditor body
> at large, to the stakeholders, through a hearing notice,
> through a disclosure statement, through a plan which has
> language advising the parties of the ability to opt out and the
> need to opt out to preserve their rights.  Beyond that, there
> are websites which – with pages addressing the issues that
> were put together by the debtor.  There were the plan and
> disclosure statement which had that language.  There's the
> ballot that had the language.  There was the solicitation letter
> drafted by the Committee explaining the process to creditors.
> There is no question that creditors were placed on proper
> notice.[219]

135.    Nevertheless, the U.S. Trustee asserts that the Third-Party Release is

non-consensual as to holders of equity that receive no recovery under the plan unless such holders

are required to "opt-in" to the releases.  The U.S. Trustee's objection is misplaced and

mischaracterizes the weight of authority in the Third Circuit that has approved opt-out

procedures.[220]  "[S]hareholders and creditors have an obligation to read their mail."[221]

136.    In *In re RTW Retailwinds, Inc*, this Bankruptcy Court approved opt-out releases as

consensual releases for all classes, except for holders of equity interests that were not entitled to

---

[218]   *Id*. at [Docket No. 1309].

[219]   *In re BlockFi Inc.*, Hr'g Tr. at 109 (Bankr. D.N.J. Sept. 26, 2023).

[220]   *Cf. In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (recognizing that not inferring consent from the nonresponsive creditors and equityholders "is a minority [position] amongst the judges in this District").

[221]   *Id*. at 880 (quoting *In re EV Energy Partners*, No. 18-10814 (CSS), Hr'g Tr. at 214 (Bankr. D. Del. May 16, 2018) ("[S]hareholders and creditors have to read legal notices; that's just the way it is.  And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.")).

any recovery under the plan.[222]  With respect to the holders of equity interests that were not entitled to any recovery, this Bankruptcy Court ultimately concluded that "what the Debtors are asking me to do is to take *Indianapolis Downs* one step further.  And rule that investors who are getting nothing under the plan should be deemed to have released the released parties under the plan, just because they didn't opt out. . . .  I'm not going to go any further than *Indianapolis Downs* went. . . . I'm inclined to reject the releases by the investors across the board."[223]  It should be noted that the court the *Indianapolis Downs* did not consider whether opt-out releases for holders of equity interests that were not entitled to any recovery under the plan were consensual.  The third-party release provision did not apply to any such equity holders and the court held that the shareholders who objected to the third-party releases lacked standing.[224]  Further, since this Bankruptcy Court's ruling in *RTW Retailwinds* numerous courts across the country have approved of opt-out releases for deemed rejecting stakeholders, including holders of public equity, based on the facts and circumstances of each case.[225]

137.    The latest opinion on this topic came over a year after *RTW Retailwinds*, when, in *In re Mallinckrodt*, the court approved as consensual third-party releases by public equity holders

---

[222]  No. 20-18445 (JKS), Hr'g Tr., 43:3–5 (Bankr. D. N.J. Feb. 2, 2021).

[223]  *Id.* at 81:17–18, 82:5–6, 83:3–4.

[224]  *See In re Indianapolis Downs,* 486 B.R. at 304.

[225]  *See, e.g., In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote), were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. for Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same).

based on an opt-out mechanism.  There, the plan sought to release claims held by equity holders deemed to reject the plan and that did not opt-out of the third-party releases.[226]  The U.S. Trustee objected to the appropriateness of the releases on the grounds that the opt-out procedures did not result in consensual releases insofar as such claimants were deemed to reject the plan.[227]  The *Mallinckrodt* court overruled the U.S. Trustee and found that the opt-out releases by deemed to reject public equity holders was appropriate and consensual, noting that:

> The notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system.  When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them.  Within the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim.  Additionally, if a claim objection is filed and the claimant fails to respond, the claim is disallowed.  There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization.[228]

138.    The *Mallinckrodt* court and others recognize that "shareholders and creditors have an obligation to read their mail."[229]  Similar to equity holders in *Mallinckrodt* that had an obligation to act in response to the opt-out form should they decide to opt-out of the third-party release, so

---

[226]    *See In re Mallinckrodt*, 639 B.R. at 877.  While *Mallinckrodt* also involved non-consensual releases of mass tort and opioid claims, the case also involved consensual releases by deemed to reject equity holders.  Further, while several appeals to the *Mallinckrodt* confirmation order remain outstanding, none challenge the consensual releases by deemed to reject equity holders.

[227]    *See id.* at 878.

[228]    *Id*. at 879.

[229]    *Id.* at 880 (quoting *In re EV Energy Partners*, No. 18-10814 (CSS), Hr'g Tr. at 214 (Bankr. D. Del. May 16, 2018) ("[S]hareholders and creditors have to read legal notices; that's just the way it is.  And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.")); *see also In re Lannett Co.*, No. 23-10559 (JKS) Hr'g Tr., 36:2–8 (Bankr. D. Del. June 8, 2023) ("As I and others on this Cour[t] have previously ruled, when a disclosure is prominent and conspicuous an[] opt-out mechanism is a valid means of obtaining consent.  It is incumbent on effected parties who have been properly served to protect their own rights. Parties that fail to act in response to a judicial process are routinely bound by the results of the process.").

too do Holders of Claims and Interests against the Debtors; they must act to opt out of the Third-Party Release. Contrary to the U.S. Trustee's assertions,[230] where, as here, creditors and equity holders have received broad actual and constructive notice of the Third-Party Release that explains in no uncertain terms that action is required to preserve claims, there is no reason to differ from the result reached by the *Mallinckrodt* court.

