**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CYXTERA TECHNOLOGIES, INC., *et al.*, | Case No. 23-14853 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF**
**ERIC KOZA IN SUPPORT**
**OF CONFIRMATION OF THE FOURTH**
**AMENDED JOINT PLAN OF REORGANIZATION**
**OF CYXTERA TECHNOLOGIES, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://www.kccllc.net/cyxtera.  The location of Debtor Cyxtera Technologies, Inc.'s
principal place of business and the Debtors' service address in these chapter 11 cases is:  2333 Ponce de Leon
Boulevard, Ste. 900, Coral Gables, Florida 33134.

Pursuant to 28 U.S.C. § 1746, I, Eric Koza, hereby declare as follows under penalty of perjury:

**Background and Qualifications**

1.       I am a Partner & Managing Director and Co-Head of the Turnaround and Restructuring Practice for the Americas at AlixPartners, LLP ("AlixPartners") and Chief Restructuring Officer ("CRO") for Cyxtera Technologies, Inc. ("Cyxtera," together with the other above-captioned debtors and debtors in possession, the "Debtors," and, collectively with their non-Debtor affiliate, "Cyxtera" or the "Company").  Prior to the filing of these cases, AlixPartners was retained by the Debtors as restructuring advisor to assist with its restructuring efforts, and on May 5, 2023, I was retained as CRO of the Debtors.

2.       I have approximately twenty-five years of experience serving in a variety of roles, including in senior management positions, as a financial advisor, a principal investor, and director of public and private companies.  I have served as a Partner & Managing Director of AlixPartners since 2018, when AlixPartners acquired my previous financial advisory firm, Zolfo Cooper.  I held several roles at Zolfo Cooper from 2009 to 2011 and from 2013 until its acquisition in 2018, including Managing Director from 2015 to 2018.  Prior to that, I held a variety of roles, including Senior Vice President, Corporate Development and Financial Strategy at Comverse Technology, Inc. from 2011 to 2013; Founding Partner of private equity firm Verax Capital LLC from 2006 to 2009; and Partner in various investment funds at investment manager W.R. Huff Asset Management Co. LLC from 1999 to 2006.  I received a B.S. from Boston College in 1996, and an M.B.A. from Boston University in 1999.  I have been a CFA® charterholder since 2003.

3.       AlixPartners has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' Chapter 11 Cases.  I have personally been involved in recent

chapter 11 reorganizations such as: *In re Avaya Inc.*, No. 23-90088 (DRF) (Bankr. S.D. Tex. Mar. 21, 2023), in which I served as CRO of Avaya Inc.; *In re Riverbed Technology, Inc et al.*, Case No, 21-11503 (Bankr. D. Del.  Nov. 16, 2021), in which I served as financial advisor to Riverbed Technologies Inc and certain of its affiliates; *In re NPC international Inc.*, Case No. 20-33353 (Bankr. S.D. Tex. July 1, 2020), in which I served as CRO of NPC International Inc.; *In re Chino Holdings, Inc.*, Case No. 20-32181 (Bankr. E.D. Va. May 4, 2020), in which I served as financial advisor to J. Crew Group Inc. and certain of its affiliates; *In re Avaya, Inc.*, Case No. 17-10089 (Bankr. S.D.N.Y. Jan. 19, 2017), in which I served as CRO of Avaya Inc.; *In re Deluxe Entm't Servs. Grp. Inc.*, Case No. 19-23774 (Bankr. S.D.N.Y. Oct. 3, 2019), in which I served as financial advisor to Deluxe Entertainment Services Group Inc.; *In re Sungard Availability Servs. Capital, Inc.*, Case No. 19-22915 (Bankr. S.D.N.Y. May 1, 2019), in which I served as CRO to Sungard Availability Services Capital, Inc.; *In re Fullbeauty Brands Holdings Corp.*, Case No. 19-22185 (Bankr. S.D.N.Y. Feb. 3, 2019), in which I served as financial advisor to Fullbeauty Brands Holdings Corp.; and *In re Cenveo Inc.*, Case No. 18-22178 (Bankr. S.D.N.Y. Feb. 2, 2018), in which I served as financial advisor to Cenveo Inc.  I specialize in advising senior executives, boards of directors, and creditors in distressed situations.  I was named one of the industry's top "People to Watch" by Turnarounds & Workouts 2018.  My combination of restructuring, operating, and transaction experience spans multiple countries and a variety of industries.

