**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: <br><br> CYXTERA TECHNOLOGIES, INC., *et al.*, <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 23-14853 (JKS) <br><br> (Jointly Administered) |

**DECLARATION OF**
**ROGER MELTZER IN SUPPORT**
**OF CONFIRMATION OF THE FOURTH**
**AMENDED JOINT PLAN OF REORGANIZATION**
**OF CYXTERA TECHNOLOGIES, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Roger Meltzer, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

**Professional Background and Qualifications**

1.  Since April 24, 2023, I have served as a disinterested director of the board of directors (the "Board") of Cyxtera Technologies, Inc. ("Cyxtera" and, together with its affiliated debtors and debtors in possession, collectively, the "Company" or the "Debtors") and a member of the special committee of the Board (the "Special Committee"). I have over 40 years of experience practicing corporate and securities law representing clients in a range of finance transactions, including mergers, acquisitions and dispositions, public offerings, and public and private placements of debt and equity securities. I hold a Bachelor of Arts from Harvard University and a Juris Doctorate from New York University School of Law. I have also served as an independent director to several non-profit and for-profit organizations.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera. The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

2. While serving as a disinterested director to the Board, I also served as the Chairman Emeritus of DLA Piper ("DLA"). Prior to serving on the Board, I was a member of DLA's Global Board and the US Executive Committee (Co-Chair) and I managed DLA for nearly 15 years, including two terms as its chairman. I was also a partner and global chair of the Corporate and Finance practice at DLA where I counseled numerous corporate boards and executives on matters considered to be of existential significance across the board, including, among others, corporate governance and securities regulation, employment issues, investigations, and litigation. I started my career at Cahill Gordon & Reindel LLP where I also served as a member of the executive committee.

3. I submit this declaration (this "Declaration") in support of confirmation of the *Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 694] (as modified, amended, or supplemented from time to time, the "Plan"), including the Debtor Release, the Third-Party Release, the Exculpation Provision, and the Injunction Provision (each as defined below) contained therein.[2] Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management team, the Debtors' legal counsel and other advisors, and the Special Committee's independent legal counsel, Katten Muchin Rosenman LLP ("Katten"), and my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives. For the avoidance of doubt, I do not, and do not intend to, waive the attorney-client privilege or any other applicable privilege by submitting this Declaration.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the *Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc., and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 552] (the "Disclosure Statement"), as applicable.

**Appointment to the Board and Special Committee**

4.  On April 24, 2023, the Board unanimously adopted resolutions (a) appointing Fred Arnold and Roger Meltzer as disinterested directors of the Board, (b) constituting the disinterested directors as the Special Committee, and (c) delegating specific authorities to the Special Committee (the "April 24 Resolutions").

5.  On May 19, 2023, the Board unanimously adopted resolutions (a) appointing Scott Vogel as a disinterested director of the Board, and (b) appointing Scott Vogel to the Special Committee (the "May 19 Resolutions," and together with the April 24 Resolutions, collectively, the "Resolutions").

6.  Pursuant to the Resolutions, the Special Committee was delegated the authority to, on behalf of the entire Board, take any action with respect to any matters related to a Restructuring Transaction (as defined therein) in which a conflict of interest exists or is reasonably likely to exist between the Company, on the one hand, and any of the Company's equity holders, affiliates, subsidiaries, directors, managers, and officers, or other stakeholders (collectively, the "Related Parties"), on the other hand (the "Conflict Matters"). In furtherance of its mandate, the Special Committee commenced an independent investigation into whether the Debtors hold any viable claims and causes of action against any of the Related Parties (the "Investigation").

7.  Cyxtera—at the direction of the Special Committee—retained Katten as independent legal counsel, as of April 24, 2023, to conduct the Investigation and to provide advice and legal services in connection with the exercise of the disinterested directors' fiduciary duties in carrying out their delegated authority pursuant to the Resolutions. As of May 19, 2023, Katten's engagement agreement was supplemented by adding Mr. Vogel as a client, in his capacity as a disinterested director. Since its establishment, the Special Committee has communicated regularly with the Debtors, their advisors, and Katten.

