**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CYXTERA TECHNOLOGIES, INC., *et al.*, | Case No. 23-14853 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF RONEN BOJMEL IN
SUPPORT OF CONFIRMATION OF THE FOURTH AMENDED JOINT
PLAN OF REORGANIZATION OF CYXTERA TECHNOLOGIES, INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera. The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

Pursuant to 28 U.S.C. § 1746, I, Ronen Bojmel, hereby declare as follows under penalty of perjury:

1. I am a Senior Managing Director of Guggenheim Securities, LLC ("Guggenheim Securities"), an investment banking firm with principal offices located at 330 Madison Avenue, New York, New York, 10017. Cyxtera Technologies, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") have retained Guggenheim Securities as their investment banker in the above-captioned Chapter 11 Cases.[2]

2. I submit this declaration (this "Declaration") in support of confirmation of the *Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 694] (the "Plan"), as amended, supplemented, or otherwise modified from time to time.[3] In further support of confirmation of the Plan, the Debtors have filed the *Declaration of Eric Koza In Support of Confirmation of the Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Koza Declaration"), and the *Declaration of Roger Meltzer In Support of Confirmation of the Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Meltzer Declaration"), each filed contemporaneously herewith.

3. Although Guggenheim Securities is compensated for its work as the Debtors' investment banker in these Chapter 11 Cases, I am not being compensated separately for this

---

[2] On July 17, 2023, the Court entered an order approving the retention of Guggenheim Securities as the Debtors' investment banker in these Chapter 11 Cases [Docket No. 287].

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, the *Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 552] (the "Disclosure Statement"), the Koza Declaration, the Meltzer Declaration, or the Purchase Agreement (each as defined herein), as applicable.

Declaration or testimony. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by Guggenheim Securities professionals involved in advising the Debtors in these Chapter 11 Cases, or information provided to me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am over the age of 18 years and am authorized to submit this Declaration.

### **Qualifications**

4. I have more than 25 years of experience, including restructuring-related investment banking experience, handling complex financial and other restructuring matters for a variety of companies (distressed or otherwise, both in and out of court), in a wide spectrum of industries. My areas of expertise include, among other things, (a) advising on financial restructuring execution and strategies, (b) analyzing business plans and related financial projections, (c) developing views on valuations based on practices widely used in the investment banking industry, (d) sizing, structuring, raising, and executing all aspects of financing transactions, including debtor-in-possession and exit financings, and (e) M&A and sale marketing processes.

5. I co-head Guggenheim Securities' investment banking restructuring practice and have been employed at Guggenheim Securities since October 2012. Before joining Guggenheim Securities, I was a Managing Director at Miller Buckfire & Co. for six years, and prior to joining Miller Buckfire & Co., I was a Vice President in the financial restructuring group at Dresdner Kleinwort Wasserstein and its predecessor, Wasserstein Perella.

**The Retention of Guggenheim Securities**

6. Guggenheim Securities has been engaged as investment banker to the Debtors, and members of my team and I have been working closely with the Debtors, since December 2022. Since being engaged by the Debtors, Guggenheim Securities has rendered investment banking advisory services to the Debtors in connection with the Debtors' evaluation of financing and strategic alternatives in light of their financial position. Additionally, Guggenheim Securities has worked with the Debtors' management and other professionals retained by the Debtors, and has become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

**The Debtors' Marketing Process and Proposed Asset Sale**

7. On March 27, 2023, the Debtors, with the assistance of Guggenheim Securities, launched a marketing process to engage third parties concerning a significant investment in or purchase of some or substantially all of the assets and/or equity interests in the Debtors (the "Prepetition Marketing Process"). In the months that followed, and prior to the Petition Date, approximately seventy-five (75) potential financial and strategic partners were contacted to solicit interest in acquiring some or substantially all of the assets and/or interests in the Debtors outside of chapter 11 or structuring a sale or other investment in the Debtors through a chapter 11 plan. As discussed in the Koza Declaration, in parallel with the Prepetition Marketing Process, the Debtors engaged with the Ad Hoc Group to chart a potential value-maximizing path forward. As further described in the Koza Declaration, on May 4, 2023, the Debtors, the Ad Hoc Group, and the Consenting Sponsors entered into a Restructuring Support Agreement that contemplated a dual-track process whereby the Debtors could continue their Prepetition Marketing Process, following the Petition Date, to facilitate discussions with interested parties regarding a potential sale transaction (the "Marketing Process" and together

