**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and Debtors in Possession*

Order Filed on November 17, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In re: | Chapter 11 |
| CYXTERA TECHNOLOGIES, INC., *et al* | Case No. 23-14853 (JKS) |
| Debtors.[1] | (Jointly Administered) |

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera.   The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

**ORDER (I) AUTHORIZING
CYXTERA CANADA TO ENTER INTO
AND PERFORM ITS OBLIGATIONS UNDER THE
COLOGIX ASSET PURCHASE AGREEMENT, (II) APPROVING
THE SALE OF CERTAIN CANADIAN ASSETS FREE AND CLEAR
OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES,
(III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through thirty (30), is

**ORDERED**.

DATED: November 17, 2023 _____

Honorable John K. Sherwood
United States Bankruptcy Court

(Page | 3)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Canada Sale Order") (a) authorizing and approving the Cyxtera Canada's entry into and performance under the APA, substantially in the form attached hereto as **Exhibit 1**, (b) authorizing and approving the sale of the Acquired Assets free and clear of any and all Encumbrances, except Permitted Encumbrances and Assumed Liabilities (c) authorizing the assumption and assignment of executory contracts and unexpired leases, and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that sufficient cause exists for the relief set forth herein; and upon adequate and sufficient notice of the Motion, the APA, and all other related transactions contemplated thereunder and in this Canada Sale Order, and it appearing that no other or further notice need be provided; and all interested parties having been heard or having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and the Canada Sale Hearing having been held on November 16, 2023; and the Court having reviewed and considered the

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion or the APA, as applicable.

| (Page | 4) | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Motion, all relief sought therein and related thereto and any objections thereto; and upon the full record in support of the relief requested by the Debtors in the Motion, including the Li Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Debtors have identified the offer by the Purchaser as the highest or otherwise best offer for the Acquired Assets; and this Court having found that sufficient cause exists for the relief set forth herein; and the Debtors having properly filed and served the *Notice of Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 656] (the "Assumption and Assignment Notice") on each applicable party as set forth in Schedule 2 attached thereto (the "Assumption and Assignment Schedule"), in accordance with the terms of the *Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 186] (the "Procedures Order"); and no timely objections have been filed to the assumption and assignment of the executory contracts and unexpired leases set forth in the Assumption and Assignment Schedule (the "Assigned Contracts"); and due and proper notice of the Procedures Order and the Assumption and Assignment Notice having been provided to each applicable counterparty to the Assigned Contracts as set forth in the Assumption and Assignment

| (Page \| 5) | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Schedule; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion and at the Canada Sale Hearing establish just cause for the relief granted herein; and this Court having found that, after an extensive marketing process by the Debtors, the Purchaser has submitted the highest or otherwise best offer for the Acquired Assets; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and upon the full record of these chapter 11 cases and all other pleadings; and upon all of the proceedings had before the Court and after due deliberation thereon, and good and sufficient cause appearing therefor **THE COURT HEREBY FINDS THAT**:[3]

## I.    Jurisdiction, Final Order, and Statutory Predicates.

A.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).

B.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

| (Page | 6) | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

C.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Rule 9013-1.

D.      This Canada Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Canada Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

## II.      Notice of the APA, the Canada Sale, and the Canada Sale Hearing.

E.      As evidenced by the affidavits of service previously filed with the Court and based on the representations of counsel at the Canada Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Canada Sale Hearing, the APA, this Canada Sale Order, and the Canada Sale has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 9007, 9008, and 9014, and the Local Rules. The Debtors have complied with all obligations to provide notice of the Motion, the Canada Sale Hearing, the APA, this Canada Sale Order, and the Canada Sale.  The aforementioned notices are good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Canada Sale Hearing, the APA, this Canada Sale Order, or the Canada Sale is, or

(Page | 7)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

F.    A reasonable opportunity to object and be heard with respect to the Canada Sale, the Motion, and the relief requested therein and provided in this Canada Sale Order has been afforded to all interested persons and entities.

## III.    **Good Faith of the Purchaser**.

G.    The APA was negotiated, proposed, and entered into by the Seller and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions and is substantively and procedurally fair to all parties. Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the APA or the Canada Sale to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

H.    As demonstrated by (i) any testimony and other evidence proffered or adduced at the Canada Sale Hearing and (ii) the representations of counsel made on the record at the Canada Sale Hearing, substantial marketing efforts and a competitive sale process were conducted and, among other things, (a) the Purchaser in no way induced or caused any chapter 11 filing by the Debtors and (b) all payments to be made by the Purchaser in connection with the Canada Sale have been disclosed. The Purchaser is consummating the Canada Sale in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is not an "insider" of any Debtor (as defined under section 101(31) of the Bankruptcy Code). The Purchaser has proceeded in good faith in all respects in connection with the Canada Sale. The

| (Page | 8) | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

IV.     **Highest or Otherwise Best Offer.**

I.      The marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.  The APA, including the form and total consideration to be realized by the Seller under the APA, (i) constitutes the highest and best offer for the Acquired Assets; (ii) is fair and reasonable; and (iii) is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

J.      The Debtors' determination that the APA, including the consideration provided by the Purchaser under the APA, constitutes the highest and best offer for the Acquired Assets and constitutes a valid and sound exercise of the Debtors' business judgment.

K.      Approval of the Motion, the APA, and the consummation of the Canada Sale is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

V.     **No Merger.**

L.      Neither the Purchaser nor any of its affiliates are a mere continuation of Cyxtera Canada or any other Debtor or their estates and there is no continuity of enterprise or common identity between the Purchaser or any of its affiliates, on the one hand, and Cyxtera Canada or any other the Debtors, on the other hand.  Neither the Purchaser nor any of its affiliates are holding themselves out to the public as a continuation of Cyxtera Canada or any

(Page | 9)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

other Debtors. Neither the Purchaser nor any of its affiliates are successors to Cyxtera Canada or any other the Debtors or their estates by reason of any theory of law or equity, and the Canada Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser or any of its affiliates with or into Cyxtera Canada or any other Debtor.

## VI.      No *Sub Rosa* **Plan**.

M.      The Canada Sale and the transactions arising thereunder do not constitute a *sub rosa* chapter 11 plan. The Canada Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for any of the Debtors.

## VII.     **Validity of Transfer**.

N.      The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, the District of Columbia, or any foreign country. None of the Debtors or the Purchaser is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims.

O.      The Seller is the sole and lawful owners of the Acquired Assets. The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Purchaser with all right, title, and interest of the Seller to the

(Page | 10)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Acquired Assets free and clear of (a) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, the "Liens"), and (b) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, trusts or deemed trusts, caveats, security interests, reservations of ownership, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined herein) and Liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Seller's or the Purchaser's interests in the Acquired Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), the "Claims"),

(Page | 11)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

and (c) all other Encumbrances (collectively, as set forth in clauses (a) through (c), the "Claims, Encumbrances, and Interests") relating to, accruing or arising any time prior to entry of this Canada Sale Order, in each case, with the exception of any Assumed Liabilities or Permitted Encumbrances.

P.    Subject to the entry of this Canada Sale Order, the Seller:  (a) has full requisite corporate or other organizational power and authority to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby, and (b) has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery, and performance of its obligations under the APA and to consummate the Canada Sale, including as required by its organizational documents, and, upon execution thereof, the APA and the related documents were or will be duly and validly executed and delivered by the Seller and enforceable against the Seller in accordance with their terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of the Seller.  No government, regulatory, or other consents or approvals, other than those expressly provided for in the APA and the DIP Credit Agreement, were required for the execution, delivery, and performance by the Seller of the APA or the consummation of the Canada Sale contemplated thereby.  No consents or approvals of the Seller, other than those expressly provided for in the APA, this Canada Sale Order, or the DIP Credit Agreement are required for the Seller to consummate the Canada Sale.

(Page | 12)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

## VIII.    Section 363(f) is Satisfied.

Q.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full.  Therefore, the Seller may sell the Acquired Assets free and clear of any Claims, Encumbrances, and Interests, other than Permitted Encumbrances and Assumed Liabilities.

R.    The Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby, if (i) the sale and/or transfer of the Acquired Assets to the Purchaser was not free and clear of all Claims, Encumbrances, and Interests (other than Permitted Encumbrances and Assumed Liabilities), or (ii) the Purchaser would, or in the future could, be liable for any such Claims, Encumbrances, and Interests (other than Permitted Encumbrances or Assumed Liabilities).

S.    The Seller may transfer or sell the Acquired Assets free and clear of all Claims, Encumbrances, and Interests, other than Permitted Encumbrances and Assumed Liabilities, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  All holders of Claims, Encumbrances, and Interests (except to the extent that such Claims, Encumbrances, and Interests are Permitted Encumbrances or Assumed Liabilities) are adequately protected by either (x) having their Claims, Encumbrances, and Interests, if any, in each instance against the Debtors, their estates, or the Acquired Assets, attach to the net cash proceeds of the Purchase Price ultimately attributable to the Acquired Assets in which such creditor alleges Claims, Encumbrances, and Interests, in the same order of priority, with the same validity, force, and effect that such Claims, Encumbrances, and

| (Page \| 13) | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Interests had prior to the Canada Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto, or (y) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

T.    Those holders of Claims, Encumbrances, and Interests who did not object or who withdrew their objections to the Motion, are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2); *provided* that the Required Lenders have only consented pursuant to paragraph U of this Canada Sale Order.

U.    The Required Lenders have consented to the Canada Sale solely on the condition that (i) the DIP Liens attach to the proceeds of the Canada Sale with the same priority as existed prior to the Canada Sale and retain the same validity, force, and effect that existed prior to the Canada Sale and (ii) such proceeds shall be distributed in accordance with the *Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 694] (as amended, modified or supplemented in accordance with its terms, the "Plan").    Absent the satisfaction of such conditions the Required Lenders would not have consented to the Canada Sale.

## IX.    Cure Costs and Adequate Assurance of Future Performance.

V.    The assumption and assignment of the Assigned Contracts pursuant to the terms of the APA and this Canada Sale Order is integral to the APA, does not constitute unfair discrimination, and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents the reasonable exercise of sound and prudent business

(Page | 14)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

judgment by the Debtors.  Subject to the terms and conditions of the APA, the Debtors shall: (a) to the extent necessary, cure or provide adequate assurance of cure, of any default existing prior to the date hereof with respect to the Assigned Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (b) to the extent necessary, provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assigned Contracts, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code.  The Debtors' promise to pay or otherwise cure all defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing Date, or otherwise required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (collectively, the "Cure Costs") in accordance with the terms of the APA and the Purchaser's promise to perform the obligations under the Assigned Contracts shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts.

W.    Under the circumstances, the Debtors have demonstrated that assuming and assigning the Assigned Contracts in connection with the Canada Sale is an exercise of their sound business judgment, and that such assumption and assignment is in the best interests of the Debtors' estates, for the reasons set forth in the Motion, in the Li Declaration, and on the record

(Page | 15)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

at the Canada Sale Hearing, including, without limitation, because the assumption and assignment of the Assigned Contracts in connection with the Canada Sale is a material component to the overall consideration provided by the Purchaser and will maintain the ongoing business of the Debtors, limit the losses of counterparties to Assigned Contracts, and maximize the distribution to creditors of the Debtors.

X.      The assignment of the Assigned Contracts is necessary and appropriate under the circumstances in connection with the Canada Sale, is integral to the Debtors' overall restructuring efforts, and the Purchaser has demonstrated that it can reasonably carry on the obligations under the Assigned Contracts.

## X.      Compelling Circumstances for an Immediate Sale.

Y.      Good and sufficient reasons for approval of the APA and the Canada Sale have been articulated.  The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the APA, and (b) compelling circumstances for the Canada Sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Canada Sale with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates and the Canada Sale will provide the means for the Debtors to maximize distributions to creditors.

(Page | 16)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Z.    The Canada Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates.  Time is of the essence in consummating the Canada Sale.  Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price, the proposed Canada Sale constitutes a reasonable and sound exercise of the Debtors' business judgment.

