**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CYXTERA TECHNOLOGIES, INC., *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-14853 (JKS)<br><br>(Jointly Administered) |

**APPLICATION OF AP SERVICES, LLC**
**FOR APPROVAL OF COMPLETION FEE**

TO THE HONORABLE JOHN K. SHERWOOD
UNITED STATES BANKRUPTCY JUDGE:

Pursuant to this Court's *Order Authorizing Debtors to (I) Retain AP Services, LLC, (II) Designate Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief* (the "Retention Order")[2] [Docket No. 300], attached hereto as **Exhibit A,** section 330 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), AP Services, LLC ("APS"), hereby submits this application (the "Application") for allowance of a completion fee (the "Completion Fee") in the amount of $2,000,000.00. The engagement letter dated May 5, 2023, between APS and the Debtors (the "Engagement Letter"), attached hereto as **Exhibit B**, provides for payment of a Completion Fee in the amount of $2,000,000.00, based on the timing from the commencement of a chapter 11 petition to confirmation of a chapter 11 plan (as detailed below). In furtherance of this Application,

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/cyxtera. The location of Debtor Cyxtera Technologies, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 2333 Ponce de Leon Boulevard, Ste. 900, Coral Gables, Florida 33134.

[2]   Capitalized terms used but not defined herein shall have meanings ascribed to them in the Engagement Letter, the Retention Application, the First Day Declaration, the Retention Order, or the Plan (each as defined herein).

APS respectfully submits the *Declaration of Eric Koza in Support of the Application of AP Services, LLC for Approval of a Completion Fee*, attached hereto as **Exhibit C** (the "Koza Declaration"), and further represents:

### Jurisdiction and Venue

1.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012.

2.       This district is the proper venue for these chapter 11 cases under 28 U.S.C. §§ 1408 and 1409.

3.       The statutory basis for the relief requested in this Application is Bankruptcy Code sections 330 and 331.

### Retention of APS

4.       On June 5, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (the "Debtors" or the "Company") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

5.       On June 28, 2023, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 173] (the "Retention Application").

6.       On July 19, 2023, this Court entered the Retention Order [Docket No. 300] authorizing the Debtors' retention and payment of APS pursuant to the Engagement Letter and Retention Application.

2

**Background and Completion Fee Terms**

7.      The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Eric Koza, Chief Restructuring Officer of Cyxtera Technologies, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 20].

8.      Throughout these Chapter 11 Cases, APS has been paid standard hourly fees for APS personnel providing services in these cases, and APS has been reimbursed for expenses incurred in connection with services provided to the Debtors.  APS has filed required compensation and staffing reports related to these fees and expenses as outlined in the Retention Order.

9.      APS played an integral role in assisting the Debtors with achieving a value maximizing plan through a quick and efficient dual-track restructuring process.  The *Fourth Amended Joint Plan of Reorganization of Cyxtera Technologies, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") (a) resulted in a value maximizing $775 million sale of substantially all of the Debtors' assets to Brookfield and will ensure the viability of the Debtors' business and continued employment of its approximately 650 employees, (b) enabled portfolio optimization efforts, (c) provided many general unsecured creditors with full recovery via vendor motions and additional recoveries for remaining general unsecured claims from a $8.65 million trust, (d) achieved overwhelming support from every funded debt constituency, (e) provided lenders with an approximately 67.6 percent recovery.  On September 28, 2023, the Debtors commenced solicitation of votes on the Plan in accordance with the Restructuring Support Agreement that was entered into with its creditor groups.  The Plan was accepted by substantially all voting creditors, including 100 percent of the outstanding principal amount of the First Lien Claims and approximately 85 percent of the outstanding claim amount of

general unsecured claims.    The Debtors minimized their time in bankruptcy, obtaining confirmation in under six months from the Petition Date, consummating a fully consensual Plan that maximizes value for their stakeholders.

10.    During the course of APS's prepetition and post-petition engagement, APS (i) designed and implemented a restructuring strategy focused on maximizing enterprise value, (ii) served as CRO and Deputy CRO ("DCRO"), providing leadership and support to the senior management team, (iii) assisted the Debtors with portfolio and operational optimization initiatives, (iv) supported the Debtors with cash flow forecasting and other aspects of cash management, including but not limited to preparing and delivering frequent liquidity reporting, (v) assisted the Debtors' treasury and accounting teams with additional support, managing vendor inquiries, reconciliations, and payments, (vi) prepared for the filing of the voluntary petitions, (vii) assisted with Plan negotiations with various creditor constituents, (viii) actively participated in sale negotiations and led the coordination, response and information flow to creditor constituents and potential buyers during the marketing process, which was crucial to ensure parties received required information on a timely basis and allowed the Debtors' personnel to focus efforts on their day to day responsibilities, (ix) prepared the Liquidation Analysis and financial exhibits for the Debtors' Disclosure Statement, and (x) assisted with the Debtors' vendor management process to ensure compliance with court-ordered payment limits.

11.    In addition to the hourly fees described above, pursuant to the Engagement Letter and Retention Application, the Debtors agreed to pay APS a Completion Fee.  The Engagement Letter and Retention Application both provide that APS shall earn a Completion Fee (subject to Court approval), based on the timing from the filing of a chapter 11 petition to confirmation of a chapter 11 plan, as described below subject to Court approval:

| Number of Months from Filing of a Chapter 11 Petition to Confirmation of Plan | Less than or equal to three months | Greater than three months, but less than or equal to six months | Greater than six months |
|---|---|---|---|
| Completion Fee Amount | $2,250,000 | $2,000,000 | $1,750,000 |

12.     The Completion Fee is intended to compensate and reward APS not only for its roles in these Chapter 11 Cases, but also for driving the engagement successfully and maximizing the value of the Debtors' estates through an expeditious restructuring process.  It is important to note that the Completion Fee was negotiated as part of the overall agreement for the services of Mr. Koza as CRO, Mr. Li as DCRO, and APS (together, the "APS Team" or "APS").  The condition for earning a Completion Fee in the amount of $2,000,000.00 was achieved as the Plan was confirmed in "Greater than three months, but less than or equal to six months".  The APS Team's significant roles and contributions helped preserve value and drive the success of these Chapter 11 Cases and, subject to Court approval, APS is entitled to payment of the Completion Fee.

**Basis for Relief**

13.     The APS Team performed substantial and necessary services in these Chapter 11 Cases which enhanced the value of the Debtors' estates, warranting an award of compensation beyond the amount that results from a simple application of the lodestar approach.

14.     Given the nature of the Debtors' global operations, it was imperative to conduct a value maximizing restructuring process with expediency and in manner that would minimize any disruption to the business.  As such, a critical element of the Debtors' approach was to implement a dual-track process while optimizing its cost structure through the restructuring.  To this end, the Debtors negotiated a "toggle" plan of reorganization that would allow the Debtors to pursue

5

confirmation of a lender-led recapitalization transaction with an option to "toggle" if a more value maximizing sale transaction materialized.  Ultimately, the Debtors exercised the "toggle" as a value maximizing bid indeed materialize from the marketing process resulting in a plan that reflects complete consensus across the Debtors' capital structure.

15.     The APS Team, carrying out the duties of the CRO and DCRO, played a vital role in the development, management, and execution of the restructuring process.  The APS Team leveraged their extensive experience in supporting the process from the onset of facilitating liquidity stabilization measures, to initiating the dual-track approach and cost optimization efforts, and to supporting the successful negotiation of the value maximizing sale transaction.  The APS Team also included certain subject matter experts who efficiently advised the Debtors on various aspects of the restructuring.