139. The specific facts and circumstances present here warrant following *Mallinckrodt* and numerous other recent cases and approving the third-party releases with respect to equity holders as consensual. First, here, unlike in *RTW Retailwinds* or *Indianapolis Downs*, Holders of Equity Interests, along with other parties bound by the Releases, will receive a mutual release in exchange for granting a release under the proposed Plan. Releases by deemed rejecting stakeholders are consistently approved by courts in the Third Circuit where, like here, the releases are mutual.[231] This approach is consistent with releases approved by bankruptcy courts in this district, other courts in the Third Circuit, and in courts across the country.[232] Unlike the releases in *RTW Retailwinds*, the mutuality of such releases—a "proverbial

---

[230]  U.S. Trustee Objection ¶ 39.

[231]  Courts in the Third Circuit have consistently ruled that opt outs mechanisms for deemed rejecting equity holders are appropriate where there is mutuality in the releases. *See, e.g.*, *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (confirming plan where third-party releases were given by deemed rejecting equity holders in exchange for releases); *In re Lannett Co.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same).

[232]  *See, e.g.*, *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote), were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. For Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same).

peppercorn-for-peppercorn"[233]—provides adequate consideration to parties that are not receiving any recovery under the Plan for the Bankruptcy Court to conclude that such party's failure to opt-out is evidence of consent.

140.    Second, *RTW Retailwinds* lacked a restructuring support agreement and thus lacked any kind of negotiated deal at the outset of its chapter 11 cases.  Here, the Debtors entered into an RSA on May 4, 2023, which ultimately had the support of 86% of the Holders of First Lien Claims and the Consenting Sponsors.  Without the Third-Party Release, the Debtors' key stakeholders would not have been willing to support the highly consensual and value-maximizing restructuring process that followed entry into the RSA.  This restructuring process ultimately provided a meaningful recovery to unsecured creditors and a value-maximizing sale transaction for the benefit of all creditors.  For instance, the RSA that served as the basis for the Plan is supported by the Consenting Sponsors, who negotiated and agreed to the comprehensive deal embodied in the RSA that contemplated no recovery on account of their equity interests.[234]   Additionally, the Third-Party Release was a critical component in negotiating the Asset Sale, which is the central component of the Plan. The Purchaser would have been unlikely to agree to the value-maximizing Sale Transaction if the Purchaser or the Debtors' employees, current and former officers and directors, vendors, and other stakeholders were subject to post-emergence litigation.

141.    Finally, unlike in *RTW Retailwinds* and *Indianapolis Downs*, the Debtors, through the Special Committee, have conducted an extensive Independent Investigation into prepetition transactions, which concluded that the Debtors' Estates do not have viable causes of action against

---

[233]   *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI), Hr'g Tr. 244:16–18 (Bankr. S.D. Tex. Apr. 4, 2018) ("I simply find that this is, in effect, the proverbial peppercorn-for-peppercorn and that is adequate consideration for the release, given its mutuality.").

[234]   *See* Koza Decl. ¶ 53.

Released Parties that are worthy of pursuit during these Chapter 11 Cases, particularly in the context of the value-maximizing Plan and underlying Sale Transaction supported with material contributions by the Related Parties.[235]  While the primary focus of the Independent Investigation was on potential Debtor claims (and thus also support the Debtor releases as described further herein), the fact that the investigation uncovered no meritorious claims supports the notion that equity holders are unlikely to hold valuable claims that they are unwittingly releasing by failing to exercise their right to opt-out.  Where, as here, the Consenting Sponsors and directors and officers agree to support a restructuring process for the benefit of creditors and support the approval of a Special Committee to investigate their prior acts and transactions, courts should approve consensual, mutual third-party releases that are consistent with numerous other confirmed plans across the country.[236]

142.    This conclusion is appropriate whether as a matter of contract law or based on general principles of notice and procedures under the Bankruptcy Code and Bankruptcy Rules. For example, in *In re Extraction Oil and Gas*, the Debtors sought approval of a plan that included an opt-out mechanism.[237]  "Releasing Parties" under the Plan was defined to included "holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting

---

[235]    *See* Meltzer Decl. ¶ 17.

[236]    *See, e.g., In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote), were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. For Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same).

[237]    *In re Extraction Oil and Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. 2020).

the releases set forth therein," which included equity holders who were deemed to reject the

plan.[238]  The court overruled the U.S. Trustee's objection to the third-party releases, holding that:

> Very importantly, these are consensual releases, these are not
> nonconsensual releases.  I have repeatedly ruled that you can imply
> consent by failing to opt out or respond to a plan, either through a
> ballot or on the docket, that calls for a release.  I don't believe this
> is necessarily a contractual point . . . as much as it is a point of notice
> under the Bankruptcy Code and the Bankruptcy Rules, because it's
> the plan that serves as the mechanism to have the release take effect
> and, thus, it's really the rules, the Federal Rules of Bankruptcy
> Procedure that figure out whether someone has achieved proper
> notice and has, by not responding, given their implied consent.
> Importantly, the Supreme Court recently, in the context of whether
> someone is consenting to the Article III jurisdiction of an Article I
> court, specifically held that you could imply consent by failure to
> preserve the right to argue that I don't have Article III powers.  This
> is no different.  This is a court who set up a mechanism to confirm
> a plan that contains releases and has provided a noticing mechanism
> under which, if it's complied with, consent can be implied.[239]

143.    Here, the conspicuous nature of the Confirmation Hearing Notice, the Ballots, and

the Non-Voting Status Notice, which explicitly included the full text of the releases, exculpation,

and injunction provision as set forth in the Plan, provided the creditors and equity holders with

ample notice and opportunity to opt-out of the Third-Party Release.  The Debtors gave their

creditors and equity holders abundant "reason to understand that assent may be manifested by

silence or inaction" and that their silence enables "the Court to infer consent" to the

Third-Party Release.[240]

144.    In its objection, the U.S. Trustee relies on a number of cases for the proposition that

some courts in the Third Circuit and in this district have determined that third-party releases of

---

[238]    *Id.* at [Docket No. 1509].