4.      In my capacity as CRO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above eighteen years of age and I am competent to testify.  Except where specifically noted, the statements in this Declaration are based on:  (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents provided to me by other members of the Debtors' management and the

3

Debtors' professional advisors, (c) information provided to me by, or discussions with, other members of the Debtors' management team or its professional advisors, and/or (d) my opinion based upon my experience.

5.      I submit this declaration (this "Declaration") in support of confirmation of the *Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 694] (as modified, amended, or supplemented from time to time, the "Plan").[2]  In further support of confirmation of the Plan, the Debtors have filed the *Declaration of Ronen Bojmel In Support of Confirmation of the Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Bojmel Declaration"), and the *Declaration of Roger Meltzer In Support of Confirmation of the Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Meltzer Declaration"), each filed contemporaneously herewith.  If called as a witness, I would testify competently to the facts set forth in this Declaration.

## The Plan

**I.      General Background and Development of the Plan.**

6.      Cyxtera has always been a strong business.  From its inception in 2017, through the fiscal year ending in 2022, Cyxtera's revenue grew from approximately $695 million to $746 million.  Despite its positive core business performance, inflation and macroeconomic volatility, among other things, contributed to the ballooning of Cyxtera's annualized interest expense on funded debt, from $35.9 million in Q1 2022, to $75.7 million in Q1 2023.  Additionally,

---

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, the *Disclosure Statement for the Second Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 552] (the "Disclosure Statement"), the Bojmel Declaration, or the Meltzer Declaration, as applicable.

Cyxtera has historically been saddled with significant long-term lease liabilities because it leased nearly all its data center locations. These challenges, along with the impending maturity of the Company's revolving and term loans, due in April and May 2024, respectively, placed increasing pressure on Cyxtera's capital-intensive business, straining the Company's liquidity profile and ability to invest in the business.

7.      As a result, the Company began exploring various strategic alternatives from 2022 into early 2023, including interest in an acquisition of the Company or an investment in connection with a financing or refinancing transaction. In March 2023, the Company, with the assistance of Guggenheim Securities, LLC, launched a comprehensive marketing process (the "Prepetition Marketing Process") to engage potential interested parties concerning a significant investment in or purchase of some or all of the Company's assets and/or equity (the "Sale Transaction").

8.      Simultaneously with the Prepetition Marketing Process, the Debtors engaged with an ad hoc group of First Lien Lenders (the "Ad Hoc Group") represented by Gibson, Dunn & Crutcher LLP as legal counsel and Houlihan Lokey, Inc. as financial advisor on a value-maximizing path forward. Discussions with the Ad Hoc Group proved successful, and on May 4, 2023, the Debtors, Holders of approximately 64 percent of First Lien Claims, and the Consenting Sponsors entered into the restructuring support agreement (the "RSA").[3] The RSA contemplated a dual-track process whereby the Debtors would pursue a recapitalization transaction (the "Recapitalization Transaction") that would equitize the Debtors' first lien indebtedness while simultaneously finalizing the Prepetition Marketing Process to determine whether a higher or otherwise better transaction could be consummated. Among other things, as part of the global

---

[3]    As of the Voting Record Date, the RSA enjoyed the broad support of Holders whose claims represented approximately 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement, as well as the Consenting Sponsors.

deal, certain of the First Lien Lenders agreed to provide the Company with an emergency $50 million bridge loan to finance short-term working capital needs, continue the Prepetition Marketing Process after the Petition Date (the "Marketing Process"), and prepare for a possible chapter 11 filing.

9.      On June 4, 2023, the Debtors commenced these Chapter 11 Cases to initiate a court-supervised process to pursue confirmation of the Recapitalization Transaction with an option to "toggle" if a Sale Transaction materialized that proved more value-maximizing via the Marketing Process.  Given the significant prepetition interest in a Sale Transaction, the Debtors' sought and received approval of the Marketing Process from of the Bankruptcy Court to facilitate discussions with interested parties regarding a potential Sale Transaction.  Over the course of the next few months, the Debtors continued to engage with multiple parties-in-interest, including Brookfield Infrastructure Partners L.P. ("Brookfield"), and received multiple acceptable non-binding written proposals prior to the July 10, 2023 Acceptable Bidder Deadline.  As a result of continued and strong interest in a potential Sale Transaction, the Debtors, in consultation with the Ad Hoc Group and the Official Committee of Unsecured Creditors (the "Committee"), determined to extend the sale schedule to allow for additional time to receive and evaluate bids, and if necessary, hold an Auction.

10.     Though discussions with Brookfield and another interested party continued to progress, neither party submitted a qualified bid prior to the qualified bid deadline.  Accordingly, the Debtors cancelled the Auction scheduled to occur on August 30, 2023, and proceeded with seeking Court authority to commence solicitation of the Plan.