**Consideration of the Restructuring Support Agreement and Plan**

8. Prior to these Chapter 11 Cases, the Company faced significant headwinds owing primarily to inflation and macroeconomic volatility as well as an impending maturity of the Company's revolving and term loans. These factors placed increasing pressure on the Company's capital-intensive business, straining the Company's liquidity profile and its ability to invest in the business. As a result, the Company began to explore all strategic alternatives, including liability management and/or an investment in, or sale of, some or all of its business.

9. In March of 2023, the Company, with the assistance of its advisors, engaged with an ad hoc group of First Lien Lenders (the "Ad Hoc Group"), represented by Gibson, Dunn & Crutcher LLP as legal counsel and Houlihan Lokey, Inc. as financial advisor, to chart a value-maximizing path forward. At the same time, the Company, with the assistance of Guggenheim Securities ("Guggenheim"), as investment banker, launched a comprehensive marketing process (the "Marketing Process") to engage potential interested parties concerning a significant investment in or purchase of some or all of the Company's assets and/or equity (the "Sale Transaction"). The Debtors' advisors and management kept the Special Committee apprised of potential restructuring transactions, including negotiations between the Debtors and the Ad Hoc Group and the status of the Marketing Process. The Special Committee and the Board met regularly to discuss the Company's restructuring options, including the status of negotiations and the Marketing Process.

10. After extensive, arm's-length negotiations, on May 2, 2023, the Board was presented with the proposal as memorialized in the restructuring support agreement (the "RSA"), dated May 4, 2023, which enjoyed the broad support of Holders whose claims at the time represented approximately 64 percent of the claims arising on account of obligations under the

4

First Lien Credit Agreement, as well as the Consenting Sponsors.[3] After deliberating with the Company and its advisors, on May 4, 2023, the Board determined that the RSA was the best alternative available to the Company. The RSA provided optionality through a contemplated two-phase toggle approach whereby the Company would (i) continue its out-of-court Marketing Process in pursuit of a Sale Transaction, or (ii) toggle to an in-court restructuring, pursuant to which the Company would continue to pursue the Marketing Process and pursue a standalone recapitalization of its balance sheet (the "Recapitalization Transaction"), unless the Marketing Process yielded a value-maximizing transaction. Moreover, concurrently with the entry into the RSA, members of the Ad Hoc Group provided the Company with a new money, $50 million term loan Bridge Facility, of which $36 million was drawn prior to the Petition Date, to bridge the Company's financing needs and allow the Company to continue the prepetition Marketing Process, provide time to prepare for a potential chapter 11 filing, and otherwise avoid a value destructive, free-fall bankruptcy filing. The Consenting Sponsors agreed to: (i) support the in-court restructuring process that would ultimately cede control to a new owner and forgo certain actions to preserve the Company's tax attributes and (ii) fully cooperate with the Investigation. Under the RSA, the Special Committee also retained exclusive authority with respect to the Company's ongoing restructuring efforts.

11. On June 4, 2023, the Company filed the Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey. The bankruptcy filing represented a continuation of the agreement embodied in the RSA. During these Chapter 11 Cases, the Debtors, with the

---

[3] As of the Voting Record Date, the RSA enjoyed the broad support of Holders whose claims represented approximately 86 percent of the claims arising on account of obligations under the First Lien Credit Agreement, as well as the Consenting Sponsors.

5

assistance of Guggenheim, continued the robust Marketing Process post-petition to find the best transaction possible.

12. On October 26, 2023, the Special Committee approved the Sale Transaction with Phoenix Data Center Holdings LLC (the "Purchaser"), an affiliate of Brookfield Infrastructure Partners L.P. (together with the Purchaser, "Brookfield"), which will provide for cash consideration of $775 million to the Debtors, subject to certain adjustments, in exchange for the Acquired Assets free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances and Assumed Liabilities). Accordingly, on October 31, 2023, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Brookfield bid (as may be amended from time to time in accordance with the terms thereof, the "Purchase Agreement").