with the Prepetition Marketing Process, the "Marketing Processes"), while simultaneously pursuing confirmation of a Recapitalization Transaction.

8. As noted in the Disclosure Statement, to facilitate the Marketing Process, the Debtors filed a motion to establish procedures to govern a marketing and auction process designed with the intent to maximize the value for the Debtors' existing assets and/or equity, by, among other things, allowing the Debtors a reasonable amount of time to solicit, evaluate, and potentially identify a more value-maximizing transaction than the Recapitalization Transaction under the Plan. The Court approved that motion on June 29, 2023, through the *Order (I) Approving the Bidding Procedures and Auction, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 180] (the "Bidding Procedures Order"). Throughout the Marketing Processes and pursuant to the terms of the Bidding Procedures, the Debtors, with the assistance of Guggenheim Securities, contacted and engaged in discussions with numerous potential counterparties, including certain of the Debtors' existing strategic partners, as well as other potential third-party investors. In total, the Debtors, with the assistance of the Guggenheim Securities, engaged with approximately eighty-eight (88) potential financial and strategic partners and executed approximately forty-five (45) non-disclosure agreements. The parties that executed such non-disclosure agreements were provided access to a virtual data room containing significant diligence materials, as well as, with respect to certain of these parties, through numerous calls and in-person meetings, access to the Debtors' management and their advisors. Ultimately, the Debtors received non-binding written whole-company proposals from seven (7) parties.

9. Following the receipt of the non-binding written proposals, the Debtors continued to engage with multiple interested parties, including with Phoenix Data Center Holdings LLC (the "Purchaser"), an affiliate of Brookfield Infrastructure Partners L.P. (together as "Brookfield"). As described in the Disclosure Statement, as the Marketing Process progressed, the Debtors, in consultation with the Ad Hoc Group and the official committee of unsecured creditors (the "Committee"), determined that the interest in the Debtors' assets and/or equity interests warranted an extension of the sale schedule. To that end, the Debtors extended certain deadlines, so as to provide the Debtors with additional time to complete their Marketing Process, to receive and evaluate bids, and, if necessary, to hold an Auction to determine the highest and best bid for some or substantially all of the Debtors' assets and/or equity interests in Reorganized Cyxtera.

10. As the final bid deadline approached, the Debtors received multiple bids from various third parties; however, the Debtors determined that none of these bids constituted a Qualified Bid. On August 29, 2023, the Debtors filed the *Notice of Cancellation of Auction* [Docket No. 472] notifying parties-in-interest that the Debtors, in accordance with the Bidding Procedures Order and in consultation with the Ad Hoc Group and the Committee, had cancelled the Auction scheduled to occur on August 30, 2023. However, as stated in the Disclosure Statement, the Debtors, with the assistance of their advisors, continued to engage in arm's-length negotiations with certain bidders (including Brookfield) and their respective advisors to try to enhance their respective proposals.

11. As noted in the Disclosure Statement, notwithstanding the foregoing negotiations, the Debtors maintained their toggle feature under the Plan, which provided that the Debtors would pursue the Recapitalization Transaction unless a more value-maximizing Sale Transaction

6

materialized with a third party prior to the Sale Transaction Notice Deadline. Specifically, if a higher or otherwise better Sale Transaction materialized prior to the Sale Transaction Notice Deadline, the Plan provided that the Debtors could "toggle" to a Sale Transaction.