**IT IS HEREBY ORDERED THAT**:

I.    **General Provisions.**

1.    The Motion is granted as provided herein, and entry into and performance under, and in respect of, the APA and the consummation of the transactions contemplated thereby.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Canada Sale Hearing (the full record of which is incorporated herein by reference) or by stipulation filed with the Court, and all reservations of rights included in such objections, are hereby denied and overruled on the merits with prejudice.  Those parties who did not object or withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code to the relief granted herein.

3.    Notice of the Motion and Canada Sale Hearing was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014.

(Page | 17)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

## II.      Approval of the APA.

4.      The APA, all other ancillary documents related thereto or contemplated thereby, and all of the terms and conditions thereof, are hereby approved pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) perform, consummate, implement, and close the Canada Sale pursuant to and in accordance with the terms and conditions of, and as contemplated in, the APA and this Canada Sale Order, and (b) execute and deliver, perform under, consummate, implement, and fully close the APA, including the assumption and assignment to the Purchaser of the Assigned Contracts, together with all additional instruments and documents that may be necessary or desirable to implement the APA and the Canada Sale, without any further corporate action or order of the Court.

6.      Subject only to the restrictions set forth in this Canada Sale Order and the APA, the Debtors and the Purchaser are hereby authorized to take any and all actions as may be necessary or desirable to implement the Canada Sale, and any actions taken by the Debtors and/or the Purchaser necessary or desirable to implement the Canada Sale prior to the date of this Canada Sale Order, are hereby approved and ratified.

7.      This Canada Sale Order and the terms and provisions of the APA shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of and holders of equity interests in any Debtor, any holders of Claims, Encumbrances, and Interests (whether

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

known or unknown) in, against, or on all or any portion of the Acquired Assets, all counterparties to the Assigned Contracts, the Purchaser, designees, successors, and assigns of the Purchaser, the Acquired Assets, and any trustees, examiners, or receivers, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon any of the Debtors' cases to cases chapter 7 under the Bankruptcy Code of any of the Debtors' cases. The APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers. Any trustee appointed in these cases (including a Chapter 7 trustee, if applicable) shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Canada Sale Order. This Canada Sale Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing (including the Purchaser's designees).

### III.        Transfer of the Acquired Assets.

8.        Subject only to the terms of this Canada Sale Order, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets to the Purchaser in accordance with the terms of the APA and such transfer shall constitute a legal, valid, binding, and effective sale and shall vest the Purchaser with title to the Acquired Assets. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, other than Permitted Encumbrances and Assumed Liabilities, the Acquired Assets shall be sold free and clear of all Claims, Encumbrances, and Interests of any kind or nature whatsoever with all such

| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
|---|---|
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Claims, Encumbrances, and Interests (as applicable) to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Claims, Encumbrances, and Interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Claims, Encumbrances, and Interests had prior to the Canada Sale, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

9.     The Debtors are hereby authorized to take any and all actions necessary to consummate the APA, including any actions that otherwise would require further approval by shareholders, members, or their board of directors, as the case may be, without the need of obtaining such approvals.

10.     The sale of the Acquired Assets to the Purchaser pursuant to the APA and the consummation of the transactions contemplated thereby do not require any consents other than as specifically provided for in the APA and the DIP Credit Agreement.  Each and every foreign and domestic federal, provincial, territorial, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  A certified copy of this Canada Sale Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, province, or local authority to act to cancel any of the Claims, Encumbrances, and Interests, and any other encumbrances of record, except the Permitted Encumbrances and Assumed Liabilities.

| | |
|---|---|
| (Page \| 20) | |
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

11.     If any person or entity that has filed statements or other documents or agreements evidencing Claims, Encumbrances, and Interests on or in all or any portion of the Acquired Assets (other than statements or documents with respect to Permitted Encumbrances or Assumed Liabilities) shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims, Encumbrances, and Interests which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtors and the Purchaser are hereby authorized, on behalf of the Debtors and the Debtors' creditors, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Acquired Assets.  The Debtors and the Purchaser are each authorized to file a copy of this Canada Sale Order, which, upon filing, shall be conclusive evidence of the release and termination of all such Claims, Encumbrances, and Interests.

12.     This Canada Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, foreign or domestic federal, state, provincial, territorial, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any

(Page | 21)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including the Canada Sale. The Acquired Assets are sold free and clear of any reclamation rights.

13. This Court requests the aid and recognition of the Canadian Court to give effect to this Canada Sale Order, to assist in carrying out its terms and to make such orders as may be necessary or desirable to give effect to this Canada Sale Order in Canada, including, without limitation, any recognition orders or ancillary orders to be issued by the Canadian Court to ensure (i) the vesting of the Acquired Assets in the Purchaser; (ii) the assumption and assignment of the Assigned Contracts to the Purchaser; and (iii) the discharge by provincial government registries of any security interests or other Claims, Encumbrances, and Interests, except for Permitted Encumbrances and Assumed Liabilities, registered on the Acquired Assets.

**IV.      Assumption and Assignment of Assigned Contracts**.

14. The Seller is hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code and the Procedures Order to (a) assume and assign to the Purchaser, in accordance with the terms of the APA and this Canada Sale Order, the Assigned Contracts free and clear of all Claims, Encumbrances, and Interests (other than the Permitted Encumbrances and Assumed Liabilities), and (b) execute and deliver to the Purchaser such documents or other instruments as the Purchaser deems may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

(Page | 22)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

15.    With respect to the Assigned Contracts:  (a) the Seller may assume each of the

Assigned Contracts in accordance with section 365 of the Bankruptcy Code; (b) the Seller may

assign each of the Assigned Contracts to the Purchaser in accordance with sections 363 and 365

of the Bankruptcy Code, and any provisions in any of the Assigned Contracts that prohibit or

condition the assignment of such Assigned Contract or allow the party to such Assigned Contract

to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term

or condition upon the assignment of such Assigned Contract, constitute unenforceable

anti-assignment provisions which are void and of no force and effect; (c) subject to the Debtors

payment of Cure Costs, all other requirements and conditions under sections 363 and 365 of the

Bankruptcy Code for the assumption by the Seller and assignment to Purchaser of each Assigned

Contract have been satisfied; and (d) the Assigned Contracts shall be transferred and assigned to,

and following the Closing remain in full force and effect for the benefit of, the Purchaser,

notwithstanding any provision in any such Assigned Contract (including those of the type

described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or

conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code,

the Debtors shall be relieved from any further liability with respect to the Assigned Contracts

after such assumption and assignment to the Purchaser.

16.    Any Assigned Contract shall be assumed by the Seller and assigned to the

Purchaser in accordance with the Assumption Procedures as defined in the Procedures Order,

which Assumption Procedures are incorporated herein by reference and shall apply and be

| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
|---|---|
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

binding to any Assigned Contract. The pendency of a dispute relating to a particular Assigned Contract shall not delay the assumption and assignment of any other Assigned Contract or the Closing. Any proposed cure amount to be included in the Assumption and Assignment Notice or the resolution of any objection filed in connection therewith will be acceptable to the Purchaser and the form and substance of any filings or pleading filed by the Debtors in connection with the Assumption Procedures will be reasonably acceptable to the Purchaser.

17.     Upon the effective date of the assignment of any Assigned Contract, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract. To the extent provided in the APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

18.     Each Assigned Contract counterparty is deemed to have consented to the assumption and assignment of such Assigned Contract, and the Purchaser shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assigned Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

19.     Upon the Seller's assignment of the Assigned Contracts to the Purchaser under the provisions of this Canada Sale Order, any additional orders of this Court, and the Debtors' payment of any Cure Costs pursuant to the terms hereof or the APA, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract shall be permitted (a) to declare under such Assigned Contract or (b) to otherwise take action against the Debtors or the

(Page | 24)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Purchaser as a result of any Debtors' financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contract. Each non-debtor party to an Assigned Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Purchaser, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date, or, against the Purchaser, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors and (ii) imposing or charging against the Purchaser or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Seller's assumption and assignment of the Assigned Contracts to the Purchaser. Any provision in any Assigned Contract that purports to declare a breach, default, or termination as a result of a change of control of the Acquired Assets is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code. To the extent that any counterparty to an Assigned Contract is notified of Cure Costs (or the absence thereof) and fails to object to such Cure Costs (or the absence thereof) with respect to an Assigned Contract, such counterparty shall be deemed to have consented to such Cure Costs (or the absence thereof) and is deemed to have waived any right to assert or collect or enforce any Cure Costs that may arise or have arisen prior to or as of the Closing.

20.     On the effective date of the assignment of any Assigned Contract, the Purchaser shall be deemed to be substituted for the applicable Debtors as a party to the applicable Assigned Contracts and the applicable Debtors shall be relieved, pursuant to section 365(k) of

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

the Bankruptcy Code, from any further liability under the Assigned Contracts.

21.     All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Debtors or the Purchaser for any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Canada Sale.

22.     Notwithstanding anything to the contrary in this Canada Sale Order or the APA, a contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such contract is rejected or terminated by the Debtors, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

## V.     **Prohibition of Actions Against the Purchaser**.

23.     Subject to the terms, conditions, and provisions of this Canada Sale Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Seller to sell and/or transfer the Acquired Assets to the Purchaser in accordance with the terms of the APA and this Canada Sale Order.

24.     To the maximum extent permitted by law, in accordance with the APA, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the

| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
|---|---|
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

Seller with respect to the Acquired Assets and the Canada Sale. To the extent the Purchaser cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect while the Purchaser, with assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of Licenses to the Purchaser.

25.      Notwithstanding anything in this Canada Sale Order, subject to section 525(a) of the Bankruptcy Code, no governmental unit (as defined in Bankruptcy Code § 101(27)) or any representative thereof may revoke, suspend any right, license, trademark, or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases, the conduct of the Canada Sale, or the consummation of the transactions contemplated by the APA.

26.      The consideration provided by the Purchaser to the Seller pursuant to the APA for the Acquired Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession, the District of Columbia, and any foreign country.

27.      The transactions contemplated by the APA are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Canada Sale shall not affect the validity of the Canada Sale,

(Page | 27)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

unless such authorization and such Canada Sale is duly stayed pending such appeal. The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

28. Upon payment of the Purchase Price by the Purchaser to the Seller, the Administrative Agent (as defined in the DIP Credit Agreement) shall release the DIP Liens against the Acquired Assets, as applicable; *provided* that the (i) DIP Liens shall attach to the proceeds of the Canada Sale with the same priority as existed prior to the Canada Sale and retain the same validity, force, and effect that existed prior to the Canada Sale and (ii) such proceeds shall be distributed pursuant to and in accordance with the Plan.

29. This Canada Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules or the Local Rules stating the contrary, the terms and provisions of this Canada Sale Order shall be immediately effective and enforceable upon its entry, any applicable stay of the effectiveness and enforceability of this Canada Sale Order is hereby waived, and the Debtors and the Purchaser are authorized to close the Canada Sale immediately upon entry of this Canada Sale Order.

30. The failure to specifically include any particular provision of the APA in this Canada Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in their entirety; *provided* that this Canada Sale Order shall govern if there is any inconsistency between such agreements (including

(Page | 28)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

all ancillary documents executed in connection therewith), as applicable, and this Canada Sale Order.

31.    The APA and any related documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

32.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Canada Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by the Seller to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Canada Sale, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Acquired Assets to the Purchaser; (b) interpret, implement, and enforce the provisions of this Canada Sale Order; and (c) protect the Purchaser against any Claims, Encumbrances, and Interests (other than the Permitted Encumbrances or Assumed Liabilities) with respect to the Seller or the Acquired Assets of any kind or nature whatsoever, attaching to the proceeds of the Canada Sale.

33.    Notwithstanding the relief granted in this Canada Sale Order and any actions taken pursuant to such relief, nothing in this Canada Sale Order shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Canada Sale Order or the Motion or any order granting the relief requested by the Motion; (e) a request or authorization to reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to reject any executory contract or unexpired lease.

34.     The Debtors and the Purchaser are authorized to take all actions necessary to effectuate the relief granted pursuant to this Canada Sale Order in accordance with the Motion.

(Page | 30)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order (I) Authorizing Cyxtera Canada to Enter into and Perform its Obligations Under the Cologix Asset Purchase Agreement, (II) Approving the Sale of Certain Canadian Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief |

35.    The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

36.    To the extent this Canada Sale Order is inconsistent with any prior order or pleading filed in these chapter 11 cases related to the Motion, the terms of this Canada Sale Order shall govern.