16.     The APS Team's initial involvement in the Debtors' cash management operations and cash flow forecasting process was crucial in identifying near-term and longer-term liquidity needs.  The APS Team worked closely with the Debtors' finance organization to refine the cash flow forecast, enable the ability to evaluate various restructuring alternatives, and develop views on funding needs for multiple filing scenarios.  Ultimately, the APS Team sized and helped negotiate a $50 million pre-petition bridge financing term loan facility that was subsequently rolled-up into a $200 million DIP term loan.  Importantly, the DIP financing was negotiated such that it would effectively become an exit facility under a lender-led recapitalization transaction. This effort also required evaluating proforma liquidity projections and assessing various jurisdictional requirements to determine minimum cash needs at each country level.  The APS Team was also responsible for the ongoing management, organization, and communication of the Debtors cash flow forecast and related reporting requirements throughout the chapter 11 case.

17.    APS also supported the Debtors in developing important updates to the business plan, which included assumptions reflecting cost optimization efforts, a critical step that informed decisions during the restructuring process.  As part of this effort, the APS Team was instrumental in leading numerous diligence sessions with the Debtors' finance and operations teams to ensure that the appropriate drivers were being considered in the business plan projections.  APS supported the management team in various ways, including but not limited to: (i) documenting assumptions, accounting treatments, Debtor-specific business metrics, and forecasting methodologies through multiple iterations of the business plan; (ii) incorporating cost optimization assumptions into the business plan as efforts were underway (iii) developing management presentations and related cleansing materials; (iv) assisting external advisors with business plan due diligence, including data collection, responding to inquiries and facilitating meetings with management; and (v) assisting with updating the business plan for bankruptcy implications.  Importantly, the APS Team was involved in conveying important aspects of the business plan, including drivers, assumptions, risks, and opportunities to key stakeholders.

18.    The APS Team worked with the management team and other advisors to evaluate and execute on cost optimization efforts, including lease renegotiations across the Debtors portfolio and certain executory contract rejections.  The teams held ongoing meetings to discuss progress and strategies as landlord negotiations continued throughout the pendency of the case. The APS Team facilitated these internal discussions, analyzed targeted and achieved savings, assisted with preparation of filings for lease rejections, and helped drive the process to completion. Overall, these actions led to an improved cash flow outlook for the business and supported the Debtors' value maximizing outcome.

19.     As the marketing process developed and the Debtors engaged with interested parties in earnest, APS played an integral role in negotiations that led to the Purchase Agreement with Brookfield and its designated purchasers for the Debtors remaining datacenters.  The APS Team helped develop key analyses and creative solutions regarding the overall economics of the transaction that were critical in the Debtors' value maximizing negotiations.  Following the execution of the Purchase Agreement, the APS Team quickly established and managed a project management office ("PMO") to set goals, provide insight, and resolve issues that mitigated risks associated with the Debtors and purchasers meeting their obligations under the respective asset purchase agreements.  The PMO structure, oversight and execution enabled all parties to complete the myriad of tasks required to position the Debtors' businesses for a relatively seamless transition to multiple parties.

20.     Additionally, APS was instrumental in managing the entire bankruptcy process leading up to and during the filing.  This involved producing all required documents and analyses for the first day motions (including spend projections by type and category), various court filings, and the financial components of the Plan and Disclosure Statement.  APS also led the effort to develop and implement certain controls necessary for the Debtors to operate in these Chapter 11 Cases and played a pivotal role in managing and overseeing all payments made throughout the process to ensure compliance with the authorization provided by this Court. Moreover, the APS Team managed a vendor management program, which efficiently and effectively addressed inquiries and concerns with respect to the Debtors' critical vendor base throughout the restructuring.

21.     The APS Team played an integral role in leading and achieving a swift and efficient confirmation of the Plan and effectuating a value maximizing Asset Sale accepted by all creditor

classes.  Importantly, the Asset Sale ensured the viability of the Debtors' business and continued employment of its approximately 650 employees.

22.    APS' skillful diligence, integrated approach, and accomplished capabilities guided the path to the successful results in these Chapter 11 Cases.  The fundamental benefits from the APS Team's contributions and related outcomes described herein reinforce the rationale for approval of the Completion Fee under the most rigorous of judicial standards.  With the assistance of APS and other professionals, the Debtors were able to confirm a value maximizing chapter 11 plan and complete the restructuring process efficiently.  This Court's allowance of the Completion Fee is proper and with merit.

## Legal Standard

23.    Performance fees or success fees are normal parts of compensation for turnaround firms and management restructuring consulting firms and are standard for APS's engagements of this type, both inside and outside of bankruptcy courts.[3]  Indeed, APS and other similar firms price their engagements to include performance or success fees as part of the total compensation packages for such engagements.  Thus, APS and other turnaround and management restructuring firms rely upon and take into account the negotiated performance or success fee when accepting engagements.

24.    Performance or success fees are typical in restructuring cases because clients appreciate an approach which aligns the interests of the client with the interests of its advisor.  In colloquial terms, success fees demonstrate that a turnaround firm, such as APS, has "skin in the game" along with the company undergoing the turnaround.  This alignment of interests inures to

---

[3]    While success fees for lawyers and accountants are rarely sought or granted, success fees are a standard component of compensation for turnaround management, restructuring, and consulting firms and investment banking firms.  APS is neither a law firm nor an accounting firm.  APS is, among other things, a firm that specializes in supplying senior executives on an interim basis to financially troubled companies.  As such, payment of the Completion Fee to APS is consistent with industry practice in and out of bankruptcy cases.

the overall benefit of a debtor, as well as its estate and creditors.  Without that demonstrated alignment of interests, such a client might be reluctant to reach out for critical leadership and specialized guidance from seasoned turnaround and management restructuring firms like APS.  As a result, the absence of specialized top-management leadership would decrease the likelihood of a successful outcome of that client's bankruptcy.

25.     Similarly, success fees are a vital and inseparable component of the overall compensation model for turnaround and crisis management firms like APS, and denial of such fees in cases such as these, where the concrete achievement of one of the stated goals outlined at the outset of APS's engagement has occurred, would ill-serve restructurings generally and potentially produce undesirable results.  Some firms would simply decline challenging engagements and others would adjust their compensation model by increasing their monthly and/or hourly fees.[4]  In recognition of these realities, courts routinely authorize and approve the payment of performance fees and success fees upon a clear and demonstrable showing of management expertise that is transformative, in terms of business viability, capital structure fit and value generation.  This reasoning is precisely applicable to the engagement of APS by the Debtors in these Chapter 11 Cases.

26.     The marketplace ordinarily compensates restructuring advisors with both a salary component, based on hours worked, and a performance based success fee.  As the Bankruptcy Court in the Southern District of Ohio held in *In re Cardinal Indus., Inc.*, 151 B.R. 843 (Bankr. S.D. Ohio 1993) (awarding APS a fee of $2.1 million plus a success fee of 50,000 shares of stock):

---

[4]     The former is not an acceptable result, as it would deny distressed companies the necessary services of firms like APS that specialize in supplying senior executives to financially troubled companies and that have earned a national and international reputation for their expertise in financial reorganizations and restructurings of troubled companies.  The latter also is not a desirable result, as it would needlessly result in increased fees during the pendency of the case, without such fees being tied to performance-based criteria and the outcome of the case itself (measuring success against alternative outcomes and relative distributable value yields).

> Performance-based or success-factor bonuses are a normal part of compensation arrangements for management restructure consultants and . . . such bonuses generally far exceed the time value of the consultant's services on a lodestar basis.  Indeed, the time value component is referred to as the base salary, apparently payable to the consultant even if success is not achieved.