[239]    *Id.*, Hr'g Tr. at 80–81 (Bankr. D. Del. Dec. 22, 2020).

[240]    *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019)
(citing Restatement (Second) of Contracts § 19 (Am. Law Inst. 1981)).

non-debtors should be allowed only to the extent the releasing parties have given affirmative consent.  The U.S. Trustee's reliance on these cases is misplaced.

145.    First, in *In re Emerge Energy*, the court specifically recognized that its holding is "a minority amongst the judges of this District,"[241] and is inconsistent with this Bankruptcy Court's ruling in *RTW Retailwinds*.  For that reason alone, it is unpersuasive.  However, even under the test set out in *Emerge Energy*, the third-party release here is appropriate.  Courts in the Third Circuit have indicated that the analysis of third-party releases is case specific, and the silence of a party that is deemed to reject a plan can be considered consent.[242]  The *Emerge Energy* court stated that it may infer consent to third-party releases from "nonresponsive creditors and equity holders" if the Debtors "show under basic contract principles that the Court may construe silence as acceptance because . . . [among other reasons (a)] the Debtors gave the creditors and equity holders reason to understand that assent may be manifested by silence or inaction, and [(b)] the creditors and equity holders remained silent and inactive intending to accept the offer."[243]

146.    Both of these requirements are met here.  As discussed above, the Debtors gave equity holders every reason to understand that assent may be manifested by silence or inaction. The Confirmation Hearing Notice, Opt-Out Forms, and Non-Voting Status Notice conspicuously described to holders of Existing Equity Interests that they would be bound by the Third-Party Release if they did not check the box labeled "opt out" on the applicable Opt-Out Form or Non-Voting Status Notice and timely return the form.  Notably, the Debtors received 190 equity

---

[241]    *Id.* at *18.

[242]    *In re Mallinckrodt PLC*, No. 20-12522 (JTD), Hr'g Tr. (June 16, 2021), 14: 4–7 ("I am aware of Judge Owens decision in Emerge.  At this point my view is, as I said, this all depends on the facts and circumstances and how this is played out in the solicitation process.").

[243]    *In re Emerge Energy*, 2019 WL 7634308, at *18.

holders opt-out forms electing to opt-out of the Third-Party Release, demonstrating that the Opt-Out Forms and Non-Voting Status Notices provided clear and conspicuous instructions and that holders of Existing Equity Interests understood that their silence would be taken as consent.[244]

147.    As to the second requirement, despite the conspicuous descriptions of the Third-Party Release on the Opt-Out Forms and Non-Voting Status Notice (and other notices concerning these cases), in light of the fact that some Holders took action to protect their rights, those Holders that remained silent and inactive demonstrated that they determined not to exercise their right to opt out of the Third-Party Release.  While the U.S. Trustee suggests that the opt-out mechanism takes advantage of creditors and shareholders that may be asleep at the proverbial wheel, that argument mischaracterizes the reality that the Holders of Existing Equity Interests are not helpless individuals who involuntary or unknowingly became associated with the Debtors.  To the contrary, such holders are investors who intentionally and affirmatively chose to purchase the Debtors' stock and become subject to all the rights—and responsibilities—that come with being an investor, including responsibilities such as reading and responding to legal notices as appropriate.[245]

148.    Second, while the U.S. Trustee correctly notes that in *In re RTW Retailwinds, Inc.* this Bankruptcy Court expressed hesitation with a release construct whereby impaired holders of equity interests that were not entitled to any recovery under the Plan or a mutual release were required to opt out rather than opt-in, the circumstances here are different.[246]  As discussed in

---

[244]    *See* Voting Report, Ex. A.

[245]    *See In re EV Energy Partners*, No. 18-10814 (CSS), Hr'g Tr. at 214:8–12 (Bankr. D. Del. May 16, 2018) (holding that failure to opt out constitutes consent for a release and stating "[i]t's very clear in the notice, you know, shareholders and creditors have to read legal notices; that's just the way it is.  And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.").

[246]    No. 20-18445 (JKS), Hearing Tr., 43: 3-5 (Bankr. D. N.J. Feb. 2, 2021) ("What the Debtors are asking me to do is to take *Indianapolis Downs* one step further.  And rule that investors who are getting nothing under the plan

detail above, here, unlike in *RTW Retailwinds* or *Indianapolis Downs*, Holders of Existing Equity Interests, along with other parties bound by the Third-Party Release, will received a mutual release in exchange for granting a release under the proposed Plan, which provides adequate consideration to parties that are otherwise not receiving any recovery under the Plan.

149.    The law allows for consent by inaction, both as a matter of contract law and based on general principles of notice and procedures under the Bankruptcy Code and Bankruptcy Rules.[247] As observed by former Chief Judge Sontchi, the Plan merely serves as the mechanism to have the Third-Party Release take effect under the Bankruptcy Rules.[248]   Under the Bankruptcy Rules, if there is proper notice, a failure to respond is considered implied consent.[249] Here, proper notice came in the form of the conspicuous nature of the Confirmation Hearing Notice, the Ballots, and the Non-Voting Status Notice, which explicitly included the full text of the releases, exculpation, and injunction provision as set forth in the Plan, and provided the creditors and equity holders with ample notice and opportunity to opt-out of the Third-Party Release.  There is nothing in the record here that suggests that the failure of Holders of Existing Equity Interests to opt out was the result of carelessness, inattentiveness, or mistake on behalf of the Debtors.  Indeed, ***190 such holders*** have chosen to opt-out of the Third-Party Release.[250]

---

should be deemed to have released the released parties under the plan, just because they didn't opt out. . . .  I'm not going to go any further than *Indianapolis Downs* went. . . .  I'm inclined to reject the releases by the investors across the board."). *Indianapolis Downs* did not consider whether opt-out releases for holders of equity interests that were not entitled to any recovery under the plan were consensual. *See In re Indianapolis Downs*, 486 B.R. at 304. The third-party release provision did not apply to any such equity holders and the court held that the shareholders who objected to the third-party releases lacked standing. *See id.*

[247]  For instance, bar-date notices bar claims that claimholders do not timely submit.