11.     On September 26, 2023, the Bankruptcy Court entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation Procedures, (III) the Forms of Ballots*

*and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto*
[Docket No. 563] (the "Disclosure Statement Order") and on September 28, 2023, the Debtors
launched solicitation of the Plan.  Notably, given that the Debtors continued to engage with
Brookfield and the other interested party on the terms of a Sale Transaction, the Debtors' Plan
maintained the flexibility to "toggle" from a Recapitalization Transaction if a higher or otherwise
better Sale Transaction materialized from the Marketing Process prior to the Sale Transaction
Notice Deadline.

12.    Following months of arm's-length, good faith negotiations with multiple parties,
the Debtors reached an agreement in principle with Brookfield on the terms of a value-maximizing
Asset Sale (as defined herein) for the purchase and sale of substantially all of the Debtors' Assets.
Accordingly, on October 31, 2023, the Debtors and Phoenix Data Center Holdings LLC, an
affiliate of Brookfield (the "Purchaser") entered into an asset purchase agreement memorializing
the terms of the Asset Sale transaction (as may be amended from time to time in accordance with
the terms thereof, the "Purchase Agreement").  The Purchase Agreement provides, among other
things, that on the Effective Date (i) the Acquired Assets and Assumed Liabilities shall have
transferred to the Purchaser free and clear of all Encumbrances (other than Permitted Post-Closing
Encumbrances and the Assumed Liabilities) and (ii) the Purchaser shall pay $775 million in cash
to the Debtors, subject to certain adjustments (the "Asset Sale").  On November 1, 2023, the
Debtors, in accordance with the Plan, filed the *Notice of Sale Transaction*,[4] notifying parties in
interest that the Debtors had "toggled" to an Asset Sale and disclosing the material terms of the
Purchase Agreement, including that the resulting implied recovery for Holders of First Lien Claims

---

[4]    [Docket No. 648].

is their *pro rata* share of the Distributable Consideration or approximately 67.6 percent recovery on account of their First Lien Claims.[5]

13.     The Plan and the Asset Sale are the result of many months of considerable collaboration among the Debtors, their advisors, the Ad Hoc Group, the Committee, and Brookfield, in an effort to maximize the economic return to creditors under the facts and circumstances underlying these Chapter 11 Cases.  Namely, the Plan contemplates (i) the settlement with the Committee, whereby Holders of General Unsecured Claims will receive up to $8.65 million in Cash on account of their Claims and (ii) how the proceeds of the Asset Sale will be used to fund distributions and wind down and dissolve the Debtors' remaining operations.  The Plan also includes a Debtor Release and a Third-Party Release (each as defined herein), which subject to an extensive Independent Investigation, as further detailed in the Meltzer Declaration, were material components of both the RSA, the Plan, and the Purchase Agreement.

14.     The Plan and the Asset Sale are the natural conclusion of the Debtors' months-long Marketing Process.  In the Debtors' business judgment, the Asset Sale is *more* value maximizing than the Recapitalization Transaction, as it offers a greater possible recovery to the Debtors' creditors while providing the Debtors with sufficient capital to wind down any remaining operations not otherwise assigned to the Purchaser or a designee in accordance with the Purchase Agreement.  Further, in consultation with their advisors, the Debtors have determined that all Holders of Claims and Interests in all Impaired classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.

---

[5]     For the avoidance of doubt, this recovery figure includes $10 million on account the Debtors' sale of Canadian assets to Cologix Canada, Inc.  *See Debtors' Motion for Entry of an Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 653].

15.     Based on my experience, and in consultation with legal counsel, I believe that the Plan satisfies the requirements of Confirmation and that the Plan is proposed in good faith, is feasible, and is in the best interests of the Debtors' creditors.

## II.     The Plan Satisfies the Requirements of Confirmation.

16.     I have been advised of the applicable standards under which a chapter 11 plan may be confirmed.  For the reasons detailed below, and with the consultation and guidance of the Debtors' advisors and legal counsel, I believe, to the best of my knowledge, that the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a plan.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan and related documents.

### A.     The Plan Satisfies the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(1).

17.     I understand that section 1129(a)(1) of the Bankruptcy Code requires a chapter 11 plan to comply with all applicable provisions of the Bankruptcy Code.  As set forth below, I believe that the Plan satisfies section 1129(a)(1) of the Bankruptcy Code.