13. The Sale Transaction provides substantial value to the Debtors' Estates, maximizes the value of all of the Acquired Assets, and provides for a substantial recovery to all Holders of Claims, including a clean exit at an approximately 67.6 percent recovery for the Holders of First Lien Claims. The Acquired Assets were subject to competing bids, which enhanced the Debtors' ability to achieve the highest or otherwise best value for such Acquired Assets. Further, the acquisition of a substantial number of lease assets by Brookfield serves to reduce long term lease costs, giving the Debtors more control over the cost structure. Moreover, because the Purchase Agreement contemplates the assumption of substantially all of the Debtors' contracts, unexpired leases, and other obligations of the Debtors' Estates, the Sale Transaction will result in payment in full for many of the Debtors' unsecured creditors.

14. The proceeds of the Sale Transaction will be used to fund distributions under the Plan and the Debtors will wind down, finalize, and make distributions to Holders of Claims, and

dissolve their remaining operations, if any. The Sale Transaction achieves—by far—the best overall outcome for the Debtors and their stakeholders, allows substantially all of the Debtors' operations to continue uninterrupted, offers the greatest recovery possible to the Debtors' creditors, and provides the Debtors with sufficient capital to wind down any remaining operations.

15.    Accordingly, the Special Committee concluded that the Sale Transaction set forth in the Plan constitutes the best option available to the Company and its stakeholders.

### The Special Committee's Investigation

16.    Since its engagement, the Special Committee, with the assistance of Katten, has conducted the Investigation. Between April 2023 and October 2023, the Special Committee met regularly to review matters relevant to the Investigation and discuss the progress of these Chapter 11 Cases. At the direction of the Special Committee, Katten submitted broad diligence requests related to Conflict Matters to the Debtors seeking documents and information relevant to the Investigation, including among other requests, copies of board materials and minutes, corporate formation and governance documents, corporate structure charts, company agreements, financial information, materials provided to the Company's lenders, documents related to the Company's significant equity holders, and internal correspondence. Katten also delivered discovery requests to BC Partners ("BC"), Medina Capital ("Medina Capital"), and Starboard Value LP ("Starboard") for the production of documents and fact witness interviews. Katten received and reviewed over 4,300 documents, comprising approximately 49,100 pages, from the Debtors, and 98 additional documents, comprising approximately 621 pages, from BC, Medina Capital, and Starboard, collectively. Katten has also reviewed the Company's filings with the U.S. Securities and Exchange Commission, met regularly with the Debtors' lead counsel, Kirkland & Ellis LLP, attended several meetings of the Board, and conducted interviews of members of the Company's

7

management, representatives of BC, Medina, and Starboard, and certain former members of the Board.

17. As of August 29, 2023, Katten retained M3 Advisory Partners ("M3") as financial advisor on behalf of and at the direction of the disinterested directors to provide specific services with respect to the Investigation. Among the services, M3 analyzed certain prepetition Related Party transactions, with a specific focus on the Company's financial condition at certain relevant times identified by Katten.

18. In connection with the Investigation, the Special Committee, with the assistance of Katten and M3, analyzed potential claims and causes of action held by the Debtors' Estates relating to, among other things: (i) the Sponsor Services Agreement, dated May 1, 2017, between the Company and its equity sponsors; (ii) the Intercompany Services Agreement, dated May 1, 2017, between the Company and its subsidiaries; (iii) the indication of interest from a third party to purchase the Company's data center business in April 2019; (iv) the loans to certain members of the Company's management in October 2019; (v) the spin-off of the Company's cybersecurity business, Appgate Inc. ("Appgate"), on December 31, 2019; (vi) the Transition Services Agreement, dated December 31, 2019, between the Company and Appgate; (vii) the Optional Share Purchase Agreement, dated February 1, 2021, and the assignment thereof; (viii) the loans by the Company to Appgate and the partial forgiveness thereof in February 2021; (ix) the capital redemption and distribution to SIS Holdings LP ("SIS"), the Company's 100 percent equity owner at the time, on February 19, 2021; (x) the business combination with Starboard Value Acquisition Corp. on July 29, 2021; (xi) the contribution by SIS to fund certain bonus payments to Cyxtera employees in August and September 2021; (xii) the resignations of certain directors in March

2023; (xiii) the payment of severance in April 2023 to certain former executives of the Company; and (xiv) certain other issues, including certain issues raised by creditor constituencies.