### The Brookfield Transaction

12. Shortly after solicitation on the Plan commenced, Brookfield and the Debtors came to an agreement in principle on the framework of an Asset Sale transaction. The Debtors then spent the next few weeks negotiating and finalizing an asset purchase agreement memorializing the terms of the asset sale transaction with Brookfield prior to the Sale Transaction Notice Deadline.

13. On November 1, 2023, the Debtors filed a *Notice of Sale Transaction* (the "Sale Notice") [Docket No. 648] in which the Debtors announced that they had reached an agreement on the terms of the Asset Sale (the "Purchase Agreement") with the Purchaser, and that, with the consent of the Required Consenting Lenders, they had "toggled" to an Asset Sale under the Plan (the "Brookfield Transaction"). As further described in the Sale Notice, pursuant to the Purchase Agreement, the Purchaser will, among other things, purchase substantially all of the Debtors' assets in exchange for $775 million in cash, subject to certain adjustments (the "Asset Sale") Also, as noted in the Sale Notice, as a result of the Brookfield Transaction, the Debtors estimate that recoveries for Holders of First Lien Claims will be approximately 67.6 percent on account of their First Lien Claims.

14. Further, as noted on Exhibit C to the *Notice of Filing Plan Supplement for the Third Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 650], the Debtors intend to assume and assign certain contracts and leases to the Purchaser in accordance with the

Purchase Agreement. Based on my participation in negotiations regarding the Brookfield Transaction, I believe that the assumption and assignment of these contracts and leases were required by the Purchaser and are an integral component of the Asset Sale and the Purchase Agreement.

15. Additionally, as noted in the *Debtors' Memorandum of Law in Support of the Debtors' Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief"), filed contemporaneously herewith, I understand that the Brookfield Transaction is premised on several separate transactions that will allow Brookfield to purchase certain of the Debtors' formerly leased properties. As noted in the Confirmation Brief, I understand that, as a result of these separate transactions, the Debtors' business will emerge from chapter 11 with reduced long-term lease liabilities without the Debtors having to reject those leases.

16. I believe, based on my involvement in connection with the Marketing Processes and my experience as a restructuring investment banker, that the Debtors' Marketing Process provided the Debtors with a reasonable amount of time to solicit and potentially identify and select a higher or otherwise better transaction than the Recapitalization Transaction and, similarly, afforded interested parties a reasonable opportunity to conduct due diligence prior to submitting their proposals or bids. The foregoing view is informed by the duration and scope of the Marketing Processes described above, the due diligence conducted by potential interested parties, the feedback obtained from the parties solicited, as well as from the parties who submitted proposals or competing bids and with whom the Debtors engaged in ensuing negotiations, and the circumstances described herein and in the Disclosure Statement.

17. I understand that the Debtors' Special Committee has determined that the Brookfield Transaction is more value-maximizing than the Recapitalization Transaction. Moreover, I am not presently aware of any other bidder having submitted a bid deemed by the Debtors to be higher or otherwise better, or more viable, than the Brookfield Transaction. In light of this, the duration and scope of the Marketing Processes described above, the due diligence conducted by potential interested parties, the feedback obtained from the parties solicited, as well as from the parties who submitted proposals or bids and with whom the Debtors engaged in ensuing negotiations, and the circumstances described herein and in the Disclosure Statement, it is my view that the Brookfield Transaction is the highest or otherwise best sale transaction presently available to the Debtors under the circumstances of these Chapter 11 Cases.

18. Finally, I assisted the Debtors, along with the Debtors' other advisors, with the negotiation of the key economic terms of the Brookfield Transaction. Based on my observation of and participation in those discussions, the negotiations, in my view, were conducted in good faith and on an arm's length basis. During these discussions, I did not observe conduct that would indicate collusive or otherwise improper activity by Brookfield.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 14, 2023

/s/ *Ronen Bojmel*
Ronen Bojmel
Senior Managing Director
Guggenheim Securities, LLC