**Exhibit 1**

**APA**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 30, 2023**

**BY AND AMONG**

**COLOGIX CANADA, INC., AS PURCHASER,**

**AND**

**CYXTERA COMMUNICATIONS CANADA, ULC,**

**AS SELLER**

**TABLE OF CONTENTS**

**Page**

**ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES** ..........................................................................................................1
1.1      Purchase and Sale of the Acquired Assets ...........................................1
1.2      Excluded Assets.......................................................................................2
1.3      Assumption of Certain Liabilities ..........................................................2
1.4      Excluded Liabilities.................................................................................3
1.5      Assigned Contracts .................................................................................3

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ..................................................4
2.1      Consideration; Payment..........................................................................4
2.2      Closing.....................................................................................................4
2.3      Closing Deliveries by Seller ...................................................................5
2.4      Closing Deliveries by Purchaser ............................................................5
2.5      Withholding.............................................................................................5

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ..............................6
3.1      Organization and Qualification ...............................................................6
3.2      Authorization of Agreement ...................................................................6
3.3      Conflicts; Consents.................................................................................6
3.4      Legal Actions..........................................................................................7
3.5      Compliance with Laws; Permits.............................................................7
3.6      Leased Real Property ..............................................................................7
3.7      Assigned Contracts .................................................................................8
3.8      Tax Matters .............................................................................................8
3.9      Environmental Matters ...........................................................................9
3.10     Due Diligence Materials.........................................................................9
3.11     Brokers ..................................................................................................10
3.12     No Other Representations or Warranties...............................................10

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .....................10
4.1      Organization and Qualification .............................................................10
4.2      Authorization of Agreement .................................................................11
4.3      Conflicts; Consents...............................................................................11
4.4      Financing...............................................................................................11
4.5      Brokers ..................................................................................................12
4.6      No Litigation .........................................................................................12
4.7      Certain Arrangements............................................................................12
4.8      Solvency................................................................................................12
4.9      Investigation..........................................................................................12
4.10     Transfer Tax Registrations ....................................................................12

**ARTICLE V BANKRUPTCY COURT MATTERS**..........................................................13
5.1      Bankruptcy Actions ..............................................................................13
5.2      Cure Costs .............................................................................................13
5.3      Approval................................................................................................13

## TABLE OF CONTENTS

**Page**

**ARTICLE VI COVENANTS AND AGREEMENTS** ..................................................... **14**
6.1     Employee Matters ........................................................................ 14
6.2     Overhead and Shared Services ...................................................... 15
6.3     De-Branding ................................................................................. 15
6.4     Shared Customer Contracts ........................................................... 15
6.5     Reasonable Efforts; Cooperation .................................................. 17
6.6     Further Assurances ....................................................................... 17
6.7     Insurance Matters ......................................................................... 17
6.8     Receipt of Misdirected Assets; Liabilities ..................................... 17
6.9     Estoppel Certificates .................................................................... 18
6.10    Acknowledgment by Purchaser ..................................................... 18

**ARTICLE VII CONDITIONS TO CLOSING** ................................................................ **19**
7.1     Conditions Precedent to the Obligations of Purchaser and Seller ........ 19
7.2     Conditions Precedent to the Obligations of Purchaser ..................... 19
7.3     Conditions Precedent to the Obligations of Seller .......................... 20
7.4     Waiver of Conditions ................................................................... 20

**ARTICLE VIII TERMINATION** .............................................................................. **21**
8.1     Termination of Agreement ............................................................ 21
8.2     Effect of Termination ................................................................... 22

**ARTICLE IX TAXES** ........................................................................................... **22**
9.1     Transfer Taxes ............................................................................. 22
9.2     Allocation of Purchase Price ......................................................... 22
9.3     Cooperation ................................................................................. 23
9.4     Preparation of Tax Returns and Payment of Taxes ......................... 23

**ARTICLE X MISCELLANEOUS** ............................................................................. **24**
10.1    Survival of Representations and Warranties and Certain Covenants;
       Certain Waivers ........................................................................... 24
10.2    Expenses ..................................................................................... 25
10.3    Notices ........................................................................................ 25
10.4    Binding Effect; Assignment .......................................................... 26
10.5    Amendment and Waiver ................................................................ 26
10.6    Third Party Beneficiaries .............................................................. 26
10.7    Non-Recourse .............................................................................. 26
10.8    Severability ................................................................................. 27
10.9    Construction ................................................................................ 27
10.10   Schedules .................................................................................... 27
10.11   Complete Agreement .................................................................... 28
10.12   Specific Performance ................................................................... 28
10.13   Jurisdiction and Exclusive Venue ................................................. 28
10.14   Governing Law; Waiver of Jury Trial ............................................ 29
10.15   Counterparts and PDF .................................................................. 29
10.16   Publicity ...................................................................................... 30

## TABLE OF CONTENTS

**Page**

10.17        Bulk Sales Laws ........................................................................................................30

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ....................................31**
11.1        Certain Definitions ......................................................................................................31
11.2        Index of Defined Terms...............................................................................................38
11.3        Rules of Interpretation .................................................................................................38

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
                        AGREEMENT
EXHIBIT B    FORM OF SALE ORDER
EXHIBIT C    FORM OF LANDLORD CONSENT
EXHIBIT D    FORM OF ESTOPPEL CERTIFICATE

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of October 30, 2023, is made by and among Cologix Canada, Inc., a Nova Scotia corporation ("<u>Purchaser</u>"), Cyxtera Communications Canada, ULC, an entity organized under the Laws of the province of Alberta ("<u>Seller</u>"). Purchaser and Seller are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein, including <u>Article XI</u>.

WHEREAS, Seller is an indirect wholly-owned Subsidiary of Cyxtera Technologies Inc., a Delaware corporation (as in existence on the date hereof, as a debtor-in-possession and a reorganized debtor, as applicable, "<u>CTI</u>");

WHEREAS, on June 4, 2023 (the "<u>Petition Date</u>"), CTI, together with certain of CTI's Affiliates, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>"), which cases are jointly administered for procedural purposes under *In re Cyxtera Technologies, Inc.*, Case No. 23-14853 (JKS) (Bankr. D.N.J. June 4, 2023) (collectively, the "<u>Bankruptcy Cases</u>");

WHEREAS, on June 6, 2023, the Foreign Representative, Seller, and certain of its Affiliates obtained an Initial Recognition Order (Foreign Main Proceeding) and Supplemental Order (Foreign Main Proceeding) from the CCAA Court (the "<u>CCAA Proceeding</u>") and thereafter have obtained further recognition Orders from CCAA Court recognizing Orders made by the Bankruptcy Court granted in the Bankruptcy Cases; and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than

Permitted Encumbrances. "Acquired Assets" means all of the right, title, and interest of Seller, as of the Closing in and to, the following assets of Seller:

(a)      (i) the Contracts listed on Schedule 1.1(a), (ii) the Transferred Customer Contracts, (iii) any purchase orders, service orders, sales orders, and similar instruments entered into by Seller prior to the Closing with respect to any Contract in clause (i) or (ii), (iv) any other Contracts entered into by Seller with respect to the Transferred Business prior to the Closing with the written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed), and (v) the Acquired Leases ((i) through (v), the "Assigned Contracts");

(b)      all prepaid or deferred charges and expenses, including all lease and rental payments, in each case, that have been prepaid by any Seller with respect to any Acquired Leased Real Property;

(c)      the leased real property listed on Schedule 1.1(c) (the "Acquired Leased Real Property" and the lease pursuant to which Seller holds its interest in such Acquired Leased Real Property, an "Acquired Lease"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(d)      all tangible assets of Seller located at any Acquired Leased Real Property and any such tangible assets on order to be delivered to any Acquired Leased Real Property, other than those assets set forth on Schedule 1.1(d); and

(e)      to the extent transferable, all rights of Seller under any permits, permissions, licenses, authorizations and other similar items, in each case, arising from a local Governmental Body having jurisdiction over, and only to the extent relating solely to the operation or use of the Acquired Leased Real Property.

1.2      Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to, in and under any properties, rights, interests and other assets of Seller other than the Acquired Assets (collectively, the "Excluded Assets").

1.3      Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)      all Liabilities and obligations of any Seller under the Assigned Contracts that first arise or become due from and after the Closing;

2

(b)      all Liabilities (including all government charges or fees) arising out of the conduct of the Transferred Business or the ownership or operation of the Acquired Assets, in each case, by Purchaser on or after the Closing Date;

(c)      all Transfer Taxes required to be paid under this Agreement;

(d)      without duplication: (i) the Pro Rata Portion of all Taxes with respect to the Acquired Assets for the Straddle Period, and (ii) all Taxes with respect to the Acquired Assets for any taxable period first beginning on or after the Closing Date;

(e)      all Liabilities agreed to be assumed by Purchaser in writing or for which Purchaser has agreed to be responsible in accordance with this Agreement; and

(f)      all Liabilities relating to Transferred Employees and all Liabilities and obligations assumed by Purchaser under Section 6.1.

1.4    Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

1.5    Assigned Contracts.

(a)    Assumption and Assignment of Executory Contracts. Seller shall take such actions in the Bankruptcy Case and the CCAA Proceedings as are reasonably necessary to effectuate the assumption and assignment to Purchaser of the Assigned Contracts hereunder in accordance with the Bankruptcy Code and the CCAA.

(b)    Non-Assignment.

(i)      Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or its Affiliates or terminated by a Seller, its Affiliates or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)      Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to, any Order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, Seller shall cooperate with Purchaser and use commercially reasonable efforts in pursuing such Consent or Governmental Authorization. If one or more such Consent or Governmental Authorization

3

has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s), if earlier), Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

**ARTICLE II**
**CONSIDERATION; PAYMENT; CLOSING**

2.1    Consideration; Payment.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $10,000,000, subject to Section 9.4(d) (the "Cash Payment").

(b)    At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the Cash Payment (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of

documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.3    Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)    any joint elections contemplated by Section 9.4(e);

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

2.4    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    the Closing Date Payment;

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)    any joint elections contemplated by Section 9.4(e);

(d)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(e)    the PST owing under the PSTA. The Parties will reasonably cooperate in determining the amount of PST with respect to the Acquired Assets so as to permit each Party to comply with its respective obligations under the PSTA; provided that if the Parties are unable to agree prior to the Closing, the Closing will still occur and Purchaser shall continue to be responsible for such PST.

2.5    Withholding. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, such amounts as may be required to be deducted and withheld therefrom or with respect thereto under the Tax Code or other applicable Law; provided that prior to any such deduction and withholding, Purchaser shall use commercially reasonable efforts to provide Seller with five (5) Business Days' written notice of its intent to deduct and withhold amounts from any such payments. If Purchaser is required under applicable Law to deduct or withhold any taxes from any payment in connection with or related to this Agreement, the sum payable by Purchaser shall be increased as necessary so that after all required

deductions have been made, Seller receives an amount equal to the sum it would have received had no such deductions been made.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with the SEC by CTI in respect of Seller and its business to the extent publicly available on the SEC's EDGAR database (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature), (ii) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (iii) set forth in the Schedules delivered by Seller concurrently herewith (each, a "Schedule" and collectively, the "Schedules"), and subject to Section 10.10, Seller represent and warrant to Purchaser as of the date hereof as follows:

3.1     Organization and Qualification. Except as set forth in Schedule 3.1, Seller is an unlimited liability corporation, duly organized, validly existing, and in good standing (if such concept is applicable) under the Laws of the jurisdiction of its incorporation or formation.