151 B.R. at 847.  *See also In re Busy Beaver Bldg. Ctr., Inc*., 19 F.3d 833, 849 (3rd Cir. 1993) (explaining that the basis for requested compensation should be based on the market rate that professional would charge and collect from a client in a non-bankruptcy setting); *In re UDC Homes, Inc*., 203 B.R. 218, 222 (Bankr. D. Del. 1996) (same).

27.    Courts review transaction fees or success fees under the "reasonableness standard" of section 330 of the Bankruptcy Code.  *See In re Northwest Airlines Corp.*, 400 B.R. 393, 395 (Bankr. S.D.N.Y. 2009); *In re XO Commc'ns, Inc.*, 398 B.R. 106, 110 (Bankr. S.D.N.Y. 2008).  In considering a success fee, courts consider:  (a) whether the financial advisor's services were necessary and beneficial to the debtors' estates at the time the services were rendered; and (b) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases outside of bankruptcy.  *XO Commc'ns*, 398 B.R. at 113.  In determining the reasonableness of a success fee and whether the services were necessary and beneficial to the debtor's estate, courts will look "at the nexus between what was achieved, *i.e.*, the restructuring of the debt, and the impact of the advisor's effort in that regard."  *Id*. at 116; *see also In re Residential Capital, LLC*, 504 B.R. 358, 367 (Bankr. S.D.N.Y. 2014).

28.    When Congress passed the Bankruptcy Reform Act of 1978, it decided to remove the "spirit of frugality" as a factor in bankruptcy fees.  The standard is now the cost of comparable services in a non-bankruptcy setting.  Inasmuch as success fees are a normal part of the fee structures of APS and other turnaround and management restructuring firms, both within and

outside of bankruptcy, approval of the Completion Fee is appropriate to assure comparable

compensation for comparable services.

29.    Recent bankruptcy cases involving success fees awarded to APS serving as interim

management include the following:

- Cineworld Group plc, a chapter 11 case in the Southern District of Texas before Judge Marvin Isgur. In 2023, AlixPartners was awarded a completion fee of $2,506,934.00 [Case No. 23-90267 (previously Case No. 23-90168), Docket 47].

- Bed Bath & Beyond Inc., a chapter 11 case in the District of New Jersey before Judge Vincent F. Papalia. In 2023, APS was awarded a completion fee of $750,000.00 [Case No. 23-13359, Docket 2411].

- Avaya, Inc., a chapter 11 case in the Southern District of Texas before Judge David R. Jones. In 2023, AlixPartners was awarded a completion fee of $2,875,000.00 [Case No. 23-90088, Docket No. 440].

- Carlson Travel, Inc., a chapter 11 case in the Southern District of Texas before Judge Marvin Isgur. In 2022, AlixPartners was awarded a success fee of $500,000.00 [Case No. 21-90017, Docket No. 274].

- Southland Royalty Company LLC, a chapter 11 case in the District of Delaware before Judge Karen B. Owens. In 2021, AlixPartners was awarded a success fee of $1,000,000.00 [Case No. 20-10158, Docket No. 1879].

- NPC International, Inc., a chapter 11 case in the Southern District of Texas before Judge David R. Jones. In 2021, AlixPartners was awarded a restructuring fee of $1,500,000.00 [Case No. 20-33353, Docket No. 1655].

- Noble Corporation PLC, a chapter 11 case in the Southern District of Texas before Judge David R. Jones. In 2021, AlixPartners was awarded a success fee of $1,750,000.00 [Case No. 20-33826, Docket No. 999].

- Tailored Brands, Inc., a chapter 11 case in the Southern District of Texas before Judge Marvin Isgur. In 2021, AlixPartners was awarded a success fee of 500,000.00 [Case No. 20-33900, Docket No. 1648].

- PG&E Corporation, a chapter 11 case in the Northern District of California before Judge Dennis Montali. In 2020, APS was awarded a success fee of $8,000,000.00 [Case No. 19-30088, Docket No. 9373].

- McDermott International, Inc., a chapter 11 case in the Southern District of Texas before Judge David R. Jones. In 2020, APS and AlixPartners were awarded a success fee of $5,000,000.00 [Case No. 20-30336, Docket No. 1022].

- Alta Mesa Resources, Inc., a chapter 11 case in the Southern District of Texas before Judge Marvin Isgur. In 2020, APS was awarded a completion fee of $200,000.00 [Case No. 19-35133, Docket No. 2007].

- Aegerion Pharmaceuticals, Inc., a chapter 11 case in the Southern District of New York before Judge Martin Glenn. In 2019, APS was awarded a success fee of $500,000.00 [Case No. 19-11632, Docket No. 406].

- Sungard Availability Capital Services, a chapter 11 case in the Southern District of New York before Judge Robert D. Drain. In 2019, APS was awarded a success fee of $1,250,000.00 [Case No. 19-22915, Docket No. 115].

- Aceto Corporation, a chapter 11 case in the District of New Jersey before Judge Vincent F. Papalia. In 2019, APS was awarded a success fee of $1,000,000.00 [Case No. 19-13448, Docket No. 683].

- Westinghouse Electric Company, a chapter 11 case in the Southern District of New York before Judge Michael E. Wiles. In 2018, APS was awarded a success fee of $7,500,000.00 [Case No. 17-10751, Docket No. 3633].

- VER Technologies Holdco, LLC, a chapter 11 case in the District of Delaware before Judge Kevin Gross. In 2018, APS was awarded a success fee of $750,000.00 [Case No. 18-1083, Docket No. 881].

30.    In determining the reasonableness of fee awards under section 330, courts consider whether the services provided are "services which are reasonably likely to benefit the debtors' estates." *In re Residential Capital, LLC*, 504 B.R. at 366 (quoting *In re Angelika Films 57th Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998)); *see also In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 71–72 (2d Cir. 1996).

31.    In short, performance fees or success fees are a normal part of compensation for firms such as APS, which provided interim management services to the Debtors, and may be approved on that basis. The services provided by APS resulted in tangible, measurable, and significant incremental value to the Debtors and their estates, to the benefit of the Debtors' stakeholders.

32.    The leadership and contributions of Mr. Koza, Mr. Li and the APS personnel were key enablers of the successful outcome and recoveries within these Chapter 11 Cases. As such,

the amount of the Completion Fee in these cases is reasonable pursuant to the standards outlined in section 330 of the Bankruptcy Code and should be approved.

### **Notice**

33.     Notice of the Application has been or will be provided to those parties entitled to receive notice hereof in accordance with any applicable order of this Court.

### **Conclusion**

34.     To summarize, the Engagement Letter provides for the payment of the Completion Fee based upon defined criteria.   The defined criteria have been attained.   Fees such as the Completion Fee are a normal part of the compensation structure of APS and other similar firms both inside and outside of bankruptcy.   APS played a pivotal role in the positive outcome of these Chapter 11 Cases.   Accordingly, the approval of the Completion Fee is warranted and appropriate.

**WHEREFORE**, APS respectfully requests that this Court enter an order awarding APS its

Completion Fee in the amount of $2,000,000.00 and such other or further relief as is just or appropriate.


Dated:  January 25, 2024                              AP Services, LLC


                                                      /s/ Eric Koza
                                                      Name: Eric Koza
                                                      Authorized Representative

## <u>Exhibit A</u>

**Retention Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors in*
*Possession*

Order Filed on July 19, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

---

In re:

CYXTERA TECHNOLOGIES, INC., *et al.*,

Debtors.[1]

Chapter 11

23-14853 (JKS)

(Jointly Administered)

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://www.kccllc.net/cyxtera.  The location of Debtor Cyxtera Technologies, Inc.'s
principal place of business and the Debtors' service address in these chapter 11 cases is:  2333 Ponce de Leon
Boulevard, Ste. 900, Coral Gables, Florida 33134.