[248]  *See In re Extraction Oil and Gas*, Hr'g Tr. at 80–81 (Bankr. D. Del. Dec. 22, 2020).

[249]  *See id.*

[250]  *See* Voting Report Ex. A.

150.    For these reasons, the Third-Party Release is consensual and should be approved and the U.S. Trustee Objection should be overruled.

**B.    The Debtor Release is Appropriate.**

151.    As described above, the Plan effectively establishes that the parties included in the definition of Released Party definition are entitled to such releases under applicable law and the Debtor Release is a vital component of the Plan, a sound exercise of the Debtors' business judgment, and should be approved.

152.    However, the U.S. Trustee objects to the Debtor Release and claims that, pursuant to *In re Genesis Health*, "[i]n considering releases, substantial contributions does not include contributions to the reorganization related to operational restructuring or negotiating for the financial restructuring."[251]    It should be noted that the *Genesis Health* court examined such substantial contributions in the context of nonconsensual releases.[252]   Such nonconsensual releases require a finding that "the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability" under *Continental Airlines*.[253]   Thus, the *Genesis Health* court's analysis of the *Zenith* factors was inexorably tied to *Continental Airlines*.   As demonstrated above, because the releases at issue here at consensual and appropriate, *Continental Airlines* is not implicated, and the context of the *Genesis Health* holding is inapplicable.    Further, several courts have declined to follow *Genesis Health's* strict definition of what constitutes a substantial contribution.[254]

---

[251]   U.S. Trustee Objection ¶ 36 (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606–07 (Bankr. D. Del. 2001)).

[252]   *See In re Genesis Health*, 266 B.R. at 603–04.

[253]   *Id.* (citing *Gillman v. Cont'l Airlines (In re Cont'l Airlines),* 203 F.3d 203, 215 (3d Cir. 2000)).

[254]   *See, e.g., In re Exide Techs.*, 303 B.R. 48, 74 n.37 (Bankr. D. Del. 2003) ("I do not hold here that the price of a release of officers, directors and others must always involve the contribution of tangible 'assets' or that efforts

153.    A wide variety of non-financial contributions may illustrate a substantial contribution to a debtor's reorganization.[255]  For example, the court in *Zenith* expressly held that (a) officers and directors made substantial contributions to the plan by designing and implementing the operational restructuring and negotiating the financial restructuring and (b) the committee made substantial contributions to the plan by negotiating the plan and assisted in the solicitation of its constituents.[256]  Similarly, in *rue21*, the court found that the agreement of a non-debtor party to refrain from selling or transferring interests in the debtors' stock pursuant to a restructuring support agreement was a substantial contribution.[257]   Finally, in *Hercules Offshore*, the court determined that a release of the debtors' officers, directors, and professionals was appropriate where there was an "intensive and thoughtful effort by management and the special committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and

---

alone of officers and directors are never sufficient to warrant such a release."); *In re rue21, inc.*, 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017) (recognizing that a contribution of "tangible assets" may be unnecessary for a non-debtor to provide a substantial contribution); *Su v. Offshore Investment Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by . . . facilitating the debtor's reorganization."); *but see In re Congoleum Corp.*, 362 B.R. 167, 193 (Bankr. D.N.J. 2007) (following *Genesis Health* and applying the *Zenith* factors in the context of a nonconsensual release).

[255]   *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring, (b) plan sponsor funded the plan and agreed to compromise its claim, and (c) a committee negotiated the plan and assisted in the solicitation of its constituents); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 757–58 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the special committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders"); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (finding non-debtor party had substantially contributed where non-debtor parties entered into a settlement where non-debtor parties agreed to reduce their claim); *In re rue21, inc.*, 575 B.R. at 327 (finding that non-debtors contribution was substantial where, through a restructuring support agreement, such party agreed not to sell or transfer any interest in the debtors' stock, thereby preserving the debtors' net operating losses).

[256]   *See In re Zenith Elecs. Corp.*, 241 B.R. at 111.

[257]   *In re rue21, inc.*, 575 B.R. at 327.

"conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders."[258]  All of these cases stand for the premise that non-financial contributions by non-debtor parties can be considered a substantial contributions when determining the propriety of a debtor release.

154.    As described above, the Consenting Sponsor and the Debtors' directors, officers, professionals, and other agents have been instrumental in negotiating, formulating, and implementing both the RSA and the restructuring transactions contemplated by the Plan.  In the absence of the "intensive and thoughtful efforts" by these parties' and their contributions to the Debtors' Estate, for which the Debtor Release was a material inducement, the Debtors would not have the substantial support of voting creditors, and the transactions contemplated by the Plan would not be possible, thereby resulting in significantly diminished value for all parties in interest.[259]  The Debtor Release, therefore, is essential to the Debtors' restructuring and the U.S. Trustee's objection should be overruled.

### C.    The Gatekeeping Provision is Integral to the Plan and Should be Approved.

155.    The U.S. Trustee objected to the so-called "gatekeeping" provision (such provision, the "Gatekeeping Provision"), which provides that:

> No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of

---

[258]  *In re Hercules Offshore,* 565 B.R. at 757–58.

[259]  *See* Liquidation Analysis.

Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.[260]

156.    The Gatekeeping Provision is a legitimate exercise of this Court's power under sections 105, 1123(b)(6), and 1141(a), (b), and (c) of the Bankruptcy Code.   The purpose of the Gatekeeping Provision is to ensure that the Debtors or other Release Parties, including the Purchaser do not become bogged down in vexatious, meritless litigation.   Gatekeeping Provisions have been utilized by many courts to provide a threshold level of review following confirmation of a chapter 11 plan.   Under this construct, which has been approved in numerous jurisdictions (including this district),[261] the Bankruptcy Court interprets its own order in the first instance and determines whether a litigant has a colorable claim that remains assertable following confirmation of the Plan.

157.    To be clear, it is not necessarily contemplated that the Bankruptcy Court is ruling on the underlying merits of the action.   Rather, the Bankruptcy Court is making an inquiry into whether or not there is an ability to bring the action or whether it has been addressed already as part of the Plan or Confirmation Order.   The Bankruptcy Court is being asked to make an initial threshold inquiry and engage in the construction of the terms of the Plan, and to interpret those terms in conjunction with the Confirmation Order.   The Bankruptcy Court is undoubtably the best forum to accurately construe the language of its own plan and confirmation order.

---

[260]   Plan, Art. VIII.F.

[261]   *See, e.g.*, *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023) (approving a similar gatekeeping provision); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Nat'l Realty Inv. Advisors, LLC*, No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) (providing that the Bankruptcy Court maintained exclusive jurisdiction to adjudicate matters related to the chapter 11 case on a post-effective date basis); *In re Princeton Alternative Income Fund, LP*, No. 18-14603 (MBK) (Bankr. D.N.J. Feb. 19, 2020) (explicitly applying the Barton Doctrine to post-confirmation suits); *In re Cineworld Group plc*, No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 26, 2023) (approving a similar gatekeeping provision); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) (same); *In re Nautical Solutions, L.L.C.*, No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) (same); *In re Highland Capital Management, L.P.*, No.19-34054 (SGJ) (Bankr. N.D. Tex. Nov. 24, 2020) (same).

158.     The Gatekeeping Provision is an outgrowth of the long-standing "Barton Doctrine" established by the Supreme Court in *Barton v. Barbour.*[262]  The Barton Doctrine provides that, as a general rule, before a suit may be brough against a trustee, leave of the appointing court must be obtained.[263]  While the Barton Doctrine originated as a protection for federal receivers, courts have applied the concept to various participants in chapter 11 cases, including debtors in possession,[264] trustees appointed to administer post-confirmation liquidation of the bankruptcy Estate,[265] officers and directors of a debtor,[266] and professionals retained by the debtors.[267]  By requiring claimants to seek leave of the Bankruptcy Court before pursuing actions against the Debtors and its successors in interest, the Gatekeeping Provision is within the spirit of the protections afforded to fiduciaries and their agents under the Barton Doctrine.

159.     The gatekeeping role is one played by Bankruptcy Courts in numerous contexts. In the *Madoff* cases, the U.S. Bankruptcy Court for the Southern District of New York served as a gatekeeper to determine whether claims against certain Madoff funds were direct or derivative

---

[262]  104 U.S. 126 (1881).

[263]  *Baron v. Sherman (In re Ondova Co.,*), 2017 Bankr. LEXIS 325, at *29 (Bankr. N.D. Tex. Feb. 1, 2017).

[264]  *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to a debtor in possession).

[265]  *In re Swan Transportation Co.*, 596 B.R. 127, 137 (Bankr. D. Del. 2018) (citing *Richardson v. Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484, 489-98 (Bankr. D. Del. 2012)).

[266]  *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (holding that a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (applying Barton Doctrine to president of the debtor).

[267]  *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (applying Barton Doctrine to trustees' counsel).

claims[268].  In *In re Motors Liquidation Co.*, the U.S. Bankruptcy Court for the Southern District

of New York serves as a gatekeeper to determine whether claims may properly be asserted against

the pre- or post-reorganization General Motors entity.[269]  Under this construct, the Bankruptcy

Court effectively serves the same role as it does when it determines whether a statutory committee

should be granted standing to file litigation on behalf of a debtor; that is, the Bankruptcy Court is

asked to make a determination as to whether the claim at issue is colorable.

160.    Neither is the Gatekeeping Provision an attempt to impermissibly extend the

Bankruptcy Court's jurisdiction past its limits.  Courts in this circuit have confirmed plans on

numerous occasions that provide permanent Bankruptcy Court jurisdiction over matters arising

out of the chapter 11 cases, recognizing that Bankruptcy Courts may continue to exclusively

adjudicate issues related to the chapter 11 cases on a post-emergence basis.[270]  Furthermore, courts

have acknowledged that Bankruptcy Court jurisdiction over matters arising out of chapter 11 cases

may extend even further where the debtor is liquidating its assets, as is the case here.  In *Boston*

*Regional Med. Ctr. Inc. v. Reynolds*, the First Circuit acknowledged that a "liquidating debtor

---

[268]    *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff),* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussing the bankruptcy court's gatekeeper role).

[269]    *See In re Motors Liquidation Co.*, 541 B.R. 104, 113 (Bankr. S.D.N.Y. 2015), *vacated and remanded on other grounds*, 590 B.R. 39 (S.D.N.Y. 2018) (discussing bankruptcy court's gatekeeper role).