#### 1.     Proper Classification of Claims and Interests — Section 1122.

18.     It is my understanding that section 1122 of the Bankruptcy Code requires that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

19.     I believe that each of the Claims and Interests in each particular class under the Plan is substantially similar to the other Claims and Interests in that class and the distinctions among classes are based on valid business, factual, and legal distinctions.  In general, the Plan's classification scheme follows the Debtors' capital structure, thereby taking into account the

relative priority among Claims and Interests, including the relative priority between secured and

unsecured claims, and with debt and equity classified separately.

20.     Under Article III of the Plan, Claims and Interests are classified as follows:

> Class 1: Other Secured Claims
> Class 2: Other Priority Claims
> Class 3: First Lien Claims
> Class 4: General Unsecured Claims
> Class 5: Section 510 Claims
> Class 6: Intercompany Claims
> Class 7: Intercompany Interests
> Class 8: Existing Equity Interests

21.     The Claims and Interests assigned to each Class listed above are substantially

similar to the other Claims and Interests in that Class and there is no unfair discrimination between

or among Classes of Claims or Interests.   Namely, the Plan separately classifies Claims and

Interests because each Holder of such Claims or Interests may hold (or may have held) rights in

the Debtors' estates legally dissimilar to the Claims or Interests in other Classes or because

substantial administrative convenience results from such separate classification.

22.     For the foregoing reasons, I believe that the Plan satisfies section 1122 of the

Bankruptcy Code.

**2.      Specification of Classes, Impairment, and Treatment —
Section 1123(a)(1)–(3).**

23.     I understand that sections 1123(a)(1), (2), and (3) of the Bankruptcy Code require

that a chapter 11 plan specify in detail the classification of claims or interests, whether such claims

or interests are unimpaired by the plan, and the treatment of each class of claims or interests that

is impaired.   Article III of the Plan specifies in detail the classification of Claims and Interests,

whether such Claims and Interests are Impaired, and the treatment that each Class of Claims and

Interests will receive under the Plan.  Accordingly, I believe that the Plan fully complies with and satisfies sections 1123(a)(1)–(3) of the Bankruptcy Code.

### 3. Equal Treatment of Similarly Situated Claims and Interests — Section 1123(a)(4).

24. I understand that section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same rights and treatment to each holder of claims or interest as other holders of allowed claims or interests within such holders' respective class.  It is my understanding that the Plan provides the same treatment for each Claim or Interest of a particular class, except where the Holder of such Claim or Interest has agreed to a less favorable treatment.  I believe that the Plan satisfies this requirement because each Holder of Allowed Claims or Interests will receive the same rights and treatment as all other Holders of Allowed Claims or Interests within the same class.

### 4. Means for Implementation — Section 1123(a)(5).

25. I believe that the Plan provides adequate means for implementation as required under section 1123(a)(5) of the Bankruptcy Code because Article IV of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented.  Among other things, Article IV of the Plan provides for:

a. the general settlement of Claims and interests;

b. the means for implementing the Asset Sale, including the sources of consideration under the Plan and distributions related thereto, the existence of the Post-Effective Date Debtors, the appointment of a Plan Administrator for the purpose of, among other things, winding down the business and affairs of the Debtors and Post-Effective Date Debtors, and the authorization for the Debtors, or Post-Effective Date Debtors, as applicable, to take corporate actions necessary to effectuate the Plan;

c. the preservation of certain Causes of Action not otherwise assigned via the Purchase Agreement;

d.      the cancellation of certain notes, instruments, certificates, licenses, and other documents;

e.      the vesting of Assets in the Post-Effective Date Debtors; and

f.      the establishment of the GUC Trust, which shall have the sole power and authority to distribute the GUC Trust Net Assets to Holders of Allowed General Unsecured Claims in accordance with the treatment set forth in the Plan for Class 4.

26.     The terms governing the execution of these transactions are set forth in greater detail in the Plan and the Plan Supplement,[6] as applicable.    Thus, the Plan satisfies section 1123(a)(5), and no party has asserted otherwise.