19. The Special Committee concluded that the Debtors' Estates do not have viable causes of action against the Related Parties that are worthy of pursuit during these Chapter 11 Cases, particularly in the context of the value-maximizing Plan and underlying Sale Transaction supported with material contributions by the Related Parties.

### Evaluation of Certain Plan Terms

20. In my role as a member of the Special Committee, I have reviewed, in consultation with the other members of the Special Committee, Messrs. Vogel and Arnold, the reasonableness and appropriateness of the global settlement and the release, exculpation, and injunction provisions in the Plan. I believe the global settlement embodied in the Plan is the product of extensive good faith, arm's-length negotiations and reflects a reasonable compromise of the various positions of the parties. The settlement embodied in the Plan contemplates, among other things, the materiality of the release, exculpation, and injunction provisions with respect to the parties' support of the Plan, the value of potential litigation Claims, and the expenses of litigating such Claims. Thus, as set forth more fully below, I believe that the Plan, including the release, exculpation, and injunction provisions, is reasonable under the circumstances, appropriate, and in the best interest of the Debtors, their Estates, and all of the Debtors' stakeholders.

    **A.**     **The Releases in the Plan Are Appropriate.**

21. Article VIII.C of the Plan provides for releases by, among others, the Debtors and their Estates of any and all Claims and Causes of Action, including any derivative claims the Debtors could assert, against the Released Parties, which includes, each in their capacities as such, among others, the Debtors, the Consenting Stakeholders, the DIP Lenders, the Agents, the Purchaser, the Official Committee of Unsecured Creditors (the "UCC"), each member of the UCC,

9

and each Related Party of each of the foregoing (the "Debtor Release").[4] The Special Committee reviewed the Debtor Release and concluded it is appropriate, justified, in the best interests of the Debtors and their stakeholders, and an integral part of the Plan for several reasons as follows.

22. *First*, key stakeholders, including the Ad Hoc Group, the Consenting Sponsors, the Purchaser, and the UCC, as applicable, were extensively involved in the negotiation process that led to the RSA and the Plan, as applicable. In particular, the Restructuring Transactions embodied in the Plan (including the Debtor Release) were negotiated by sophisticated parties and counsel, including months of prepetition negotiations among the Debtors and the Consenting Stakeholders that resulted in the RSA. In addition, the post-petition negotiations with the Purchaser were imperative to accomplish the Sale Transaction, which is the central component of the Plan. The Debtors' key stakeholders and current directors and officers were critical participants in the Plan process, both in terms of negotiating a consensual deal for the benefit of all stakeholders, voting in favor of the plan, and/or cooperating with the Investigation. Absent the support of these stakeholders, the Debtors would not have been able secure DIP financing to fund these Chapter 11 Cases, run an orderly Marketing Process, seek solicitation of the Disclosure Statement on a fully consensual basis, extend their exclusive right to file a chapter 11 plan and solicit acceptances thereof on a fully consensual basis, and obtain the votes necessary to confirm the Plan on this expedited timeline. The strong support from all of the Debtors' various stakeholders from the outset of these Chapter 11 Cases was in part because the Debtors agreed to provide the Debtor Release and the Third-Party Release (as defined herein) contemplated in the Plan, subject to the findings of the Investigation discussed herein.

---

[4] The foregoing description is meant as a summary of the operative Plan provisions only. Certain of the Released Parties are defined as such in multiple capacities. To the extent there is any conflict between the foregoing summary and the definition of "Released Party" contained in Article I of the Plan, the Plan shall control.