3.2     Authorization of Agreement. Subject to requisite Bankruptcy Court approvals:

(a)     Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which Seller is a party and to perform its obligations hereunder and to consummate the Transactions;

(b)     the execution, delivery and performance by Seller of this Agreement and the other Transaction Agreements to which Seller is a party, and the consummation by Seller of the Transactions, subject to requisite Bankruptcy Court approvals and CCAA Orders being granted, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of Seller, and no other organizational proceedings on Seller's part are necessary to authorize the execution, delivery and performance by Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c)     this Agreement and the other Transaction Agreements to which Seller is a party have been, or will be, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3     Conflicts; Consents. Assuming that (a) the Sale Order and all other requisite Bankruptcy Court approvals and CCAA Orders are obtained, and (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are made, given, obtained or waived (as applicable), neither the execution and delivery by Seller of this Agreement or the other

Transaction Agreements, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of the Organizational Documents of Seller (ii) except as set forth on Schedule 3.3, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Assigned Contract or accelerate Seller's obligations under any such Assigned Contract, (iii) violate any Law or Order applicable to Seller or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except, in the case of clauses (ii), (iii) or (iv), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    Legal Actions. As of the date of this Agreement, except as set forth on Schedule 3.4, there are no, and during the two (2) years preceding the date hereof there have been no, Actions pending or to the Knowledge of Seller, threatened in writing that relate to the Transferred Business (a) to which Seller is or was a party or to which any property, rights or interests of any of them is or was subject, except for (i) such Action that, if adversely determined, would not reasonably be expected to result in (x) Liabilities or obligations of any nature of Seller following the Closing in excess of $500,000 or (y) equitable remedies that would reasonably be expected to be material and adverse to the Transferred Business, taken as a whole, following the Closing, and (ii) following the Petition Date, claims of creditors or other parties in the Bankruptcy Cases or (b) that challenge, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Transactions.

3.5    Compliance with Laws; Permits.

(a)    Except as set forth on Schedule 3.5(a), with respect to the Transferred Business, Seller is, and during the two (2) years preceding the date hereof has been, in compliance in all material respects with the requirements of all Laws applicable to it or to its properties, except where the failure to so comply would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and no written notices have during the two (2) years preceding the date hereof been received by Seller alleging such material violation of any such Laws.

(b)    To the Knowledge of Seller, except as set forth on Schedule 3.5(b), Seller possesses all Permits that are necessary or required to conduct the Transferred Business with respect to the Acquired Assets as currently conducted, except for such Permits, the failure to have so obtained, made or delivered would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Within the two (2) years preceding the date hereof, Seller has not received written notice of any revocation or modification of any Permit and all such Permits are in full force and effect and will continue to be in full force and effect following the consummation of the Transactions, except where the failure to so continue would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.6    Leased Real Property. Schedule 3.6 contains a true and complete list of all Acquired Leases. Seller has delivered to the Purchaser or the Purchaser's Advisors true and complete copies of the Acquired Leases. Except as set forth on Schedule 3.6 (and subject to entry of the Sale Order), with respect to each of the Acquired Leases: (i) such Acquired Lease is legal, valid, binding, enforceable and in full force and effect; (ii) to the Knowledge of Seller, there are no existing

material disputes with respect to such Acquired Lease; (iii) none of Seller, or, to the Knowledge of Seller, any other party to the Acquired Lease is in breach or default under such Acquired Lease, and, to the Knowledge of Seller, no event has occurred within the two (2) years preceding the date hereof or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Acquired Lease, except, in each case, for such breaches or defaults as would not reasonably be expected to be material to the Transferred Business, taken as a whole; (iv) Seller does not currently sublease, license or otherwise grant any Person the right to use or occupy such Acquired Leased Real Property or any portion thereof, other than datacenter collocation and related services; and (v) none of the Acquired Leases, or any interest therein, is collaterally assigned or subject to a security interest. The Acquired Leases comprise all of the real property used or intended to be used in, or otherwise related primarily to, the Transferred Business. Other than licenses granted under the Transferred Customer Contracts, Seller is the sole party in possession of the Acquired Leased Real Property.

3.7   <u>Assigned Contracts</u>.

(a)   Subject to requisite Bankruptcy Court approvals and CCAA Orders being granted, and assumption by Seller of the applicable Contract in accordance with applicable Law and except (i) as a result of the commencement of the Bankruptcy Cases and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Assigned Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed in all material respects all obligations required to be performed by it under each Assigned Contract, (C) Seller has received no written notice of the existence of any breach or default on the part of Seller under any Assigned Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a material default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Assigned Contract and (E) Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Assigned Contract.

3.8   <u>Tax Matters</u>. Except as set forth on <u>Schedule 3.8</u>:

(a)   (i) all material Tax Returns required to be filed by or on behalf of Seller with regard to the Acquired Assets have been timely filed with the appropriate Taxing Authorities (after giving effect to any valid extensions of time in which to make such filings) and all material Taxes shown as due on such Tax Returns have been timely paid, except for Taxes being contested in good faith by appropriate proceedings.

(b)   Seller has, within the last three (3) years, duly and timely withheld from Business Employees salaries, wages, and other compensation and have paid over to the appropriate Taxing Authorities all material amounts required to be so withheld and paid over for all periods under all applicable Laws.

(c)   All material deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority of the Tax Returns of Seller with regard to the Acquired

8

Assets have been paid, settled or withdrawn, and there are no other audits or investigations by any Taxing Authority in progress, nor has Seller received written notice from any Taxing Authority that it intends to conduct such an audit or investigation.

(d)    Seller is not a non-resident of Canada for the purposes of the *Income Tax Act* (Canada).

(e)    Seller is registered for the collection of the GST/HST and its registration number under the ETA is 869416073 RT000, is registered for the collection of the QST and its registration number under the QSTA is 1207636149 TQ0001, and is registered for the collection of PST and its registration number under the PSTA is 1014-4649.

(f)    The representations and warranties contained in this Section 3.8 are the only representations and warranties being made with respect to Tax matters of Seller, and nothing in this Section 3.8 or otherwise in this Agreement shall be construed as a representation or warranty with respect to the amount, availability or usability of any net operating loss, capital loss, Tax basis or other Tax asset or attribute of Seller or in any taxable period.

3.9    Environmental Matters. Except as set forth on Schedule 3.9, with regard to the Acquired Assets (i) Seller is in compliance in all material respects with all applicable Environmental Laws, which compliance includes possessing and complying in all material respects with all Permits required by applicable Environmental Laws, (ii) within the two (2) years preceding the date hereof Seller has not received any written notice, and there are no Actions pending or, to the Knowledge of Seller, threatened in writing against Seller or any Subsidiary, regarding any material violation of Environmental Laws and (iii) to the Knowledge of Seller, within the past two (2) years preceding the date hereof Seller has not released any Hazardous Material at the Acquired Leased Real Property in violation of Environmental Laws and in a manner that currently requires remediation under Environmental Laws. This Section 3.9 contains Seller's sole representations and warranties regarding Environmental Laws, Hazardous Materials, or any other environmental, health or safety matters.

3.10    Due Diligence Materials.   Schedule 3.10(a) and 3.10(c) are true, accurate, and complete in all material respects regarding the matters addressed below as listed thereon.

(a)    Schedule 3.10(a) sets forth, as of the date hereof, for each of the Transferred Business (i) the name of such customer, (ii) the currency for such customer's payments, (iii) the monthly recurring revenue for such customer, (iv) the sold capacity, measured in kilowatts, for such customer, (v) price per kilowatt for such customer, (vi) the start date of such customer's current Contract with Seller, (vii) the current end of the term of such customer's current Contract with Seller, (viii) the length of the term of such customer's current Contract, and (ix) the annual price escalator percentage for such customer under its current Contract.

(b)    To the Knowledge of Seller, no customer set forth on Schedule 3.10(a) has materially reduced, cancelled or terminated (except for expiration of Contracts pursuant to their terms) its business relationship with Seller or has notified Seller in writing of any intent to do so.

(c)    Schedule 3.10(c) sets forth, as of the date hereof, each Business Employee and indicating each such Business Employee's (i) name or identification number; (ii) seniority

9

date; (iii) active or inactive status; (iv) job title; (v) full time, part time or temporary status; (vi) work location; (vii) base annual salary, (viii) bonus entitlement, (ix) vacation entitlement (other than statutory entitlement), (x) any other employee benefit entitlement (other than statutory entitlements), and (xi) terms of all related employment agreements, or a statement that there are no employment agreements for such Business Employee.

3.11    Brokers. No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller.

3.12    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser has relied only on such Express Representations and warranties), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and neither Purchaser has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Transferred Business, the other Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Seller or any of its Affiliates or Advisors. Without limiting the foregoing, neither Seller nor any of its Advisors or any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in expectation of the Transactions or any discussions with respect to any of the foregoing information.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Seller as of the date hereof as follows.

4.1    Organization and Qualification. Purchaser is an entity duly created, formed or organized (as applicable), validly existing and in good standing under the Laws of the jurisdiction of its creation, formation or organization (as applicable) and has all requisite corporate or limited liability company power and authority necessary to conduct its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have an adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) under the Laws of each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or

in the aggregate, reasonably be expected to have an adverse effect on Purchaser's ability to consummate the Transactions.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals and CCAA Orders being granted, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals and CCAA Orders being granted, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Assuming that (i) the Sale Order, and all other requisite Bankruptcy Court approvals and CCAA Orders are obtained and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3(a)</u> are made, given, obtained or waived (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's Organizational Documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)     Except as set forth on <u>Schedule 4.3(a)</u>, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

4.4     <u>Financing</u>. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Payment in full and to consummate all of the other Transactions, including the payment of the Purchase Price in full and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions and, to

Purchaser's knowledge, there is no circumstance or condition that could reasonably be expected to prevent or substantially delay the availability of such funds or otherwise impair such capability at the Closing and such other dates that such obligations and transactions are required to be satisfied pursuant to the terms hereof. Purchaser affirms that it is not a condition to Closing or to any of its obligations under this Agreement that Purchaser obtains financing for the Transactions.

4.5     Brokers. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.6     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will or would be reasonably likely to adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

4.7     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of directors (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any Affiliate of Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.8     Solvency. Purchaser is, and immediately after giving effect to the Transactions, Purchaser shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

4.9     Investigation. Purchaser acknowledges, covenants and agrees that it is relying on its own independent investigation and analysis in entering into this Agreement and consummating the Transactions. Purchaser is knowledgeable about the industries in which Seller operates and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded full access to the books and records, facilities and personnel of Seller for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of Seller. Purchaser does not have any knowledge that the representations and warranties of Seller in this Agreement are not true and correct in all respects, and Purchaser does not have any knowledge of any errors in, or material omissions from, the Schedules.

4.10     Transfer Tax Registrations. Purchaser is registered for the collection of the GST/HST and its registration number under the ETA is 859292344, and is registered for the collection of the QST and its registration number under the QSTA is 1219448291TQ0001.

12

**ARTICLE V**
**BANKRUPTCY COURT MATTERS**

5.1     <u>Bankruptcy Actions</u>.

(a)     Within three (3) Business Days following the date hereof, Seller shall file, or caused to be filed, with the Bankruptcy Court a motion seeking approval of the Sale Order. Seller shall use commercially reasonable efforts to schedule a hearing with the Bankruptcy Court to consider entry of the Sale Order.

(b)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)     Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the Transactions.

(d)     The Foreign Representative and Seller shall file with the CCAA Court an application in the CCAA Proceeding seeking the granting of the CCAA Orders within a reasonable period of time following approval of the Sale Order by the Bankruptcy Court.

(e)     Each Party shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received by a Seller from the Bankruptcy Court with respect to the Transactions.

(f)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

5.2     <u>Cure Costs</u>. Subject to entry of the Sale Order, Seller shall, on or prior to the Closing, pay all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement ("<u>Cure Costs</u>").

5.3     <u>Approval</u>. The Parties' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order) and CCAA Court (including granting of the CCAA Orders). Nothing in this Agreement shall require either Party or their respective Affiliates

13

to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1    Employee Matters.

(a)    At least 5 Business Days prior to Closing, Purchaser shall extend to each Business Employee employed by Seller a written offer of employment, which offer shall (i) be reviewed by Seller, with a reasonable opportunity to provide Seller's comments, if any,  and (ii) if accepted, become effective immediately after the Closing ("Transfer Offer"). Business Employees who accept such Transfer Offers and begin employment with Purchaser shall be collectively referred to herein as "Transferred Employees." Purchaser shall promptly notify Seller of whether each Business Employee has accepted their Transfer Offer, and following such notice, Seller will deliver evidence reasonably satisfactory to Purchaser that each Business Employee's employment with Seller will be terminated effective as of Closing, it being the intent of the Parties that effective as of the Closing, (i) employment by Purchaser of Transferred Employees shall commence and (ii) each Business Employee previously employed by Seller shall cease to be an employee of Seller. Nothing in this Agreement shall be construed as a representation or guarantee by Seller or any of its Affiliates that any or all Business Employees employed by Seller will accept the Transfer Offer, or that any Transferred Employee will continue in employment with Purchaser following the Closing for any period of time.