2314853230720000000000003

**ORDER AUTHORIZING THE (I) RETENTION OF AP SERVICES, LLC,
(II) DESIGNATION OF ERIC KOZA AS CHIEF RESTRUCTURING OFFICER AND
RAYMOND LI AS DEPUTY CHIEF RESTRUCTURING OFFICER EFFECTIVE
AS OF THE PETITION DATE, AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through eight (8), is **ORDERED**.

**DATED: July 19, 2023**

Honorable John K. Sherwood
United States Bankruptcy Court

(Page | 3)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief |

Upon the *Debtors' Application for Entry of an Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief* (the "Application")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") authorizing the Debtors to (a) retain and employ AP Services, LLC ("APS"), (b) designate Eric Koza as Chief Restructuring Officer ("CRO") and Raymond Li as Deputy Chief Restructuring Officer ("DCRO"), each pursuant to the terms of the engagement letter by and among the Debtors and APS, dated as of May 5, 2023 (the "Engagement Letter"), a copy of which is attached to the Application as Exhibit B, effective as of the Petition Date, and (c) granting related relief, all as more fully set forth in the Application; and upon consideration of the Koza Declaration; and the Court having found that APS is a "disinterested person" as such term is defined under section 101(14) of the Bankruptcy Code, as supplemented by section 1107(b) of the Bankruptcy Code; and the Court having jurisdiction over this Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and the Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that sufficient cause exists for the relief set forth herein; and this Court having found that the Debtors'

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

(Page | 4)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief |

notice of the Application was appropriate under the circumstances and no other notice need be provided; and the Court having reviewed the Application; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.    The Application is **GRANTED** as set forth herein.

2.    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are authorized to (i) retain and employ APS and (ii) designate Eric Koza as CRO and Raymond Li as DCRO, effective as of the Petition Date, and in accordance with the terms and conditions set forth in the Engagement Letter attached to the Application as Exhibit B.

3.    The terms of the Engagement Letter, including, without limitation, the indemnification provisions, are reasonable and are approved in all respects, as set forth in this Order.

4.    APS is authorized to apply the Retainer and advanced payments to satisfy any unbilled or other remaining prepetition fees and expenses that APS becomes aware of during its ordinary course billing review and reconciliation.  The balance of the Retainer shall be treated as an evergreen retainer and held by APS as security throughout these chapter 11 cases.

5.    Upon employment and retention by the Debtors, Mr. Koza and Mr. Li shall be empowered and authorized to carry out all duties and responsibilities set forth in the Engagement Letter.

(Page | 5)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief |

6.      Notwithstanding anything to the contrary in the Application or the Engagement Letter, APS's engagement is subject to the following terms:

a.      APS and its affiliates shall not act in any other capacity (for example, and without limitation, as a financial advisor or investor/acquirer) in connection with these chapter 11 cases.

b.      In the event the Debtors seek to have APS Personnel assume executive officer positions that are different than the position(s) disclosed in the Application, or to materially change the terms of the engagement by either (i) materially modifying the functions of personnel, or (ii) altering or expanding the scope of the engagement, a motion to modify the retention shall be filed.

c.      Notwithstanding anything to the contrary contained in the Application, the Engagement Letter or any exhibits hereto, during the course of these chapter 11 cases, APS will only seek reimbursement of actual and necessary expenses.

d.      APS may from time to time add or remove staff, and APS will file staffing reports that will reflect the APS Personnel that provided services on a monthly basis ("Staffing Reports").  Staffing Reports shall include the names and functions filled of the individuals assigned.  All staffing shall be subject to review by the Court in the event an objection is filed.

e.      APS shall submit reports of compensation earned and expenses incurred on a monthly basis ("Compensation Reports") to the Court with copies to the U.S. Trustee and provide notice of the same to the Notice Parties. Compensation Reports shall contain summary charts which describe the services provided, and identify the compensation earned and expenses incurred by each interim officer and APS Personnel/staff employee.  The Notice Parties shall have fourteen (14) days after the date each Compensation Report is served upon them to object.  Such compensation and expenses will be subject to Court review in the event an objection is filed.

f.      For hourly based fees, APS shall append to the Compensation Reports time records that contain detailed time entries describing the tasks performed on a daily basis and the corresponding charges (time multiplied by hourly rate) organized by project category.  The time entries shall identify the time spent completing such tasks in tenth of an hour (.1) increments and the

| | |
|---|---|
| (Page \| 6) | |
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al.* |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief |

corresponding charge (time multiplied by hourly rate) for each task (by daily project category entry). Where personnel are providing services at a flat/fixed rate, the time entries shall be kept in hourly increments. All compensation shall be subject to review by the Court in the event an objection is filed.

g.    No principal, employee, or independent contractor of APS and its affiliates shall serve as a director of any of the above-captioned Debtors during the pendency of these chapter 11 cases.

h.    The Debtors are permitted to indemnify those persons serving as corporate officers on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtors' D&O policy.

i.    There shall be no indemnification of APS or its affiliates.

j.    The limitation of liability section in the Engagement Letter will be eliminated for the duration of these chapter 11 cases.

k.    Success fees, transaction fees, or other back-end fees shall be approved by the Court at the conclusion of the case on a reasonableness standard and shall not be pre-approved under section 328(a) of the Bankruptcy Code by entry of this Order.  No success fee, transaction fee, or other back-end fee shall be sought upon conversion of the case, dismissal of the case for cause, or appointment of a trustee.

l.    For a period of three years after the conclusion of the engagement, neither APS nor any of its affiliates shall make any investments in the Debtors or the reorganized Debtors.

m.    APS Personnel serving as corporate officers of the Debtors shall be subject to the same fiduciary duties and obligations applicable to other persons serving in such capacity.

n.    APS shall follow the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules regarding limitations on reimbursement of expenses.

o.    APS shall make appropriate disclosures of any and all facts that may have a bearing on whether APS, its affiliates, or any individuals working on the engagement hold/represent any interest adverse to, the Debtors, their

(Page | 7)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief |

creditors, or other parties in interest.  The obligation to disclose identified in this subparagraph is a continuing obligation.

7.      The relief granted herein shall be binding upon any chapter 11 trustee appointed in these chapter 11 cases, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases to cases under chapter 7.

8.      Notwithstanding anything in the Application or the Engagement Letter to the contrary, APS shall: (a) pass through the cost of Contractors to the Debtors at the same rate that APS pays the Contractors; (b) with respect to costs incurred by the Contractors, seek reimbursement for actual, reasonable, and documented costs only; (c) ensure that the Contractors are subject to the same conflict checks as were required for APS in accordance with this retention; and (d) filed with the Court such disclosures as are required by Bankruptcy Rule 2014.

9.      APS shall not seek reimbursement of any fees or costs, including attorney fees and costs, arising from the defense of any of APS's fee applications in the cases.

10.      To the extent there is any inconsistency between the terms of the Engagement Letter, the Application, and this Order, the terms of this Order shall govern.

11.      APS shall use its reasonable efforts to avoid any unnecessary duplication of services provided by any retained professionals in these chapter 11 cases.