[270]    *See, e.g., In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023) (providing that the bankruptcy court will have sole and exclusive jurisdiction to determine whether a claim or cause of action constitutes a direct or derivative claim, is colorable and, to adjudicate the underlying claim or cause of action); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 12, 2020) (providing that the bankruptcy court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the chapter 11 cases and the plan); *In re Lannett Co.*, No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) (same).

exists for the singular purpose of executing an order of the bankruptcy court," and "[a]ny litigation involving such a debtor thus relates much more directly to a proceeding under title 11."[271]

161.    Furthermore, contrary to the assertions of the U.S. Trustee, the Gatekeeping Provision does not impose any greater burden or administrative hurdle on claimholders than the Plan would impose without the Gatekeeping Provision.   Nearly all chapter 11 plans in complex cases, including the Plan, contain an injunction permanently preventing parties from asserting released claims against released parties.  If a claimant seeks to assert a claim following the Effective Date of the Plan but is unsure whether that claim constitutes a colorable claim that has not been released, the claimant will need a judicial determination that the claim was not released under the Plan; otherwise, the claim could not be properly asserted. The Gatekeeping Provision ensures that the Bankruptcy Court—the court most familiar with the facts and circumstances of these Chapter 11 Cases, the court best-positioned to determine as to whether the claim may be asserted—is the court making that determination.  This inures to the benefit of all parties, including potential claimants.

162.    The propriety of gatekeeping provisions was recently litigated in the Fifth Circuit in *In re Highland Capital*.  There, the debtors sought approval of a provision nearly identical to the Gatekeeping Provision in the Plan.  In upholding confirmation of the plan, the Fifth Circuit recognized that the Gatekeeping Provision was necessary to ensure the effectiveness of the debtors' plan by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants."[272]  Indeed, following confirmation of the plan, the

---

[271]    *Boston Regional Med. Ctr. Inc. v Reynolds (In re Boston Regional Med. Ctr. Inc.)*, 410 F.3d 100, 107 (1st Cir. 2005).

[272]    *NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt, L.P.)*, 48 F.4th 419, 435 (5th Cir. 2022).

U.S. Bankruptcy Court for the Northern District of Texas exercised the gatekeeper provision by

denying a suit by a non-debtor against the debtors' former chief executive officer.[273]

163.    This Bankruptcy Court has recently approved gatekeeping provisions consistent

with the Gatekeeping Provision.[274]  For example, the *In re Bed Bath & Beyond Inc.* gatekeeping

provision provided that:

> From and after the Effective Date, any Entity (other than the DIP
> Agent, the DIP Lenders, the ABL Agent, the FILO Lenders, or the
> FILO Agent) that opted out of (or otherwise did not participate in)
> the releases contained in this Article X.D may not assert any claim
> or other Cause of Action against any Released Party for which it is
> asserted or implied that such claim or Cause of Action is not subject
> to the releases contained in Article X.C of the Plan without first
> obtaining a Final Order from the Bankruptcy Court (a) determining,
> after notice and a hearing, that such claim or Cause of Action is not
> subject to the releases contained in Article X.C of the Plan and
> (b) specifically authorizing such Person or Entity to bring such
> claim or Cause of Action against any such Released Party. . . .  The
> Bankruptcy Court will have sole and exclusive jurisdiction to
> determine whether a claim or Cause of Action constitutes a direct or
> derivative claim, is colorable and, only to the extent legally
> permissible and as provided for in Article XIII of the Plan, the
> Bankruptcy Court shall have jurisdiction to adjudicate the
> underlying claim or Cause of Action.[275]

164.    In overruling the U.S. Trustee's objection to this provision and approving the

provision, the *Bed Bath* court recognized that, absent a gatekeeping function, courts across the

country are likely to "construe and interpret the language of a plan and a confirmation order in

inconsistent fashion."[276]  The *Bed Bath* court also recognized the minimal burden imposed on the

---

[273]    *In re Highland Capital Mgmt., L.P.,* No.19-34054 (SGJ) (Bankr. N.D. Tex. Aug. 25, 2023).

[274]    *See In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023); *In re Bed Bath & Beyond Inc.*,
No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023).

[275]    *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023).

[276]    *Id.*, Hr'g Tr. 41:17–42:1 (Bankr. D.N.J. Sept. 12, 2023) ("Absent a gatekeeping function, there is a risk that you're
going to have courts across this country construe and interpret the language of a plan and a confirmation order in

court in acting as a gatekeeper because "in all likelihood in all of these situations it's coming back

before the bankruptcy court anyway."[277]

165.    Similarly, the *In re BlockFi Inc.* gatekeeping provision stated that:

> From and after the Effective Date, any Entity (i) that opted out of
> the releases contained in this Article VIII.B or (ii) was deemed to
> reject the Plan may not assert any claim or other Cause of Action
> against any Released Party for which it is asserted or implied that
> such claim or Cause of Action is not subject to the releases contained
> in Article VIII.A of the Plan without first obtaining a Final Order
> from the Bankruptcy Court (a) determining, after notice and a
> hearing, that such claim or Cause of Action is not subject to the
> releases contained in Article VIII.A of the Plan and (b) specifically
> authorizing such Person or Entity to bring such claim or Cause of
> Action against any such Released Party.  The Bankruptcy Court will
> have sole and exclusive jurisdiction to determine whether a claim or
> Cause of Action constitutes a direct or derivative claim, is colorable
> and, only to the extent legally permissible and as provided for in
> Article XI of the Plan, the Bankruptcy Court shall have jurisdiction
> to adjudicate the underlying claim or Cause of Action.[278]

166.    In overruling the U.S. Trustee's objection, the *BlockFi* court expanded on the

court's reasoning in *Bed Bath*, observing that the gatekeeping provision is not an assertion of

jurisdiction over which the court does not have and is instead limited to what the Bankruptcy Code

and the judicial code allows the court to decide.[279]  Instead, the court reasoned that the gatekeeper

function preserves both judicial economy and the centrality of the bankruptcy court as an

appropriate forum to decide what the meaning of the plan and confirmation order is and how

---

inconsistent fashion. That's disservice to those plaintiffs. It's a disservice to those who were under the impression
they were benefitting by making a contribution to the reorganization and getting certain protections.").