**5.      Prohibition of Issuance of Non-Voting Stock — Section 1123(a)(6).**

27.     I am advised that section 1123(a)(6) of the Bankruptcy Code requires that a corporate debtor's chapter 11 plan provide for the inclusion in the reorganized debtor's charter (if any) of a prohibition against the issuance of non-voting equity securities and related protections for Holders of preferred shares.   The Plan does not provide for the issuance of non-voting equity securities or preferred interests.    Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

**6.      Selection of Officers and Directors — Section 1123(a)(7).**

28.     Article IV.D.4 of the Plan discharges all of the Debtors' officers, directors, and managers of the Post- Effective Date Debtors from their duties effective as of the Effective Date without any further action.  In addition, Article IV.D.4 provides that, following an Asset Sale, the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers.  The manner for selection of the Plan Administrator is set forth

---

[6]     *See* Plan Supplement [Docket No. 650].

in the Plan and Plan Supplement.  The selection of the Plan Administrator is consistent with the interests of Holders of Claims and Interests and public policy.  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

**B.     The Debtors Have Satisfied the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(2).**

29.     Based on consultation and guidance from legal counsel, I believe that the Plan satisfies section 1129(a)(2) of the Bankruptcy Code, which I understand requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.  I have been advised that section 1129(a)(2) encompasses both the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code, as well as the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.

30.     Here, I understand that the Court approved the Disclosure Statement as containing adequate information, and the Debtors solicited and tabulated votes on the Plan in accordance with the Solicitation Procedures approved by the Court in the Disclosure Statement Order.  As further detailed in the *Declaration of James Lee With Respect to the Tabulation of Votes on the Second Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Report"), filed contemporaneously herewith,[7] the Debtors, through their Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order.  I understand that the Debtors transmitted the same Disclosure Statement to each Holder of a Claim entitled to vote on the Plan.

31.     I further understand that the Debtors solicited votes from the Holders of Claims in Impaired classes entitled to vote under the Plan, as indicated below.  The remaining Holders of

---

[7]     *See* Voting Report.

Claims and Interests in the classes listed in the table below are either Unimpaired under the Plan and therefore were deemed to accept the Plan or will not receive any distribution under the Plan and are therefore deemed to reject the Plan.  While the Debtors did not solicit votes from the Holders of Claims and Interests in such classes, the Debtors mailed (i) the Confirmation Hearing Notice, (ii) a Notice of Non-Voting Status, and (iii) applicable Opt-Out Form to such Holders in accordance with the Disclosure Statement Order.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.     The Debtors Proposed the Plan in Good Faith — Section 1129(a)(3).**

32.     I believe that the Plan was proposed in good faith, with the legitimate and honest purpose of maximizing value for the Debtors and their estates.

33.     It is my testimony that the Plan is the result of collaborative efforts between the Debtors, their advisors and legal counsel, and their stakeholders.  I believe that the Plan maximizes the economic return to the creditors in light of the totality of the facts and circumstances of the case.

**D.     Payment of Professional Fees and Expenses Is Subject to Court Approval — Section 1129(a)(4).**

34.     It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, a debtor, or a person receiving distributions

of property under the plan be approved by the Court or remain subject to approval by the Court as reasonable.  The Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.  Moreover, Article II.C.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than forty-five days after the Effective Date.  Accordingly, I believe that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### E.     The Plan Satisfies the Bankruptcy Code's Governance Disclosure Requirements — Section 1129(a)(5).

35.     It is my understanding that section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan; appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and to disclose the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.  Because the Plan provides for the liquidation of the Estates' remaining assets and resignation of the Debtors' officers, directors, and managers, section 1129(a)(5) of the Bankruptcy Code does not apply.  To the extent section 1129(a)(5) of the Bankruptcy Code applies to the Post-Effective Date Debtors, the Debtors have satisfied the requirements of this provision by, among other things, disclosing the identity of the Plan Administrator and the responsibilities and compensation thereof.

### F.     The Plan Does Not Require Government Regulatory Approval of Rate Changes — Section 1129(a)(6).

36.     It is my understanding that Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and, accordingly, will not require

15

governmental regulatory approval.  As such, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

> **G.    The Plan Is in the Best Interests of Holders of Claims and Interests — Section 1129(a)(7).**

37.    I have been advised that the "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.

38.    To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of AlixPartners, the Debtors' restructuring advisors, prepared a liquidation analysis [Docket No. 492] (the "Liquidation Analysis").  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions regarding a hypothetical conversion to a chapter 7 liquidation as of a certain date.

39.    Based on the Liquidation Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan.  Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**H.**     **Voting Requirements — Section 1129(a)(8).**

40.     I understand that the Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan. The Deemed Accepting Classes are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Nevertheless, because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, rather than section 1129(a)(8), of the Bankruptcy Code. Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and, thus, satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

**I.**     **Priority Cash Payments — Section 1129(a)(9).**

41.     I have been advised that section 1129(a)(9) of the Bankruptcy Code generally requires that claims entitled to administrative priority must be repaid in full in cash or receive certain other specified treatment. Article II.A. of the Plan contemplates that Allowed Administrative Claims will be repaid in full in Cash. Further, no Holders of the types of Claims specified by section 1129 of the Bankruptcy Code are Impaired under the Plan. In addition, Allowed Priority Tax Claims will be paid in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**J.**     **At Least One Impaired Class of Claims Accepted the Plan —
Section 1129(a)(10).**

42.     I understand that the Bankruptcy Code requires that if any class of claims is impaired under the plan, then at least one class of impaired claims must accept the plan, without including any acceptance of the plan by any insider. I understand that Holders of Claims in Class

3 – First Lien Claims and Class 4 – General Unsecured Claims, which are Impaired under the Plan,

voted to accept the Plan.  Accordingly, I believe that the Plan satisfies the requirements of section

1129(a)(10) of the Bankruptcy Code.