23. **Second**, the Released Parties have provided and/or continue to provide substantial benefits to all parties in interest. In particular, the Debtors' key stakeholders and current directors and officers have worked collaboratively and constructively with the Debtors and have provided (whether by their execution of the RSA, voting to accept the Plan, or otherwise) value to the Estates in the form of, among other things, providing consents under the Company's governing documents, resolving matters to enable the Debtors to swiftly emerge from Chapter 11, and cooperating with, and thereby minimizing costs associated with, the Special Committee's Investigation. For example, the Debtors' current directors and officers have actively participated in meetings and negotiations during these Chapter 11 Cases and continued to provide services that have positioned the Company to consummate the Restructuring Transactions set forth in the Plan. In addition, several of the current directors and officers assisted in responding to the Purchaser's diligence requests and met with the Purchaser and its advisors during the due diligence process. Additionally, the Purchaser negotiated in good faith and, ultimately, will consummate the value-maximizing Sale Transaction for the Benefit of the Debtors, their Estates, and all parties in interest. Each of the Released Parties is providing a mutual release of claims and causes of action.

24. **Third**, these contributions have resulted in a restructuring that contemplates the Debtor Release and enjoys the support of all relevant economic stakeholders, including Class 3 First Lien Claims and Class 4 General Unsecured Claims—the only classes entitled to vote—and will allow the Debtors to successfully emerge from bankruptcy positioned for future success.

25. **Fourth**, the Debtor Release is an essential *quid pro quo* for the Released Parties' contributions to and support of the Debtors' restructuring, including the mutual release of claims and causes of action. The Plan, including the Debtor Release contained therein, is supported by the Debtors' creditor constituencies, including the UCC. As described above, the Debtors' key

stakeholders and current directors and officers contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors, subject to the Investigation. In the absence of the Released Parties' support, the Debtors would not be in a position to confirm the Plan, consummate the Sale Transaction, effectuate the transactions contemplated thereunder, and maximize value for the benefit of the Debtors' stakeholders. The Debtor Release, therefore, is a critical component of the Plan.

26. Additionally, the releases given by holders of Claims and Interests included in Article VIII.D of the Plan (the "Third-Party Release") are a negotiated term of the Plan, the inclusion of which was a material condition for the Released Parties' contributions to and support of the Debtors' restructuring. I believe that all parties in interest benefit from the Restructuring Transactions contemplated by the Plan, which will provide for the sale of all or substantially all of the Debtors' assets and position them for future success. Moreover, I believe that the Third-Party Release is a consensual release. I understand that all Holders of Claims entitled to Vote had the opportunity to opt out of the Third-Party Release through their Ballots and that remaining Holders of Claims and Interests had the opportunity to opt out through the Opt Out Forms or to object to the Third-Party Release by timely filing an objection on the docket of the Chapter 11 Cases, and that some Holders of Claims and Interests did exercise their right to opt out. I also understand that all Releasing Parties will receive a mutual release from all other Released Parties. Importantly, the Ballots, the Notice of Non-Voting Status and Opt Out Forms, and the Confirmation Hearing Notice, each as appended to the *Debtors' Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 553], quoted the entirety of the Third-Party Release in bold, conspicuous font, clearly informing such Holders

of Claims and Interests of the steps they should take if they disagreed with the scope of the release. Thus, affected parties were on notice of the Third-Party Release, including the option to opt out or object to the Third-Party Release. As such, I believe that the Third-Party Release is consensual as to all creditors and interest holders who did not object.