(b)    For the avoidance of doubt, and notwithstanding anything to the contrary set forth in Section 1.3 above, all Liabilities relating to the employment by Seller of any Business Employees shall be Excluded Liabilities; provided, however, that Purchaser shall be solely liable for all Liabilities relating to the Transferred Employees to the extent such Liability (i) first arises after such Transferred Employee commences employment with Purchaser and relates to or arises from such employment with Purchaser, or (ii) relates to or arises from a breach of or default under a Transfer Offer. Purchaser further agrees and acknowledges that some of the Business Employees reside in or are otherwise protected by the Laws of the Province of Quebec, and that such Laws may relate to Purchaser's decision or potential obligation to extend a Transfer Offer to one or more Business Employees, the terms contained in any such Transfer Offer, or Purchaser's other decisions with respect to the Transferred Employees or Business Employees that reside in or are otherwise protected by the Laws of the Province of Quebec (the "Quebec Employment Matters"). Purchaser will decide issues relating to the Quebec Employment Matters in its sole discretion; provided that Purchaser shall be solely responsible for any and all Liabilities arising from or relating to any Quebec Employment Matters. Purchaser agrees to indemnify and save harmless Seller from all such Liabilities a Governmental Body or Business Employee asserts or imposes as a result of the Quebec Employment Matters.

(c)    For the avoidance of doubt, and notwithstanding anything to the contrary set forth in Section 1.3 above, effective as of the Closing, Purchaser and Purchaser's Affiliates shall assume all obligations, Liabilities and commitments in respect of claims made by any Transferred Employee and Québec Employee (or any other individual claiming that he or she is or should be a Transferred Employee or a Québec Employee) for severance or other termination

benefits (including claims for wrongful dismissal, dismissal without a good and sufficient cause, reasonable notice of termination of employment, pay in lieu of reasonable notice or breach of Contract) arising out of, relating to or in connection with any failure to offer employment to, or to continue the employment of, any such Transferred Employee and Québec Employee (or other individual claiming that he or she is or should be a Transferred Employee or a Québec Employee) or other failure to comply with the terms of this Agreement.

(d)     The provisions of this <u>Section 6.1</u> are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or any Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this <u>Section 6.1</u> or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this <u>Section 6.1</u>, alter or limit Purchaser's or Seller's ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

6.2     <u>Overhead and Shared Services</u>. (i) Purchaser acknowledges and agrees that, effective as of the Closing Date: (i) all Overhead and Shared Services provided to the Transferred Business shall cease, (ii) Seller and its Affiliates shall have no further obligation to provide any such Overhead and Shared Services to the Transferred Business and (iii) all rights of the Transferred Business under Shared Contracts shall be terminated and the Transferred Business shall have no further rights thereunder, other than Shared Customer Contracts, which are the subject of <u>Section 6.4</u>.

6.3     <u>De-Branding</u>. As soon as reasonably practicable, but in no event more than thirty (30) days following the Closing, Purchaser shall take all actions necessary to remove any of Seller's or any of its Affiliates' trademarks, tradenames, trade dress, branding, signage, or other usage of Seller's or any of its Affiliates' trademarks, business names and logos, including all uses of the name "Cyxtera," located on or about the Acquired Leased Real Property or on, as may be applicable, any billing or other information technology systems and applications, stationery, purchase orders, invoices, receipts, and other similar documents and materials, advertising and marketing materials, policies, procedures and manuals, employee information or data, employee identifications, and similar documents and materials.

6.4     <u>Shared Customer Contracts</u>.

(a)     With respect to Shared Customer Contracts, Seller and its Affiliates shall use commercially reasonable efforts (and Purchaser shall reasonably cooperate with Seller and its Affiliates in connection with such efforts) to:

(i)     cause each Shared Customer Contract to be assigned in relevant part to Purchaser or to appropriately amend such Shared Customer Contract so that Purchaser will, from and after the Closing, be entitled to the rights and benefits inuring to the

Transferred Business under such Shared Customer Contracts on substantially the same terms as then in effect; and

(ii)    obtain prior to the Closing or, if not obtained, shall use commercially reasonable efforts to obtain, prior to the earliest of (A) six months following the Closing Date, (B) the closing of the Bankruptcy Cases or the windup or dissolution of Seller, and (C) the expiration of such Shared Customer Contract in accordance with its current terms (such period, the "Shared Contract Period"), from the counterparty to each Shared Customer Contract any Consent or similar action that is required to separate the portion of such Shared Customer Contract that relates to the Transferred Business, it being understood that (X) Seller and Purchaser shall not be required to grant any consideration to any counterparty to such Shared Customer Contract, (Y) the allocations of benefits and burdens of any Shared Customer Contract shall be apportioned such that the Transferred Business receives and bears such benefits and burdens consistent in all material respects with the past practice of Seller, its Affiliates, and such counterparty, and (Z) any amendment to any Shared Customer Contract that would adversely affect in any material respect the Transferred Business shall be subject to Purchaser's written approval (not to be unreasonably withheld, conditioned or delayed).

(b)    During the Shared Contract Period, Purchaser and Seller shall cooperate and work in good faith to separate the applicable portion of any Shared Customer Contract hereunder. The Contract constituting the separated portion of any Shared Customer Contract that relates to the Transferred Business shall constitute a Transferred Customer Contract, and in no event shall those portions of any Shared Customer Contract not relating to the Transferred Business be considered a Transferred Customer Contract. With respect to any Shared Customer Contract, if partial assignment or amendment cannot be obtained, or if an attempted partial assignment or amendment thereof would adversely affect in any material respect the rights of the Purchaser, Seller or their respective Affiliates, Seller and Purchaser will, and will cause the respective Affiliate to, use their commercially reasonable efforts to negotiate a mutually acceptable arrangement under which Purchaser (or its Affiliates) or Seller (or its Affiliates) will, from and after the Closing, to the extent permitted by applicable Law, obtain the benefits and assume the Liabilities and obligations under such Shared Customer Contract (consistent with this Section 6.4) to the extent related to the Transferred Business (in the case of the Purchaser) or the other businesses of Seller and its Affiliates (in the case of Seller), including entering into sub-contracting, sub-licensing or sub-leasing arrangements for the benefit of Purchaser or Seller, as the case may be.

(c)    Without limiting the generality of the foregoing and notwithstanding anything to the contrary herein, Seller and Purchaser each hereby further covenant and agree to and cause its respective Affiliates to abide by and comply with all of the terms and conditions of each applicable Shared Customer Contracts at all times during the Shared Contract Period, and in connection therewith each Party shall promptly indemnify and hold harmless the other Party and its respective Affiliates for any failure to comply with its compliance obligations hereunder. Notwithstanding anything to the contrary herein, including in Section 10.4 or in Section 10.6 hereof, all rights, obligations, remedies and defenses of Seller under this Section 6.4 with respect to any Shared Customer Contract shall be automatically assigned to an acquiror of the Seller's interest in such Shared Customer Contract, and such acquiror shall automatically be an express

16

third party beneficiary of this Section 6.4. This Section 6.4 may not be amended or modified, and no waiver may be granted hereunder, without the prior written consent of any such acquiror of a Shared Customer Contract.

6.5    Reasonable Efforts; Cooperation.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Subsidiaries to, use its and their commercially reasonable efforts to perform its and their respective obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)    The obligations of Seller pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Seller's debtor-in-possession financing, and Seller's obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Sale Order), and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6    Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.7    Insurance Matters. Purchaser acknowledges that, upon Closing, all insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to the Transferred Business, the Acquired Assets and the Assumed Liabilities and no further coverage shall be available to the Transferred Business, the Acquired Assets or the Assumed Liabilities under any such policies.

6.8    Receipt of Misdirected Assets; Liabilities.

(a)    From and after the Closing, if Seller or any of its Affiliates receives any right, property or asset that is an Acquired Asset, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust by Purchaser for Seller until so transferred.

17

(b)     From and after the Closing, if Seller or any of its Affiliates is subject to a Liability that should belong to Purchaser or its Affiliates pursuant to the terms of this Agreement, Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to Seller or its Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller or Affiliate, and such Seller or Affiliate shall assume and accept such Liability.

6.9    <u>Estoppel Certificates</u>. From and after the date hereof, Seller shall use good faith, commercially reasonable efforts to obtain: (a) from each landlord of the Acquired Leased Real Property an estoppel certificate in the form attached hereto as <u>Exhibit C</u> (each a "<u>Landlord Consent</u>"); and (b) from each customer under the Transferred Customer Contracts, an Estoppel Certificate.

6.10    <u>Acknowledgment by Purchaser</u>.

(a)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Transferred Business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects), the Acquired Assets, and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely, are relying, and will rely, solely, on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors, in each case, whether written or oral, made or provided by or on behalf Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, statutory, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in meetings, calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of any of the Acquired Assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the

18

immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence.

(b)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the members of Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this <u>Section 6.10</u>. Purchaser acknowledges and agrees, on its own behalf and on behalf of the members of Purchaser Group, that the covenants and agreements contained in this <u>Section 6.10</u> (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this <u>Section 6.10</u>, Seller would not enter into this Agreement.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     no Governmental Body of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) or Law restraining, enjoining or otherwise prohibiting the Closing that is continuing in effect; and

(b)     the Bankruptcy Court shall have entered the Sale Order and shall not have been stayed, reversed, or modified;

(c)     the CCAA Court shall have pronounced the CCAA Orders and the CCAA Orders shall not have been stayed, set-aside, reversed or modified.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties made by Seller in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (i) that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date, and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.11</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct only as of such date;

19

(b)    Seller shall not have breached, in any material respect, the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing;

(c)    No Material Adverse Effect shall have occurred and be continuing with respect to the Transferred Business;

(d)    Seller shall have executed or delivered to Purchaser all of the documents, instruments, and agreements set forth in Section 2.3;

(e)    The Sale Order, as approved by the Bankruptcy Court, shall be substantially in the forms attached to this Agreement as Exhibit B.

(f)    Purchaser shall have received on and as of the Closing Date a certificate of an authorized officer of Seller confirming that the conditions set forth Section 2.3 have been satisfied.

7.3    <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Seller to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)    Purchaser shall not have breached in any material respect the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)    Seller shall have received on and as of the Closing Date a certificate of an authorized officer of Purchaser confirming that the conditions set forth in Section 2.4 have been satisfied.

7.4    <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

**ARTICLE VIII**
**TERMINATION**

8.1     <u>Termination of Agreement</u>. This Agreement may be terminated at any time prior to the Closing only in accordance with this <u>Section 8.1</u>, and in no other matter:

(a)     by written notice of either Purchaser or Seller to the other, if there is in effect any Law or Order enacted or issued by a Government Body of competent jurisdiction that restrains, enjoins, declares unlawful or otherwise prohibits the consummation of the Closing or declaring unlawful the Transactions, and such Law or Order has become final, binding and non-appealable; <u>provided</u> that no Party may terminate this Agreement under this <u>Section 8.1(a)</u> if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(b)     by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before December 31, 2023 (the "<u>Outside Date</u>") (or such later date as provided in <u>Section 10.12</u>); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(b)</u> if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement; <u>provided</u> <u>further</u> that Seller may extend the Outside Date up to an additional 45 days to the extent necessary to satisfy the conditions set forth in <u>Section 7.1</u> so long as the other conditions in <u>Article VII</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are capable of being satisfied);

(c)     by written notice from Seller to Purchaser, if all of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are capable of being satisfied) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.2</u>;

(d)     by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Purchaser (other than a breach or failure by Purchaser to close when required pursuant to <u>Section 2.2</u>) then Seller may not terminate this agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date, which that the earlier of (A) one (1) Business Day prior to the Outside Date and (B) ten (10) days after Seller notifies Purchaser of such breach and (ii) Seller's right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in breach of any covenant, representation or warranty hereunder such that the conditions in <u>Section 7.3</u> cannot be satisfied.