12.      Notice of the Application as provided therein shall be deemed good and sufficient notice of such Application, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

(Page | 8)

| | |
|---|---|
| Debtors: | CYXTERA TECHNOLOGIES, INC., *et al*. |
| Case No. | 23-14853 (JKS) |
| Caption of Order: | Order Authorizing the (I) Retention of AP Services, LLC, (II) Designation of Eric Koza as Chief Restructuring Officer and Raymond Li as Deputy Chief Restructuring Officer Effective as of the Petition Date, and (III) Granting Related Relief |

13.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

14.     During the pendency of these chapter 11 cases, the arbitration provision in the Engagement Letter shall not be applicable and the Court shall have exclusive jurisdiction over APS's engagement during the pendency of these chapter 11 cases.

15.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

16.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit B

**Engagement Letter**

# APServices

Mr. Carlos Sagasta                                                    May 5, 2023
Chief Financial Officer
Cyxtera Technologies, Inc.
2333 Ponce De Leon Boulevard, Suite 900
Coral Gables, FL 33134

**Re:     Agreement for Interim Management Services**

Dear Mr. Sagasta:

This letter, together with the attached Schedule(s) and General Terms and Conditions, sets forth the agreement ("Agreement") between AP Services, LLC ("APS"), and Cyxtera Technologies, Inc. and certain of its affiliates and subsidiaries (the "Company") for the engagement of APS to provide interim management services to the Company.

All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedule(s) and General Terms and Conditions. The Company and APS are each a "party," and together the "parties."

The engagement of APS, including any APS employees who serve in executive officer positions, shall be under the supervision of the Board of Directors of the Company.

**Objectives and Tasks**

Subject to APS's (i) internal approval from its Risk Management Committee, (ii) confirmation the Company has a Directors and Officers Liability insurance policy in accordance with Section 7 of the General Terms and Conditions regarding Directors and Officers Liability Insurance coverage, and (iii) receipt of a copy of the signed Board of Directors' resolution (or similar document as required by the Company's governance documents) as official confirmation of the appointment, APS will provide Eric Koza to serve as the Company's Chief Restructuring Officer ("CRO") reporting to a special committee of the Board of Directors with authority over restructuring transactions and Raymond Li to serve as the Company's Deputy Chief Restructuring Officer ("DCRO") reporting to the CRO. Working collaboratively with the senior management team, the Board of Directors, and other Company professionals, Mr. Koza and Mr. Li will assist the Company with the following:

- Prepare budgets and 13-week cash forecasts and evaluate variances thereto, as required by the Company's lenders.
- Communicate with, and meet information needs of, its various constituencies, including potential exit lenders.
- Strengthen the Company's core competencies in the finance organization, particularly cash management, planning, general accounting, and financial reporting information management.
- Develop the Company's revised business plan, and such other related forecasts as may be required by the Company's lenders in connection with negotiations or by the Company for other corporate purposes.
- Develop a short-term operating plan designed to minimize cash requirements while maintaining the efficiency of operations, sustaining vendor relationships, and minimizing the impact on the Company's customer base.
- Design, negotiate and implement a restructuring strategy designed to maximize enterprise value, taking into account the unique interests of key constituencies.

**AP**Services

Cyxtera Technologies, Inc.
Page 2 of 12

- Develop short-term and long-term cash flow forecasting tools and related methodologies to support negotiations with the Company's stakeholders and fundraising initiatives.
- Prepare for and file a Bankruptcy Petition, coordinating and providing administrative support for the proceeding and developing the Company's Plan of Reorganization or other appropriate case resolution, if necessary.
- In connection with a bankruptcy, prepare (i) a Disclosure Statement and Plan of Reorganization, (ii) a liquidation analysis, (iii) statements of financial affairs and schedules of assets and liabilities, (iv) a potential preferences analysis, (v) a claims analyses, and (vi) monthly operating reports and other regular reporting required by the U.S. Bankruptcy Court.
- Coordinate with the professionals assigned to sourcing, negotiating, and implementing any financing, including debtor-in-possession and exit financing facilities, in conjunction with the Plan of Reorganization and the overall restructuring.
- Manage the "working group" professionals who are assisting the Company in the reorganization process or who are working for the Company's various stakeholders to improve coordination of their efforts and individual work product to be consistent with the Company's overall restructuring goals.
- Create and communicate materials for diligence purposes and manage the flow of information to potential acquirers in connection a potential sale of the Company's assets.
- Render testimony, as requested from time to time, regarding any matters to which AlixPartners is providing services.
- Assist the Company with such other matters as may be requested by the Company and are mutually agreeable.

**Staffing**

APS will provide the Company with Mr. Koza and Mr. Li, subject to the terms and conditions of this Agreement, with the titles, pay rates and other descriptions set forth herein and in Schedule 1 below.

Mr. Koza and Mr. Li will be assisted by other professionals at various levels, as required, at the pay rates listed in Schedule 1. APS will keep the Company informed as to APS's staffing.

**Timing and Fees**

APS will commence this engagement on or about May 5, 2023, after receipt of a copy of the executed Agreement and confirmation of the Company's compliance with the requirements set forth in the first paragraph of the Objective and Tasks section above.

Upon commencement of this engagement agreement, the prior engagement letter dated March 22, 2023 (the "Advisory Engagement") between AlixPartners, LLP ("AlixPartners"), an affiliate of APS, and the Company shall terminate. All fees and expenses earned under the Advisory Engagement shall be valid and payable. The Company agrees that any outstanding fees and expenses due and owing to AlixPartners under the Advisory Engagement, if any, will be promptly paid by the Company upon execution of this Agreement.

The Company shall compensate APS for its services, and reimburse APS for expenses, as set forth on Schedule 1.



Cyxtera Technologies, Inc.
Page 3 of 12

* * *

In the event the Company seeks protection under the U.S. Bankruptcy Code, the Company will promptly apply to the Bankruptcy Court to obtain approval of APS's retention and retainer *nunc pro tunc* to the date of filing. APS acknowledges that its retention and the terms thereof are subject to Bankruptcy Court approval.

If these terms meet with your approval, please sign and return a copy of this Agreement.

We look forward to working with you.

Sincerely yours,

AP SERVICES, LLC

Eric Koza
Partner & Managing Director

Acknowledged and Agreed to:

CYXTERA TECHNOLOGIES, INC.

By:

Its: CARLOS SAGASTA

Dated: 5/10/2023



**Schedule 1**

**Fees and Expenses**

1. **Fees:** APS's fees will be based on the hours spent by APS personnel at APS's hourly rates, which are:

| | |
|---|---|
| Partner & Managing Director | US $1,140 – US $1,400 |
| Partner | US $1,115 |
| Director | US $880 – US $1,070 |
| Senior Vice President | US $735 – US $860 |
| Vice President | US $585 – US $725 |
| Consultant | US $215 – US $565 |
| Paraprofessional | US $360 – US $380 |

APS generally reviews and revises its billing rates semi-annually.

For those engagements where APS provides electronic discovery services – which may include the identification, preservation, collection, processing, hosting and production of electronically stored information – the following charges for processing, hosting and production will apply in addition to the hourly fees associated with those services.

| Service Description | Per Unit Cost |
|---|---|
| Data Processing (de-duplication, text and metadata extraction, index for search) [1] | US$125/GB |
| Hard Copy / Third-Party Load Fee [1] [2] | US$50/GB |
| Relativity Load Fee [1] | US$300/GB |
| Advanced Analytics/Technology Assisted Review | Included |
| Automated Document Redaction | US$1.60/document |
| Foreign Language Machine Translation | US$0.97/document |
| Hosting Fees (Monthly Charge) [3] [4] | US$25/GB |



| | |
|---|---|
| Database Access Fee (Monthly Charge) [4] | US$100/user |
| OCR (where specifically requested) | US$0.03/page |
| Production Fee (images, endorsements, load file creation) [1] | US$350/GB |
| Other Items | |
| Media | For data security purposes, AlixPartners uses 256 Bit AES hardware encrypted hard drives for collection, archive, and production of client data.  The charge for these hard drives is:<br>1TB Hard Drive – US$200<br>2TB Hard Drive - US$300<br>4TB Hard Drive - US$400<br>8TB Hard Drive - US$500<br>Larger hard drives and custom storage devices will be billed separately.<br><br>In addition to hard drive charges, shipping costs and hourly time to prepare shipments will be included on invoices. |
| Nearline (no user access) (Monthly Charge) | 1/2x full monthly hosted rate |
| Full Project Archive [5] | 1x full monthly hosted rate |
| Full Project Restoration | 1x full monthly hosted rate |
| Archived Project Data Storage [6] | US$1/GB per month, payable annually on January 1 with a minimum fee of US$2,500/year |

[1]  1GB minimum.