[277]    *Id.* at 42:2–9 ("The ability of a single court to take on a limited burden, and let's be clear -- it's minimal. Let's be
clear, in all likelihood in all of these situations it's coming back before the bankruptcy court anyway.  It's either
the defendant is going to come back before the court to ask for clarity and enforcement of a confirmation order,
enforcement of a discharge or one of the other parties to the litigation.  And that's the way it should be because
the courts will have a familiarity.").

[278]    *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023)

[279]    *Id.,* Hr'g Tr. at 111:23–25 (Bankr. D.N.J. Sept. 26, 2023).

potential claims fall within such documents.[280]  "It makes no sense to urge parties to make contributions to a Chapter 11 case and in return secure releases or secure certain rights that will be undercut by then having to defend their position all across the country in front of separate courts in separate forums, with inconsistent results."[281]

167.    The Bankruptcy Court should approve the Gatekeeping Provision for the same reasons identified by the Northern District of Texas in *In re Highland Capital* and consistent with *Bed Bath* and *BlockFi*.  Rather than seeking to shift the burden of proof to claimants or provide a further release of claims or causes of action under the Plan, the Gatekeeping Provision simply provides a threshold level of review necessary to ensure the effectiveness of the Plan.  In the absence of the Gatekeeping Provision, it is entirely possible that parties subject to the Plan's release and exculpation provisions will seek to assert frivolous claims, or claims barred by the Plan's injunction provisions, hindering the effectiveness of the Debtors' Plan.    The Gatekeeping Provision "serves the interests of those who bargained for certain rights in making contributions and it serves the interest of even the plaintiffs in not spending time and money on a claim that will have no traction."[282]    Further, as observed by courts in this district, this Bankruptcy Court, "the court with close[] hands-on [] understanding of the plan and the terms of the confirmation order,"[283] is the appropriate forum to decide what the meaning of the Plan and Confirmation Order is and how potential claims may fall within these documents.

---

[280]    *Id.* at 111:25–112:6.

[281]    *Id.* at 112:15–20.

[282]    *Id.* at 113:1–4.

[283]    *Id.* at 112:21–25.

168. The Gatekeeping Provision represents a permissible exercise of the Bankruptcy Court's jurisdiction and will inure to the benefit of the Debtors, their successors-in-interest, and potential claimants. Accordingly, the Bankruptcy Court should overrule the objection of the U.S. Trustee and approve the Gatekeeping Provision.

### Waiver of Bankruptcy Rule 3020(e)

169. Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[284] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code. Each rule also permits modification of the imposed stay upon court order.

170. To implement the Plan, the Debtors seek a waiver of the 14-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e). Given the complexity of the Plan and the various transactions implicated by the Plan, the Debtors may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective Date so that the Effective Date can occur promptly. Therefore, good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

### Conclusion

171. For the reasons set forth herein, the Debtors respectfully request that the Bankruptcy Court overrule the outstanding Objections and enter the Confirmation Order.

---

[284] *See* Bankruptcy Rule 3020(e).

Dated:  November 14, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      edward.sassower@kirkland.com
            christopher.marcus@kirkland.com
            derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

<u>**Exhibit A**</u>

**Objection Chart**

**IN RE CYXTERA TECHNOLOGIES, INC., ET AL., CASE NO. 23-14853 (JKS)**

**CHART OF OBJECTIONS AND PROPOSED RESPONSES TO THE FOURTH AMENDED JOINT PLAN OF CYXTERA TECHNOLOGIES INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN")[1]**

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 646 | The U.S. Trustee | • The Exculpation Clause is impermissibly broad in that it is not limited to estate fiduciaries.  Further, the inclusion of the Plan Administrator in the definition of Exculpated Parties is improper.<br><br>• The Debtor Release is overly broad.  It (a) unclear whether an identity of interest exists between the Debtors and the Released Parties; (b) it does not appear that each of the Released Parties provided a substantial contribution of assets; (c) no information is provided to support a contention that all the releases are necessary; and (d) it does not appear that unsecured creditors will receive all or substantially all of their claims.<br><br>• The Third-Party Release is non-consensual because it covers those who do not affirmatively opt-out.  Furthermore, the Third-Party Release does not satisfy the necessity standard under *Continental* and should not be approved.<br><br>• The Gatekeeping Provision is improper because releases are affirmative defenses that cannot be | • The definition of "Exculpated Parties" as amended is limited to estate fiduciaries and their representatives.<br><br>• The Debtor Release is appropriate because (i) key stakeholders were extensively involved in the negotiation process that led to the RSA and the Plan, as applicable; (ii) the Released Parties have provided and/or continue to provide substantial benefits to all parties in interest; (iii) the contributions have resulted in a restructuring that contemplates the Debtor Release and enjoys the support of all relevant economic stakeholders; (iv) the Debtor Release is an essential *quid pro quo* for the Released Parties' contributions to and support of the Debtors' restructuring; (v) the parties bound by the Third-Party Release have received sufficient consideration in exchange for the release of their Claims against Released Parties. *See Memorandum* ¶¶ 109–19, 152–55. |

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the Plan, the Plan Supplement, the Purchase Agreement, the Meltzer Declaration, the Koza Declaration, or the Bojmel Declaration, as applicable.