**K.    The Plan Is Feasible — Section 1129(a)(11).**

43.    I understand that the Bankruptcy Code requires that the Court find that a plan is

feasible as a condition precedent to confirmation.  I have been advised that to demonstrate that a

plan is feasible, it is not necessary for a debtor to guarantee success.  I believe that the Plan satisfies

the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing for a clear

path to emergence from these Chapter 11 Case and the ability of the Debtors to satisfy all of their

obligations under the Plan.  In negotiating the Asset Sale, the Debtors thoroughly analyzed their

ability to meet their respective obligations under the Plan.  Upon the Effective Date, the Debtors

expect to have sufficient funds and proceeds from cash-on-hand and proceeds from the Asset Sale

to meet all the Debtors' obligations as contemplated by the Plan, including the obligations related

to a wind down of the Debtors' Estates.  The Debtors have worked with their advisors to ensure

that the Post-Effective Date Debtors maintain, with the leadership of the Plan Administrator,

adequate liquidity and the necessary staffing in order to effectively wind down the Debtors' estates.

There will be sufficient value to satisfy all Priority and Administrative Claims under the Plan,

including all Professional Fee Claims.  As such, the Debtors have a demonstrated ability to fund

distributions required under the Plan, including to taxing authorities, administrative claimants, and

other Unimpaired Classes of Claims.  Thus, I believe that the Debtors will be able to meet their

obligations under the Plan.

**L.    The Plan Provides for Payment of All Fees — Section 1129(a)(12).**

44.    Article II.C of the Plan includes an express provision requiring payment of all fees

under 28 U.S.C. § 1930 in compliance with section 1129(a)(12) of the Bankruptcy Code.

**M.      Retiree Benefits, Domestic Support Obligations, Individuals, and Nonprofit Corporations — Section 1129(a)(13), (14), (15), and (16).**

45.      The Debtors have no obligations to pay retiree benefits.  The Debtors are not required to pay domestic support obligations pursuant to a judicial or administrative order or statute as set forth in section 1129(a)(14) of the Bankruptcy Code.  The Debtors are not individuals under the Bankruptcy Code.  The Debtors are transferring property under the Plan in accordance with applicable non-bankruptcy law that governs the particular property.  Therefore, the Plan complies with sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code, respectively.

**N.      The Plan Satisfies the Requirements for Confirmation of the Plan Over Nonacceptance of Impaired Classes — Section 1129(b).**

46.      To the best my knowledge, the Plan distributes value to Holders of Claims and Interest in the priorities set forth in the Bankruptcy Code, and no Holder of a junior Claim or Interest will receive a recovery on account of such junior Claim or Interest until all senior Claims are paid in full.  It is my understanding that (a) Class 3 – First Lien Claims and Class 4 – General Unsecured Claims voted to accept the Plan and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Interests in the Deemed Rejecting Classes.  As such, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**O.      Only One Plan is Eligible to be Confirmed — Section 1129(c).**

47.      I understand that section 1129(c) of the Bankruptcy Code prohibits the confirmation of multiple plans.  Section 1129(c) of the Bankruptcy Code is not implicated here because there is only one proposed plan.

**P.        Section 1129(e)of the Bankruptcy Code Is Inapplicable.**

48.      I understand that section 1129(e) of the Bankruptcy Code does not apply to the Plan

because none of the Debtors' Chapter 11 Cases is a "small business case" within the meaning of

the Bankruptcy Code.

**III.    The Principal Purpose of the Plan is Not the Avoidance of Taxes or Securities Law as Required Under Section 1129(d) of the Bankruptcy Code.**

49.      The Plan has not been filed for the purpose of avoidance of taxes or the application

of section 5 of the Securities Act of 1933, as amended.  Moreover, no party that is a governmental

unit, or any other entity, has requested that the Bankruptcy Court decline to confirm the Plan on

the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the

application of section 5 of the Securities Act of 1933.