27. Moreover, for months prior to the commencement of these Chapter 11 Cases and throughout the pendency of these Chapter 11 Cases, the Debtors' key stakeholders worked constructively with the Debtors to negotiate and ultimately implement the Restructuring Transactions embodied in the Plan, which will enable the Debtors to consummate a value-maximizing Sale Transaction and emerge from these Chapter 11 Cases. Namely, the Plan contemplates that the Purchaser will continue to operate the Debtors' business as a going concern for the benefit of all parties in interest. I believe that the Debtors' key stakeholders, including the Purchaser, worked constructively with the Debtors to negotiate the Restructuring Transactions embodied in the Plan and have provided material concessions, benefits, and commitments to the Debtors through the RSA, the Purchase Agreement, and during the pendency of these Chapter 11 Cases. It is my understanding that the Debtors' key stakeholders were unwilling to support the Plan without the assurance that there would not be post-emergence litigation or other disputes related to the restructuring. In particular, I understand that the Purchaser would have been unlikely to agree to the value-maximizing Sale Transaction if the Purchaser or the Debtors' employees, current and former officers and directors, vendors, and other stakeholders were subject to post-emergence litigation. The Debtor Release therefore benefits the Debtors' post-emergence enterprise as a whole.

28. *Fifth*, the parties bound by the Third-Party Release have received sufficient consideration in exchange for the release of their Claims against the Released Parties. The

Released Parties have provided and/or continue to provide benefits that flow to all parties in interest from the transactions contemplated by the Plan. In particular, the Debtors' key stakeholders and current directors and officers have provided significant contributions, resulting in Restructuring Transactions that will allow the Debtors to emerge from these Chapter 11 Cases. Those contributions further provide the Post-Effective Date Debtors or the Purchaser the ability to continue to operate the business as a going concern. The significant consideration provided by the Released Parties inured not only to the benefit of the Debtors, but also to the benefit of all stakeholders by, among other things, allowing the Chapter 11 Cases to efficiently proceed and, thus, maximizing the value of the Debtors' Estates and providing the best recovery to stakeholders.

29. Accordingly, I believe that the Debtor Release and the Third-Party Release are integral and essential provisions of the Plan and provide finality for the Released Parties regarding the parties' respective obligations under the Plan. I also believe the Debtor Release and the Third-Party Release have been provided in exchange for good and valuable consideration from the Released Parties, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, are fair, equitable and reasonable, and are given and made after due notice and opportunity to be heard. As such, I believe the Debtor Release and the Third-Party Release should be approved.

B. **The Exculpation and Injunction Provisions in the Plan Are Appropriate.**

30. The Special Committee also reviewed the appropriateness of the exculpation provision (the "Exculpation Provision") contained in Article VIII.E of the Plan. I believe the Exculpation Provision in the Plan is an integral piece of the overall settlement embodied by the Plan. It is limited to parties that have performed valuable services in connection with the Debtors' restructuring and is the product of good faith, arm's-length negotiations. I understand the Exculpation Provision is narrowly tailored to exclude criminal acts and acts of actual fraud, willful

14

misconduct, or gross negligence, and relates only to acts or omissions in connection with, or arising out of, the Debtors' restructuring. As such, I believe the Exculpation Provision is a critical component of the Plan, and along with the Debtor Release and Third-Party Release, forms an integral piece of the overall settlement embodied in the Plan.

### C. The Injunction Provision Is Appropriate.

31. The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") is also a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions. Further, the Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to the Chapter 11 Cases and the Restructuring Transactions by requiring the Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, the Third-Party Release, or the Exculpation Provision.

32. I also understand that the "gatekeeper" provision is a material and necessary term of the Plan. The purpose of the gatekeeper provision is to ensure that the Debtors or other Released Parties, including the Purchaser, do not become bogged down in meritless litigation. Accordingly, considering the broad support for the Plan from nearly all stakeholders, along with the importance of the gatekeeper provision, I believe that the gatekeeper provision is in the best interest of the Estates.

33. Based on these considerations, as a disinterested director of the Board and a member of the Special Committee, I determined that the Plan is fair, reasonable, and in the best interests of the Debtors, their Estates, and their stakeholders, and that the Debtor Release, the

15

Third-Party Release, the Exculpation Provision, and the Injunction Provision should be approved as part of confirmation of the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 14, 2023

/s/ *Roger Meltzer*
Roger Meltzer
Disinterested Director and Member of the
Special Committee of the Board of
Cyxtera Technologies, Inc.