(e)     by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(a)</u> or <u>7.3(b)</u> would not be satisfied; provided that (i) if such breach is curable by Seller (other than a breach or failure by Seller to close when required pursuant to <u>Section 2.2</u>) then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is

the earlier of (A) one (1) Business Day prior to the Outside Date and (B) ten (10) days after the Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in breach of any covenant, representation or warranty hereunder such that the conditions in Section 7.2 cannot be satisfied;

(f)     by written notice from Purchaser to Seller if any Material Adverse Effect occurs to the Transferred Business after the date hereof.

8.2    Effect of Termination. In the event of termination of this Agreement in accordance with Article VIII, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equity holders will have any Liability under this Agreement; provided that this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve Purchaser from any liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, but shall exclude consequential, special, punitive, and any other damages beyond actual damages incurred by Seller and related directly to such Willful Breach, any speculative damages or any damages based on any multiple or other valuation method) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

## ARTICLE IX
## TAXES

9.1    Transfer Taxes. Any U.S. federal, state, local, or non-U.S., GST/HST, QST, PST or other consumption sales, use, excise, value added, registration, real property, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes with the appropriate Taxing Authority.

9.2    Allocation of Purchase Price. For U.S. federal and applicable state and local and non-U.S. income Tax purposes, Purchaser, Seller, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal and non-U.S. income Tax purposes) among the Acquired Assets, which shall be consistent with the requirements of Section 1060 of the Code and the regulations promulgated thereunder and any similar provision of applicable Tax Law (the "Allocation Methodology"). As soon as commercially practicable, but no later than 45 days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Seller setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal and Canadian income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation") subject to Seller's review and approval (such approval

22

not to be unreasonably delayed, conditioned or withheld). Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Allocation. If Seller delivers a written objection within 30 days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchaser cannot resolve such dispute within 30 days of Purchaser's receipt of Seller's objection, then each of Purchaser, on the one hand, and Seller, on the other hand, shall be entitled to take its own position regarding the appropriate Allocation. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this <u>Section 9.2</u>) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the Tax Code and other applicable Law.

9.3    <u>Cooperation</u>. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Seller.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets for any Tax period ending after the Closing Date. With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall provide Seller or its successors in rights, as applicable, with a draft of such Tax Returns at least 30 days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns.

(c)    Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax that is payable or otherwise borne by Seller, without the written consent of Seller (such consent not to be unreasonably delayed, conditioned or withheld); except to the extent Purchaser reasonably believes such position is required by Law.

(d)    Property, ad valorem, intangible, and other periodic Taxes imposed or assessed directly against, the Acquired Assets (including to landlords through CAM charges under the Acquired Leases, but, for the avoidance of doubt, excluding any Transfer Taxes and any gross, net or similar Taxes) for any Straddle Period will be apportioned and prorated between Seller, on one hand, and Purchaser, on the other hand, as of the Closing Date. Purchaser shall bear the Pro Rata Portion of such Taxes, and Seller shall bear the remaining portion of such Taxes. The Parties hereby agree and acknowledge the apportionment of Taxes contemplated by this <u>Section 9.4(d)</u> results in an aggregate amount equal to $6,073.16 payable at Closing by Purchaser to Seller, that the Cash Payment will be adjusted accordingly, and that such apportionment shall not be revisited after Closing, even if the actual apportionment (which would have been determined when the actual amount of such Taxes become known) is greater or less than the apportionment made at Closing.  Purchaser shall be responsible for preparing and filing all Tax Returns with respect to,

23

and shall be responsible for paying to the applicable Taxing Authority or landlord, as applicable, all of, the Taxes contemplated by this Section 9.4(d).

(e)     If available, the Parties will complete and sign on or before the Closing Date, a joint election under section 167(1) of the ETA and section 75 of the QSTA, to permit the purchase and sale of any applicable Acquired Assets, without incurring GST/HST or QST. If available, the Purchaser will duly file the elections with the appropriate Governmental Body within the time permitted under the ETA and QSTA. The Purchaser agrees to indemnify and save harmless Seller from all Tax, penalties and interest in the event a Governmental Body asserts the election or elections contemplated by this section are not available. In the event the joint elections are not available, the Purchaser agrees to self-assess for any GST/HST and QST on the real property, and fixtures to real property included in the Acquired Assets and to pay any GST/HST, QST and PST to Seller at Closing. All PST owing on the Acquired Assets shall be payable by the Purchaser to Seller at Closing.

## ARTICLE X
## MISCELLANEOUS

10.1   Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Except as set forth below, and except for any claim based on fraud (which claims, if any, shall, for the avoidance of doubt, be subject to Section 6.10), each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing, such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for one year following the Closing Date, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf, with respect to Purchaser, and on behalf of the Purchaser Group that the agreements contained in (among others) Section 6.10 and this Section 10.1 require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for one year. Notwithstanding anything to the contrary above in this Section 10.1 but subject in all cases to Section 6.10, the representations and warranties set forth in Sections 3.8(d), 3.9, and 3.10, (and no other representations and warranties) and any claim based on fraud (which claims, if any, shall, for the avoidance of doubt, be subject to Section 6.10), shall survive Closing in each case for a period of one year; provided that Seller shall have no Liability for any breach of such representations or warranties if Purchaser's aggregate Liability incurred as a result of all such breaches is less than $10,000.00 and in no event shall Seller's Liability hereunder include (i) any consequential, special, punitive, or any other damages beyond actual damages incurred by Purchaser and related directly to such breach, (ii) any speculative damages or (iii) any damages based on any multiple or other valuation method.

24

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof) if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

       Notices to Purchaser:

       Cologix Canada, Inc.
       c/o Cologix, Inc.
       1601 19th Street, Suite 650
       Denver, Colorado 80202
       Attention:     General Counsel
       Email:        legal@cologix.com

       Notices to Seller:

       Cyxtera Technologies, Inc.
       2333 Ponce De Leon Blvd, Suite 900
       Coral Gables, Florida 33134
       Attention:     Victor Semah, Chief Legal Officer
       E-mail:       victor.semah@cyxtera.com
                  legal@cyxtera.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Christopher Marcus, P.C.
                Derek Hunter
                Steve Toth
Email:          christopher.marcus@kirkland.com
                derek.hunter@kirkland.com
                steve.toth@kirkland.com

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; <u>provided</u> that such assignee assumes all of the assignors obligations hereunder and neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; <u>provided</u> <u>further</u> that either Party may assign this Agreement in connection with the transfer of all or substantially all of its assets or the Acquired Assets. Notwithstanding the foregoing, Purchaser may elect, by notice delivered at least five Business Days prior to Closing, to assign its rights under this Agreement to an Affiliate for the purpose of taking assignment of the Acquired Leased Real Property in such Affiliate's name; <u>provided</u> that any such assignment shall in no way relieve Purchaser of its obligations under this Agreement.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of <u>Section 6.10</u>, the Seller Parties and, for purposes of <u>Section 10.7</u>, the Non-Recourse Parties and (ii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "<u>Non-Recourse Party</u>") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or

26

for any Agreement Dispute (as defined herein), and (ii) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>provided</u> that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms have actually been disclosed in writing on or before the date hereof. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

27

10.11  <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement; provided that the refusal of any such courts refuse to grant specific performance or other equitable relief shall not itself constitute a breach of this clause (a), so long as the applicable Party has otherwise complied with and not made a claim or assertion inconsistent with this <u>Section 10.12</u>, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order and neither Party will oppose the granting of specific performance or other equitable relief on the basis that the other Party has an adequate remedy at Law. The remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and neither Party will claim or assert that the election by the other Party to pursue an injunction or specific performance will restrict, impair, or otherwise limit such other Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be.

10.13  <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement

28

(each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the

extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.16    <u>Publicity</u>. Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Seller, as applicable, disclosure is otherwise required of such Party by applicable Law, such disclosure is consistent with (and discloses no substantive terms of the Agreement other than those disclosed in prior permitted releases) or disclosure is required by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller (or their respective Affiliates) lists securities; <u>provided</u> that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law, Bankruptcy Court requirement, or rule to consult with the other Party with respect to the text thereof. Without limiting the foregoing, no Party, without the prior written approval of Seller and Purchaser, shall disclose the Purchase Price, the approximate amount of the Purchase Price, any other financial information from which the approximate amount of the Purchase Price may be determined, or disclose any of the other essential terms of this Agreement, except (a) as required by Law or required for financial reporting purposes and except or (b) to the extent such statements are consistent with, and disclose no substantive terms of this Agreement other than those disclosed in any previous press releases, public disclosures or public statements made jointly by the Parties (or individually), if approved by Seller and Purchaser.

10.17    <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer Laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1     <u>Certain Definitions</u>.

(a)     "<u>Action</u>" means any action, complaint, suit, litigation, arbitration, third-party mediation, audit, or proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

(b)     "<u>Advisors</u>" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)     "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)     "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(e)     "<u>Business Employee</u>" means each employee of Seller who is primarily engaged in the Transferred Business.

(f)     "<u>CCAA</u>" means the *Companies' Creditors Arrangement Act* (R.S.C., 1985, c. C-36)

(g)     "<u>CCAA Court</u>" means the Court of King's Bench of Alberta under Court File No. 2301-07385 with respect to the CCAA Proceeding.

(h)     "<u>CCAA Orders</u>" means a Canadian recognition Order of the Sale Order and a Canadian vesting Order for the benefit of the Purchaser with respect to the Acquired Assets, both as granted by the CCAA Court in the CCAA Proceeding pursuant to the CCAA.

(i)     "<u>Confidentiality Agreement</u>" means that Mutual Confidentiality and Nondisclosure Agreement, effective as of October 13, 2022, by and between Cyxtera Technologies, LLC and Cologix Canada, Inc.

(j)     "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(k)     "<u>Contract</u>" means any written contract, indenture, note, bond, lease, license, sublease, sublicense, mortgage, agreement, guarantee, or other agreement that is legally binding upon a Person or its property (in each case, including all amendments, supplements, extensions

31

and other modifications and including all purchase orders, service orders, sales orders, and similar instruments).

        (l)    "COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

        (m)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

        (n)    "Environmental Laws" means all Laws concerning pollution, human health or safety (solely to the extent relating to exposure of any natural Person to Hazardous Materials), or protection of the environment as enacted and in effect as of the date hereof.

        (o)    "Estoppel Certificate" means, with respect to a Transferred Customer Contract, a document in the form attached hereto as Exhibit D.

        (p)    "ETA" means Part IX of the *Excise Tax Act* (Canada) (R.S.C., 1985, c. E-15).

        (q)    "Foreign Representative" means Cyxtera Technologies, Inc.

        (r)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

        (s)    "Governmental Authorization" means any Permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

        (t)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether non-U.S., federal, provincial, territorial, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court of applicable jurisdiction.

        (u)    "GST/HST" means the goods and services Tax and harmonized sales Tax imposed under the ETA.

        (v)    "Hazardous Material" means any material or substance that is defined as "hazardous" or "toxic" under Environmental Laws due to its dangerous or deleterious properties or characteristics, including petroleum products or byproducts, friable asbestos or polychlorinated biphenyls.

        (w)    "Knowledge of Seller", or words of like import means the actual knowledge of Mitchell Fonseca and Victor Semah without personal Liability on the part of such individuals.

(x)    "Law" means any federal, national, state, provincial, territorial, county, municipal, provincial, local, non-U.S. or multinational, statute, constitution, common law, ordinance, code, decree, Order, judgment, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body of competent jurisdiction.

(y)    "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Acquired Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Acquired Leased Real Property.