[2]  Fees cover loading text/metadata to ECA and importing standard third-party deliveries with accompanying field-map. Third-party delivery error resolution is charged at the hourly Project Management rate.

[3]  Hosted volume is calculated based on the size of all data types loaded in all hosted and analytics workspaces, including native files, search indices, and database log files.

[4]  AlixPartners does not prorate hosting or database access fees.  Any active hosting or database access licenses accounts during any month result in a full month's fees.

[5]  Full archive charges are billed when the archive takes place.



(6)  Archived Project Data Storage applies only when the data is in full archive and stored in
AlixPartners' environment. The minimum fee of US$2,500/year covers physical storage of up
to five hard drive devices and data stored on an AlixPartners archive server.  Any quantity of
hard drive devices greater than five will be billed at an additional US$500/hard drive
device/year, regardless of size.

2.  **Completion Fee:** In addition to the fees above, in the event of the filing of a Chapter
11 petition, APS will be compensated for its efforts by the payment of a Completion Fee.

The Company shall pay APS the Completion Fee based on the timing from the
commencement of a Chapter 11 petition to confirmation of a Chapter 11 plan as
described below:

| Number of Months from Filing of a Chapter 11 Petition to Confirmation of Plan | Less than or equal to three months | Greater than three months, but less than or equal to six months | Greater than six months |
|---|---|---|---|
| **Completion Fee Amount** | $2,250,000 | $2,000,000 | $1,750,000 |

3.  **Expenses:** In addition to the Fees set forth in this Schedule, the Company shall pay
directly, or reimburse APS upon receipt of periodic billings, for all reasonable out-of-
pocket expenses incurred in connection with this assignment, such as travel, lodging
and meals.

4.  **Retainer:** AlixPartners received a retainer in connection with its Advisory Engagement
with the Company, in the amount of $500,000 (the "Retainer").  Any balance of this
Retainer will be transferred to this engagement and held as an evergreen retainer,
pending approval of the Court, or applied to approved post-petition fees and expenses if
an evergreen retainer is not approved.

5.  **Payment:** AlixPartners will submit semi-monthly invoices, or sooner such that retainer
remains with a positive balance, for services rendered and expenses incurred. All
invoices shall be due and payable immediately upon receipt.

**APServices**

**Data Protection Schedule**

**Description of Transfer**

**1.  Categories of Data Subjects**

 X   Employees / Members / Contractors of Data Controller

_____ Clients of Data Controller

_____ Other:

**2.  Types of Personal Data**

_____ Background Check Data (Criminal History, Drug Test Results, References, etc.)

_____ Biometric Data (Facial Recognition, Fingerprints, Voice Recording, etc.)

_____ Browsing Data (Cookies, Website History, IP Address, etc.)

_____ Contact Information (Contact Details, Address, Email Address, Phone Numbers, etc.)

_____ Education and Skills (Academic Transcripts, Educational Degrees, Languages, Training, etc.)

 X   Employment Information (Compensation, Job Title, Personnel Number, Workers Comp, Office Location, etc.)

_____ Family Information (Children, Parents, etc.)

_____ Financial Personal Information (Bank Accounts, Credit Card Numbers, etc.)

_____ Genetic Information (Genetic Sequence)

_____ Government Identifiers (National Identification Number, SSN, Driving License, etc.)

_____ Personal Identifiers (Name, Age, Date of Birth, Race, Video/Photo, Signature, etc.)

_____ Professional Experience & Affiliations (Trade Union Membership, Qualifications/Certifications, etc.)

_____ Social Media Data (Social Media Accounts, Social Media History, etc.)

_____ Travel and Expense (Travel History, Expense Details, etc.)

_____ User Account Information (Account Age, Account Number, Account Password, etc.)

_____ Workplace Welfare (Harassment Reports, Disciplinary Action, etc.)

_____ Other:

**3.  Frequency of Data Transfers**

The frequency of the transfer will be continuous (multiple transfers).

**4.  Processing by APS**

4.1. Nature of processing: The nature of processing will include receiving, storing, analyzing, transmitting to appropriate parties, and disposing of Personal Data.

4.2. Purpose of the data transfer and further processing: The purpose of processing is to provide the services described in the agreement above.

4.3. The period for which the personal data will be retained, or if the period is not known, the criteria used to determine the period: APS will process Personal Data for the duration of the engagement.

4.4. Transfer to Sub-processors: Sub-processors may process Personal Data for the duration of the engagement life cycle and for the purposes specified above. See https://www.alixpartners.com/policies/subprocessors/ for a list of sub-processors.

**AP Services, LLC**
General Terms and Conditions

These General Terms and Conditions ("Terms") are incorporated into the Agreement to which these Terms are attached. In case of conflict between the wording in the letter and/or schedule(s) and these Terms, the wording of the letter and/or schedule(s) shall prevail.

**Section 1. Company Responsibilities**

The Company will undertake responsibilities as set forth below:

1. Provide reliable and accurate detailed information, materials, documentation and

2. Make decisions and take future actions, as the Company determines in its sole discretion, on any recommendations made by APS in connection with this Agreement.

APS's delivery of the services and the fees charged are dependent on (i) the Company's timely and effective completion of its responsibilities; and (ii) timely decisions and approvals made by the Company's management.

**Section 2. Retainer, Billing, Payments, and Taxes**

**Retainer.** Upon execution of the Agreement, the Company shall promptly pay APS the agreed-upon advance retainer as set forth on Schedule 1. Invoices shall be offset against the retainer. Payments of invoices will be used to replenish the retainer to the agreed-upon amount. Any unearned portion of the retainer will be applied against the final invoice or returned to the Company at the end of the engagement.

**Billing and Payments.** All payments to be made to APS shall be due and payable upon delivery of invoice via check or wire transfer to APS's bank account, as shown on the invoice. All amounts invoiced are based on services rendered and expenses incurred to date, and are not contingent upon future services or Work Product (as defined below), or the outcome of any case or matter. "Fees," as used in this Agreement, shall include all amounts payable by the Company to APS in accordance with Schedule 1, including any success fee or break fee, but excluding reimbursable expenses.

**Taxes.** APS's fees are exclusive of taxes or similar charges, which shall be the responsibility of the Company (other than taxes imposed on APS's income generally). If APS's fees are subject to any taxes, such as State sales tax, Goods and Services Tax/Harmonized Sales Tax or Value Added Tax, then APS will include such taxes on its invoices as separate line items.

**Section 3. Relationship of the Parties**

The parties intend that an independent contractor relationship will be created by the Agreement. As an independent contractor, APS will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business. Employees of APS will not be entitled to receive from the Company any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. APS will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business.

APS is not an accounting firm and does not give accounting advice or guidance. While APS' work may involve analysis of accounting, business and other related records, this engagement does not constitute an audit in accordance with either generally accepted auditing standards or the standards of the Public Company Accounting Oversight Board or any other similar governing body.