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | adjudicated prior to the filing of an action and it would increase administrative costs.<br><br>• The Injunction is impermissible because pursuant to confirmation of a plan does not operate as an injunction.<br><br>• The Plan is not a settlement subject to approval under Bankruptcy Rule 9019.<br><br>• Requests that the provision for statutory fees in the Plan is revised to reflect that the Debtors, Post-Effective Date Debtors, and the GUC Trust are jointly and severally liable for the payment of statutory fees.<br><br>• Closing of certain of the Debtors' Chapter 11 Cases cannot be approved without an appropriate motion filed that seeks closure of the case. | • The Third-Party Release is consensual and appropriate. Parties in interest, including equity holders, were provided with sufficient notice and opportunity to opt-out of the Third-Party Release. *See* Memorandum ¶¶ 106–08, 130–151.<br><br>• In the absence of the Gatekeeping Provision, it is entirely possible that parties who opt out of the Third-Party Release (and even those who do not) will seek to assert frivolous claims, or claims barred by the Plan's injunction provisions, hindering the effectiveness of the Debtors' Plan. The Gatekeeping Provision represents a permissible exercise of the Bankruptcy Court's jurisdiction, and will inure to the benefit of the Debtors, their successors-in-interest, and potential claimants. *See* Memorandum ¶¶ 156-69.<br><br>• Article VIII.F is updated to include language to resolve the U.S. Trustee's objection regarding the Injunction being impermissible under section 525(a)(3).<br><br>• Article VIII.A is revised to remove reference to Bankruptcy Rule 9019.<br><br>• The Wind-Down Amount definition is revised to include any statutory fees payable pursuant to the Bankruptcy Code.<br><br>• The language in Art. IV.N regarding Closing of certain chapter 11 cases is removed from the Plan. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 660 | Oracle | • Objects to the assumption and assignment of executory contracts between the Debtors and Oracle. Oracle argues that (i) the agreements pertain to intellectual property that are not assignable without Oracle's consent; (ii) the contract descriptions are inadequate and many of the contracts may be expired and thus not executory; (iii) seeks adequate assurances; and (iv) Oracle reserves their right in the event that the Asset Purchase Agreement includes the unauthorized shared use of Oracle's licenses in a manner not permitted by Oracle's agreements. | • Debtors are working with Oracle to review all contracts to narrow the scope of what is still active and therefore subject to assumption and assignment.<br><br>• Debtors provided adequate assurance as provided by Purchaser.<br><br>• The Debtors are working with Oracle on their concerns to the shared contracts provision of the APA. |
| 661 | EastGroup Properties, LP | • Objects to the amounts set forth in the cure schedules as well as want adequate assurances. | • Debtors to add language into the Confirmation Order to make clear both pre- and post-petition amounts owed will be paid on the effective date.<br><br>• Debtors provided adequate assurance as provided by Purchaser. |
| 662 | ACPF Nova Data Center, LLC & RREEF CPIF 2425 Busse Road, LLC | • Objects to the assumption and assignment of leases without the Debtors and/or Purchaser complying with all requirements of Section 365 of the Bankruptcy Code.<br><br>• Did not receive adequate assurance.<br><br>• Objects to the Debtors' proposed cure amounts.<br><br>• Requests that (i) the assignee be required to enter into a short form assumption and amendment agreement | • Debtors provided adequate assurance as provided by Purchaser.<br><br>• Cure amounts substantially agreed upon. Debtors will file a revised assumption schedule reflecting the changes prior to confirmation hearing.<br><br>• The request that (i) the assignee be required to enter into a short form assumption and amendment agreement; and (ii) the Bankruptcy Court condition the assumption and assignment is not applicable |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | and; (ii) the Bankruptcy Court condition the assumption and assignment of the leases to all applicable reciprocal easement agreements and other restrictive covenants.<br><br>• Argues the release and related provisions are overbroad and ambiguous.<br><br>• Requests Confirmation Order language to address their concerns regarding (i) setoff and recoupment right; and (ii) allegedly broad release and exculpation provisions. | because the Purchaser is buying the site from the Landlord.<br><br>• They did not receive a solicitation package or a voting ballot, so they are deemed to have opted-out of the Releases.<br><br>• Debtors are reviewing proposed language to resolve the issues related to (i) setoff and recoupment rights and (i) the release and related provisions. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 670 | Maricopa County Treasurer | • Objects to the Plan and related Sale Transaction to the extent the Debtors seek to sell, transfer or remove the personal property in Maricopa County prior to paying the full amount of the 2023 personal property taxes. Argue the Plan and APA are not clear as to who will pay the remainder of the 2023 taxes and when.<br><br>• Argues that it is unclear if the full amount owed for the second half of 2023 taxes is an Assumed Liability of the Purchaser.<br><br>• Requests retention of the tax liens until the taxes and any interest are paid in full. | • To be resolved through additions to the Confirmation Order. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 680 | NVIDIA | <ul><li>Objects to the lack of assumption of settlement agreement.</li><li>Unclear as to whether the Purchaser or the Debtor will continue to perform on the Service Orders.</li><li>Seeks adequate assurances.</li><li>Argues that the Service Order descriptions are inadequate and that MSA is not on the list.</li><li>Argues that two of the lease agreements related to the MSA and Service Orders are not on the assigned list.</li></ul> | <ul><li>Debtors added the NVIDIA settlement agreement to the schedule of assumed and assigned contracts. Debtors will file a revised assumption schedule reflecting the changes prior to confirmation hearing.</li><li>Provided clarity that the Purchaser is performing under the applicable service orders and continuing relationship in full.</li><li>Debtors provided adequate assurance provided by Purchaser.</li><li>Revised assumption schedule to be filed prior to confirmation hearing.</li></ul> |
| 686 | SI POR02 ABS LLC, and DCCO Tukwila, LLC | <ul><li>Objects to proposed cure amounts.</li></ul> | <ul><li>Debtors are working to resolve expeditiously. Parties have agreed to adjourn the cure dispute to after confirmation if necessary.</li></ul> |
| 688 | 1919 Park Ave Weehawken | <ul><li>Objects to proposed adequate assurance specifically related to a replacement guarantee and letter of credit.</li></ul> | <ul><li>Purchaser, Debtors, and objector are working to resolve the adequate assurance issues.</li></ul> |
| 689 | Microsoft | <ul><li>Objects to proposed cure amounts.</li></ul> | <ul><li>Debtors are working to resolve expeditiously. Parties have agreed to adjourn the cure dispute to after confirmation if necessary.</li></ul> |