**IV.    The Releases, Exculpation, and Injunctions in the Plan are Appropriate.**

50.      I understand that Article VIII of the Plan contains provisions implementing certain

releases and exculpations, compromising claims and interests, and enjoining certain causes of

action.  These provisions (a) are the product of arm's-length negotiations, (b) have been critical to

obtaining the support of the various constituencies for the Plan, (c) are given for valuable

consideration, (d) were accepted by creditors; (e) are fair and equitable and in the best interests of

the Debtors, their estates, and these Chapter 11 Cases, and (f) I am advised are consistent with

section 1123 and other applicable provisions of the Bankruptcy Code and Third Circuit law.

**A.        The Debtor Release is Appropriate and in the Best Interests of the Debtors' Estates.**

51.      Article VIII.C of the Plan sets forth the Debtors' releases (the "<u>Debtor Release</u>").

I believe that the Debtor Release is appropriate, justified, and integral component of the Plan.

***First***, each Released Party has made a substantial contribution to the Debtors' Estates.  The

Released Parties played an integral role in the formulation of the Plan and contributed to the Plan

not only by expending significant time and resources analyzing and negotiating the terms thereof.

***Second***, the Debtor Release is essential to the success of the Debtors' Plan because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Debtors would have been able to build the extraordinary level of consensus with respect to the Plan and the transactions contemplated thereby.  ***Third***, the Plan provides for meaningful consideration under the circumstances for all creditors potentially giving up colorable claims under the releases. Accordingly, I believe that the Debtor Release is fair, equitable, and in the best interests of the Debtors' Estates.

**B.      The Third-Party Release Is Appropriate and Complies with the Bankruptcy Code.**

52.      Article VIII.D of the Plan contains a third-party release provision (the "<u>Third-Party Release</u>").  Based on my consultation with legal counsel, I understand that the Third-Party Release is (a) consensual, (b) in exchange for the good and valuable consideration provided by the Released Parties, (c) a good-faith settlement and compromise of the claims and Causes of Action released by the Third-Party Release, (d) materially beneficial to and in the best interests of the Debtors, their Estates, and their stakeholders and is important to the overall objectives of the Plan to finally resolve certain Claims among or against certain parties in interest in the Chapter 11 Cases, (e) fair, equitable, and reasonable, (f) given and made after due notice and opportunity for hearing, and (g) a bar to any of the Releasing Parties asserting any claim or Cause of Action released by the Third-Party Release against any of the Released Parties.

53.      The Third-Party Release is an integral part of the Plan that is supported by many of the Debtors' creditors and provides a meaningful recovery under the facts and circumstances of these Chapter 11 Cases.  Like the Debtor Release, the Third-Party Release facilitated participation of the Released Parties in the RSA, the Plan and the chapter 11 processes generally.  The

Third-Party Release is instrumental to the Plan and was critical in incentivizing the Released Parties to support the Plan and preventing potentially significant and time-consuming litigation regarding the parties' respective rights and interests. The Third-Party Release was instrumental in developing the RSA that served as the basis for the Plan and is supported by the Consenting Stakeholders, the Purchaser, and the Committee, among other parties in interest. In exchange, the Released Parties worked constructively with the Debtors to negotiate and implement the Restructuring Transactions embodied in the Plan and have provided material concessions, benefits, and commitments to the Debtors through the RSA and during the pendency of these Chapter 11 Cases. The Debtors' key stakeholders would not have been willing to support the highly consensual and value-maximizing restructuring process that followed entry into the RSA without the assurance that they and their collateral and interests would not be subject to post-emergence litigation or other disputes related to these Chapter 11 Cases. Accordingly, the Third-Party Release allowed the Debtors and the Debtors' creditors to develop a plan that, through the Asset Sale, maximizes value for all of the Debtors' stakeholders, preserves certain of the Debtors' businesses as a going concern, and allows for the orderly wind down of these Chapter 11 Cases. The Third-Party Release is necessary to bringing these Chapter 11 Cases to a resolution.

54.     The Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process, and the Released Parties have made a substantial contribution to the Debtors' Chapter 11 Cases. Furthermore, the Third-Party Release is consensual as the Releasing Parties were provided adequate notice of the chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan, except for Holders of Claims that vote to accept the Plan, all Holders of Claims or Interests were given the opportunity

to opt out of the Third-Party Release, and the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots.  As further detailed in the Voting Report, the Claims and Noticing Agent were able to successfully deliver Ballots to all Holders of Claims or Interests entitled to vote on the Plan.