(z)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(aa)    "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that has a material adverse effect on the Transferred Business, the Acquired Assets, and the Assumed Liabilities, taken as whole; provided that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any Effect in, arising from or relating to general business or economic conditions affecting the industry in which the Transferred Business operates or is conducted, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other countries in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including COVID-19 or the worsening thereof) or any quarantine or trade restrictions related thereto or any other force majeure; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any equipment or supplies necessary to or used in the provision of services by Seller (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased

33

cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii ) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) the compliance by any Party with the terms of this Agreement, including any action taken or refrained from being taken pursuant to or in accordance with this Agreement, or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Transferred Business, the Acquired Assets, or the Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business of Seller; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules; or (xv) (A) the commencement or pendency of the Bankruptcy Cases or the CCAA Proceeding; (B) any objections in the Bankruptcy Court or the CCAA Court to (1) this Agreement or any of the Transactions, (2) the Sale Order, the CCAA Order, or the reorganization or liquidation of Seller or (3) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or the CCAA Court or any actions or omissions of Seller in compliance therewith; provided that any adverse Effects resulting or arising from the matters described in clauses (i) through (vii) may be taken into account in determining whether there has been a Material Adverse Effect to the extent, and only to the extent, that they have a materially disproportionate adverse effect on the Transferred Business in the aggregate relative to similarly situated participants in the industries and geographic areas in which the Transferred Business operates (in which case only such incremental materially disproportionate adverse effect may be taken into account in determining whether there has been a Material Adverse Effect).

(bb)    "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body of competent jurisdiction, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(cc)    "Ordinary Course" means the ordinary and usual course of operations of the Transferred Business conducted by Seller, taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and the CCAA Proceeding and past practice in light of the current pandemic, epidemic or disease outbreak (including COVID-19); provided that any action

taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak (including COVID-19) shall be deemed to be in the ordinary course of business.

(dd)    "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(ee)    "Overhead and Shared Services" means the ancillary, corporate or other shared services or processes that are provided to or used in both (i) the Transferred Business and (ii) any Excluded Assets, including services and processes relating to: travel; meeting management and entertainment; labor; office supplies (including copiers and faxes); personal telecommunications (including email); computer/telecommunications maintenance and support; software application and data hosting services; energy/utilities; procurement and supply arrangements; advertising and marketing; treasury; public relations, legal and regulatory matters; risk management (including workers' compensation); payroll; procurement cards and travel cards; telephone/data connectivity; disaster recovery; accounting; tax; internal audit; executive management; quality control and oversight; product design and engineering; human resources and employee relations management; employee benefits; billing, credit, collections and accounts payable; property management; facility management; site security; asset management; supply chain and manufacturing; global trade compliance; and customs and excise matters.

(ff)    "Permits" means all licenses, permits, registrations, certifications, agreements, authorizations, Orders, certificates, qualifications, waivers, approvals, permissions, authorizations, and exemptions pending with or issued by Governmental Bodies, in each case, that is material to the Transferred Business or the Acquired Leased Real Property.

(gg)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Acquired Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Acquired Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions, Environmental Laws and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Acquired Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis pursuant to any Assigned Contracts, (vi)  such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on Schedule 11.1(gg), and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(hh)     "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, organization, estate, Governmental Body or other entity or group.

(ii)     "Pro Rata Portion" means, in the context of Liabilities or Taxes, the fraction of a Liability or Tax attributable to the Straddle Period, the numerator of which is the number of days between the Closing Date and the last day of the Straddle Period, inclusive, and the denominator of which is the total number of days in the Straddle Period. By way of example, if a Straddle Period is coextensive with the calendar year 2023, and the Closing Date occurred on April 10, 2023, the Pro Rata Portion would be (265/365) (representing the number of days between April 10, 2023 and December 31, 2023, divided by the number of days in calendar year 2023).

(jj)     "Purchaser Group" means, with respect to Purchaser, Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(kk)     "PST" means the provincial sales tax imposed under the PSTA.

(ll)     "PSTA" means the *Provincial Sales Tax Act* (British Columbia).

(mm)   "QST" means the Quebec sales tax imposed under the QSTA.

(nn)     "QSTA" means *An Act respecting the Quebec sales tax*.

(oo)     "Sale Order" means an Order of the Bankruptcy Court approving the Transactions, substantially in the form attached hereto as Exhibit B, with such changes as may be reasonably acceptable to the Parties.

(pp)     "Seller Parties" means Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(qq)     "Shared Contract" means any Contract to which Seller is a party and that inures to the benefit or burden of, or otherwise relates to, both (i) the Transferred Business and (ii) any other business of any Seller or any of their Subsidiaries (including any business related to the Excluded Assets).

(rr)     "Shared Customer Contract" means any Contract with any customer of Seller or any of its Affiliates to which Seller or any of its Affiliates is a party, and in each case that provides for such customers to receive services from the Transferred Business as well as one or more products or services that are provided by any business or operation pertaining to the Excluded Assets.

(ss)     "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

36

(tt)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(uu)    "Tax" or "Taxes" means all U.S. federal, state, local or non-U.S. taxes including any net income, gross receipts, capital stock, franchise, profits, ad valorem, value added, levies, duties, fees, imposts, import, export, withholding, social security, governmental pension, employment insurance, unemployment, disability, workers compensation, real property, personal property, business, development, occupancy, stamp, excise, occupation, PST, consumption sales, use, transfer, land transfer, conveyance, service, registration, premium, windfall or excess profits, customs, duties, licensing, surplus, alternative minimum, estimated, GST/HST, QST or other similar tax, including any interest, penalty, fines or addition thereto.

(vv)    "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(ww)    "Tax Return" means any return, report or similar filing (including the attached schedules) filed or required to be filed with respect to Taxes, including any information return, claim for refund, or amended return.

(xx)    "Taxing Authority" means any U.S. federal, state, provincial, local or non-U.S. government, any subdivision, agency, commission or authority thereof or any quasi-governmental body exercising Tax regulatory authority.

(yy)    "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(zz)    "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(aaa)    "Transferred Business" means collectively the Transferred Montreal Business and the Transferred Vancouver Business.

(bbb)    "Transferred Customer Contracts" shall mean all: (i) Contracts of Seller with customers for the provision by Seller of services solely in the Transferred Business (and not, for the avoidance of doubt, services at any location other than the Acquired Leased Real Property); and (ii) the portion of any Shared Customer Contract that provides for the delivery of services in the Transferred Business, it being understood that in no event shall those portions of any Shared Customer Contract providing for the delivery of goods and services at any location other than the Acquired Leased Real Property be considered a Transferred Customer Contract.

(ccc) "<u>Transferred Montreal Business</u>" means the business operations of Seller at the Cyxtera Montreal Data Center located at 3000 Renee Levesque, Montreal, Quebec.

(ddd) "<u>Transferred Vancouver Business</u>" means the business operations of Seller at the Cyxtera Vancouver Data Center located at 555 West Hastings Avenue, Suite 1480 and Suite 2460, Vancouver, British Columbia.

(eee) "<u>Willful Breach</u>" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2    <u>Index of Defined Terms</u>.

| | |
|---|---|
| Acquired Assets ...........................................2 | Enforceability Exceptions ...........................6 |
| Acquired Lease ............................................2 | Excluded Assets...........................................2 |
| Acquired Leased Real Property ...................2 | Excluded Liabilities.....................................3 |
| Agreement ..................................................1 | Express Representations .............................10 |
| Agreement Dispute ....................................28 | Fundamental Representations...................19 |
| Allocation .................................................22 | Landlord Consent ......................................18 |
| Allocation Methodology............................22 | Non-Recourse Party...................................26 |
| Assigned Contracts......................................2 | Outside Date ..............................................20 |
| Assignment and Assumption Agreement ....5 | Parties .........................................................1 |
| Assumed Liabilities .....................................2 | Party............................................................1 |
| Bankruptcy Cases .......................................1 | Petition Date ...............................................1 |
| Bankruptcy Code ........................................1 | Purchase Price .............................................4 |
| Bankruptcy Court .......................................1 | Purchaser .....................................................1 |
| Cash Payment .............................................4 | Québec Employment Matters ....................14 |
| CCAA Proceeding .......................................1 | Schedule ......................................................6 |
| Chosen Courts ...........................................28 | Schedules .....................................................6 |
| Closing.........................................................4 | Seller............................................................1 |
| Closing Date ................................................5 | Shared Contract Period.............................16 |
| Closing Date Payment .................................4 | Transfer Offer ...........................................14 |
| CTI...............................................................1 | Transfer Taxes ...........................................22 |
| Cure Costs .................................................13 | Transferred Employees..............................14 |
| Effect .........................................................32 | |

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and exhibit references contained in this Agreement are references to sections, clauses, Schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

38

(b)      Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)      The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e)      Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)      The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)      All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i)      Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (i) delivered or provided to Purchaser or any of Purchaser's Advisors, including by electronic means, or (ii) made available upon request, including at Seller's offices.

(j)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)      Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m)      A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

39

[*Signature pages follow.*]

United States Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In re: | Case No. 23-14853-JKS |
| Cyxtera Technologies, Inc. | Chapter 11 |
| Debtor | |

# CERTIFICATE OF NOTICE

| District/off: 0312-2 | User: admin | Page 1 of 6 |
|---|---|---|
| Date Rcvd: Nov 17, 2023 | Form ID: pdf903 | Total Noticed: 10 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |
| ^ | Addresses marked '^' were sent via mandatory electronic bankruptcy noticing pursuant to Fed. R. Bank. P. 9036. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Nov 19, 2023:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Cyxtera Technologies, Inc., 2333 Ponce De Leon Boulevard, Suite 900, Coral Gables, FL 33134-5449 |
| aty | + | Brian Nakhaimousa, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |
| aty | + | Cole Schotz P.C., 25 Main Street, Court Paza North, Hackensack, NJ 07601-7015 |
| aty | + | Derek I. Hunter, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |
| aty | + | Edward O. Sassower, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |
| aty | + | Jordan Elkin, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |
| aty | + | Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |
| aty | + | Michael P. Esser, Kirkland and Ellis LLP, 555 California Street, San Francisco, CA 94104-1503 |
| aty | + | Nikki Gavey, Kirkland and Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |
| aty | + | Oliver Pare, Kirkland and Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |

TOTAL: 10

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| aty | ^ | MEBN | Nov 17 2023 20:25:11 | Derek I. Hunter, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |
| aty | ^ | MEBN | Nov 17 2023 20:26:26 | Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4643 |

TOTAL: 2

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| aty | | Stephen M. Silva |

TOTAL: 1 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Nov 19, 2023          Signature:          /s/Gustava Winters

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on November 17, 2023 at the address(es) listed below:**

| Name | Email Address |
| --- | --- |
| Alan J. Brody | on behalf of Creditor Citibank  N.A. brodya@gtlaw.com, NJLitDock@gtlaw.com |
| Alexandra Grant | on behalf of Creditor Public Service Electric and Gas Company alexandra.grant@pseg.com  mary.ryan@pseg.com |
| Allison J. Arotsky | on behalf of Interested Party Tax Technologies  Inc. aarotsky@moritthock.com |
| Amish R. Doshi | on behalf of Creditor Oracle America  Inc. amish@doshilegal.com |
| Andrew H. Sherman | on behalf of Creditor MP2 Energy LLC d/b/a Shell Energy Solutions asherman@sillscummis.com |
| Anthony Sodono, III | on behalf of Creditor Virtustream  Inc., asodono@msbnj.com |
| Boris I Mankovetskiy | on behalf of Creditor MP2 Energy LLC d/b/a Shell Energy Solutions bmankovetskiy@sillscummis.com asherman@sillscummis.com |
| Bradford J. Sandler | on behalf of Creditor Committee Official Committee of Unsecured Creditors bsandler@pszjlaw.com mseidl@pszjlaw.com;lsc@pszjlaw.com |
| Bruce H Levitt | on behalf of Creditor Cinthia Ganchozo blevitt@levittslafkes.com sslafkes@levittslafkes.com;lspcattorneys@gmail.com;hbr69524@notify.bestcase.com;lsbankruptcynotices@gmail.com |
| Bruce H Levitt | on behalf of Creditor Sergio Portillo blevitt@levittslafkes.com sslafkes@levittslafkes.com;lspcattorneys@gmail.com;hbr69524@notify.bestcase.com;lsbankruptcynotices@gmail.com |
| Carl J. Soranno | on behalf of Creditor LD Acquisition Company 16 LLC csoranno@bracheichler.com dfamula@bracheichler.com;jpmartin@bracheichler.com;krutkowski@bracheichler.com |
| Christopher Marcus | on behalf of Debtor Cyxtera Technologies  Inc. christopher.marcus@kirkland.com, christopher-marcus-7767@ecf.pacerpro.com |
| Colin R. Robinson | on behalf of Creditor Committee Official Committee of Unsecured Creditors crobinson@pszjlaw.com |
| Dale E. Barney | on behalf of Creditor Ad Hoc First Lien Group dbarney@gibbonslaw.com  elrosen@gibbonslaw.com |
| Dana S. Plon | on behalf of Creditor American Data Center Solutions  LLC dplon@sirlinlaw.com |
| David Gerardi | on behalf of U.S. Trustee U.S. Trustee david.gerardi@usdoj.gov |
| David H. Stein | on behalf of Creditor Iron Mountain Data Centers  LLC dstein@wilentz.com, ciarkowski@wilentz.com |
| Donald K. Ludman | on behalf of Creditor SAP SE dludman@brownconnery.com |
| Edwin H Caldie | on behalf of Creditor Lumen Technologies ed.caldie@stinson.com |
| Felice R. Yudkin | on behalf of Debtor Cyxtera Technologies  Inc. fyudkin@coleschotz.com, fpisano@coleschotz.com |
| Frank F. McGinn | on behalf of Creditor Iron Mountain Data Centers  LLC ffm@bostonbusinesslaw.com |
| Gary T. Holtzer | on behalf of Creditor Digital Realty Trust  L.P. gary.holtzer@weil.com |
| Gary T. Holtzer | on behalf of Creditor Digital CR US REIT  Inc. gary.holtzer@weil.com |