APS is not authorized to practice law or provide legal advice. No services provided under this Agreement are intended to be, nor should be construed to be, legal services.

**Section 4. Confidentiality**

Each party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party during the performance of APS's services hereunder (the "Confidential Information"), and neither party will disclose any Confidential Information to any other person or entity. "Confidential Information" includes the terms of this Agreement, non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models, or any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors, and consultants.

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, APS from making such disclosures of Confidential Information that APS reasonably believes are required by law or any regulatory requirement or authority to clear client conflicts. APS may also disclose Confidential Information to its partners, directors, officers, employees, independent contractors, and agents who have a need to know the Confidential Information as it relates to the services being provided under this Agreement, provided APS is responsible for any breach of these confidentiality obligations by any such parties. APS may make reasonable disclosures of Confidential Information to third parties, such as the Company's suppliers and/or vendors, in connection with the performance of APS's obligations and assignments hereunder, provided APS reasonably believes that such third party is bound by confidentiality obligations. In addition, APS will have the right to disclose to any person that it provided services to the Company or its affiliates and a general description of such services, but shall not provide any other information about its

**AP Services, LLC**
General Terms and Conditions

involvement with the Company. The obligations of the parties under this Section 4 shall survive the end of any engagement between the parties for a period of three (3) years.

Work Product (as defined in Section 5) may contain APS proprietary information or other information that is deemed to be Confidential Information for purposes of this Agreement, and the parties may not want to make public. Therefore, the parties acknowledge and agree that (i) all information (written or oral), including advice and Work Product (as defined in Section 5), generated by APS in connection with this engagement is intended solely for the benefit and use of the Company in connection with this Agreement, and (ii) no such information shall be used for any other purpose or disseminated to any third parties, or, quoted or referred to with or without attribution to APS at any time in any manner or for any purpose without APS's prior approval (not to be unreasonably withheld or delayed), except as required by law. The Company may not rely on any draft or interim Work Product.

## Section 5. Intellectual Property

All analyses, final reports, presentation materials, and other work product (other than any Engagement Tools, as defined below) that APS creates or develops specifically for the Company and delivers to the Company as part of this engagement (collectively known as "Work Product") shall be owned by the Company and shall constitute Company Confidential Information as defined above. APS may retain copies of the Work Product and any Confidential Information necessary to support the Work Product subject to its confidentiality obligations in this Agreement.

All methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, templates, models, utilities, and other intellectual property that APS has created, acquired, or developed or will create, acquire, or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive property of APS. The Company shall not acquire any interest in the Engagement Tools other than a limited worldwide, perpetual, non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product.

The Company acknowledges and agrees, except as otherwise set forth in this Agreement, that any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied, or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

## Section 6. Framework of the Engagement

The Company acknowledges that it is retaining APS solely to assist and advise the Company as described in the Agreement. This engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement.

## Section 7. Indemnification and Other Matters

The Company shall indemnify, hold harmless and defend APS and its affiliates and its and their partners, directors, officers, employees and agents (collectively, the "APS Parties") from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with the engagement of APS that is the subject of the Agreement (collectively, "Losses"), except to the extent that it is determined by a court of competent jurisdiction in a final, non-appealable judgment or other review that such Losses resulted solely from the gross negligence, bad faith, or willful misconduct of such APS Parties. The Company shall pay damages and reasonable and documented expenses as incurred, including reasonable and documented legal fees and disbursements of counsel. If, in the opinion of counsel, representing both parties in the matter covered by this indemnification creates a potential conflict of interest, the APS Parties may engage separate counsel to represent them at the Company's expense.

In addition to the above indemnification, APS employees serving as directors or officers of the Company or affiliates will receive the benefit of the most favorable indemnification provisions provided by the Company to its directors, officers, and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.

The Company shall specifically include and cover APS employees and agents serving as directors or officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers, and any equivalently placed employees ("D&O insurance"). Prior to APS accepting any officer position, the Company shall, at the request of APS provide a copy of its current D&O policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as APS may reasonably request evidencing the appointment and coverage of the indemnitees. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include APS employees and agents under the Company's policy or does not have first dollar coverage acceptable to APS in effect for at least $10 million (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), APS may, at its option, attempt to purchase a separate D&O insurance policy that will cover APS employees and agents only. The cost of the policy shall be invoiced to the Company as an out-of-pocket expense. If APS is unable or unwilling to purchase such D&O insurance, then APS reserves the right to terminate the Agreement.

The Company's indemnification obligations in this Section 7 shall be primary to, and without allocation against, any similar indemnification obligations that

| AP Services, LLC |
| General Terms and Conditions |

APS may offer to its personnel generally, and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by APS or otherwise). APS is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third-party products or services are against the third-party vendor and not against APS, whether or not APS is instrumental in procuring such third-party product or service.

### Section 8. Governing Law and Arbitration

The Agreement is governed by and shall be construed in accordance with the laws of the State of New York with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each party shall appoint one non-neutral arbitrator. The two-party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two-party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in New York, New York under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, either party may proceed directly to a court of competent jurisdiction to enforce the terms of this Agreement for any claim in connection with (i) the non-payment of Fees or expenses due under this Agreement, or (ii) the non-performance of obligations under Section 7. For the purposes of this paragraph, the parties expressly consent to the jurisdiction of all Federal and state courts located in New York, New York.

In any court proceeding arising out of this Agreement, the parties hereby waive any right to trial by jury.

### Section 9. Termination and Survival

The Agreement may be terminated at any time by written notice by one party to the other; provided, however, that notwithstanding such termination APS will be entitled to any Fees and expenses due under the provisions of the Agreement (for fixed fee engagements, fees will be pro rata based on the amount of time completed). Such payment obligation shall inure to the benefit of any successor or assignee of APS.

Additionally, unless the Agreement is terminated by the Company due to APS' material breach (and such material breach continues after 30 days' written notice thereof and opportunity to cure) APS shall remain

entitled to the success fee(s), if any, that otherwise would be payable during the 12 months after the date of termination of the Agreement.

Sections 2, 4, 5, 7, 8, 9, 10, 11, 12, 13 and 14 of these Terms, the provisions of Schedule 1 and the obligation to pay accrued reasonable and documented fees and expenses shall survive the expiration or termination of the Agreement.

### Section 10. Non-Solicitation of Employees

The Company acknowledges and agrees that APS has made a significant monetary investment recruiting, hiring, and training its personnel. During the term of this Agreement and for a period of two years after the final invoice is rendered by APS with respect to this engagement (the "Restrictive Period"), the Company and its affiliates agree not to directly or indirectly hire, contract with, or solicit the employment of any of APS's Partner & Managing Directors, Partners, Directors, or other employees/ contractors the Company or its affiliates had interactions with or gained knowledge about as a result of the services provided under this Agreement.

If during the Restrictive Period the Company or its affiliates directly or indirectly hires or contracts with any of APS's Partner & Managing Directors, Partners, Directors, or other employees/contractors in violation of the preceding paragraph, the Company agrees to pay to APS as liquidated damages and not as a penalty the sum total of: (i) for a Partner & Managing Director, $1,000,000; (ii) for a Partner or Director, $500,000; and (iii) for any other employee/contractor, $250,000. The Company acknowledges and agrees that liquidated damages in such amounts are (x) fair, reasonable and necessary under the circumstances to reimburse APS for the costs of recruiting, hiring and training its employees as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that APS has made in its Partner & Managing Directors, Partners, Directors, and other employees/ consultants; and (y) appropriate due to the difficulty of calculating the exact amount and value of that investment.