55.     There is an identity of interests between the Debtors and the entities that will benefit from the Third-Party Release.  Each of the Released Parties, as stakeholders and critical participants in the Debtors' Chapter 11 Cases and the Plan process, share a common goal with the Debtors in seeing the Plan succeed.

56.     The scope of the Third-Party Release is appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the Third-Party Release.  Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure is necessary.  The Debtors, as evidenced by the Solicitation Affidavit, provided sufficient notice of the Third-Party Release, and no further or other notice is necessary.  The Third-Party Release is specific in language, integral to the Plan, and given for substantial consideration.

57.     Accordingly, I believe that the Third-Party Release is consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code and should therefore be approved.

### C.     The Exculpation Provision Is Appropriate.

58.     Based on my experience and discussions with counsel, it is my belief that the exculpation provision described in Article VIII.E of the Plan (the "Exculpation") is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length discussions with key constituents, and is appropriate limited in scope.

The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, and related documents.  I understand that the inclusion of the Exculpation provision was a critical component of the negotiations over the terms of the Plan.  In short, I believe that the Exculpation represents an integral piece of the overall settlement embodied in the Plan.  Accordingly, under the circumstances, I believe that it is appropriate for the Court to approve the Exculpation provision.

### D.    The Injunction Provision is Appropriate.

59.    The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Post-Effective Date Debtors, the Plan Administrator, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests discharged, released, exculpated, or settled under the Plan.

60.    I believe that the Injunction Provision is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions that are crucially important to the Plan. Further, the injunction provision provided for in the Plan is narrowly tailored to achieve its purpose.  As such, I believe that the Injunction Provision should be approved.

### E.    The Debtors Will Cure Monetary Defaults Under Any Assumed Executory Contracts — Section 1123(d).

61.    I understand that section 1123(d) of the Bankruptcy Code requires that cure amounts be determined in accordance with the underlying agreement and non-bankruptcy law.

62.    I believe that the Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of Cure Amounts under each Executory Contract to be assumed or assumed and assigned under the Plan, in accordance with the Purchase Agreement, on the

24

Effective Date or in the ordinary course of business, subject to the limitations described in Article V.D. of the Plan.  In accordance with the Plan and the Purchase Agreement, the Post-Effective Date Debtors shall be responsible for paying such Cure Amounts.

**IV.    The Modifications to the Plan Comply with Section 1127 of the Bankruptcy Code.**

63.    I understand that Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, I understand that Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.

64.    The Debtors made certain immaterial modifications, including technical modifications, as reflected in the redline filed with the Plan (the "Modifications").  I believe that the Modifications made by the Debtors are immaterial and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**V.    The Asset Sale Should be Approved Under Sections 363 and 1123(b)(4) of the Bankruptcy Code.**

65.    Under the Plan and pursuant to the Asset Sale, the Debtors seek to sell substantially all of their assets to the Purchaser.  I believe that the Debtors' sale of the Acquired Assets under the Asset Sale represents a sound exercise of the Debtors' business judgment and is essential to the Debtors' Plan.  The Asset Sale represents the most efficient and appropriate means of maximizing the value of the Debtors' estate.

66.    The terms set forth in the Purchase Agreement are the product of arm's length negotiations.  I believe that the consideration to be provided by the Purchaser under the Purchase

Agreement is fair and reasonable, as it provides substantial value to the Debtors' estates, maximizes the value of all of the Acquired Assets, and provides for substantial recovery to holders of claims.  Brookfield is not affiliated with the Debtors in any way and has proceeded in good faith during the entirety of the negotiation process.  Thus, I believe that proceeding with the Asset Sale under the Purchase Agreement and pursuant to the Plan is in best interests of the Debtors and their Estates.

**VI.     Good Cause Exists to Waive the Stay of the Confirmation Order.**

67.     I understand that certain Bankruptcy Rules provide for the stay of an order confirming a chapter 11 plan, but that such a stay may be waived upon court order after a showing of good cause.

68.     Given the complexity of the Plan and the various transactions implicated by the Plan, the Debtors may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective Date so that the Effective Date can occur as soon as needed. Accordingly, I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

**VII.    Conclusion.**

69.      In conclusion, it is my opinion that the Plan satisfies the requirements of confirmation.  Among other things, the Plan and the Asset Sale will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what such Holders would receive pursuant to a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code and thus, should be approved.


*[Remainder of page intentionally left blank]*


26

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct.

Dated: November 14, 2023                           By: */s/ Erica Koza*
                                                   Name: Eric Koza
                                                   Title: Chief Restructuring Officer
                                                   Cyxtera Technologies, Inc.