District/off: 0312-2

User: admin

Page 3 of 6

Date Rcvd: Nov 17, 2023

Form ID: pdf903

Total Noticed: 10

Gary T. Holtzer
on behalf of Creditor Digital Realty Trust Inc. gary.holtzer@weil.com

Grace A. Thompson
on behalf of Interested Party Fred Arnold Roger Meltzer, and Scott Vogel, in their capacity as disinterested directors of Cyxtera
Technologies, Inc. grace.thompson@katten.com, nyc.bknotices@katten.com

Ilana Volkov
on behalf of Creditor 1919 Park Avenue Associates LLC ivolkov@mcgrailbensinger.com

Jacqueline Price
on behalf of Creditor Iron Mountain Data Centers LLC jmp@bostonbusinesslaw.com

Jill L. Nicholson
on behalf of Creditor Cummins Inc. jnicholson@foley.com, jlee@foley.com

John D. Demmy
on behalf of Creditor Element Fleet Corporation john.demmy@saul.com

John F. Finnegan, III
on behalf of Interested Party HITT Contracting Inc. jfinnegan@watttieder.com,
mdevoll@watttieder.com;jkneeland@watttieder.com;ljobrien@watttieder.com

Jorge Garcia
on behalf of Creditor Equinix Inc. jorge.garcia@saul.com, cindy.carhartt@saul.com

Joseph H. Lemkin
on behalf of Creditor EastGroup Properties L.P. jlemkin@stark-stark.com

Joseph L. Schwartz
on behalf of Creditor Wilmington Savings Fund Society FSB, as Administrative Agent and Collateral Agent
jschwartz@riker.com

Joshua S. Bauchner
on behalf of Creditor Galveston County jbauchner@mblawfirm.com courtfilings@ansellgrimm.com;ajd@ansellgrimm.com

Leslie Carol Heilman
on behalf of Creditor TBI Inc. d/b/a Telecom Brokerage, Inc. heilmanl@ballardspahr.com,
vesperm@ballardspahr.com;roglenl@ballardspahr.com

Leslie Carol Heilman
on behalf of Creditor Shaw Road L.L.C. heilmanl@ballardspahr.com vesperm@ballardspahr.com;roglenl@ballardspahr.com

Leslie Carol Heilman
on behalf of Creditor AppSmart Agent Services Inc. heilmanl@ballardspahr.com,
vesperm@ballardspahr.com;roglenl@ballardspahr.com

Leslie Carol Heilman
on behalf of Creditor Gateway Jefferson Inc. heilmanl@ballardspahr.com, vesperm@ballardspahr.com;roglenl@ballardspahr.com

Leslie Carol Heilman
on behalf of Creditor ACPF NOVA Data Center LLC heilmanl@ballardspahr.com,
vesperm@ballardspahr.com;roglenl@ballardspahr.com

Leslie Carol Heilman
on behalf of Creditor RREEF CPIF 2425 Busse Road LLC heilmanl@ballardspahr.com,
vesperm@ballardspahr.com;roglenl@ballardspahr.com

Logan Kugler
on behalf of Creditor Lumen Technologies logan.kugler@stinson.com

Lynn W Holbert
on behalf of Creditor CyrusOne AMS3 B.V. lynnholbert@eversheds-sutherland.us

Marc C Capone
on behalf of Creditor Simplify. Inc. ecf@gbclawgroup.com
GillmanBrutonCaponeLLC@jubileebk.net,e4eaf5f23@maildrop.clio.com;mcapone@ecf.courtdrive.com;jgillman@ecf.courtdrive.com

Marcella M. Jayne
on behalf of Interested Party Wasabi Technologies mjayne@foley.com marcella-jayne-8977@ecf.pacerpro.com

Mark Minuti
on behalf of Interested Party D. Webber Consulting Inc. dba Megawatt Electrical mark.minuti@saul.com,
robyn.warren@saul.com

Mark E. Hall
on behalf of Creditor Microsoft Corporation mhall@foxrothschild.com cbrown@foxrothschild.com

Michael Kwiatkowski
on behalf of Creditor Virginia Electric and Power Company d/b/a Dominion Energy Virginia mkwiatkowski@cullenllp.com
crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Southern California Gas Company mkwiatkowski@cullenllp.com  crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor NStar (East) Electric Company mkwiatkowski@cullenllp.com  crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Salt River Project mkwiatkowski@cullenllp.com  crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Constellation NewEnergy- Gas Division  LLC mkwiatkowski@cullenllp.com, crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Ohio Power Company d/b/a American Electric Power mkwiatkowski@cullenllp.com  crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Commonwealth Edison Company mkwiatkowski@cullenllp.com  crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Tampa Electric Company mkwiatkowski@cullenllp.com  crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Southern California Edison Company mkwiatkowski@cullenllp.com  crodriguez@cullenllp.com

Michael Kwiatkowski

on behalf of Creditor Constellation NewEnergy  Inc. mkwiatkowski@cullenllp.com, crodriguez@cullenllp.com

Michael A Alberico

on behalf of Creditor Digital Realty Trust  L.P. malberico@eckertseamans.com

Michael A Alberico

on behalf of Creditor Digital Realty Trust  Inc. malberico@eckertseamans.com

Michael A Alberico

on behalf of Creditor Digital CR US REIT  Inc. malberico@eckertseamans.com

Michael D. Sirota

on behalf of Debtor Cyxtera Technologies  Inc. msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Debtor Cyxtera Communications Canada  ULC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Debtor Cyxtera Canada  LLC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Debtor Cyxtera Management  Inc. msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Debtor Cyxtera Communications  LLC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Debtor Cyxtera Federal Group  Inc. msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Debtor Cyxtera Canada TRS  ULC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Attorney Cole Schotz P.C. msirota@coleschotz.com
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

on behalf of Debtor Cyxtera Technologies  LLC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota

District/off: 0312-2                                User: admin                                Page 5 of 6
Date Rcvd: Nov 17, 2023                        Form ID: pdf903                        Total Noticed: 10

Michael D. Sirota
on behalf of Debtor Cyxtera DC Parent Holdings  Inc. msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota
on behalf of Debtor Cyxtera Holdings  LLC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota
on behalf of Debtor Cyxtera Netherlands B.V. msirota@coleschotz.com
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota
on behalf of Debtor Cyxtera Digital Services  LLC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota
on behalf of Debtor Cyxtera Technologies Maryland  Inc. msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota
on behalf of Debtor Cyxtera DC Holdings  Inc. msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota
on behalf of Debtor Cyxtera Employer Services  LLC msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael D. Sirota
on behalf of Debtor Cyxtera Data Centers  Inc. msirota@coleschotz.com,
fpisano@coleschotz.com;ssallie@coleschotz.com;lmorton@coleschotz.com;pratkowiak@coleschotz.com;ddelehanty@coleschotz.com

Michael J. Stafford
on behalf of Creditor U.S. Electrical Services  Inc. d/b/a Franklin - Griffith mjstafford@nordlaw.legal,
mnord@nordlaw.legal;anord@nordlaw.legal

Michael J. Viscount, Jr.
on behalf of Interested Party Seacoast Bank as successor by merger to Professional Bank and assignee of Liberty Commercial
Finance LLC mviscount@foxrothschild.com  rsolomon@foxrothschild.com;ksenese@foxrothschild.com

Michael R. Herz
on behalf of Interested Party Seacoast Bank as successor by merger to Professional Bank and assignee of Liberty Commercial
Finance LLC mherz@foxrothschild.com  cbrown@foxrothschild.com

Michele M. Dudas
on behalf of Creditor Virtustream  Inc., mdudas@msbnj.com

Morris S. Bauer
on behalf of Creditor Phoenix Data Center Holdings LLC MSBauer@duanemorris.com  tjsantorelli@duanemorris.com

Paul John Labov
on behalf of Creditor Committee Official Committee of Unsecured Creditors plabov@pszjlaw.com  lsc@pszjlaw.com

Phillip Pavlick
on behalf of Creditor PNC Bank  National Association ppavlick@mccarter.com

Rachel Ehrlich Albanese
on behalf of Interested Party LDAC16 DE LLC rachel.albanese@us.dlapiper.com

Robert J Feinstein
on behalf of Creditor Committee Official Committee of Unsecured Creditors rfeinstein@pszjlaw.com

Ronald S. Gellert
on behalf of Interested Party NVIDIA Corporation rgellert@gsbblaw.com  abrown@gsbblaw.com;smattia@gsbblaw.com

Sabrina L Streusand
on behalf of Creditor Virtustream  Inc., streusand@slollp.com, lemaster@slollp.com

Scott J. Greenberg
on behalf of Creditor Ad Hoc First Lien Group sgreenberg@gibsondunn.com

Shawn M. Christianson
on behalf of Creditor Oracle America  Inc. schristianson@buchalter.com, cmcintire@buchalter.com

Sommer Leigh Ross
on behalf of Creditor Phoenix Data Center Holdings LLC slross@duanemorris.com  AutoDocketWILM@duanemorris.com

Stephanie Lindemuth

on behalf of Interested Party DCCO Tukwila  LLC slindemuth@akingump.com, nymco@akingump.com

Stephanie Lindemuth

on behalf of Interested Party Starboard Value LP slindemuth@akingump.com  nymco@akingump.com

Stephanie Lindemuth

on behalf of Interested Party SI CHI01A ABS  LLC slindemuth@akingump.com, nymco@akingump.com

Stephanie Lindemuth

on behalf of Interested Party SI POR02 ABS LLC slindemuth@akingump.com  nymco@akingump.com

Stephen D. Silverman

on behalf of Creditor Ad Hoc First Lien Group ssilverman@gibsondunn.com

Steven J. Reisman

on behalf of Interested Party Fred Arnold  Roger Meltzer, and Scott Vogel, in their capacity as disinterested directors of Cyxtera
Technologies, Inc. sreisman@katten.com, nyc.bknotices@katten.com

Terri Jane Freedman

on behalf of Creditor Cummins  Inc. tfreedman@csglaw.com, mpdermatis@pbnlaw.com;rasegall@pbnlaw.com

Timothy Mohan

on behalf of Creditor Cummins  Inc. tmohan@foley.com

Turner Falk

on behalf of Creditor Element Fleet Corporation turner.falk@saul.com  catherine.santangelo@saul.com;tnfalk@recap.email

Turner Falk

on behalf of Interested Party D. Webber Consulting  Inc. dba Megawatt Electrical turner.falk@saul.com,
catherine.santangelo@saul.com;tnfalk@recap.email

U.S. Trustee

USTPRegion03.NE.ECF@usdoj.gov


TOTAL: 101