The provisions of this Section shall apply except to the extent the provisions conflict with applicable law.

### Section 11. Limitation of Liability

THE APS PARTIES SHALL NOT BE LIABLE TO THE COMPANY, OR ANY PARTY ASSERTING CLAIMS ON BEHALF OF THE COMPANY, EXCEPT FOR DIRECT DAMAGES FOUND IN A FINAL DETERMINATION TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE, BAD FAITH, SELF-DEALING, OR INTENTIONAL MISCONDUCT OF APS PARTIES. THE APS PARTIES SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, LOST PROFITS, LOST DATA, REPUTATIONAL DAMAGES, PUNITIVE DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY CIRCUMSTANCES, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF

**AP Services, LLC**
General Terms and Conditions

SUCH DAMAGES. THE APS PARTIES' AGGREGATE LIABILITY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, IS LIMITED TO THE AMOUNT OF FEES PAID TO APS FOR SERVICES UNDER THIS AGREEMENT (OR IF THE CLAIM ARISES FROM AN ADDENDUM TO THIS AGREEMENT, UNDER THE APPLICABLE ADDENDUM) (THE "LIABILITY CAP"). The Liability Cap is the total limit of the APS Parties' aggregate liability for any and all claims or demands by anyone pursuant to this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by APS pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the APS Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the APS Parties pursuant to this Agreement exceed the Liability Cap.

**Section 12. General**

**Equitable Remedies.** Each party acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of the Agreement. Each party agrees that the non-breaching party shall have the right to seek a restraining order and/or an injunction for any breach of the Agreement. If any provision of the Agreement is found to be invalid or unenforceable, then it shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable.

**Severability.** If any portion of the Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent possible.

**Entire Agreement.** This Agreement, including the letter, the Terms, and the schedule(s), contains the entire understanding of the parties relating to the services to be rendered by APS and supersedes any other communications, agreements, understandings, representations, or estimates among the parties (relating to the subject matter hereof) with respect to such services. The Agreement, including the letter, the Terms and the schedule(s), may not be amended or modified in any respect except in a writing signed by the parties. APS is not responsible for performing any services not specifically described herein or in a subsequent writing signed by the parties.

**Related Matters.** If an APS Party is required by applicable law, legal process or government action to produce information or testimony as a witness with respect to this Agreement, the Company shall reimburse APS for any professional time and expenses (including reasonable external and internal legal costs and e-discovery costs) incurred to respond to the request, except in cases where an APS Party is a party to the proceeding or the subject of the investigation.

**Joint and Several.** If more than one party signs this Agreement, the liability of each party shall be joint and several. In addition, in the event more than one entity

is included in the definition of Company under this Agreement, the Company shall cause each other entity which is included in the definition of Company to be jointly and severally liable for the Company's liabilities and obligations set forth in this Agreement.

**Third-Party Beneficiaries.** The APS Parties shall be third-party beneficiaries with respect to Section 7 hereof.

**Notices.** All notices required or permitted to be delivered under the Agreement shall be sent, if to APS, to:

> AlixPartners, LLP
> 2000 Town Center, Suite 2400
> Southfield, MI 48075
> Attention: General Counsel

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General Counsel, or to such other name or address as may be given in writing to APS. All notices under the Agreement shall be sufficient only if delivered by overnight mail. Any notice shall be deemed to be given only upon actual receipt.

**Section 13. Bankruptcy Related Matters**

Notwithstanding any to the contrary in these Terms, in the event the Company files for protection under the U.S. Bankruptcy Code, the following provisions will prevail:

The Company shall promptly apply to the Bankruptcy Court for approval of the Company's retention of APS under the terms of the Agreement. The form of retention application and proposed order shall be reasonably acceptable to APS. APS shall have no obligation to provide any further services if the Company becomes a debtor under the U.S. Bankruptcy Code unless APS's retention under the terms of the Agreement is approved by a final order of the Bankruptcy Court reasonably acceptable to APS. The Company shall assist, or cause its counsel to assist, with filing, serving, and noticing of papers related to APS's fee and expense matters.

The Company and APS agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement.

APS will have the right to obtain independent legal counsel to obtain advice with respect to its services under this engagement. The Company will reimburse APS's for the reasonable and documented fees and expenses of such independent legal counsel.

APS acknowledges that, during the pendency of any Bankruptcy Court approved retention, the indemnification provisions and Liability Cap set forth above may be subject to modification as stated within the Bankruptcy Court's retention order.

| AP Services, LLC |
| General Terms and Conditions |

Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the date of filing, APS may have incurred but not billed fees and reimbursable expenses which relate to the prepetition period. APS will seek Bankruptcy Court approval to apply the retainer to these amounts.

If APS finds it desirable to augment its consulting staff with independent contractors (an "I/C") in this case, (i) APS will file, and require the I/C to file, 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in this case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that APS is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in this case during the time APS is involved in providing services to the Company. APS's standard practice is to charge for an I/C's service at the rate equal to the compensation provided by APS to such I/C.

**Section 14. Data Protection**

To the extent applicable, the Company and APS shall comply with the terms of the APS Data Protection Addendum (located at: https://www.alixpartners.com/policies/processor-data-protection-addendum/), which form part of the Agreement. The Data Protection Schedule of this Agreement shall apply to the Data Protection Addendum.

**<u>Exhibit C</u>**

**Declaration of Eric Koza**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
edward.sassower@kirkland.com
christopher.marcus@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*


**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CYXTERA TECHNOLOGIES, INC., *et al.*, | Case No. 23-14853 (JKS) |
| Debtors. [1] | (Jointly Administered) |


**DECLARATION OF**
**ERIC KOZA IN SUPPORT OF THE APPLICATION**
**OF AP SERVICES, LLC FOR APPROVAL OF COMPLETION FEE**

I, Eric Koza, make this declaration and state as follows:

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://www.kccllc.net/cyxtera.  The location of Debtor Cyxtera Technologies, Inc.'s
principal place of business and the Debtors' service address in these chapter 11 cases is:  2333 Ponce de Leon
Boulevard, Ste. 900, Coral Gables, Florida 33134.

1.      I am a Managing Director of AP Services, LLC ("APS"), which has a place of business at 909 Third Avenue, 30th Floor, New York, New York, 10022.

2.      This declaration is submitted pursuant to Section 504 of the Bankruptcy Code and Bankruptcy Rule 2016 in connection with and in support of APS's application (the "Application") for allowance of the Completion Fee[2] payable to APS.  I have read the Application, and the facts contained therein are true and correct to the best of my knowledge, information, and belief.

3.      The Application requests that this Court enter an order awarding APS a Completion Fee of $2,000,000.00.

4.      No agreement or understanding exists between APS and any other persons or parties to share in any compensation received in connection with these Chapter 11 Cases, other than as among members of APS.

5.      The services of APS are integral to the continued positive results in these cases and contribute significant direct and incremental value to the Debtors and other stakeholders, as detailed in the Application.

6.      In addition to time-based fees, performance-based fees are a normal part of compensation for APS and other turnaround and management restructuring consulting firms.  APS priced the engagement and negotiated the Completion Fee as part of its total compensation package, and APS took the Completion Fee into account in accepting the engagement from the Debtors.  The Completion Fee is fair, reasonable, and comparable to success fees charged by APS and other advisors in similar engagements both in and out of chapter 11.

---

[2]    Capitalized terms used but not defined herein have the meanings defined in the Application.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 25, 2024                    AP Services, LLC


                                           /s/ Eric Koza
                                           Name: Eric Koza
                                           Authorized Representative